# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| TWITTER, INC., | |
| Plaintiff, | |
| v. | Case No. |
| COVENANT FINANCIAL SERVICES, LLC | |
| Defendant. | |

**DECLARATION OF LAURA E. MILLER IN SUPPORT OF
TWITTER, INC.'S MOTION TO COMPEL
COVENANT FINANCIAL SERVICES, LLC TO PRODUCE DOCUMENTS
PURSUANT TO FED. R. CIV. P. 45**

I, Laura E. Miller, declare as follows:

1.      I am an attorney with the law firm of Durie Tangri LLP, counsel to Defendant Twitter, Inc. ("Twitter"). The factual assertions made herein are made of my personal knowledge and, if called upon to do so, I could and would testify competently thereto.

2.      Attached hereto as **EXHIBIT A** is a true and correct copy of the March 29, 2017, Release No. 4672, Order Instituting Administrative and Cease-And-Desist Proceedings issued *In the Matter of Covenant Financial Services, LLC and Stephen Shafer* in S.E.C. Administrative Proceeding File No. 3-17891.

3.      Attached hereto as **EXHIBIT B** is a true and correct copy of the Declaration of Christopher Wyatt filed October 1, 2015 in the case *Mansour bin Abdullah Al-Saud v. Youtoo Media L.P., et al.*, C.A. No 3:15-CV-3074 (N.D. Tex.).

4.      Attached hereto as **EXHIBIT C** is a true and correct copy of the Petition filed September 27, 2016 in the case *Robert F. Browne Family LLC, et al. v. Stephen E. Shafer, et al.*, CJ-2016-4937 (Oklahoma Cty. Dist. Ct,) ("the Browne litigation").

5.      Attached hereto as **EXHIBIT D** is a true and correct copy of the Patent Owner's Power of Attorney filed April 21, 2017 in the case *Twitter Inc. v. Youtoo Technologies, LLC*, Case IPR2017-01131, before the Patent Trial and Appeal Board.

6.      Attached hereto as **EXHIBIT E** is a true and correct copy of Plaintiff's Combined Response in Opposition to Defendants Emergency Motion filed May 10, 2017 in the Browne litigation.

7.      Attached hereto as **EXHIBIT F** is a true and correct copy of Defendant's Supplement to Its Emergency Motion filed May 10, 2017 in the Browne Litigation.

8.      Attached hereto as **EXHIBIT G** is a true and correct copy of the May 15, 2017 Order issued in the Browne litigation.

9.      Attached hereto as **EXHIBIT H** is a true and correct copy of the June 1, 2017 Agreed Order issued in the Browne litigation.

10.      Attached hereto as **EXHIBIT I** is a true and correct copy excerpts from the Transcript of Proceedings from the May 1, 2017 hearing in the Browne litigation.

11.      Attached hereto as **EXHIBIT J** is a true and correct copy of the June 5, 2017 Agreed Order issued in the Browne litigation.

12.      Attached hereto as **EXHIBIT K** is a true and correct copy of the March 2, 2017 Subpoena to Produce Documents served upon Covenant Global Alpha Fund, L.P. ("Covenant") in *Youtoo Techs., LLC v. Twitter, Inc.*, Case No. 16-cv-00764-N (N.D. Tex.).

13.      Attached hereto as **EXHIBIT L** is a true and correct copy of a June 13–June 14, 2017 email chain between James Tsuei and Samuel Joyner.

14.      Attached hereto as **EXHIBIT M** is a true and correct copy of the August 25, 2017 Order issued in *Youtoo Technologies, LLC v. Twitter, Inc.*, No. CIV-17-728-M (W.D. Okla.).

15.      Attached hereto as **EXHIBIT N** is a true and correct copy of the August 7, 2017 Subpoena to Produce Documents served upon Covenant Financial Services, LLC. ("CFS") in *Youtoo Techs., LLC v. Twitter, Inc.*, Case No. 16-cv-00764-N (N.D. Tex.).

16.    Attached hereto as **EXHIBIT O** is a true and correct copy of an August 30–31, 2017 email chain between Sonal N. Mehta and Samuel E. Joyner.

17.    On June 14, 2017, Covenant Global Alpha Fund produced a set of agreements with the Youtoo affiliates, constituting only a small subset of the documents requested in Twitter's subpoena.

18.    CFS failed to raise any timely objections, move to quash, or produce responsive documents responsive to the August 7, 2017 subpoena served upon it in Oklahoma City.

19.    Twitter informed CFS that it would move to compel if the documents were not produced by September 6, 2017.  CFS's counsel has not responded and no documents have been produced.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 21, 2017, in San Francisco, California.



*/s/ Laura E. Miller*
LAURA E. MILLER

# Exhibit A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**INVESTMENT ADVISERS ACT OF 1940**
**Release No.  4672/ March 29, 2017**

**ADMINISTRATIVE PROCEEDING**
**File No.  3-17891**

| | |
|---|---|
| **In the Matter of**<br><br>**COVENANT FINANCIAL SERVICES, LLC AND STEPHEN SHAFER,**<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e), 203(f), AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Covenant Financial Services, LLC ("Covenant") and Stephen Shafer ("Shafer") (collectively referred to as "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act Of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order  ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds that:

**Summary**

1.        This matter involves Covenant, an investment adviser registered with the Commission from June of 2007 to August of 2016, and Shafer, the Vice-President, majority owner, portfolio manager, and Chief Investment Officer of Covenant, materially misstating the value of assets in five private funds, resulting in the funds paying Covenant excessive management fees and incorrectly calculating redemptions from the funds.   Beginning in 2009, Covenant used a third party vendor pricing service (the "Pricing Service") to value municipal bonds held in the funds. However, beginning in approximately mid-August 2011, a period of significant market volatility, the values provided by the Pricing Service (the "Pricing Service Values") were not consistent with a Generally Accepted Accounting Principles ("GAAP") measurement of fair value. Among other indications that the funds overstated the value of their recorded assets beginning in mid-August 2011, the funds sold some of the municipal bonds at prices that were materially less than amounts recorded. Nevertheless, Respondents continued to use the Pricing Service Values for the funds' municipal bonds through the first quarter of 2013.  This approach was inconsistent with the funds' statements in their 2011 financial statements, Covenant's written valuation policy, and the representations in the funds' PPMs and LPAs.  As a result of this conduct, Covenant received excess fees of over $400,000. Based on the foregoing, Covenant and Shafer negligently violated Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. Moreover, Covenant negligently violated Section 206(4) of the Advisers Act and Rule 206(4)-7, and Shafer negligently caused such violation.

**Respondents**

2.        Covenant Financial Services, LLC, an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma, was a Commission-registered investment adviser from June of 2007 to August of 2016.  Currently, Covenant provides advisory services to eight private funds, and has approximately $81 million in assets under management.

3.        Stephen Shafer resides in Oklahoma City, Oklahoma, and has been the Vice-President and a minority owner of Covenant since 2004, the portfolio manager and  Chief Investment Officer of Covenant since 2008, and the majority owner of Covenant since 2009. Shafer made the investment decisions for the funds at issue during the August 2011 through February 2013 time frame (the "Relevant Period").

**FACTS**

A.        **The Funds, the Private Placement Memoranda, and the Limited Partnership Agreements**

4.        From August 2009 through 2012, Covenant sold limited partnership interests in five private funds: the Covenant Income Appreciation Fund, LP, the Covenant Total Return Fund, Ltd., and the Covenant Total Return Fund, LP (the "Domestic Funds") and the Covenant Global Alpha Fund, Ltd. and Covenant Global Alpha Fund, LP, respectively (the

"Offshore Funds" and collectively with the Domestic Funds, the "Funds"). The limited partners included Covenant's investment advisory clients. Pursuant to the Funds' documents, Covenant was entitled to an annual management fee calculated as a percentage of the net asset value of the Funds.

5. The Offshore Funds' Private Placement Memoranda ("PPMs") provided that the Directors of the Offshore Funds were responsible for determining the net asset value of the Offshore Funds in accordance with GAAP, but delegated the determination of the value of the funds' securities and the calculation of the net asset value to the Offshore Funds' administrator and to Covenant. The PPMs and Limited Partnership Agreements ("LPAs") for the Domestic Funds did not represent that the net asset value of those funds would be determined in accordance with GAAP, but they did provide that Covenant determines the value of the assets held in the Domestic Funds in good faith.

**B.    Fair Value**

6. Covenant's valuation policy provided that the assets held in the Funds would be valued in accordance with GAAP, specifically Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* ("FAS 157"). Effective for periods ending after September 15, 2009, FAS 157 was subsequently codified as Accounting Standards Codification 820 ("ASC 820").

7. ASC 820 defines fair value for purposes of GAAP as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

8. ASC 820-10-35-36 states that the methods used to measure fair value "shall maximize the use of relevant observable inputs and minimize the use of unobservable inputs." ASC 820 prioritizes inputs used to measure fair value into three levels based on the observability of the inputs. The highest, and generally most reliable, level of inputs – Level 1 – are "quoted prices (unadjusted) in active markets for identical assets or liabilities." ASC 820-10-35-40. Level 2 inputs are "inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly." ASC 820-10-35-47. Level 3 inputs are "unobservable inputs for the asset or liability." ASC 820-10-35-52. ASC 820-10-35-53 further notes as follows: "Unobservable inputs shall be used to measure fair value to the extent that relevant observable inputs are not available, thereby allowing for situations in which there is little, if any market activity for the asset or liability at the measurement date."

**C.    Covenant's Valuation Policy**

9. On June 1, 2008, Covenant initially adopted the provisions of FAS 157, Fair Value Measurements. Covenant's written valuation policy, effective on or about July 21, 2011 states, among other things, that:

- in measuring fair value, Covenant maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available;

- for the assets that rely on Level 2 inputs of the fair value hierarchy, valuations are based on quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly;

- when determining which pricing method should be used, Covenant's order of preference is:

  o when there is an active market for a security, a broker quote; and

  o when there is not an active market available, Covenant evaluates the compilation of pricing data it acquires and considers factors specific to each position. Covenant is actively monitoring the activity associated with its positions throughout the month, weekly, if not daily.

  o for municipal bonds, Covenant obtained and documented the indicated price for the bond on month-end assigned to the bond via the Pricing Service.

**D.    Covenant Relied Almost Exclusively on the Pricing Service and Failed to Use Substantial Observable Inputs to Value the Municipal Bonds**

10.    Beginning in 2009, Covenant used the Pricing Service to value the Funds' municipal bond holdings.  The Pricing Service's literature disclosed to Covenant that the Pricing Service provided estimated values based on a  model that required unobservable inputs  (i.e., an approach that uses Level 3 inputs), as opposed to quoted market prices based on the sale of similar bonds (i.e., an approach that uses Level 2 inputs).   In early 2013, the company providing the Pricing Service discontinued this service.

11.    Covenant continued to rely on the Pricing Service Values when valuing municipal bonds held by the Funds even though after approximately mid-August 2011, there existed relevant observable and unobservable inputs indicative of fair value that should have been considered. Those indicators included trades Covenant made in similar or the same bonds, broker marks routinely obtained by Covenant, as well as broker quotes obtained by Covenant.  The trades, broker marks, and broker quotes data from mid-August 2011 through February 2013 provided indications of fair value significantly lower than the Pricing Service Values during those periods. In particular, beginning in mid-August 2011 through the first quarter of 2013, on over twenty occasions over approximately nineteen months Covenant sold a portion of the Funds' municipal bonds at prices between 10% to 42% less than the Pricing Service Values for those same bonds immediately before the sale.  For example, on August 16, 2011, Covenant sold Miami Dade County bonds at a price that was approximately 41% less than their then current Pricing Service Values.  Similarly, on September 29, 2011, Covenant sold some public highway bonds at a price that was approximately 30% less than their then current Pricing Service Values.

12.    As a result, from approximately August 15, 2011 until February 28, 2013, Respondents did not record the Funds' holdings in accordance with GAAP or its stated valuation

policy.  Moreover, Respondents failed to value the Offshore Funds' assets as required by the PPMs and LPAs.[1]  Similarly, Respondents also failed to value the Funds' holdings in good faith as required by the Domestic Funds' PPMs and LPAs in that Respondents had information establishing that the values provided by the Pricing Service for certain municipal bonds were overstated and that they did not comply with Covenant's valuation policies and procedures.

13.     Respondents' inaccurate valuations during the Relevant Period resulted in the overstatement of the Funds' performance of between 3.43% to 6.99% in monthly and quarterly reports provided to the Funds' investors.  In particular, the revaluation for the Relevant Period caused the cumulative performance of four of the five Funds to be negative rather than positive and caused the fifth fund's performance to change from 7.26% to 1.93%.

14.     The Funds' 2011 financial statements provided to fund investors included numerous misstatements.  First, the financial statements provided that they were prepared in conformity with GAAP.  Second, the financial statements stated that Covenant maximized the use of observable inputs and minimized the use of unobservable inputs in measuring fair value.  Third, the financial statements provided that Covenant valued debt securities based on the quotes obtained from various securities brokers and market markers, when it was relying almost solely on the Pricing Service Values for municipal bonds.

15.     Covenant received over $400,000 in excess management fees based on these valuations.

**E.     Covenant Failed To Implement Its Valuation Policy**

16.     Despite Covenant's written valuation policy, Covenant failed to maximize the use of observable inputs and minimize the use of unobservable inputs when valuing the municipal bonds.  Moreover, Covenant failed to comply with the order of preference as set out in its valuation policy when valuing the municipal bonds because it failed to evaluate the pricing data it acquired and failed to consider factors specific to each position.  By almost exclusively using values provided by the Pricing Service to value the municipal bonds and by not using substantial available observable inputs, Covenant failed to follow its own valuation policy.

**F.     The Revised Valuation of the Funds' Municipal Bond Holdings**

17.     The Funds' outside auditor identified the municipal bond valuation issue during its audit of the Funds' fiscal year 2012 financial statements.  Ultimately, Covenant and the Funds' administrator obtained fair value estimates of the Funds' municipal bonds  using another pricing service that relied on market pricing of the bonds at issue and similar bonds to determine the fair value of the bonds. As a result, the Funds' performances during the period from May 2011

---

[1] The value of all the assets in the Offshore Funds (minus liabilities) comprised the net asset value of the Offshore Funds. Since the Offshore Funds' assets were not valued in accordance with GAAP, the net asset values of the Offshore Funds were not determined in accordance with GAAP.

through February 28, 2013 (the "Revaluation Period") decreased by 8.25% to 13.5%, depending on the fund at issue. [2]

18.    In May of 2013, shortly after the auditor identified the valuation issue, Covenant refunded approximately $444,000 in excess management fees to the Funds.

19.    Covenant also determined that in connection with redemptions the Funds had made during the Revaluation Period and through May 1, 2013, the Funds had overpaid approximately 40 redeeming limited partners a total of over $3 million.  Covenant has paid approximately $270,000 to the Funds as partial compensation for these over-redemptions.

**G.    Violations**

20.    Section 206(2) of the Advisers Act prohibits investment advisers from directly or indirectly engaging in "any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." A violation of Section 206(2) of the Advisers Act may rest on a finding of simple negligence; scienter is not required. SEC v. Steadman, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)). As a result of the negligent conduct described above, Respondents willfully violated Section 206(2) of the Advisers Act.[3]

21.    Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder prohibits investment advisers from (1) making any untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (2) otherwise engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle. Proof of scienter is not required to establish a violation of Section 206(4) of the Advisers Act and rules thereunder. SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992).  As a result of the negligent conduct described above, Respondents willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

22.    Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder require an investment adviser to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and rules thereunder. Proof of scienter is not required to establish such a violation of Section 206(4) of the Advisers Act and the rules thereunder, and a violation of Section 206(4) and the rules thereunder may rest on a finding of simple negligence. SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992) . As a result of the negligent conduct described above, Covenant willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-7

---

[2] The Revaluation Period is three months longer than the Relevant Period.

[3] A willful violation of the securities laws means merely "'the person charged with the duty knows what he is doing.'" Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" Id. (quoting Gearhart & Otis, Inc. v. SEC, 348 F.2d 798, 803 (D.C. Cir. 1965)).

thereunder by failing to implement written policies and procedures designed to prevent violation of the Advisers Act and rules thereunder. Shafer negligently caused Covenant's failure to implement its valuation policy in violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

### H.    Respondents' Remedial Efforts

23.    In determining to accept the Offers, the Commission considered remedial acts promptly undertaken by Covenant and Shafer.  Specifically, Covenant notified investors of the restatement and refunded approximately $444,000 in management fees directly to the Funds, resulting in a pro-rata increase of the capital account of each limited partner who held a limited partnership interest as of February 28, 2013.

24.    Moreover, in an effort to make the Funds whole following the overpayment of redemptions, Covenant also repaid approximately $270,000 to the Funds.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f) and 203(k) of the Advisers Act, it is hereby ORDERED THAT:

A.    Respondents Covenant and Shafer shall cease and desist from committing or causing any violations and any future violations of Sections 206(2) and, 206(4) of the Advisers Act and Rules 206(4)-7 and 206(4)-8 thereunder.

B.    Respondents Covenant and Shafer are censured.

C.    Respondents shall pay, on a joint and several basis, a civil penalty and prejudgment interest as follows:

1.    Respondents shall pay a civil penalty of $130,000.

2.    Respondents shall pay prejudgment interest of $14,845.78.

3.    Payment shall be made in the following installments: $28,969.16 within 30 days of the entry of the Order, an additional $14,484.58 within 120 days of the entry of the Order, an additional $14,484.58 within 210 days of the entry of the Order, and an additional $86,907.46 within 300 days of the entry of the Order. Respondents shall deposit these amounts, as described in this paragraph (collectively, the "Distribution Fund") into an escrow account acceptable to the Commission staff and shall provide the Commission staff with evidence of such deposit in the form acceptable to the Commission staff. Payments shall be deemed made on the date they are placed into the escrow account referenced above, and shall be applied first to the prejudgment interest. If any payment is not made by the date the payment is required by this Order, the entire outstanding

balance plus any additional interest accrued pursuant to SEC Rule of Practice 600 or pursuant to 31 U.S. C. § 3717, shall be due and payable immediately, without further application.

4.      Respondents shall be responsible for administering the Distribution Fund and may hire a professional to assist them in the administration of the distribution. Respondents shall pay from the Distribution Fund the affected limited partners of the Funds who held limited partnership interests as of February 28, 2013, the date of the revaluation of the funds. The following limited partners will not be eligible to participate in the distributions: a) limited partners who redeemed their limited partnership interests prior to February 28, 2013; b) limited partners who purchased limited partnership interests subsequent to February 28, 2013; and c) limited partners who redeemed their partnership interest after February 28, 2013 and who were overpaid based on the overvaluation of the Funds.  The Distribution Fund will be allocated across the five Funds in proportion to the excess redemptions made from each Fund.  Each distribution payment will be calculated by multiplying each investor's percentage of ownership interest in the Funds by the amount of the Distribution Fund.  Respondents shall distribute the Distribution Fund to the Funds' investors based on each investor's interest in the Funds during the Relevant Period pursuant to a disbursement calculation (the "Calculation") that has been submitted to, reviewed, and approved by the Commission staff in accordance with this Subsection  C. Within thirty (30) days of the entry of this Order, Respondents shall submit a proposed Calculation to the staff for review and approval. The proposed Calculation will include the names of the affected investors in the Funds and payment amounts. The Respondents also shall provide to the Commission staff such additional information and supporting documentation as the Commission staff may request for its review. In the event of one or more objections by the Commission staff to the proposed Calculation or any of its information or supporting documentation, the Respondents shall submit a revised Calculation for the review and approval of the Commission staff or additional information or supporting documentation within ten (10) days of the date the Respondents are notified of the objection, which revised calculation shall be subject to all of the provisions of Subsection C.

5.      The distribution of the Distribution Fund shall be made within 330 days of the date of the entry of this Order, unless such time period is extended as provided in Paragraph 10 of this Subsection C. Such distribution is to be based on the methodology set forth in the Calculation and as reviewed and not objected to by the staff.   No portion of the Distribution Fund shall be paid to any affected person or entity directly or indirectly in the name of or for the benefit of either Respondent in this proceeding.

6.      If the Respondents do not distribute any portion of the Distribution Fund for any reason, including factors beyond their control, the Respondents shall transfer any such undistributed funds to the Commission for transmittal to the United States Treasury in accordance with Section 21F(g)(3) of the Securities Exchange Act of 1934 after the final accounting provided for in Paragraph 8 of this Section C is submitted to the Commission staff. Any such payment must be made in one of the following ways:

a.      Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

    b.  Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

    c.  Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

     Enterprise Services Center
     Accounts Receivable Branch
     HQ Bldg., Room 181, AMZ-341
     6500 South MacArthur Boulevard
     Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Covenant Financial Services, LLC and Stephen Shafer as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to C. Dabney O'Riordan, Co-Chief, Asset Management Unit, Division of Enforcement, Securities and Exchange Commission, 444 South Flower Street, Suite 900, Los Angeles, CA 90071.

    7.  Respondents agree to be responsible for all tax compliance responsibilities associated with distribution of the Distribution Fund and may retain any professional services necessary.  The costs and expenses of any such professional services shall not be paid out of the Disgorgement Fund;

    8.  Within 365 days after the date of the entry of the Order, Respondents shall submit to the Commission staff a final accounting and certification of the disposition of the Distribution Fund not unacceptable to the staff, which shall be in a format to be provided by the Commission staff.  The final accounting and certification shall include: (i) the amount paid or credited to each person or entity (designated by Fund); (ii) the date of each payment or credit; (iii) the check number or other identifier of money transferred or credited to the person or entity; and (iv) any amounts not distributed to be forwarded to the Commission for transfer to the United States Treasury.  Respondents shall submit the final accounting and certification, together with proof and supporting documentation of such payments and credits in a form acceptable to Commission staff, under a cover letter that identifies Respondents in these proceedings and the file number of these proceedings, to Dabney O'Riordan, co-Chief, Asset Management Unit, Division of Enforcement, Securities and Exchange Commission, 444 South Flower Street, Suite 900, Los Angeles, CA 90071, or such other address the Commission staff may provide.  Any and all supporting documentation for the accounting and certification shall be provided to the Commission staff upon request;

    9.  After Respondents have submitted the final accounting to the Commission staff, the staff shall submit the final accounting to the Commission for approval and shall request Commission approval to send any remaining amount to the United States Treasury; and

    10.  The Commission staff may extend any of the procedural dates set forth in this Subsection C for good cause shown.  Deadlines for dates related to the Distribution Fund shall

be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

D.    Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the prejudgment interest and penalties referenced in paragraph C above. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondents of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MANSOUR BIN ABDULLAH AL-SAUD, §
                                §
        Plaintiff,              §
                                §
VS.                             §    CIVIL ACTION NO. 3:15-CV-3074-C
                                §
YOUTOO MEDIA, L.P., YOUTOO      §
MANAGEMENT, LLC and             §
CHRISTOPHER WYATT,              §
                                §
        Defendants.             §

### DECLARATION OF CHRISTOPHER WYATT

I, Christopher Wyatt, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Christopher Wyatt.  I am over the age of twenty-one (21) years, of sound mind, and fully competent to testify in this cause.  I have personal knowledge of the facts stated herein, all of which are true and correct.

2.      I am the Manager of Youtoo Management, LLC.  Youtoo Management is the general partner of Youtoo Media, LP f/k/a ComStar Media LP (Media LP).  Media LP has two main operating subsidiaries – Youtoo Technologies, LLC (Youtoo Tech) and Youtoo Network, LLC (Youtoo Network).  It owns 85% of the equity in each of these entities.  Youtoo Network owns 100% of Youtoo TV, LLC.  Attached as Exhibit A is a simplified organizational chart of the Youtoo companies.  This basic corporate structure was in place prior to any of the transactions between Media LP and the Plaintiff.  I am the Manager and CEO of Youtoo Tech, Youtoo Network and Youtoo TV.

3.      Youtoo Tech has developed a proprietary interactive TV platform that allows viewers at home to interact in real-time with live and pre-recorded television programs using HD video, social media, text, voting, pictures and games.    In September of 2013, Media LP opened a $20 million investment round to fund the growth the company was experiencing in the global TV market.

4.      In my capacity as the Manager of Media LP's general partner, I personally negotiated a letter of intent between Media LP, HRH Prince Mansour bin Abdullah Al-saud (Prince Mansour) and Eng. Saud bin Mutlaq bin Altwalah (Saud Altwalah).  We entered into the letter of intent on or about October 10, 2013. A true and correct copy of the letter of intent (the LOI) is attached as Exhibit A-1 to Prince Mansour's declaration (Dkt. #1-1) filed in this case.  The LOI was to facilitate two transactions: (1) a $20 million investment in Media LP by Prince Mansour; and (2) a joint venture between Prince Mansour, Media LP and Saud Altwalah.

5.      To induce Media LP to enter into the LOI, Prince Mansour represented that he was willing to invest $20 million into Media LP.  He further represented that he would use his contacts as the son of the King of Saudi Arabia to assist Media LP and its operating companies to sell their services in the Middle East. Prince Mansour specifically represented that he had significant connections at Middle East Broadcast Center (MBC), Saudi TV and other major television networks in the Middle East as well as a the state owned Telco, STC, that he could and would use to develop Youtoo's business in that region.  He further promised to manage the joint venture and to handle all of its marketing.  The Prince's promise

2

to use his connections with major regional TV networks and Telcos was of paramount importance to Media LP as it would have been otherwise impossible for us to compete in that market without those connections.  As a region, the Middle East was important to Media LP as it would serve as an incubator and proof of concept for the services that we were attempting to sell in the United States and other international markets.

6.    Under the LOI, Prince Mansour agreed to retain three valuation firms to value Media L.P (the Valuation Process) within three months of the execution date of the LOI. In return, Media LP agreed to give Prince Mansour the exclusive right to purchase the ownership stake in Media LP, and would pursue no other investors in Media LP during the evaluation period. To help fund Media LP during the Valuation Process, Prince Mansour wired $3 million to Media LP on or about October 11, 2013.  This money was not to be held in escrow or otherwise reserved. Instead, it was to be used by Media LP to fund is operations while Prince Mansour completed the Valuation Process.

7.    In the event that Prince Mansour elected to complete the purchase, the $3 million would be treated as a down payment on the purchase price.  If he elected not to purchase an interest in Media LP, the parties agreed that

> Youtoo Media shall reimburse the Down Payment to HRH Prince Mansour through a mechanism which is to be agreed between the Parties at such time and with such mechanism to have the economic effect of the Down Payment being reimbursed in full to HRH Prince Mansour.

LOI at 2.

3

8.    Prince Mansour refused to retain the required advisors or to complete the Valuation Process.  Instead, from October 2013 until March 2014, he delayed and made numerous additional demands on Media LP, including requiring that the Middle East Broadcast Center (MBC) be the first client of the planned joint venture. Throughout this time, Prince Mansour affirmatively and repeatedly promised me that he would complete the proposed $20 million investment in Media LP.  With the expectation that Prince Mansour would honor his commitment to complete the Valuation Process and complete the investment, Media LP indefinitely extended the valuation period and participated in the creation and operation of Youtoo Technologies Middle East FZ-LLC (Youtoo ME), the joint venture that the parties agreed to form in the LOI.  During this time period, Media LP complied with its agreement not to seek additional investors despite its increasing needs for new investment capital.  As a result, when the Prince failed to make the $20 million investment that he promised to make, Media LP had suffered significant financial losses that include incurring $6,848,181 in additional debt (principal and interest) and losing over $50,000,000 in company value by not being able to fund timely growth.

9.    By March 2014, it became clear that Prince Mansour was not interested in investing in Media LP but was interested in proceeding with Youtoo ME.  At that point, I had discussions with Prince Mansour and his advisors as to the mechanism for providing the Prince economic value for his $3 million investment as required by the LOI.  The discussions took place in Saudi Arabia

4

between me on behalf of Media LP and Prince Mansour.  Saud Altwalah and Ali Al Toyim also participated in the discussions on behalf of Prince Mansour.

10.    During those discussions, I explained to the Prince that his failure to make the $20 million investment he promised to make and the long delay had significantly harmed Media LP because it had prevented us from obtaining other investors.  We eventually agreed that Prince Mansour would receive the first $3 million in distributions that Media LP was entitled to receive as a result of its ownership interest in Youtoo ME.  To support Youtoo ME, Prince Mansour agreed to invest an additional $1.8 million in Youtoo ME and I agreed to spend an additional five months in Dubai working without once returning to the US to launch Youtoo ME's business.  As agreed, Media LP was not reimbursed for my time; nor was the value of my services treated as a contribution of capital by Media LP.  This agreement is memorialized in a writing contained in Youtoo ME's books and records, which are in the possession and control of Prince Mansour.  I have copies of some but not all of the minutes of Youtoo ME's company meetings.  I do not have a copy of the minutes of the meeting where this agreement was memorialized.

11.    Also as part of our agreement, Prince Monsour agreed to loan $310,000 to Media LP in March of 2014.  We agreed that Media LP would pay off this loan by providing services to Youtoo ME without charge.  These were services for which Media LP was allowed to charge and had typically charged Youtoo ME.  Our agreement that the loan would be repaid with services  was also memorialized in the minutes of Youtoo ME.  Attached as <u>Exhibit B</u> is a true and correct copy of

minutes from the March 29, 2014 meeting of Youtoo ME's board meeting showing the agreement regarding the $310,000 advance.

12.    Media LP complied in full with its agreements with Prince Monsour related to the reworking of his $3 million investment in Media LP.  I spent an additional five (for a total of six) months in Dubai working for Youtoo ME without returning to the US.  Media LP paid off the loan on or before February 28 2015 in advance of the date the loan was due.  In fact, the Prince made a second loan to Media LP on the same terms, which Media LP also repaid with services rendered. Due to Prince Monsour's inability or unwillingness to use his contacts to develop business for Youtoo ME, excessive expenses incurred by his advisors and his unwillingness to provide adequate managment, Youtoo ME has yet to turn a profit.

13.    In the first quarter of 2015, the parties engaged in the process of reconciling the financial records of Youtoo ME and the contributions of each of its partners.  I was involved in this process.  At no point during this process did Prince Monsour or any of his representatives dispute, repudiate or otherwise question the agreement that the March 2014 loan was to be repaid through services rendered by Media LP.   This process was completed by April 2015.  In April 2015, Media LP provided Prince Mansour with a final accounting showing the repayment of the $310,000 loan.  Attached as Exhibit C to my declaration is a true and correct copy of an e-mail sent by Frank Hundley (Media LP's Chief Financial Officer) to Amir Farid (an agent of Prince Mansour) on April 2, 2015 transmitting the accounting.  I was copied on this e-mail.

6

14.    Prince Mansour has never demanded that Media LP pay him $3 million to return his investment in Media LP.  Media LP has not refused to reimburse Prince Mansour for his investment.  Instead, it agreed to a mechanism to reimburse him through Youtoo ME as required by the LOI.

15.    Beginning in 2012, Heartland Bank (Heartland) made several loans to Youtoo TV.  The current principal balance of the Heartland loans is $6,099,500 of which $5,099,500 is owed to Heartland and $1,000,000 is owed to Wrangler Trust, a participant in the loan.  Taking into account fees and interest accrued to date, Youtoo TV owes $6,408,844 to Heartland and $1,337,680 to Wrangler Trust. Youtoo Tech, Youtoo Management and their affiliates (including Media LP) guaranteed these loans.  The loans are secured by, among other things, all of the assets of Media LP and all of the assets of Youtoo Tech including its portfolio of patents.  Heartland's security interest was first memorialized in a security agreement dated August 22, 2012 and an Intellectual Property Security Agreement dated August 22, 2012, true and correct copies of which are attached as <u>Exhibit D</u> and <u>Exhibit E</u>.  Youtoo Tech later assigned its patents to Heartland for the purpose of perfecting Heartland's security interest.  A true and correct copy of the current assignment (dated May 14 2014) is attached as <u>Exhibit F</u>.

16.    In 2014 and 2015, Media LP borrowed $3,500,000 from Covenant Global Alpha Fund, L.P. and Covenant Private Equity Partners II, Inc. (collectively, Covenant).  Youtoo Tech guaranteed this loan.  Covenant's loan is secured by a lien on Youtoo Tech's portfolio of patents and patent applications.  The current amount

7

due to Covenant is $3,777,603.   A true and correct copy of Covenant's security agreement is attached as <u>Exhibit G</u>.

17.    In 2015, Media LP borrowed $507,500 from Strategic Gaming Management, LLC and an affiliate, Trestle Creek Properties, LLC (collectively, Strategic Gaming).   This loan is guaranteed by Youtoo Tech and secured by a lien on Youtoo Tech's portfolio of patents and patent applications.   The current amount due to Strategic Gaming is $525,939.   A true and correct copy of Strategic Gaming Management's promissory note is attached as <u>Exhibit H</u> and of Trestle Creek's promissory note is attached as <u>Exhibit I</u>.   A chart showing the debt securing Youtoo Tech's patent portfolio is attached as <u>Exhibit J</u>.

18.    All of the Heartland loans are in forbearance.   But for the forbearance of Heartland, all of the loans would be in default and Heartland would be entitled to foreclose upon its collateral.   A true and correct copy of the Forbearance Agreement between Heartland and Youtoo TV (the Forbearance Agreement) is attached as <u>Exhibit K</u>.

19.    Pursuant to the Forbearance Agreement, Youtoo Tech is required to sell four of its patents – Patents Nos. 8,311,382; 8,464,304; 8,601,506 and Publication No. 2013/0302005 (collectively, the Sale Patents) – at auction.   While valuable, the Sale Patents are not necessary to the current and future business of Youtoo Tech or any of its affiliates.   They are inventions by me and others that are not used in our current services.   Youtoo Tech, Youtoo TV and the remaining guarantors are retaining the rest of their assets including their software, source

code, service marks, patents and patent applications covering their current services. No assets of Media LP are scheduled to be sold.

20.    Youtoo Tech retained Aqua Licensing, LLC (Aqua), a well-regarded auctioneer of intellectual property to conduct the auction.    Aqua has been advertising the auction since July 2015.  Public information about the Sale Patents has been widely distributed to about 90 potential bidders that include the world's largest technology firms and confidential information has been shared with approximately 37 bidders.   The auction process calls for at least two rounds of bidding.  The first round of bidding was scheduled to close on September 25, 2015. The completion of the auction process and closing of the sale of the Patents was anticipated to occur by the end of October.   The auction and auction process is designed not to disturb any existing licenses.

21.    The proceeds of the sale will be used to pay off Youtoo TV's secured debts and to provide working capital for Youtoo TV, Youtoo Tech and the remaining Youtoo companies. While the outcome of an auction is not certain, I have been advised by Aqua that the auction should generate sufficient funds to pay off the secured debt and to fund the companies' future operations.

22.    Neither Media LP nor its affiliates (including Youtoo Tech and Youtoo TV) is insolvent.   The companies have valuable assets which are illiquid.   The companies' lenders have demanded payment and entered into a process to monetize certain of the assets (the Sale Patents) in order to provide the liquidity necessary to pay debts and to operate the business.

23.     With the Forbearance Agreement and the proposed auction, the Youtoo companies have an opportunity to survive; without it they have no chance whatsoever.  If Youtoo Tech is not allowed to sell the Sale Patents at auction in accordance with the Forbearance Agreement, Youtoo TV will be in breach of the Forbearance Agreement.  As a result, the loans from Heartland and the other lenders will fall into default.  Heartland will have the right to and almost surely will foreclose upon all of its collateral, including the Sale Patents and the remainder of Youtoo Tech's intellectual property.  Unlike the orderly auction contemplated by the Forbearance Agreement, a foreclosure auction by Heartland is likely to generate only enough to satisfy Heartland's loans.  Moreover, foreclosure by Heartland will result in the complete destruction of the Youtoo family of companies, including Media LP, Youtoo Tech and Youtoo TV.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Christopher Wyatt

10

# Exhibit C





IN THE DISTRICT COURT of OKLAHOMA COUNTY
STATE OF OKLAHOMA

ROBERT F. BROWNE FAMILY LLC,
ROBERT F. BROWNE REVOCABLE
TRUST, KAREN A. BROWNE
REVOCABLE TRUST, ROBERT F.
BROWNE ROTH IRA, KRISTINE P.
BROWNE IRA, CORI E. BROWNE
REVOCABLE TRUST, CORI E. BROWNE
401(K), EDWIN D. ABEL REVOCABLE
TRUST, EDWIN D. ABEL TRADITIONAL
IRA, EDWIN D. ABEL SIMPLE IRA,
CAROL ABEL REVOCABLE TRUST,
CAROL C. ABEL SEP IRA, T. LUKE ABEL
TRUST AND LAURA M. ABEL TRUST,
TIMOTHY LUKE ABEL SIMPLE IRA,
CONNIE M. BAKER REVOCABLE TRUST,
CONNIE M. BAKER IRA, THE EA AND
RUTH M. BALDWIN REVOCABLE
LIVING TRUST, BEECHER JOINT
REVOCABLE TRUST, JANIS L.
BINGAMAN TRUST, JOHN E.
BINGAMAN, JR. REVOCABLE TRUST,
JOHN E. BINGAMAN TRADITIONAL IRA,
JANIS L. BINGAMAN TRADITIONAL
IRA, JOHN AND JANIS BINGAMAN
CHARITABLE REMAINDER TRUST,
MORGAN FAMILY TRUST, AMANDA J.
BINGAMAN BDA IRA, BARRY C.
BLADES LEGACY TRUST, BARRY C.
BLADES REVOCABLE TRUST, JANIS K.
BLADES REVOCABLE TRUST, BARRY C.
BLADES TRADITIONAL IRA, JANIS K.
BLADES 401(K) AND PSP, BARRY C.
BLADES 401(K) PLAN, JANIS K. BLADES
TRADITIONAL IRA, DAVID AND
MARCIA CHRISTOFFERSON JOINT
TRUST, CHARLOTTE A. EVANS
TRADITIONAL IRA, GREGORY R.
GUDENBURR, GREGORY R.
GUDENBURR IRA, PATRICIA M.
HASWELL BDA IRA, PARTICIA M.
HASWELL IRA, DAVID W. HORNBEEK
IRA, DAVID W. HORNBEEK SIMPLE IRA,
DAVID W. HORNBEEK 401(K), SKYE N.
HOUSEMAN TRUST, SKYE N.

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

SEP 27 2016

RICK WARREN
COURT CLERK

31

Case No. **CJ-2016-4937**

1

IN THE DISTRICT COURT of OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| ROBERT F. BROWNE FAMILY LLC, ROBERT F. BROWNE REVOCABLE TRUST, KAREN A. BROWNE REVOCABLE TRUST, ROBERT F. BROWNE ROTH IRA, KRISTINE P. BROWNE IRA, CORI E. BROWNE REVOCABLE TRUST, CORI E. BROWNE 401(K), EDWIN D. ABEL REVOCABLE TRUST, EDWIN D. ABEL TRADITIONAL IRA, EDWIN D. ABEL SIMPLE IRA, CAROL ABEL REVOCABLE TRUST, CAROL C. ABEL SEP IRA, T. LUKE ABEL TRUST AND LAURA M. ABEL TRUST, TIMOTHY LUKE ABEL SIMPLE IRA, CONNIE M. BAKER REVOCABLE TRUST, CONNIE M. BAKER IRA, THE EA AND RUTH M. BALDWIN REVOCABLE LIVING TRUST, BEECHER JOINT REVOCABLE TRUST, JANIS L. BINGAMAN TRUST, JOHN E. BINGAMAN, JR. REVOCABLE TRUST, JOHN E. BINGAMAN TRADITIONAL IRA, JANIS L. BINGAMAN TRADITIONAL IRA, JOHN AND JANIS BINGAMAN CHARITABLE REMAINDER TRUST, MORGAN FAMILY TRUST, AMANDA J. BINGAMAN BDA IRA, BARRY C. BLADES LEGACY TRUST, BARRY C. BLADES REVOCABLE TRUST, JANIS K. BLADES REVOCABLE TRUST, BARRY C. BLADES TRADITIONAL IRA, JANIS K. BLADES 401(K) AND PSP, BARRY C. BLADES 401(K) PLAN, JANIS K. BLADES TRADITIONAL IRA, DAVID AND MARCIA CHRISTOFFERSON JOINT TRUST, CHARLOTTE A. EVANS TRADITIONAL IRA, GREGORY R. GUDENBURR, GREGORY R. GUDENBURR IRA, PATRICIA M. HASWELL BDA IRA, PARTICIA M. HASWELL IRA, DAVID W. HORNBEEK IRA, DAVID W. HORNBEEK SIMPLE IRA, DAVID W. HORNBEEK 401(K), SKYE N. HOUSEMAN TRUST, SKYE N. | Case No. |

1

HOUSEMAN SIMPLE IRA, SKYE N.
HOUSEMAN IRA, CRESTED BUTTE
ELECTRICAL INC., ANNALIESE J.
HOUSEMAN SIMPLE IRA, LESTER
FAMILY, L.L.C., WARREN G. LOW
TRADITIONAL IRA, C. STEPHEN LYNN
REVOCABLE TRUST, MILAH P. LYNN
REVOCABLE TRUST, JOHN PHILLIP
LYNN, NANCY L. DAVIS AND KAREN R.
WILLIAMS TRUST, C. STEPHEN LYNN
AND MILAH P. LYNN CHARITABLE
REMAINDER TRUST, C. STEPHEN LYNN
LAGRANGE COLLEGE CHARITABLE
REMAINDER TRUST, JANE E. MASSEY
REVOCABLE TRUST, JANE E. MASSEY
IRA, JOHN MUNKRES TRADITIONAL
IRA, SUSAN M. NEWMAN TRUST,
SUSAN M. NEWMAN BDA IRA, SUSAN
M. NEWMAN ROTH IRA, SUSAN M.
NEWMAN TRADITIONAL IRA,
KENNETH S. PARKER IRA, LINDA H.
PARKER SEP IRA, FRED SCHOENHALS
TRADITIONAL IRA, MARY
SCHOENHALS TRADITIONAL IRA, JEFF
A. AND RANEE SCHOENHALS, JEFFREY
A. SCHOENHALS IRA, JOHN F.
SCHOENHALS AND CHRISTINA L.
SCHOENHALS LIVING TRUST, JACK H.
AND BEVERLY SUE VAUGHN JT TRUST,
WATSON FAMILY 2002 TRUST,
ANDREW E. WATSON IRA, STEVEN J.
ZICHICHI, AND STEVEN J. ZICHICHI IRA
ROLLOVER, for themselves and derivatively
on behalf of COVENANT GLOBAL ALPHA
FUND, L.P. f/k/a CFS AGGRESSIVE
STRATEGY FUND, L.P., COVENANT
GLOBAL ALPHA FUND, LTD. f/k/a
COVENANT AGGRESSIVE STRATEGY
FUND, LTD., COVENANT OPPORTUNITY
CAPITAL FUND, L.P., and COVENANT
INCOME APPRECIATION FUND, L.P.,

Plaintiffs,

v.

STEPHEN E. SHAFER, COVENANT
FINANCIAL SERVICES, LLC d/b/a

2

COVENANT GLOBAL INVESTORS, and
CARTOGRAPHER LP,

    Defendants,

and

COVENANT GLOBAL ALPHA FUND, L.P.
f/k/a CFS AGGRESSIVE STRATEGY
FUND, L.P., COVENANT GLOBAL ALPHA
FUND, LTD. f/k/a COVENANT
AGGRESSIVE STRATEGY FUND, LTD.,
COVENANT OPPORTUNITY CAPITAL
FUND, L.P., and COVENANT INCOME
APPRECIATION FUND, L.P.,

    Nominal Defendants.

## PETITION

COME NOW the Plaintiffs, Robert F. Browne Family LLC, Robert F. Browne Revocable Trust, Karen A. Browne Revocable Trust, Robert F. Browne Roth IRA, Kristine P. Browne IRA, Cori E. Browne Revocable Trust, Cori E. Browne 401(k), Edwin D. Abel Revocable Trust, Edwin D. Abel Traditional IRA, Edwin D. Abel Simple IRA, Carol Abel Revocable Trust, Carol C. Abel Sep IRA, T. Luke Abel Trust and Laura M. Abel Trust, Timothy Luke Abel Simple IRA, Connie M. Baker Revocable Trust, Connie M. Baker IRA, the EA and Ruth M. Baldwin Revocable Living Trust, Beecher Joint Revocable Trust, Janis L. Bingaman Trust, John E. Bingaman, Jr. Revocable Trust, John E. Bingaman Traditional IRA, Janis L. Bingaman Traditional IRA, John and Janis Bingaman Charitable Remainder Trust, Morgan Family Trust, Amanda J. Bingaman Bda IRA, Barry C. Blades Legacy Trust, Barry C. Blades Revocable Trust, Janis K. Blades Revocable Trust, Barry C. Blades Traditional IRA, Janis K. Blades 401(k) and PSP, Barry C. Blades 401(k) Plan, Janis K. Blades Traditional IRA, David and Marcia Christofferson Joint Trust, Charlotte A. Evans Traditional IRA, Gregory R. Gudenburr, Gregory R. Gudenburr IRA, Patricia M. Haswell BDA

IRA, Particia M. Haswell IRA, David W. Hornbeek IRA, David W. Hornbeek Simple IRA, David W. Hornbeek 401(k), Skye N. Houseman Trust, Skye N. Houseman Simple IRA, Skye N. Houseman IRA, Crested Butte Electrical Inc., Annaliese J. Houseman Simple IRA, Lester Family, L.L.C., Warren G. Low Traditional IRA, C. Stephen Lynn Revocable Trust, Milah P. Lynn Revocable Trust, John Phillip Lynn, Nancy L. Davis and Karen R. Williams Trust, C. Stephen Lynn and Milah P. Lynn Charitable Remainder Trust, C. Stephen Lynn LaGrange College Charitable Remainder Trust, Jane E. Massey Revocable Trust, Jane E. Massey IRA, John Munkres Traditional IRA, Susan M. Newman Trust, Susan M. Newman Bda IRA, Susan M. Newman Roth IRA, Susan M. Newman Traditional IRA, Kenneth S. Parker IRA, Linda H. Parker SEP IRA, Fred Schoenhals Traditional IRA, Mary Schoenhals Traditional IRA, Jeff A. and Ranee Schoenhals, Jeffrey A. Schoenhals IRA, John F. Schoenhals and Christina L. Schoenhals Living Trust, Jack H. and Beverly Sue Vaughn Joint Trust, Watson Family 2002 Trust, Andrew E. Watson IRA, Steven J. Zichichi, and Steven J. Zichichi IRA Rollover, for Themselves and Derivatively on Behalf of Covenant Global Alpha Fund, L.P. f/k/a/ as CFS Aggressive Strategy Fund, L.P., Covenant Global Alpha Ltd. Fund, Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund, L.P., (collectively, "Plaintiffs"), on behalf of themselves and the limited partnership funds Covenant Global Alpha Fund, L.P., f/k/a as CFS Aggressive Strategy Fund, L.P., Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund, L.P., and the fund Covenant Global Alpha Fund Ltd. f/k/a Covenant Aggressive Strategy Fund, Ltd., (collectively, the "Covenant Funds"), and for their causes of action against Defendants allege and state as follows:

4

## NATURE OF THE ACTION

1.      This case is about breaches of fiduciary duty, self-dealing, and gross abuses by CFS, the Covenant Funds' General Partner, as well as Shafer, CFS's Managing Member (together, the "Covenant Defendants").

2.      The Covenant Defendants' actions demonstrate that they lied when they told Plaintiffs in January 2015 that the Covenant Funds would be liquidated over the next twelve months—after gating those funds to prohibit any investor withdrawals.  Specifically, the following acts lay bare the Covenant Defendants' false statements about immediately liquidating the Covenant Funds' assets:

- selling Covenant Hospitality for an arbitrary price to another fund that Defendant Shafer is trying to launch, and financing the transaction with money borrowed from the Covenant Funds (*i.e.*, cash that could immediately have been distributed to Plaintiffs);

- failing to put the Covenant Funds' illiquid precious gems on the auction market that convenes only several times a year, absent which selling them is essentially impossible;

- spending millions of dollars on doubling the equity stake in YouToo Media and on aspirational litigation, instead of selling that asset and distributing the cash to investors; and

- using the Covenant Funds' luxury homes as personal vacation residences for Defendant Shafer—as well as his family and employees—without even paying for their use, instead of meaningfully trying to sell these assets.

3.      Moreover, the Covenant Defendants used liquid assets to purchase oil puts to raise cash, despite having absolutely no experience investing in oil, let alone oil options.  That reckless move—which the Covenant Defendants hid—invariably resulted in at least a $4.5 million loss.  Nor was this so-called attempt to raise cash intended to benefit Plaintiffs as the Covenant Defendants distributed none of the cash to Plaintiffs.

4.      During this purported liquidation period, the Covenant Defendants also undertook at least one major self-dealing transaction with Cartographer—which is a competing fund that

Defendant Shafer controls. The mischief here is that the Covenant Defendants transferred Covenant Hospitality to Cartographer at an arbitrary price without ever trying to market that asset, even though there was an interested buyer. That inured to Defendants Shafer's and Cartographer's benefit—particularly because Shafer is attempting to get Cartographer off the ground—while plainly harming Plaintiffs' interests. Defendant Shafer did all this despite Plaintiffs' express instructions to the contrary.

5. What is more, the Covenant Defendants have churned their management fees by gating Plaintiffs' fund redemptions and not expeditiously liquidating all Covenant Funds' assets. Because the Covenant Defendants' management fee is based on the value of the fund assets, they are motivated to hold assets prisoner for as long as possible—Plaintiffs' interests be damned. This is particularly so in failed funds such as here, where there is no longer an opportunity for the managing or general partner to earn any success fees.

6. As with many misdeeds, there was a cover-up here. The Covenant Defendants tried to conceal their actions by not complying with their books-and-records obligations, which is how Plaintiffs can police precisely the sort of misconduct that the Covenant Defendants have undertaken. What bits of information the Covenant Defendants have supplied have been at their own pleasure—and not in response to Plaintiffs' books-and-records demands. And the Covenant Defendants' books-and-records productions have been woefully incomplete in any event.

7. Plaintiffs went out of their way to avoid litigation, meeting with the Covenant Defendants in April 2016 to propose a compromise and reiterate their demand for books and records. But after that meeting, the Covenant Defendants simply made a perfunctory and inadequate production, which omitted information about expenses or investor distributions predating 2015. The Covenant Defendants also made the data available on what appeared to be newly created spreadsheets (rather than in native format), making it impossible to verify the data

6

and stoking suspicion that they were being deceivingly selective. Moreover, the Covenant Defendants then lied about the self-dealing transactions that they were imminently closing for Covenant Hospitality (a real estate asset).

8.      This lawsuit is, in part, a derivative action by Plaintiffs on behalf of themselves and all others similarly situated against the Covenant Defendants, seeking to remedy and recover damages for, among other things, the Covenant Defendants' breaches of contract, breaches of fiduciary duties, and other violations of the law, the Agreements, and the Offering Circulars.

## THE PARTIES, JURISDICTION, AND VENUE

9.      Plaintiffs are Legacy Limited Partners and Legacy Shareholders as defined in the Agreements described below and investors in one or more of the Covenant Funds. Plaintiffs are either residents of Oklahoma or have investment interests in assets located in and/or managed from Oklahoma.

10.     Covenant Global Alpha Fund, L.P., f/k/a as CFS Aggressive Strategy Fund, L.P. ("Covenant Global"), is a Delaware limited partnership that is registered to do business in Oklahoma. Its principal place of business is located in Oklahoma City, Oklahoma. The first of the Covenant Funds, it was formed on February 15, 2008.

11.     Covenant Global Alpha Ltd. Fund f/k/a Covenant Aggressive Strategy Fund, Ltd. ("Covenant Global Ltd."), is an investment company formed under the laws of the Cayman Islands. On information and belief, its principal place of business is in Oklahoma City, Oklahoma and it is managed in Oklahoma City.

12.     Covenant Opportunity Capital Fund, L.P. ("Covenant Opportunity") is a Delaware limited partnership that is registered to do business in Oklahoma. It was formed on October 27, 2008.

7

13.     Covenant Income Appreciation Fund, L.P. ("Covenant Income") is a Delaware limited partnership that is registered to do business in Oklahoma. It was formed on August 10, 2009.

14.     Plaintiffs collectively represent a majority of the interests in the Covenant Funds and will adequately represent the interests of all the investors in the Covenant Funds in enforcing and prosecuting their rights in this action.

15.     Defendant Covenant Financial Services, LLC ("CFS"), an Oklahoma limited liability company, is the General Partner of each of the three limited partnership Covenant Funds. CFS is the Investment Adviser and managing officer of Covenant Global Ltd ("Investment Advisor"). Its principal place of business is in Oklahoma City, Oklahoma.

16.     Defendant Stephen E. Shafer ("Shafer") is the Managing Member and Chief Investment Officer of CFS. Shafer is a resident of Oklahoma City, Oklahoma.

17.     Defendant Cartographer LP ("Cartographer") is a Delaware limited partnership, and its principal place of business is in Oklahoma City, Oklahoma. Shafer is the Managing Member of Cartographer.

18.     Certain Plaintiffs with equity in Covenant Global and CFS entered into the Third Amended and Restated Agreement of Limited Partnership of Covenant Global Alpha Fund, L.P. The Plaintiffs with equity in Covenant Opportunity and CFS entered into the First Amended and Restated Agreement of Limited Partnership of Covenant Opportunity Capital Fund, L.P. The Plaintiffs with equity in Covenant Income and CFS entered into the Second Amended and Restated Agreement of Limited Partnership of Covenant Income Appreciation Fund, L.P. Representative versions of the partnership agreements listed above (collectively referred to as the "Partnership Agreements") are attached to this Petition as *Exhibits 1 3*, respectively. The Partnership Agreements are substantively similar except as to the name of the Fund and investor involved.

8

The Plaintiffs with equity in Covenant Global Ltd. entered into substantively identical agreements regarding the investments in that Fund (hereinafter referred to as the "Ltd. Fund Agreements").

19.    Other investors entered into substantively identical Partnership Agreements and Ltd. Fund Agreements (hereinafter collectively referred to as the "Agreements") on different dates.

20.    The Partnership Agreements contain forum-selection clauses in which the General Partner and the Limited Partners agree to the exclusive jurisdiction and venue of any state court in the city and county of the partnership's principal place of business at the time the dispute arises, which is Oklahoma City, Oklahoma.

21.    This Court has subject matter and personal jurisdiction over this matter pursuant to 12 OKLA. STAT. § 2001.

22.    Venue is proper pursuant to the forum-selection clauses and 12 OKLA. STAT. §§ 134 and 137.

## FACTUAL ALLEGATIONS

### *The Covenant Funds exist to invest money for Plaintiffs' benefit*

23.    The Agreements require the Covenant Defendants to manage the Covenant Funds' various investments for Plaintiffs' benefit.

24.    Plaintiffs vary in their business acumen and sophistication. And their investments vary in size. Some Plaintiffs have tied up their retirement money. Others invested money that they earned and had hoped to pass on to their children and grandchildren.

25.    In January 2015, as more fully described below, the Covenant Defendants prevented Plaintiffs from redeeming their investments from the Covenant Funds by gating them. The Covenant Defendants then announced that they would liquidate the Covenant Funds' assets to satisfy Plaintiffs' requests for redemption.

9

*On January 1, 2015, the Covenant Defendants gated the*
*Covenant Funds and then claimed that they would start to*
*liquidate the assets to distribute proceeds to Plaintiffs.*

26.    Under the terms of the Agreements, Legacy Limited Partners/Legacy Shareholders are entitled to withdraw all or part of their investments with 10 days' business notice and their withdrawals take priority over all others, giving the Legacy Limited Partners/Legacy Shareholders substantially greater liquidity than other limited partners/shareholders. The Covenant Defendants have unilaterally and unlawfully vitiated the rights of the Legacy Limited Partners/Legacy Shareholders.

27.    In 2013, the Covenant Funds performed poorly. In 2014 the decline became even more precipitous.

28.    Instead of distributing cash from the Covenant Hospitality sale and otherwise responding to Plaintiffs' requests, effective January 1, 2015, the Covenant Defendants stopped all withdrawals from the Covenant Funds, notwithstanding the Plaintiffs' bargained-for withdrawal rights. In industry parlance, the Covenant Defendants "gated" the funds.

29.    Shortly after they closed the gate, the Covenant Defendants sent a letter to all investors, including Plaintiffs, announcing that they were indefinitely "suspending withdrawals and redemptions for the January withdrawal and redemption date, 1/31/2015, and all subsequent withdrawals and redemptions." That letter (the "Gate Letter") is attached as *Exhibit 4*.

*On the eve of getting sued, the Covenant Defendants tried to*
*create the impression that they are at last doing something.*

30.    On information and belief, after the Covenant Defendants learned Plaintiffs were about to file this Petition, they purportedly signed agreements to auction three (3) gems through Christies. This meaningless and empty gesture to create the impression that they are at last liquidating the Covenant Funds only shows that the Covenant Defendants are not serious.

10

31.    The Covenant Defendants could and should have put up the gems—all six of them—for auction a year and a half ago when the Covenant Defendants gated the funds and started the promised liquidation. But the Covenant Defendants sat on the gems (collecting management fees for doing nothing), despite Plaintiffs' pleas.

## I.    DEFENDANTS HAVE LIED TO PLAINTIFFS ABOUT CONDUCTING A LIQUIDATION.

### *The Covenant Defendants promised to complete the liquidation by the end of 2015.*

32.    In the Gate Letter, the Covenant Defendants announced to Plaintiffsthat the Covenant Defendants would liquidate the Covenant Funds' assets and would begin distributing the assets to investors "in a multi-month distribution process beginning in February [2015]." They also stated that distributions were expected to occur in February, March, and April of 2015 and that the majority of the Covenant Funds' liquid assets would be sold and the cash proceeds distributed by April 2015.

33.    In that same letter the Covenant Defendants acknowledged that they had "fiduciary" obligations to Plaintiffsand that their "priority [was] to protect and optimize [Plaintiffs'] capital." In fact, CFS' letterhead states "A Commitment to Trust."

34.    As of January 2015, the Covenant Funds' investments consisted mostly of the following asset classes:

a.    cash;

b.    bonds;

c.    stock in various companies;

d.    six rare gemstones appraised in the first quarter of 2015 at an aggregate value of more than $25 million (held in Covenant Real Return Partners LLC);

e.    five luxury homes in Florida and Washington States; and

f.    equity in operating, non-public companies called YouToo Media, Carry On, and Covenant Hospitality LLC, n/k/a Anthology Collection LLC ("Covenant Hospitality"), which manages the five

11

luxury homes listed above and earns a positive cash flow of approximately $500,000 per year.

35.    As of this lawsuit—more than a year-and-a-half after the announced gating and liquidation—the Covenant Defendants have failed to make any meaningful effort to liquidate the Covenant Funds' assets, have sunk more money into the assets, and have prolonged liquidation indefinitely. In fact, the Covenant Defendants have no concrete or realistic plan to liquidate and distribute the remaining Covenant Fund assets at all, let alone quickly, but instead plan to line their pockets with management and performance fees, and an undisclosed amount of alleged, unverifiable "expense."

36.    To date, the Covenant Defendants have not even sold and distributed to Plaintiffs the immediately liquid assets in the Covenant Funds. Indeed, the Covenant Defendants have not distributed all the Covenant Funds' cash yet—the most liquid of all assets. In total, the Covenant Defendants have liquidated and distributed proceeds from less than half of the Covenant Funds' assets.

### The Covenant Defendants lied about the Covenant Hospitality transaction, and then lied about its financing.

37.    On June 30, 2016, the Covenant Defendants closed the deal to sell Covenant Hospitality to Cartographer, Shafer's competing fund. The Covenant Defendants went ahead with the transaction despite Plaintiffs' express requests on June 21, 24, and 27 of 2016 for information about any Covenant Hospitality sale and instructions to hold off until the Covenant Defendants produced all relevant books and records.

38.    Plaintiffs objected to selling Covenant Hospitality to Cartographer because they were concerned about inevitable self-dealing. This is a particularly acute problem for Plaintiffs because, as discussed below, while the Covenant Funds are now in runoff (*i.e.*, being wound down), Cartographer could still have the potential to return positive investment results. Unlike the

12

Covenant Funds, Shafer could earn significant performance fees from Cartographer, in addition to management fees.

39.     To facilitate the Covenant Hospitality transaction, the Covenant Defendants caused the Covenant Funds to issue two notes totaling $836,470.  This flatly contradicts the Covenant Defendants' statement that Cartographer would finance the deal with 85% conventional bank lending and the remainder with equity contributions from new Cartographer investors.

40.     Rather than distribute any cash from the Covenant Hospitality transaction, the Covenant Defendants used that liquid asset to facilitate an insider transaction at an arbitrary price, which is described below.

41.     Plaintiffs remain at risk on the note repayment.

42.     The Covenant Defendants have refused to produce any books and records about their plans to distribute the funds related to Covenant Hospitality, although they announced that they are withholding the proceeds to pay for aspirational litigation on behalf of another asset, YouToo Media.

### *The Covenant Defendants lied about liquidating the Covenant Funds' assets because they have made no meaningful effort to sell six rare gemstones.*

43.     One of the primary illiquid asset classes in the Covenant Funds consists of six rare gemstones named Yellow Rose, Golconda, Burma Blue, Star Sapphire, Mandalay, and Red Spinel. In the first quarter of 2015, these six stones were appraised at an aggregate value of a little over $25 million.

44.     In 2015, there was a strong market demand for rare gemstones such as these. But the Covenant Defendants did not bring these six gems to auction.  Instead, the Covenant Defendants inexplicably put cash into the entity that holds the gems.

13

45.     Nor did the Covenant Defendants meaningfully attempted to sell these gems in the over eighteen months since they announced the liquidation. This lack of effort to sell the rare gems flies in the face of the Covenant Defendants' statements that liquidation would be complete or nearly complete by the end of 2015.

46.     Even though the Covenant Defendants have made no attempt to sell the gemstones, the Covenant Defendants reported increases in their valuations, which translates into a larger amount of assets on which the Covenant Defendants can charge management fees. On information and belief, these value increases are entirely attributable to activity in a strong gemstone market in which the Covenant Defendants chose not to participate, despite expressly representing to Plaintiffs that they were liquidating all Covenant Fund assets.

### *The Covenant Defendants lied about liquidating assets because instead of selling YouToo Media, they doubled the equity stake in that asset and are spending millions on aspirational litigation.*

47.     Throughout 2015, the Covenant Defendants falsely represented to Plaintiffs on several occasions that the sales of the Covenant Funds' investment in YouToo Media and Carry On were nearing completion. To date, the Covenant Defendants have sold no equity in these companies—assets that are owned by three of the four Covenant Funds. To the contrary, the Covenant Defendants have increased the investments in these companies.

48.     On April 30, 2016, the Covenant Defendants closed a deal that more than doubled the equity stake in YouToo Media—at a cost of about $8 million to Plaintiffs. More than doubling the Covenant Funds' equity stake is on its face inconsistent with the Covenant Defendants' stated promise to liquidate the funds and distribute the proceeds to the Plaintiffs.

49.     To make matters worse, the Covenant Defendants funded the balance of this transaction by taking out mortgages on two of the Covenant Funds' luxury residential properties in Florida. The Covenant Defendants have since announced that as they sell additional assets,

14

such as real estate or gemstones, they will in the first instance apply proceeds to reduce the existing mortgages on the Florida properties. Encumbering the Florida properties with large mortgages does not facilitate selling them, and is not in the best interests of Plaintiffs.

50.    On information and belief, the Covenant Defendants deliberately concealed this YouToo Media transaction from Plaintiffs. This is apparent from the fact that when Shafer met with certain Plaintiffs in April 2016, the Covenant Defendants were on the cusp of closing a deal with YouToo Media the next day—and had already mortgaged the Florida properties—but never breathed a word that they were lending millions from the Covenant Funds to facilitate the transaction. Just the opposite, the Covenant Defendants did not disclose this deal until August 12, 2016—and only then in an email responding to Plaintiffs' specific questions posed two weeks earlier.

51.    When Plaintiffs requested to see the books and records reflecting the money being spent on these companies, the Covenant Defendants stalled for months, while failing to mention that they planned to lend cash from the Covenant Funds to these companies.

52.    After gating the Covenant Funds, the Covenant Defendants allocated about $3 million of the Covenant Funds' liquid and distributable assets to aspirational litigation involving YouToo Media (over the next two years). Not only is committing to spend so lavishly on litigation incongruent with the Covenant Defendants' promises to liquidate assets, but the cash devoted to this litigation is necessarily not being distributed to Plaintiffs.

### The Covenant Defendants lied about liquidating assets because they have not honestly attempted to sell the five luxury home investments, and Shafer personally benefits from retaining them.

53.    The Covenant Funds own five luxury homes in Florida and Washington States. In the first quarter of 2015, the Covenant Defendants purported to appraise all five properties. But the Covenant Defendants inexplicably did not list the homes for sale until after April 2016. None

of the properties have been sold to date, and it is not even clear that the properties have been shown to any prospective buyers, much less aggressively marketed.

54.    Not only have the Covenant Defendants lied about expeditiously liquidating these assets, but on information and belief, Shafer uses these luxury homes for his own personal benefit without compensating the Covenant Funds. He has even vacationed with his family at some of these properties. Shafer also has offered these homes to former key employees of Defendant CFS.

55.    Shafer never sought or obtained Plaintiffs' permission to use these luxury homes—which belong to the Covenant Funds—for his own personal benefit. Because Shafer has never complied with Plaintiffs' books-and-records requests, there is no way to be certain when he stopped using these homes for his personal benefit (if he stopped at all).

II.    **DEFENDANTS HAVE PROLONGED LIQUIDATING INVESTMENTS IN THE COVENANT FUNDS TO CHURN MANAGEMENT FEES.**

*The Covenant Defendants are delaying selling the*
*Covenant Funds' assets to churn management fees.*

56.    On information and belief, the Covenant Defendants have not liquidated the Covenant Fund assets in an effort to enrich themselves by continuing to collect management fees. Under Section 11.1 of the Partnership Agreements, the Covenant Defendants' management fee is based on the value of assets in the funds. Under the Ltd. Fund Agreements, the Covenant Defendants' management fee is based on the net asset value of each class and series account.

57.    Under Section 10.6 of the Partnership Agreements, the Capital Account Balance is "the value of the Partnership's assets and liabilities," which the General Partner "shall determine . . . in good faith." Defendants thus collect quarterly management fees that are based on the value of partnership assets (net of liabilities), which the Covenant Defendants themselves determine. Without producing books and records, Plaintiffs have nothing but the Covenant Defendants' say-so on these issues.

16

> *Since the purported liquidation started, the Covenant Defendants*
> *have sunk more Covenant Funds' cash into certain investments*
> *while not even attempting to sell other investments.*

58.    The Covenant Funds own equity in operating companies called Carry On and YouToo Media.  Despite being in liquidation and committing to sell all remaining assets to distribute the proceeds to Plaintiffs, the Covenant Defendants have placed more Covenant Fund money into Carry On and YouToo Media since January 1, 2015.

59.    While assuring Plaintiffs several times throughout 2015 that "deals" to sell the Covenant Funds' equity in YouToo Media and Carry On were nearing completion, the Covenant Defendants have to date sold no equity in these companies.  On the contrary, the Covenant Defendants have doubled down the investments in these companies and allocated money to aspirational patent litigation.

60.    On information and belief, the Covenant Defendants have not attempted to sell any of the six gemstones or the five luxury houses, all of which churn management fees for the Covenant Defendants.

## III.    THE COVENANT DEFENDANTS HAVE NOT MADE AVAILABLE THE COVENANT FUNDS' BOOKS AND RECORDS.

> *The Agreements and applicable law require the*
> *Covenant Defendants to maintain all accounts,*
> *books, and records, and produce them on demand.*

61.    Sections 13.5 and 13.6 of the Partnership Agreements require the General Partner to maintain all accounts, books, records, and other relevant Partnership documents, and produce them on request.  On information and belief, the Ltd. Fund Agreements require the Covenant Defendants to maintain all accounts, books, records, and other relevant entity documents, and produce them on request.  These obligations also exist under the applicable governing law.

62.    By refusing, delaying, and otherwise blocking the access of Plaintiffs to the Covenant Funds' books and records, the Covenant Defendants have prevented Plaintiffs from (a)

17

verifying the management fees collected and expenses incurred, and (b) examining what efforts they have made to liquidate the Covenant Funds.

63.    The Covenant Defendants have deliberately tried to conceal their actions and misconduct by not complying with their books-and-records obligations. The limited productions they have made have been woefully incomplete and inadequate.

### The Covenant Defendants have effectively ignored Plaintiffs' many requests for accountings and records.

64.    Concerned about the Covenant Defendants' conduct, Plaintiffs began requesting accountings, books, records, and various information about the remaining assets in the Covenant Funds to better understand the stalled liquidation efforts. Plaintiffs requested information on at least the following dates:

| | |
|---|---|
| • April 28, 2015 | • February 3, 2016 |
| • April 30, 2015 | • February 9, 2016 |
| • May 1, 2015 | • February 12, 2016 |
| • May 10, 2015 | • March 2, 2016 |
| • May 17, 2015 | • March 3, 2016 |
| • May 19, 2015 | • March 4, 2016 |
| • May 20, 2015 | • March 6, 2016 |
| • May 22, 2015 | • March 10, 2016 |
| • May 24, 2015 | • April 5, 2016 |
| • June 9, 2015 | • May 6, 2016 |
| • October 23, 2015 | • May 9, 2016 |
| • December 3, 2015 | • June 21, 2016 |
| • January 13, 2016 | • June 24, 2016 |
| • February 1, 2016 | • June 27, 2016 |

65.    To most of these requests for information, the Covenant Defendants did not respond for days, sometimes eventually stating that Shafer was "traveling" or "in constant meetings." When the Covenant Defendants would at last answer, they refused to provide even basic information about the assets that remain in the Covenant Funds, including plans to liquidate remaining assets, information about operating expenses, details about cash balances, meaningful

18

valuations, and basic corporate governance structures of the assets. No one else from the Covenant Defendants provided that information.

66.    The Covenant Defendants refused to provide any information about their plans to hold back proceeds of the few assets that they did liquidate or about their plans to borrow cash from the Covenant Funds for Cartographer to purchase assets and to expand investments in YouToo Media.

67.    On information and belief, the cross-trades between the Covenant Funds and Cartographer have not benefitted Plaintiffs and have, and in fact, have been detrimental to them. The Covenant Defendants' refusal to provide sufficient information and access to the Covenant Funds' books and records has prevented Plaintiffs from evaluating whether the consideration for those cross-trades is fair.

68.    When Plaintiffs continued to push for access to accounts, books, and records, Shafer became defensive and angry, and made it clear that books-and-records requests—or any questions at all about the Covenant Funds' business—were unwelcome. In other words, Plaintiffs were told any efforts by them would be futile.

69.    The Covenant Defendants' stonewalling only heightened Plaintiffs' concerns. To make its demand clear, Plaintiffs' counsel sent a demand letter to the Covenant Defendants on March 28, 2016, requesting the following:

      a.    a full accounting of the Covenant Defendants' liquidation efforts to date, including information to show that reasonable market prices were obtained for the assets already sold;

      b.    books, records, and any other documents sufficient to establish what assets remain in the Covenant Funds and how they are valued;

      c.    books, records, and any other documents relevant to all transfers and sales of assets from the Covenant Funds to Cartographer, including information sufficient to establish that the sale prices were fair and reasonable;

19

      d.     an accounting of operating expenses since the start of the liquidation; and

      e.     all financial statements and balance sheets related to the underlying assets, including the operating businesses (YouToo Media, Carry On, and Covenant Hospitality); and

      f.     a standstill of all insider trades or cross-trades.

70.    Instead of complying with their obligations to send documents, the Covenant Defendants complained about the volume of the requested information and claimed that they needed time to respond, even though certain Plaintiffs made most of these requests months earlier.

71.    When the Covenant Defendants eventually responded—three months later—they sent unverifiable documents with no backup data. These documents were also limited in scope to 2015 forward and were thus meaningless. This confirmed that Plaintiffs' efforts to get the liquidation on track would be futile.

## IV.    JUST BEFORE GATING THE COVENANT FUNDS SHAFER CREATED CARTOGRAPHER.

### *Defendant Shafer is cherry-picking Covenant Funds' assets for Cartographer in self-dealing transactions and charging expenses to Plaintiffs.*

72.    On information and belief shortly before gating the Covenant Funds, Defendant Shafer created and became General Partner of a new fund called Cartographer. Cartographer is not part of the Covenant Funds' group of investment funds.

73.    Defendant Shafer has a far greater management and performance fee compensation potential in Cartographer. Unlike the Covenant Funds (which have essentially failed), the new fund still has potential to return positive investment results, which could earn Defendant Shafer, in addition to management fees, an incentive performance fee, which under the partnership agreement for Cartographer is calculated at 20% of the profits.

74.    Defendant Shafer thus has an incentive to cherry-pick assets from Covenant Funds for Cartographer, without first marketing these assets to third parties or looking to sell at least at

market prices, to realize greater gain, and consequently greater performance fees, in addition to management fees.

75.     The Covenant Defendants have refused to provide sufficient information to enable Plaintiffs to evaluate whether the consideration for those cross-trades among and between the Covenant Funds and Cartographer is fair to Plaintiffs.  On information and belief, those cross-trades have not benefited Plaintiffs.

76.     Nor have the Covenant Defendants produced books and records to show that they are not comingling expenses for the Covenant Funds and Cartographer.  On information and belief, that is precisely what is happening while Shafer manages the Covenant Funds and Cartographer from the same office space.  On information and belief, Shafer used the Covenant Funds' assets to lease nearly 7,000 square feet (for a total of two people) of expensive real estate in downtown Oklahoma City at the Oklahoma Tower.  The Covenant Defendants' refusal to provide sufficient information and access to the Covenant Funds' books and records has prevented Plaintiffs from evaluating this and other expenses.

### *The Covenant Defendants sold Covenant Hospitality to Cartographer in what plainly is an insider transaction.*

77.     Covenant Hospitality is an entity that, among other things, manages the five luxury homes owned by the Covenant Funds.  According to the limited financial statements Plaintiffs have received from the Covenant Defendants, the positive cash flow is approximately $500,000 per year.  However, the Covenant Defendants have not distributed any of that money to Plaintiffs.

78.     After Shafer said in March 2016 that he intended to have his new Cartographer fund purchase Covenant Hospitality, Plaintiffs objected repeatedly.  In particular, on at least each of the following dates Plaintiffs requested in writing that the Covenant Defendants maintain the *status quo* and not engage in any transactions with (or otherwise transfer value to) Cartographer or any other funds that Defendant Shafer manages:

21

- March 10, 2016
- April 5, 2016
- May 6, 2016
- May 9, 2016
- June 21, 2016
- June 24, 2016
- June 27, 2016

79.     Despite many requests from Plaintiffs—and despite the existence of a third-party offer for this asset—the Covenant Defendants provided no information and proceeded with the insider transaction.

### *Plaintiffs demanded that the Covenant Defendants liquidate the Covenant Funds' assets immediately.*

80.     As described in Paragraph 64 above, Plaintiffs wrote many times to request that the Covenant Defendants produce books and records (including basic information about the purported liquidation). Plaintiffs also requested that the Covenant Defendants immediately liquidate the Covenant Fund assets. The Covenant Defendants did not comply with any of these requests.

81.     On information and belief, after the Covenant Defendants refused to comply with these requests, Shafer threatened to run the Covenant Funds into the ground if Plaintiffs commenced this lawsuit.

82.     In any event, if these demands are deemed inadequate, doing anything more would be pointless, and would simply give the Covenant Defendants more time to self-deal, commit fraud, and churn management fees. Any additional demand would be futile.

## CLAIMS FOR RELIEF

### COUNT I — REMOVAL OF THE GENERAL PARTNER/INVESTMENT ADVISER (against CFS)

83.     Plaintiffs repeat and incorporate by reference each and every allegation above.

84.    Section 16.1(c) of the Partnership Agreements requires removing CFS as General Partner sixty (60) days after a claim has been filed against the General Partner seeking, in part, "liquidation, dissolution or similar relief under any statute, law or regulation."

85.    This Petition seeks the liquidation of the Covenant Funds and satisfies the removal requirements of the Partnership Agreements.

86.    Section 16.1(c) of the Partnership Agreements also requires removing CFS as General Partner sixty (60) days after the appointment of a trustee, receiver, or liquidator, should such person be appointed by the Court.

87.    Under the agreements governing Covenant Global Ltd., Plaintiffs, on behalf of Covenant Global Ltd, are entitled to terminate CFS as Investment Adviser at the end of any month on 61 days' written notice. Based on the foregoing facts and circumstances, CFS should be removed as, as Investment Adviser of Covenant Global Ltd. at the end of the month counting 61 days from the filing of this Petition. should be removed immediately.

## COUNT II — BREACH OF FIDUCIARY DUTY

### (against the Covenant Defendants)

88.    Plaintiffs repeat and incorporate by reference each and every allegation above.

89.    CFS, as General Partner, and Shafer, as the Chief Investment Officer and Managing Member of CFS, have a fiduciary duty to the Covenant Funds, their creditors, and Plaintiffs, including duties of care, loyalty, and good faith, and the obligation to comply with the terms of the Agreements, the Offering Circulars, any governing corporate documents, and applicable law.

90.    The Covenant Defendants, acting individually and together, knowingly and/or willfully breached their contractual, statutory, and common law fiduciary duties to Plaintiffs by, among other things, refusing and failing to perform their obligations under the Agreements, failing to put the interests of the Covenant Funds and Plaintiffs above their own personal interests,

23

engaging in self-dealing, using the Covenant Funds' assets for their personal benefit, failing to manage the Covenant Funds in good faith and for the benefit of the Covenant Funds and Plaintiffs, lying to Plaintiffs about the status of the Covenant Funds' assets, and attempting to conceal their misconduct by blocking Plaintiffs' rightful access to books and records.

91.     The Covenant Defendants knew such actions and/or inactions were not in the best interest of the Covenant Funds and/or Plaintiffs and were not consistent with the Covenant Funds' financial objectives.

92.     By placing their personal interests above those of the Covenant Funds and Plaintiffs and by engaging in the conduct alleged in this Petition, the Covenant Defendants have breached their duties of care, loyalty, and good faith.

93.     As a direct result of the Covenant Defendants' knowing and willful breach of their fiduciary duties, Plaintiffs have suffered economic harm—to the benefit of the Covenant Defendants.

## COUNT III — BREACH OF CONTRACT
### (against the Covenant Defendants)

94.     Plaintiffs repeat and incorporate by reference each and every allegation above.

95.     The Covenant Defendants willfully breached the Agreements by, among other things, the following conduct:

        a.     misusing the Covenant Funds' assets for their own personal benefit;

        b.     engaging in self-dealing;

        c.     lying to Plaintiffs about the status of the assets and the liquidation process;

        d.     failing to produce on request accounts, books, records, and other relevant Covenant Funds documents to Plaintiffs;

        e.     failing and refusing to account for the Covenant Funds' assets;

        f.     indefinitely suspending withdrawals from the Covenant Funds while failing to make good faith efforts to liquidate the Covenant Funds' assets;

24

g.      vitiating the Legacy Limited Partners'/Legacy Shareholders' rights to withdraw with ten-days' notice and their entitlement to greater liquidity by failing to lift the suspension on withdrawals as soon as was reasonably practicable; and

h.      failing to wind down and dissolve the Covenant Funds, liquidate the Covenant Funds' assets to the benefit of Plaintiffs, and distribute those assets to Plaintiffs.

96.     All conditions precedent have been met by Plaintiffs on their breach of contract claim.

97.     As a result of the willful breaches of contract, Plaintiffs have been injured and are entitled to recover damages

98.     Accordingly, Plaintiffs are entitled to punitive damages from the Covenant Defendants in an amount that the Court determines is fair.

99.     Plaintiffs also are entitled to specific performance whereby the Covenant Defendants are ordered to produce all requested accounts, books, records, and other relevant Covenant Funds documents in their entirety, to account for all of the Covenant Funds' assets, and to expeditiously liquidate the Covenant Funds' assets.

## COUNT IV — ULTRA VIRES
### (against the Covenant Defendants)

100.    Plaintiffs repeat and incorporate by reference each and every allegation above.

101.    By engaging in the acts alleged above, the Covenant Defendants acted outside their authority under the Agreements, the Offering Circulars, any governing corporate documents, and the applicable law.

102.    As a result of the Covenant Defendants' *ultra vires* acts, Plaintiffs have been harmed and are entitled to recover damages in an amount that will compensate Plaintiffs for any injuries resulting from the Covenant Defendants' *ultra vires* acts.

25

## COUNT V — CONVERSION
### (against the Covenant and Cartographer Defendants)

103.    Plaintiffs repeat and incorporate by reference each and every allegation above.

104.    Plaintiffs own equity in and have the right to possess the Covenant Funds' assets.

105.    The Covenant Defendants have intentionally prevented Plaintiffs from accessing and/or retaking possession of their investments in the Covenant Funds in order to continue collecting a larger amount of management fees.

106.    The Covenant Defendants have engaged in *ultra vires* acts and have wrongfully transferred the Covenant Funds' assets to Cartographer for the personal benefit of the Covenant Defendants.

107.    Plaintiffs did not consent to the Covenant Defendants' wrongful property transfers, churning of fees, lies, breaches of fiduciary duties, and misuse of the Covenant Funds' assets.

108.    Plaintiffs have been, and continue to be, harmed as a result of the Covenant Defendants' wrongful conversion of the Covenant Funds' assets, and are entitled to damages in an amount that will compensate Plaintiffs for any injuries resulting from such wrongful conversion.

## COUNT VI — COMMON LAW FRAUD
### (against the Covenant Defendants)

109.    Plaintiffs repeat and incorporate by reference each and every allegation above.

110.    The Covenant Defendants knowingly misrepresented that they would complete liquidating the Covenant Funds' assets by the end of 2015.

111.    The Covenant Defendants knowingly misrepresented that they would sell a majority of the Covenant Funds' assets and distribute the cash by April 2015.

112.    The Covenant Defendants knowingly misrepresented the value and liquidity of assets in the Covenant Funds or were recklessly indifferent to those issues.

113.    The Covenant Defendants' conduct reflects that they knew these statements were false when made or were recklessly indifferent about stating the truth.

114.     To date, the Covenant Defendants have failed to make meaningful and good faith efforts to liquidate the Covenant Funds' assets, misused assets, which should have been liquidated and distributed to Plaintiffs, for the Covenant Defendants' own personal benefit, and prolonged liquidation indefinitely.

115.     The Covenant Defendants have intentionally delayed liquidating the Covenant Funds' assets so as to continue collecting management fees based on a higher Capital Account Balance, incurring expenses and charging the Covenant Funds for such and other personal benefits resulting from the wrongful conduct alleged here.

116.     The Covenant Defendants knowingly misrepresented to Plaintiffs that the sales of the Covenant Funds' equity in YouToo Media and Carry On were nearing completion.   On information and belief, the Covenant Defendants made these representations to conceal the fact that Covenant Defendants were wrongfully increasing the investments in these companies with assets that should have been distributed to Plaintiffs.

117.     To date, the Covenant Defendants have sold no equity in these companies.

118.     The Covenant Defendants knowingly misrepresented to Plaintiffs that Cartographer would finance the sale of Covenant Hospitality with conventional bank lending and equity contributions from new Cartographer investors.

119.     Instead, the Covenant Defendants used the Covenant Funds' assets to finance the sale by loaning the Covenant Funds' assets to Cartographer to the detriment of Plaintiffs and to the benefit of Covenant Defendants.

120.     Plaintiffs relied on the Covenant Defendants' misrepresentations to their detriment and have suffered injuries and incurred damages.

### COUNT VII—TORTIOUS INTERFERENCE
**(against Cartographer Defendant)**

121.     Plaintiffs repeat and incorporate by reference each and every allegation above.

27

122.    Plaintiffs and the Covenant Defendants had contractual relationships requiring the Covenant Defendants to, among other things, act as a fiduciary with respect to Plaintiffs and the assets invested in the Covenant Funds. Defendant Cartographer was aware of those contractual relationship.

123.    Defendant Cartographer intentionally interfered with the contractual relationships through unfair and improper means.

124.    Plaintiffs have suffered damages as a direct result of Defendant Cartographer's actions.

### COUNT VIII — CIVIL CONSPIRACY TO BREACH CONTRACT
### (against the Covenant and Cartographer Defendants)

125.    Plaintiffs repeat and incorporate by reference each and every allegation above.

126.    Shafer, CFS, and Cartographer form a confederation of two or more people or entities.

127.    On information and belief, all Defendants together facilitated and furthered, and continue to facilitate and further, the transfer of desirable assets from the Covenant Funds to Cartographer, which is a breach of the Covenant Defendants' fiduciary duty.

128.    Defendants' misconduct and facilitation of the transfer of the Covenant Funds' assets caused, and continues to cause, Plaintiffs actual harm for which they are entitled to recover damages.

### COUNT IX — AIDING AND ABETTING BREACH OF CONTRACT
### (against Cartographer Defendant)

129.    Plaintiffs repeat and incorporate by reference each and every allegation above.

130.    The Covenant Defendants breached their fiduciary duties under the Agreements, governing corporate documents, and applicable law.

131.    Defendant Cartographer accepted valuable assets and from the Covenant Funds for an arbitrary price that was chosen without the assets being marketed to third parties. Defendant

28

Cartographer accepted management services at the expense of Plaintiffs. Cartographer accepted and benefitted from these assets at the expense of the Covenant Funds and Plaintiffs.

132.    Defendant Cartographer knew the assets and management services it received were the Covenant Funds' property by contract and knew the Covenant Defendants' self-interested transfer of those assets and services constituted a contractual breach of Covenant Defendants' fiduciary and other duties.

133.    Defendant Cartographer knowingly participated in the foregoing improper transactions by directly or indirectly aiding, abetting, and/or causing the Covenant Defendants to transfer Covenant Fund assets to Cartographer in a grossly unfair process.

134.    Plaintiffs have suffered economic harm as a result, while Defendant Cartographer has benefitted, and continues to benefit, from these desirable assets and management services.

135.    Accordingly, Plaintiffs are entitled to disgorgement and damages from Defendant Cartographer in an amount to be determined at trial.

### COUNT X — UNJUST ENRICHMENT
### (against the Covenant and Cartographer Defendants)

136.    Plaintiffs repeat and incorporate by reference each and every allegation above.

137.    On information and belief, the Covenant Defendants have delayed liquidating the remaining assets and have not distributed proceeds from liquid assets in the Covenant Funds so as to continue collecting management fees based on a higher Capital Account Balance.

138.    On information and belief, the Covenant Defendants have transferred desirable assets from the Covenant Funds to Cartographer without attempting to sell the assets in arm's-length transactions to maximize Cartographer's Capital Account Balance and thus collect greater performance fees from Cartographer.

139.   The Covenant Defendants' conduct relating to the transfer of assets described above was unjustified.  Cartographer was unjustified in accepting assets it knew to be improperly transferred.

140.   On information and belief, by transferring desirable assets from the Covenant Funds to Cartographer without attempting to sell the assets in arm's-length transactions, the Covenant Defendants have unjustly enriched themselves through their ownership and other economic interests in Cartographer.  Cartographer has unjustly enriched itself by gaining valuable assets from the Covenant Funds below market value.

141.   On information and belief, the Covenant Defendants have misused the Covenant Funds' assets for their personal benefit by, among other things, recklessly investing money in oil puts so as to gain quick access to cash, fraudulently using the Covenant Funds' assets to pay for travel to search for new investors when the Covenant Defendants should have been dissolving and liquidating the Covenant Funds, and improperly using the Covenant Funds' to lease expensive and unnecessarily large office space that Cartographer also uses.  Additionally, Defendant Shafer has misused the Covenant Funds' assets by vacationing with his family at the Covenant Funds' luxury homes and allowing friends and employees to use the luxury homes without consent and without compensating the Covenant Funds.

142.   The Covenant Defendants have unjustly enriched themselves by misusing the Covenant Funds' assets.  Cartographer has unjustly enriched itself by knowingly using office space purchased with the Covenant Funds' assets without providing reasonable compensation.

143.   As a result of the acts and omissions of the Covenant Defendants and Cartographer, Plaintiffs have been, and continue to be, harmed while the Covenant Defendants and Cartographer have and will benefit unjustly.

30

## COUNT XI — DISGORGEMENT
### (against the Covenant and Cartographer Defendants)

144.     Plaintiffs repeat and incorporate by reference each and every allegation above.

145.     Through their actions and omissions, including delaying liquidation, self-dealing, and other misuses of Covenant Fund assets, the Covenant Defendants and Cartographer have received benefits to which they are not entitled and to the detriment of Plaintiffs.

146.     As a result, Plaintiffs suffered and continue to suffer economic harm.

147.     The Covenant Defendants and Cartographer should be required to disgorge all improperly received and ill-gotten profits and benefits.

## COUNT XII — RESCISSION OF COVENANT HOSPITALITY SALE
### (against the Covenant and Cartographer Defendants)

148.     Plaintiffs repeat and incorporate by reference each and every allegation above.

149.     The Covenant Defendants made misrepresentations and/or refused to disclose to Plaintiffs material aspects of the Covenant Hospitality sale to Cartographer prior to closing of the sale.

150.     The Covenant Defendants knowingly misrepresented to Plaintiffs that Cartographer would finance the sale of Covenant Hospitality with conventional bank lending and equity contributions from new Cartographer investors.

151.     Instead, the Covenant Defendants used the Covenant Funds' assets to finance the sale by loaning Covenant Fund assets to Cartographer to the benefit of Covenant Defendants and to the detriment of Plaintiffs.

152.     The Covenant Defendants transferred Covenant Hospitality to Cartographer at an arbitrary price without ever trying to market that asset, even though there was an interested buyer. That inured to Shafer's and Cartographer's benefit—particularly because Shafer is attempting to get Cartographer off the ground—while plainly harming Plaintiffs' interests. Defendant Shafer closed the sale despite Plaintiffs' express instructions to the contrary.

31

153.    Defendant Cartographer knew the assets it received were the Covenant Funds' property by contract and knew the Covenant Defendants' self-interested transfer of those assets constituted a contractual breach of Covenant Defendants' fiduciary and other duties.

154.    Because of the lies involved in the Covenant Hospitality sale (and Defendant Cartographer's knowledge of those lies), rescinding the sale will assist in placing all parties in the same position they were in before the sale.

155.    The Covenant Defendants' misconduct and facilitation of the transfer of Covenant Funds' assets caused, and continues to cause, Plaintiffs actual harm for which they are entitled to rescission of the sale in addition to damages.

### COUNT XIII — INSPECTION OF BOOKS AND RECORDS
### (against the Covenant Defendants)

156.    Plaintiffs repeat and incorporate by reference each and every allegation above.

157.    The Covenant Defendants are obligated to maintain all accounts, books, records, and other relevant documents under the Agreements for each of the Covenant Funds.

158.    Pursuant to the Agreements, the Covenant Defendants are obligated, on Plaintiffs' request, to produce all accounts, books, records, and other relevant documents that the Covenant Defendants are obligated to maintain under the Agreements.

159.    Plaintiffs have requested all accounts, books, records, and other relevant documents sufficient to investigate, among other things, (a) what assets remain in the Covenant Funds; (b) whether assets have been sold at fair market value; (c) the Covenant Defendants' efforts to maximize value for Plaintiffs; (d) the Covenant Defendants' plans to complete liquidation; and (e) whether fund expenses have been properly allocated.

160.    These requests are reasonable and necessary not only because Plaintiffs have an absolute right to such documents but also to review the Covenant Defendants' liquidation efforts to date and their lack of effort to liquidate the remaining assets in the Covenant Funds.  The

requests also are necessary to review the Covenant Defendants' expenses and any commingling of expenses for Cartographer and the Covenant Funds.

161.    Plaintiffs, including through counsel, have demanded accounts, books, and records on many occasions.

162.    The Covenant Defendants have produced or made available only some very limited and non-responsive accounts, books, and records responsive to Plaintiffs' books-and-records demands. Judicial intervention is necessary and requested to enforce Plaintiffs' rights under the Agreements and to ensure that assets in the Covenant Funds are being liquidated properly.

### COUNT XIV — ACCOUNTING
### (against the Covenant Defendants)

163.    Plaintiffs repeat and incorporate by reference each and every allegation above.

164.    The Covenant Defendants, as fiduciaries, have an obligation to account to Plaintiffs for their management of the Covenant Funds and, in addition, the Agreements require the Covenant Defendants to maintain complete and accurate accounts of all transactions on behalf of the Covenant Funds and Plaintiffs.

165.    Despite demands for a full accounting of the Covenant Defendants' liquidation efforts to date, including information to confirm that reasonable market prices were obtained for the assets sold to date and an accounting of operating expenses since liquidation started, the Covenant Defendants have failed and refused to provide an accounting.

166.    Because the Covenant Defendants' have refused to provide an accounting, Plaintiffs are unable to adequately monitor the Covenant Defendants' conduct. This has caused Plaintiffs harm for which the request relief.

167.    The Court should order the Covenant Defendants to make the books, records, and other documents necessary for a full accounting of the Covenant Funds' assets available to Plaintiffs to examine, inspect, audit, and copy.

## COUNT XV — DECLARATORY JUDGMENT
### (against the Covenant Defendants)

168.    Plaintiffs repeat and incorporate by reference each and every allegation above.

169.    Under the Agreements, the General Partner/Investment Adviser is only entitled to indemnification for actions or inactions not constituting a breach of any fiduciary duty, and only if it undertakes to repay any legal fees in the event of an adverse outcome in litigation.

170.    The Covenant Defendants' actions and omissions as stated in this Petition constitute a breach of their fiduciary duties to the Covenant Funds and Plaintiffs.

171.    The Covenant Defendants knew when they committed the acts and omissions, that those acts and omissions were not in the best interests of the Covenant Funds and Plaintiffs. The Covenant Defendants could not, in good faith, have believed otherwise.

172.    The Covenant Funds and Plaintiffs are entitled to an Order declaring that the Covenant Funds are not required to indemnify the Covenant Defendants for any litigation fees and expenses incurred in connection with this litigation.

## COUNT XVI — APPOINTMENT OF LIQUIDATING RECEIVER
### (against the Covenant Funds and the Covenant Defendants)

173.    Plaintiffs repeat and incorporate by reference each and every allegation above.

174.    Due to the Covenant Defendants' actions and omissions as set forth in this Petition, including misrepresentation, fraud, self-dealing, and gross mismanagement of the Covenant Funds, a receiver should be appointed over the Covenant Funds in the place and stead of the Covenant Defendants.

175.    Pursuant to 12 OKLA. STAT. §1551, *et seq.*, this Court has the power to appoint a receiver over the assets of the Covenant Funds for the purpose of protecting the Covenant Funds' assets and Plaintiffs' rights, accounting for the assets, and distributing the assets to Plaintiffs in accordance with Partnership Agreements, governing corporate documents, applicable law, and equity.

34

176.   As a result of the foregoing, the Court should appoint a receiver of the assets of the

Covenant Funds.

**WHEREFORE**, Plaintiffs request as follows:

a.   an Order removing CFS as the General Partner/Investment Adviser of the Covenant Funds;

b.   an Order compelling the Covenant Defendants to comply with its obligations to produce all accounts, books, records, and other Covenant Funds' documents;

c.   an Order compelling Covenant Defendants to account fully for their liquidation efforts to date, including information confirming that they obtained reasonable market prices for assets sold to date and related to all operating expenses;

d.   an Order requiring the Covenant Defendants to disgorge all profits that they unjustly gained as a result of their delay in liquidating the Covenant Funds' assets, their transfer of assets to Cartographer without attempting to market those assets, and their misuse of Covenant Fund assets;

e.   an Order requiring the Covenant Defendants to disgorge all management fees they collected as a result of their failure to liquidate the Covenant Funds, self-dealing, other misuses of the Covenant Funds' assets for personal benefit, and the comingling of the Covenant Funds' and Cartographer's expenses;

f.   an Order requiring all Defendants to pay compensatory damages subject to proof at trial in an amount exceeding $10,000 along with punitive damages;

g.   an Order requiring all Defendants to disgorge all ill-gotten gains;

h.   an Order rescinding the sale of Covenant Hospitality;

i.   an Order appointing a liquidating receiver over the Covenant Funds' assets;

j.   an Order declaring that the Covenant Funds are not required to indemnify the Covenant Defendants for any litigation fees and expenses incurred in connection with this litigation;

k.   an Order requiring all Defendants to pay pre- and post-judgment interest as applicable;

l.   an Order requiring all Defendants to pay reasonable attorney's fees and costs of prosecuting this action; and

m.   such other and further relief that this Court may deem just and equitable under the facts and circumstances.

35

Dated:  Oklahoma City, Oklahoma
         September 27, 2016

Respectfully submitted,

By: _____

Cheryl P. Hunter, OBA No. 4499
HOLLADAY & CHILTON, PLLC
204 N. Robinson Ave., Ste. 1550
Oklahoma City, OK
405-236-0045  (phone)
405-236-2349 (fax)
cheryl.hunter@holladaychilton.com

-and-

Gary Svirsky
O'MELVENY & MYERS LLP
7 Times Square
New York, NY  10036
212-326-2000 (phone)
212-326-2061 (fax)
gsvirsky@omm.com

ATTORNEYS FOR PLAINTIFFS

36

Dated:  Oklahoma City, Oklahoma
        September 27, 2016

Respectfully submitted,

By:

Cheryl P. Hunter, OBA No. 4499
HOLLADAY & CHILTON, PLLC
204 N. Robinson Ave., Ste. 1550
Oklahoma City, OK
405-236-0045  (phone)
405-236-2349 (fax)
cheryl.hunter@holladaychilton.com

-and-

Gary Svirsky
O'MELVENY & MYERS LLP
7 Times Square
New York, NY  10036
212-326-2000 (phone)
212-326-2061 (fax)
gsvirsky@omm.com

ATTORNEYS FOR PLAINTIFFS

## THIRD AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## COVENANT GLOBAL ALPHA FUND, L.P.

This THIRD AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into as of January 1, 2012, and amends and restates in its entirety that certain Agreement of Limited Partnership dated as of May 6, 2008 and last amended and restated as of January 1, 2011, by and among Covenant Financial Services, LLC, an Oklahoma limited liability company doing business as Covenant Global Investors (the "General Partner"), and the persons (the "Limited Partners") who have (as Limited Partners) executed counterparts of this Agreement personally or by attorney-in-fact and who shall not have ceased to be Limited Partners (the Limited Partners and the General Partner being herein sometimes called, collectively, the "Partners" and, individually, a "Partner").

1.    **Formation**.  The Partners have formed a limited partnership (the "Partnership") under the Act.  The General Partner filed a certificate of limited partnership of the Partnership under the Act in each jurisdiction where such filing or recordation was required and shall so file or record any additional, supplemental or amended certificates of limited partnership and like documents as the General Partner may deem necessary or advisable in accordance herewith.  The Partners agree further that they shall comply with the requirements and provisions of the Act, which shall govern the rights and liabilities of the Partners, except as otherwise provided in this Agreement.

2.    **Name**.  Before the date of this Agreement, the name of the Partnership was, and its business was conducted under the name, CFS Aggressive Strategy Fund, L.P.  On and after such date, such name is hereby changed to Covenant Global Alpha Fund, L.P.

3.    **Term**.  The Partnership began on the date that this Agreement was executed (personally or by attorney-in-fact) and delivered by the General Partner and one or more Limited Partners.  The Partnership shall continue until it is terminated as herein provided.

4.    **Addresses**.

4.1    **Partnership and General Partner**.  The principal place of business and principal executive office of the Partnership is the office of the General Partner at 10914 Hefner Pointe Drive, Suite 304, Oklahoma City, OK 73120 and such other place or places as the General Partner may from time to time designate by notice to each Limited Partner.  The Partnership may also maintain such other offices at such other places as the General Partner may deem advisable.

4.2    **Limited Partners**.  The address of each Limited Partner is set forth in such Limited Partner's Subscription Agreement.  A Limited Partner may change such address by notice to the General Partner, which notice shall become effective on receipt or such later time as such notice may specify.

4.3    **Agent for Service of Process**.  The Partnership's agent for service of process in Delaware shall be The Corporation Service Company, whose address is 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.  The General Partner may change such agent for service of process or such address from time to time in the manner provided by applicable law.


EXHIBIT
1

5.    **Certain Definitions**.  As used in this Agreement, the following terms shall have the meanings indicated:

5.1    "Act" means the Delaware Revised Uniform Limited Partnership Act, as amended.

5.2    "Affiliate" means, when used with reference to a specified person, any person directly or indirectly controlling, controlled by or under common control with the specified person, any trust or foundation to which the specified person has made a majority of the grants, donations or contributions received by that trust or foundation, a person owning or controlling ten percent or more of the outstanding voting securities of the specified person, a person ten percent or more of whose outstanding voting securities are owned or controlled by the specified person, any officer, director, general partner, manager or trustee of the specified person, and if the specified person is an officer, director, general partner, manager or trustee, any corporation, partnership, limited liability company or trust for which the specified person acts in any such capacity.

5.3    "BHCA" means the Bank Holding Company Act of 1956, as amended.

5.4    "BHCA Subject Person" means any Limited Partner that is subject, directly or indirectly, to the restrictions of the BHCA.

5.5    "Business Day" means any day that is not a public holiday in the State of Oklahoma and on which the major New York stock exchanges are open for trading.

5.6    "Capital Account" means:

(a)    The individual Capital Account that the Partnership shall establish and maintain for each Partner in accordance with the following provisions:

(1)    To the Capital Account of a Partner, the Partnership shall credit that Partner's Capital Contributions, share of Profits, any items in the nature of income or gain that the Partnership specially allocates thereto pursuant to section 10.5(b) and the amount of any Partnership liabilities that the related Partner personally assumes or that are secured by any Partnership property that the Partnership distributes to that Partner;

(2)    From the Capital Account of a Partner, the Partnership shall debit the amount of cash and the fair market value, determined as provided in section 10.6, of any Partnership property that the Partnership distributes to that Partner pursuant to any provision of this Agreement, that Partner's share of Losses, any items in the nature of expenses or loss that the Partnership specially allocates thereto pursuant to section 10.5(b) and the amount of any liabilities of that Partner that the Partnership assumes or that are secured by any property that the Partner contributes to the Partnership; and

(3)    In determining the amount of any liability, the Partnership shall take into account Code section 752(c) and any other applicable provisions of the Code and Regulations.

(b)    If any interest in the Partnership is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest.

(c)    The foregoing provisions and other provisions of this Agreement relating to maintaining Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent therewith.  If the General Partner determines that

it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed to comply with Regulations section 1.704-1(b), the General Partner may make such modification if it is not likely to have a material adverse effect on amounts distributable to any Partner under this Agreement on the Partnership's dissolution. The General Partner shall adjust the amounts that the Partnership debits or credits to Capital Accounts with respect to any property that a Partner contributes to the Partnership or that the Partnership distributes to a Partner and any liabilities secured by such contributed or distributed property or that the Partnership or that Partner assumes in connection with such contribution or distribution if the General Partner determines that such adjustments are necessary or appropriate under Regulations section 1.704-1(b)(2)(iv). The General Partner also shall make any appropriate modifications if unanticipated events might cause this Agreement not to comply with Regulations section 1.704-1(b), and the General Partner shall make all elections provided for under such Regulations.

5.7    "Capital Contribution" means an investment of cash or assets contributed to the Partnership by a person that is (or thereupon becomes) a Partner, whether initially contributed or subsequently contributed as permitted hereby, but excluding loans designated as such.

5.8    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

5.9    "Election Notice" has the meaning ascribed to that term in section 13.7(f).

5.10    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

5.11    "FINRA" means the Financial Industry Regulatory Authority, Inc.

5.12    "Fiscal Period" means each period from the first day of a Fiscal Quarter, the date that a Partner makes a Capital Contribution or the day after any withdrawal from or distribution by the Partnership, to the earliest of (a) the last day of such Fiscal Quarter, (b) the day preceding the date that a Partner next makes a Capital Contribution or (c) the next date of a withdrawal from or distribution by the Partnership.

5.13    "Fiscal Quarter" means the period from the date the Partnership commences through the succeeding March 31, June 30, September 30 or December 31 (whichever is soonest), each period thereafter of three calendar months ending on any March 31, June 30, September 30 or December 31, or the period from the January 1, April 1, July 1 or October 1, whichever is the latest, preceding the date of dissolution and termination of the Partnership and ending on the date of dissolution and termination of the Partnership.

5.14    "Fiscal Year" means the period from the date the Partnership commences or commencing on any subsequent January 1, and ending on the succeeding December 31, or, if earlier, ending on the date of dissolution and termination of the Partnership.

5.15    "ICA" means the Investment Company Act of 1940, as amended.

5.16    "Illiquid Securities" means Securities that the Partnership holds that are restricted from transfer for any reason.

5.17    "Legacy Limited Partner" means (a) any Limited Partner admitted to the Partnership before January 1, 2012, (b) any person admitted as an investor before that date in any other investment pool or account managed by the General Partner, (c) any spouse, ex-spouse, parent, sibling or descendant (biological or adopted, including step-children) and other family members of such a Limited

Partner or investor, even if that person invests on or after that date, with the General Partner having the power to determine and apply this familial status test in its discretion, and (d) any assignee of any such Limited Partner or investor so long as that assignee has complied with the provisions of section 18.3 and been admitted to the Partnership as a substituted Limited Partner as described in section 18.3(c).

5.18    "Liquidating Fund" has the meaning ascribed to that term in section 9.3(f)(1).

5.19    "Majority in interest" of the Partners (or a class of Partners) means Partners (or Partners of that class) whose Ownership Percentages (as modified for consent purposes pursuant to sections 13.7 and 13.8), on the first day of the Fiscal Period during which such majority is to be determined, aggregate more than fifty percent of the Ownership Percentages (as so modified) on such date of all Partners (or Partners of that class).  For purposes of this section 5.19, Legacy Limited Partners and New Limited Partners shall not be considered separate classes of Limited Partners.

5.20    "Management Fee" means the fee payable to the General Partner pursuant to section 11.1.

5.21    "New Issue" means a Security that is included within the definition of "new issue" in FINRA Rule 5130.

5.22    "New Issue Rules" means FINRA Rules 5130 and 5131, as such Rules may be amended or replaced from time to time by FINRA, or any similar rule or interpretation of any self-regulatory organization or governmental agency or official having similar authority.

5.23    "New Limited Partner" means a Limited Partner admitted to the Partnership on or after January 1, 2012, but excludes the Legacy Limited Partners that are admitted after that date and deemed by the General Partner to be Legacy Limited Partners, as described in section 5.17.

5.24    "Opening Balance" means a New Limited Partner's Capital Account balance as of the first day of the applicable Fiscal Quarter, after deducting the Management Fee charged on that date and any Special Profit Allocation that has accrued but not yet been charged for that Fiscal Year.

5.25    "Outside Accountants" means the independent public accountants regularly engaged by the Partnership to prepare its tax returns or compile, review or audit its financial statements.

5.26    The "Ownership Percentage" of a Partner at any date means the percentage computed by dividing such Partner's Capital Account balance at that date by the aggregate of all Partners' Capital Account balances at that date, except as adjusted pursuant to section 13.7 or 13.8.

5.27    "Permitted Withdrawal Date" has the meaning ascribed to that term in section 9.3(a).

5.28    "Profits" and "Losses" mean for each Fiscal Year, Fiscal Quarter, Fiscal Period or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, Fiscal Quarter, Fiscal Period or other period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any Partnership income that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this section 5.28 shall be added to such taxable income or loss;

(b)      Any Partnership expenditures described in Code section 705(a)(2)(B) or treated as Code section 705(a)(2)(B) expenditures pursuant to Regulations section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this section 5.28 shall be subtracted from such taxable income or loss;

(c)      The initial book value of any asset contributed to the Partnership shall be its gross fair market value at the time of contribution determined as provided in section 9.1(b). The book value of all Partnership assets shall be adjusted pursuant to Regulation section 1.704-1(b)(2)(iv)(f) to equal their respective gross fair market values, determined as provided in section 10.6, as of the following times: (1) when any new or existing Partner acquires an additional interest in the Partnership; (2) when the Partnership distributes to a Partner, or a Partner withdraws, more than a de minimis amount of Partnership property, unless all Partners receive simultaneous distributions of undivided interests in the distributed property in proportion to their respective Ownership Percentages; (3) the last day of each Fiscal Period; and (4) a liquidation within the meaning of Regulations section 1.704-1(b)(2)(ii)(g). If the book value of any Partnership asset is adjusted pursuant to this section 5.28(c), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses, and gain or loss resulting from any subsequent disposition of such property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the adjusted book value of such property, notwithstanding that the adjusted tax basis of such property differs from such book value;

(d)      If the book value of any Partnership property is adjusted pursuant to section 5.28(c), then in lieu of the depreciation, amortization and other cost recovery deductions taken into account with respect to such property in computing such taxable income or loss, the Partnership shall take into account proportionate depreciation, amortization or other cost recovery deductions based on the adjusted book value of such property for such Fiscal Year or other period; and

(e)      Notwithstanding any other provision of this section 5.28, the Partnership shall not take into account in computing Profits and Losses any items that are specially allocated pursuant to sections 10.5(b) and (c), and the Partnership shall specially allocate Management Fees as expenses to the respective Capital Accounts against which they are charged and taken into account in computing Profits and Losses.

5.29      "Pro Rata Share" has the meaning ascribed to that term in section 9.3(f)(1).

5.30      "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

5.31      "Revocation Notice" has the meaning ascribed to that term in section 13.7(f).

5.32      "Securities" means securities, commodities, repurchase agreements and other intangible investment instruments and vehicles of every kind and nature, U.S. or non-U.S., whether publicly or nonpublicly traded, including, without limitation, stocks, notes, bills, bonds, debentures, subscriptions, preferred stocks, convertible securities, options (including, without limitation, covered and uncovered puts and calls and over-the-counter options), rights, warrants, swaps, units, currencies, futures, single stock futures, other commodity interests, commodity options, options on futures, certificates of deposit, trust receipts, American Depositary Receipts, global depositary receipts, equipment trust certificates, interests in partnerships and limited liability companies, certificates of interest or participation in any profit-sharing agreement, collateral trust certificates, bankruptcy claims, investment contracts, shares of investment companies, interests in real estate, natural resources (including but not limited to precious and industrial metals, rare earth materials and energy sources),

electricity, bio-fuels, agricultural products, environmental products and resources, petrochemicals and plastics, weather contracts, pollution credits, collectibles (including but not limited to diamonds and other precious stones and gems, jewelry, wine, art and antiques), evidences of indebtedness and derivative and similar transactions, including, but not limited to, transactions such as: (a) basis, buy/sell-back, interest rate, currency, cross currency, foreign exchange, commodity, credit, emissions, equity, equity index, weather, bond, option, bullion, repurchase, securities lending or total-return transactions, (b) any transaction included in the definition of "Specified Transaction" in the ISDA 1992 or 2002 Master Agreement (or any predecessor or successor thereto), (c) transactions ancillary to transactions described within this definition, (d) any other similar transaction existing now or developed in the future in the financial markets, or (e) transactions to secure, collateralize or provide credit support for any of the foregoing transactions or assets. Such transactions may be structured, where relevant, as swaps, collars, forwards, forward rate agreements, caps, floors, futures, options, options on transactions or other types of structures or combinations of structures.

5.33    "Special Profit Allocation" has the meaning ascribed to that term in section 10.4(b).

5.34    "Subscription Agreement" means any subscription agreement executed and delivered by a Limited Partner and accepted by the General Partner as a condition precedent to becoming a Limited Partner.

5.35    "Tax Matters Partner" means the tax matters partner for the Partnership appointed by the General Partner, as such term is defined in Code section 6231(a)(7).

5.36    The "Unrecouped Losses" of a New Limited Partner are all Losses allocated to that New Limited Partner's Capital Account in each Fiscal Year, reduced (but not below zero) by all Profits allocated to that New Limited Partner's Capital Account in that Fiscal Year or in any subsequent Fiscal Year. Unrecouped Losses exclude Profits and Losses allocated in any Fiscal Year before the most recent Fiscal Year that began with zero Unrecouped Losses. As an example, if there were $200 of Losses in 2012, $100 of Profits in 2013, $150 of Profits in 2014 and $200 of Losses in 2015, Unrecouped Losses at the end of 2015 would be $200 because there were zero Unrecouped Losses at the beginning of 2014. If a New Limited Partner withdraws capital or receives a distribution from the Partnership, that New Limited Partner's Unrecouped Losses are reduced to an amount equal to those Unrecouped Losses multiplied by a fraction, the numerator of which is that New Limited Partner's Capital Account balance immediately after the withdrawal or distribution and the denominator of which is that New Limited Partner's Capital Account balance immediately before the withdrawal or distribution.

6.    **Investment Activities of the Partnership**.  The purpose and business of the Partnership generally is to acquire, directly or indirectly, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in Securities, to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities held or owned by the Partnership, and to engage in any activity incidental to the foregoing, including, without limitation, borrowing and lending Securities and funds and otherwise entering into credit arrangements in connection therewith.  The Partnership may engage in these activities directly or indirectly by investing in an investment entity, such as a so-called master fund, that may or may not be an Affiliate of the General Partner.  To these ends, the Partnership may enter into, make and perform all contracts and other undertakings and engage in all activities and transactions, as the General Partner may consider necessary or advisable to carry out the foregoing objects and purposes, including, without limitation, to:

6.1    Acquire long positions or short positions in Securities, and make purchases or sales increasing, decreasing, covering and liquidating such positions;

6.2    Borrow or lend monies and obtain letters of credit without limitation as to amount, and secure the payment of any obligation of the Partnership by mortgage on, or hypothecation or pledge of, all or any part of the property of the Partnership;

6.3    Enter into credit, deposit and custodian agreements with banks, securities brokerage firms, futures commission merchants and other financial institutions (whether or not affiliated with the Partnership or the General Partner), open, maintain and close bank, brokerage and other accounts and draw checks or other orders for the payment of money or the delivery of instruments; and

6.4    Hire full- or part-time managers to manage and operate any asset of the Partnership, hire or retain persons, such as administrators, attorneys, accountants, investment advisers, industry and financial consultants, to perform services with respect thereto, and purchase insurance.

7.    **Other Activities**.

7.1    **Interests in Other Activities**.  Any Partner and such Partner's Affiliates, agents, shareholders, limited partners, members and employees may engage in any activities, whether or not related to the Partnership's business.  The Partners specifically recognize that some or all of them and their Affiliates, agents, shareholders, limited partners, members and employees are or may be engaged in various aspects of the securities business, including, without limitation, Securities portfolio management and organizing and managing other investment entities, both for their own accounts and for others.  Such Partners, Affiliates, agents, shareholders, limited partners, members and employees may continue, or initiate further, such activities.  Each Partner agrees that any Partner and any Affiliate, agent, shareholder, limited partner, member or employee of any Partner (a) is not and shall not be obligated to present any investment opportunity or prospective economic advantage to the Partnership or any Partner, even if the opportunity is of the character that, if presented to the Partnership, could be taken by the Partnership, and any Partner shall have the right to hold any investment opportunity or prospective economic advantage for such Partner's own account and to recommend such opportunity to persons other than the Partnership, (b) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for such person's own account, independently or with others, including, without limitation, any business, industry or activity in which the Partnership may be interested in investing or may also have investments and (c) may do so without any obligation to report the same to the Partnership or any Partner or to afford the Partnership or any Partner any opportunity to participate therein.  Neither the Partnership nor any Partner shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom.

7.2    **Consequences of Other Activities.**  The Limited Partners hereby acknowledge that the General Partner may be prohibited from taking action for the benefit of the Partnership: (a) due to confidential information acquired or obligations incurred in connection with an outside activity permitted under section 7.1; (b) because an Affiliate, agent, shareholder, limited partner, member or employee of the General Partner serves as an officer or director of a company in which the Partnership has invested; or (c) in connection with activities undertaken by an Affiliate, agent, shareholder, limited partner, member or employee of the General Partner.  In addition to the provisions of section 12.5, no person shall be liable to the Partnership or any Limited Partner for any failure to act for the benefit of the Partnership for one or more of the reasons described in the preceding sentence.

8.    **Waiver of Conflicts**.  The fact that any Partner, or any Affiliate of any Partner, or a member of such Partner's family, is employed by, or is directly or indirectly interested in or connected with, any person or entity employed or engaged by the Partnership, or any company in which the Partnership has invested, to render or perform a service, or from whom the Partnership or such company may make any purchase, or to whom the Partnership or such company may make any sale, or from or to whom the Partnership or such company may obtain or make any loan or enter into any lease or other

arrangement, shall not prohibit the Partnership or such company from engaging in any transaction with such person or entity, or create any additional duty of legal justification by such Partner or such person or entity beyond that of an unrelated party, and neither the Partnership nor any other Partner shall have any right in or to any revenues or profits derived from such transaction by such Partner, Affiliate, person or entity.

9.    **Capital**.

9.1    **Limited Partners' Contributions**.

(a)    **Initial and Additional Contributions by Limited Partners**.    The Partnership is authorized to offer and sell an unlimited amount of limited partner interests in the Partnership.  Each Limited Partner has contributed or shall contribute to the Partnership's capital the amount of that Limited Partner's Capital Contributions heretofore or hereafter subscribed by that Limited Partner and accepted by the General Partner on behalf of the Partnership.  The General Partner may establish such minimum initial Capital Contribution as it deems appropriate and it may waive or change that minimum thereafter.  With the General Partner's consent, any Limited Partner may make an additional Capital Contribution in an amount that the General Partner deems appropriate.  With the General Partner's consent, a Limited Partner may make Capital Contributions in amounts other than those set forth above and at any time that the General Partner permits and, in such cases, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement with the advice of the Outside Accountants.  A Limited Partner's initial or additional Capital Contributions pursuant to this section 9.1(a) shall not require any consent or approval of any other Limited Partner.  The General Partner shall have the authority to accept a Capital Contribution as of a date before the date the Capital Contribution is actually made, if it determines that deeming such Capital Contribution to have been made as of an earlier date will not have a materially adverse effect on the Limited Partners generally.

(b)    **Contributions of Assets**.  Any Capital Contribution under this section 9.1 or section 9.2 may be made in cash or, with the consent of the General Partner, by contributing assets, including Securities.  If assets are contributed, the General Partner shall determine the value of those assets for purposes of establishing the contributor's Capital Account, but under no circumstances shall that value exceed the fair market value of those assets on the date the contribution is made, determined as provided in section 10.6.  In determining the value, the General Partner may reduce that value to account for expenses, such as brokerage commissions, that the Partnership will incur when it sells such assets.  The Partnership shall be under no obligation to hold the assets contributed to it.  Each Partner contributing assets to the Partnership's capital hereby represents and warrants to the Partnership and the other Partners that such Partner is the sole and absolute owner of those assets, subject only to holding such assets of record in "street" or nominee name for such Partner's sole and exclusive benefit, that such assets have not been pledged, hypothecated or otherwise encumbered and that the Partnership will receive on completion of such contribution good and marketable title to such assets, free of all liens, claims, security interests, community property rights, restrictions on transfer and other restrictions or defects in title.

9.2    **General Partner's Contributions**.  The General Partner may contribute from time to time such amounts to the Partnership's capital as it may elect.  The General Partner's Capital Contributions may be made in cash or by contributing assets as provided in section 9.1(b).

9.3    **Withdrawals.**

(a)    **Limited Partner Withdrawals.**

(1)    **Legacy Limited Partners.**  Subject to section 9.3(c), a Legacy Limited Partner may, on at least ten Business Days' prior notice to the General Partner, withdraw all or part of its Capital Account balance as of the last day of any calendar month (each such date, a "Permitted Withdrawal Date"); provided that no partial withdrawal of less than $10,000 shall be permitted.

(2)    **New Limited Partners.**

(A)    Notwithstanding any provision herein to the contrary and subject in all cases to sections 9.3(a)(2)(B) and 9.3(c), a New Limited Partner may, on at least ten Business Days' prior notice to the General Partner, withdraw from its Capital Account balance on any Permitted Withdrawal Date; provided that the aggregate amount that a New Limited Partner may withdraw on Permitted Withdrawal Dates during any Fiscal Quarter may not exceed twenty-five percent of its Opening Balance for such Fiscal Quarter; and provided further that (i) if a New Limited Partner withdraws such maximum twenty-five percent in a Fiscal Quarter, then on Permitted Withdrawal Dates during the next Fiscal Quarter, that New Limited Partner may make aggregate withdrawals of up to thirty-three and one-third percent of its Opening Balance for that next Fiscal Quarter, (ii) if such maximum thirty-three and one-third percent is withdrawn in that second consecutive Fiscal Quarter, then on Permitted Withdrawal Dates during the next Fiscal Quarter, that New Limited Partner may make aggregate withdrawals of up to fifty percent of its Opening Balance for that next Fiscal Quarter, and (iii) if such maximum fifty percent is withdrawn in the third consecutive Fiscal Quarter, then on Permitted Withdrawal Dates during the next Fiscal Quarter, that New Limited Partner may make aggregate withdrawals of up to the full balance of its Capital Account.  In each case, ten Business Days' prior notice must be provided with respect to each Permitted Withdrawal Date on which such New Limited Partner desires to withdraw any permitted portion of its Capital Account balance.  In addition, in each case, no partial withdrawal of less than $10,000 shall be permitted, unless that amount is the maximum amount permissible to withdraw under the foregoing provisions.  If the maximum permissible amount is not withdrawn in any of those consecutive Fiscal Quarters, then the twenty-five percent withdrawal restriction again applies with respect to the next Fiscal Quarter in which a withdrawal occurs.  If, however, the New Limited Partner ever again makes withdrawals in consecutive Fiscal Quarters, the foregoing expanded limits in clauses (i) through (iii) shall always again apply, so long as the maximum permitted amount is always withdrawn in each consecutive Fiscal Quarter.  Thus, if a New Limited Partner desires to withdraw all of its Capital Account balance (subject to section 9.3(c)), it will take four consecutive Fiscal Quarters to withdraw fully.  As an example, if a New Limited Partner has an Opening Balance of $8,000,000 as of October 1, 2012 (an actual balance of $9,000,000 but with an accrued but uncharged Special Profit Allocation for 2012 of $1,000,000, resulting in an "Opening Balance" of $8,000,000 per the definition in section 5.24), and desires to withdraw its entire Capital Account balance as quickly as possible, then, subject to payment of the Special Profit Allocation as provided in section 9.3(a)(2)(B), it can withdraw an aggregate of up to $2,000,000 as of any Permitted Withdrawal Date or Dates in the fourth Fiscal Quarter of 2012. If the New Limited Partner withdraws that maximum amount and $600,000 of Profits (after deducting the Special Profit Allocation and the Management Fee) are allocated to that Capital Account in that Fiscal Quarter, then that New Limited Partner would have an Opening Balance for the first Fiscal Quarter of 2013, of $6,600,000 and one third of that Opening Balance, or $2,200,000, can be withdrawn in that Fiscal Quarter.  If that New Limited Partner withdraws that maximum amount and $400,000 of Losses (including the Management Fee) are allocated to that Capital Account in that Fiscal Quarter, then that New Limited Partner would have an Opening Balance for the second Fiscal Quarter of 2013 of $4,000,000 and one-half of that Opening Balance, or $2,000,000, can be withdrawn in that Fiscal Quarter.  If that amount is so withdrawn, then subject to sections 9.3(a)(2)(B) and

9.3(c), the balance of that Capital Account can be withdrawn in the third Fiscal Quarter of 2013. In all cases, the amount that remains in the Capital Account is at risk in the Partnership.

(B)    If a New Limited Partner makes a withdrawal as of a date other than the last day of a Fiscal Year, the Fiscal Year shall be deemed to end at the effective date of the withdrawal with respect to the amount withdrawn, and the Special Profit Allocation shall be made pursuant to section 10.4(b) with respect to that amount.

(b)    **Payment.**  Amounts withdrawn pursuant to section 9.3(a) shall be paid as follows:

(1)    Subject to section 9.3(f), withdrawals of up to ninety-five percent of a Limited Partner's Capital Account balance shall be paid within ten days after the applicable Permitted Withdrawal Date;

(2)    Subject to section 9.3(f), if a withdrawal exceeds ninety-five percent of a Limited Partner's Capital Account balance, such ninety-five percent shall be paid within ten days after the applicable Permitted Withdrawal Date and the remainder, if any, of the withdrawal shall be paid as soon as the General Partner determines that it is reasonably practicable after the Partnership receives financial statements for the Fiscal Year in which the withdrawal occurs compiled, reviewed or audited by the Outside Accountants, but the total withdrawal paid may not exceed that Limited Partner's Capital Account balance, as shown by those financial statements (and such remainder shall not earn interest or be considered to be invested in the Partnership). If the Outside Accountants determine that the amount paid by the Partnership exceeds that Capital Account balance, the Limited Partner shall forthwith, on demand by the General Partner, repay such excess to the Partnership in cash; and

(3)    Subject to section 13.7(e), the Partnership may pay any amount that a Limited Partner withdraws by assigning to the Limited Partner any of the Partnership's assets (as the General Partner selects and including an interest in a Liquidating Fund as described in section 9.3(f)), or a combination of cash and such assets, having an aggregate value at the applicable Permitted Withdrawal Date equal to the amount to be withdrawn determined in the manner set forth in section 10.6.

(c)    **Suspension of Withdrawals.**  The General Partner may suspend or limit the right of withdrawal or postpone the date of payment for any period during which (1) any exchange or over-the-counter market on which a substantial part of the Securities owned by the Partnership are traded is closed (other than weekend and holiday closings) or trading on any such exchange or market is restricted or suspended, (2) there is a state of emergency, as a result of which it is not reasonably practicable for the Partnership to dispose of its assets or to determine their value fairly, (3) any of the means normally employed in ascertaining the value of a substantial part of the Partnership's assets breaks down or when for any other reason the value of such assets cannot reasonably be ascertained, (4) the amount of requested withdrawals would (in the opinion of the General Partner) result in a disorderly liquidation of Partnership investments or a violation of the Partnership's investment policies, or (5) there are such other extraordinary circumstances, as the General Partner determines in good faith, that cause withdrawals or such payments to be impracticable under existing economic or market conditions or conditions relating to the Partnership (such as the receipt from Limited Partners of notices of withdrawal of amounts aggregating more than twenty-five percent of the Capital Account balances of all of the Partners or the inability or inadvisability, in the General Partner's opinion, to liquidate Securities). At the conclusion of such period, the General Partner shall resume permitting withdrawals as provided in the other provisions of this section 9.3 and shall resume any payments required pursuant to the other provisions of this section 9.3 as soon as reasonably practicable.

(d)     **Waivers.** The General Partner may waive the foregoing notice period or any other Limited Partner withdrawal restriction in this Agreement, or permit withdrawals and payments from Capital Accounts at times and in amounts other than those set forth above and, in addition, as provided in section 13.7. If a Limited Partner is permitted to make a withdrawal other than on a Permitted Withdrawal Date as described above, (1) the Special Profit Allocation shall be made on the date of withdrawal with respect to the amount withdrawn by a New Limited Partner, (2) payments of the withdrawn amounts shall be made as described in sections 9.3(b) and 9.3(f) as if the date of withdrawal were a Permitted Withdrawal Date, (3) the General Partner may require that Limited Partner to pay to the Partnership a withdrawal fee of up to $5,000, and (4) the General Partner shall, with the advice of the Outside Accountants, cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. No portion of the Management Fee or the expenses charged to a Limited Partner's Capital Account pursuant to section 11 shall be refunded to that Limited Partner on its withdrawal of capital.

(e)     **Deemed Withdrawals.** At the General Partner's election, a Limited Partner shall be deemed to have withdrawn from the Partnership (1) on his or her death, (2) on the entry of any court order charging that Limited Partner's interest in the Partnership with the unsatisfied amount of any judgment, (3) if that Limited Partner's interest in the Partnership vests in any other person as the result of the Limited Partner's insolvency or incapacity, (4) on notice from the Partnership to that Limited Partner indicating that the balance of that Limited Partner's Capital Account at the end of any Fiscal Year is less than the lesser of that Limited Partner's initial Capital Contribution or $200,000, unless within five days after receipt of the notice that Limited Partner makes an additional Capital Contribution to increase the balance to at least that amount, or (5) on notice given by the General Partner to that Limited Partner pursuant to section 12.4, which withdrawal shall be effective as of the end of the calendar month in which any of the events described in the preceding clauses (1)-(4) occurs, or, in the case of an event described in the preceding clause (5), on the date specified in section 12.4. Payments of the withdrawn amounts shall be made as described in sections 9.3(b) and 9.3(f) as if the date of withdrawal were a Permitted Withdrawal Date.

(f)     **Liquidating Fund for Withdrawing Limited Partner.**

(1)     If a Limited Partner withdraws any or all of that Limited Partner's Capital Account balance pursuant to this section 9.3 or is expelled pursuant to section 12.4 when the Partnership holds Illiquid Securities, the General Partner may transfer that Limited Partner's Pro-Rata Share of one or more of such Illiquid Securities to one or more separate liquidating funds (each, a "Liquidating Fund") that the General Partner may cause the Partnership to establish for withdrawing Limited Partners, in lieu of distributing to those Limited Partners the Illiquid Securities in kind or other Partnership assets. If a Limited Partner that has an interest in a Liquidating Fund makes an additional withdrawal, that Limited Partner's Pro Rata Share of any Illiquid Securities relating to that subsequent withdrawal may also be placed, at the election of the General Partner, in the same or an additional Liquidating Fund. A withdrawing Limited Partner's "Pro-Rata Share" of an Illiquid Security (or the proceeds thereof) on a Permitted Withdrawal Date is the value, as determined pursuant to section 10.6, of that Illiquid Security that the Partnership holds at the close of business on the Permitted Withdrawal Date, multiplied by a fraction, the numerator of which is the amount being withdrawn by that Limited Partner and the denominator of which is the aggregate of all Capital Account balances of the Partners on the Permitted Withdrawal Date (including amounts being withdrawn on that Permitted Withdrawal Date).

(2)     Each beneficial owner of a Liquidating Fund shall be subject to the governing documents of such Liquidating Fund, which shall include, unless waived by the General Partner, a management fee and special profit allocation in the same amounts and charged or allocated at the same times as the Management Fee and Special Profit Allocation (if any) applicable with respect to

that Limited Partner's interest in the Partnership. The other terms of a Liquidating Fund shall be substantially similar to those of the Partnership, omitting the provisions in this section 9.3(f) and except that the withdrawal and distribution rights in the Liquidating Fund shall be as the General Partner deems appropriate. Notwithstanding such similar terms, however, a Limited Partner's or former Limited Partner's interest in a Liquidating Fund or in the Illiquid Securities held by that Liquidating Fund shall not be deemed an interest in the Partnership for any purpose and shall not give that Limited Partner or former Limited Partner any rights under this Agreement that such Limited Partner or former Limited Partner would not otherwise have.

(3)    The Liquidating Fund shall hold its interest in the Illiquid Securities contributed to it until such Illiquid Securities are sold or otherwise disposed of by the General Partner on behalf of the Partnership and the Liquidating Fund, at which time the Liquidating Fund shall distribute its share of the disposition proceeds, less any accrued but unpaid management fee and special profit allocation relating to the Liquidating Fund, to the beneficial owners of the Liquidating Fund.

(g)    **General Partner Withdrawals**. The General Partner may withdraw all or part of its Capital Account balance at any time, including on dates other than Permitted Withdrawal Dates, without notice to the Partnership or the Limited Partners. Any such withdrawal shall not be subject to the other terms and conditions that apply to capital withdrawals by Limited Partners under sections 9.3(a) through (e). The Partnership shall pay to the General Partner the entire amount withdrawn within thirty days after the withdrawal date. In addition to the foregoing and the General Partner's right to receive Management Fees under section 11.1, whether or not any withdrawals are made by, or any distributions are made to, the Limited Partners, within ninety days after the end of any Fiscal Year, the General Partner shall have the right to withdraw in cash or Securities any Profits allocated to it under section 10.4 for such Fiscal Year. Any withdrawal made pursuant to the immediately preceding sentence shall be deemed effective as of the first day of the Fiscal Year in which the withdrawal occurs, and any such Profits not so withdrawn shall be credited to the General Partner's Capital Account as provided in section 10.4.

(h)    **Distributions**. In addition to the withdrawal provisions in sections 9.3(a) through (e), the General Partner shall determine the amounts, times and proportions as among the Partners of all distributions by the Partnership and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Distributions in kind shall be made at valuations determined as provided in section 10.6 and may be made by using a Liquidating Fund as described in section 9.3(f).

(i)    **Withholdings**. Each Partner acknowledges and agrees that the Partnership may be required to deduct and withhold tax or to fulfill other obligations of such Partner or the Partnership on any withdrawal or distribution under this section 9.3 or allocation under section 10.4. All amounts withheld with respect to any withdrawal, distribution or allocation to a Partner shall be treated as amounts withdrawn or distributed to such Partner for all purposes under this Agreement as of the effective date of the related withdrawal, distribution or allocation.

(j)    **Restrictions on Withdrawals and Distributions**. Any of the foregoing provisions of this section 9.3 to the contrary notwithstanding, no withdrawal or distribution shall be made (1) if such withdrawal or distribution would violate any contract or agreement to which the Partnership is then a party or any law then applicable to the Partnership, or (2) to the extent that the General Partner determines that it is necessary or advisable for the Partnership to retain any amount otherwise withdrawable or distributable to pay, or to establish a reserve for the payment of, any liability or obligation of the Partnership, whether known or unknown, liquidated, fixed, contingent or other.

9.4    **Deposit of Contributions**. Anything in this Agreement to the contrary notwithstanding, all Capital Contributions shall be paid directly to a custodian of the Partnership's assets

designated by the General Partner and shall not be paid to the General Partner. Any such payment may be made by check payable to the Partnership's account with such custodian or by wire transfer to such custodian for the Partnership's account according to wire transfer instructions furnished by the Partnership.

9.5    **Records of Contributions, Withdrawals and Distributions**. On each Capital Contribution, withdrawal or distribution as contemplated by this Agreement, the General Partner shall cause the Partnership's records to reflect accurately such Capital Contribution, withdrawal or distribution.

9.6    **No Interest**. No Partner shall be entitled to receive from the Partnership payment of any interest on any Capital Contribution.

9.7    **No Other Contributions**. Without the consent of all Partners, no Partner shall contribute any funds or other property to the Partnership's capital except as is expressly required or permitted by this Agreement.

10.    **Profits and Losses**.

10.1    **Books**. The General Partner shall maintain complete and accurate accounts in proper books of all transactions of or on behalf of the Partnership and shall enter or cause to be entered therein a full and accurate account of all transactions on behalf of the Partnership. The Partnership's books and accounting records shall be kept in accordance with such accounting principles as the General Partner may determine to be convenient and advisable.

10.2    **Accountings**. As soon as is reasonably practicable after the close of each Fiscal Year, the General Partner shall make or cause to be made a full and accurate accounting of the Partnership's affairs as of the close of that Fiscal Year and shall prepare or cause the Outside Accountants to prepare a balance sheet as of the end of such Fiscal Year, a profit and loss statement for such Fiscal Year and a statement of Partners' capital showing the respective Capital Accounts of the Partners as of the close of such Fiscal Year and, if any, the Capital Contributions of and distributions to Partners during such Fiscal Year. In addition, the General Partner shall furnish to each Partner information regarding the Partnership necessary for such Partner to complete such Partner's federal and state income tax returns. The General Partner shall also furnish a copy of the Partnership's tax returns to any Partner requesting the same, excluding the Schedules K-1 of the other Partners. On such accounting being made, Profits and Losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Partnership to the respective Partners as herein provided.

10.3    **Capital Accounts**. The Partnership shall maintain an individual Capital Account for each Partner as provided in section 5.6, section 9.3 and this section 10.

10.4    **Allocations**. Profits and Losses shall be allocated to the Partners for each period described below, as follows:

(a)    **Allocations Generally**. Subject to the provisions below regarding the Special Profit Allocation and the special allocations in section 10.5, all Profits and Losses for each Fiscal Period shall be allocated to the Capital Accounts of the Partners in proportion to their respective Ownership Percentages as of the first day of such Fiscal Period.

(b)    **Special Profit Allocation**. Notwithstanding the foregoing, for the applicable measurement period described below, the General Partner shall receive a Special Profit Allocation (the "Special Profit Allocation") with respect to each New Limited Partner equal to twenty percent of the amount by which the Profits (including realized and unrealized gains and losses) otherwise

allocable to that New Limited Partner's Capital Account in that measurement period exceed that New Limited Partner's remaining Unrecouped Losses. The Partnership shall make the Special Profit Allocation at the end of each Fiscal Year with respect to that Fiscal Year; provided, however, that if a New Limited Partner withdraws or is otherwise distributed all or any portion of that New Limited Partner's Capital Account balance on a date other than the last day of a Fiscal Year, consistent with section 9.3(a)(2)(B), the Partnership shall make the Special Profit Allocation with respect to that New Limited Partner for the portion of the applicable Fiscal Year ending on the withdrawal or distribution date with respect to the amount withdrawn or distributed.

(c)    **Debit and Credit of the Special Profit Allocation**. As of the end of each Fiscal Year or other period described in section 10.4(b), the Partnership shall debit the Special Profit Allocation from each New Limited Partner's Capital Account. The total amount so debited shall be concurrently credited to the General Partner's Capital Account. The General Partner may cause all or a portion of the Special Profit Allocation to be allocated to another Partner in any period, including a Limited Partner, without notice to the Limited Partners.

(d)    **Assignment and Waiver**. The General Partner may assign its right to receive the Special Profit Allocation to any other person or entity, and it may waive all or any portion of the Special Profit Allocation with respect to any New Limited Partner in any period without notice to the Limited Partners.

10.5    **Special Capital Account Allocations**. Notwithstanding the allocation provisions of section 10.4, the following special allocations shall be made in allocating Profits and Losses:

(a)    **New Issues**. The General Partner may cause the Partnership to invest in, hold, sell, transfer or otherwise dispose of one or more New Issues. Anything in section 10.4 to the contrary notwithstanding, the General Partner shall specially allocate the Profits and Losses that relate to New Issues in a manner that it determines is consistent with section 10.4 to the extent permitted under the New Issue Rules or appropriate to ease the administrative or other burdens of applying these provisions. Consistent with the preceding sentence, the General Partner may elect not to allocate any New Issue Profits and Losses to persons defined as "restricted persons" under the New Issue Rules, notwithstanding the fact that an allocation to such persons might be permitted under the New Issue Rules.

(b)    **Section 704 Allocations**. Special allocations shall be made as the General Partner considers necessary to comply with the requirements of Code section 704 and the Regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions therein.

(c)    **Tax Allocations**.

(1)    Subject to section 10.5(c)(2), in each Fiscal Year, items of income, deduction, gain, loss or credit that are recognized for income tax purposes shall be allocated among the Partners, General and Limited, in a manner that reflects equitably amounts credited to or debited against the Capital Account of each Partner, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership shall establish and maintain records that show the extent to which the Capital Account of each Partner comprises, as of the last day of each Fiscal Year, amounts that have not been reflected in the taxable income of such Partner. To the extent that the General Partner deems it feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits.

(2)      Notwithstanding any of the foregoing provisions to the contrary, if a Partner withdraws capital during a Fiscal Year, the General Partner may elect to make allocations of taxable income and loss as follows:

(A)      The Partnership may first allocate taxable income or gain to each Partner who has withdrawn or been distributed all or part of that Partner's Capital Account balance in that Fiscal Year, to the extent that such withdrawal or distribution exceeds that Partner's adjusted tax basis in that Partner's interest in the Partnership immediately before such withdrawal or distribution. If more than one Capital Account has been so withdrawn or distributed in full or in part, such allocations, if made, shall be made to the extent of and in proportion to such differences;

(B)      The Partnership may first allocate taxable loss or deduction to each Partner who has withdrawn or been distributed all of that Partner's Capital Account balance in that Fiscal Year, to the extent that that Partner's adjusted tax basis in that Partner's interest in the Partnership exceeds that Capital Account balance immediately before such withdrawal or distribution. If more than one Capital Account balance has been so withdrawn or distributed, such allocations, if made, shall be made to the extent of and in proportion to such differences; and

(C)      Thereafter, the Partnership may allocate taxable income and loss as provided in section 10.5(c)(1).

(3)      The General Partner shall make any elections or other decisions relating to such allocations, or computations of taxable income, in any manner that reasonably reflects the purpose and intention of this Agreement and shall be binding on all Partners. Allocations pursuant to this section 10.5(c) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Capital Account or share of Profits, Losses or other items of any Partner, or distributions to any Partner, pursuant to any provision of this Agreement.

(d)      **Other Allocation Rules**.

(1)      Generally, all Profits and Losses shall be allocated among the Partners as provided in section 10.4 and this section 10.5. If Partners are admitted or make Capital Contributions to the Partnership on different dates during any Fiscal Year, the Profits or Losses for each such Fiscal Year shall be allocated in accordance with Code section 706, using any convention permitted by law and selected by the General Partner.

(2)      For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as the General Partner determines using any permissible method under Code section 706 and the Regulations thereunder.

(3)      The Partners acknowledge that they are aware of the income tax consequences of the allocations made by this section 10.4 and this section 10.5 and hereby agree to be bound thereby in reporting their shares of Profits and Losses for income tax purposes.

(4)      Notwithstanding any of the foregoing provisions to the contrary, if taxable gain to be allocated includes income resulting from the sale or disposition of Partnership property or property of a limited partnership or joint venture in which the Partnership owns an interest that is treated as ordinary income, such gain so treated as ordinary income shall be allocated to and reported by each Partner in proportion to allocations to that Partner of the items that gave rise to such ordinary income, and the Partnership shall keep records of such allocations. In the event of the subsequent admission of any new Partner, any item that would constitute "unrealized receivables" under

Code section 751 and the Regulations thereunder shall not be shared by the newly admitted Partners, but rather shall remain allocated to existing Partners.

(e) **Provisional Allocation**. If any amount that the Partnership claims to constitute a deductible expense in any Fiscal Year is treated by any federal, state or local taxing authority as a payment to a Partner in that Partner's capacity as a member of the Partnership for income tax purposes, with regard to that authority, items of Partnership income and gain for such Fiscal Year shall first be allocated to that Partner to the extent of such payment.

10.6 **Valuation**. The General Partner shall determine the value of the Partnership's assets and liabilities in good faith. Such determination shall be conclusive and binding on all of the Partners and all parties claiming through or under them.

10.7 **Bank and Other Accounts**. All Partnership funds shall be deposited and maintained in one or more accounts in the Partnership's name at such bank or banks or other financial institutions (including, without limitation, money market mutual funds and instruments, futures commission merchants and securities brokerage firms) as the General Partner may select. All withdrawals from any such account or accounts shall be made only by written instrument signed by or on behalf of the General Partner.

11. **General Partner's Management Fee and Expenses**.

11.1 **Management Fee**. As compensation to the General Partner for its services in managing the Partnership's investments, on the first day of each Fiscal Quarter an amount shall be deducted from the Capital Account of each Limited Partner and paid as a Management Fee to the General Partner. Such amount shall equal (a) with respect to New Limited Partners, 0.375 percent of that Capital Account balance and (b) with respect to Legacy Limited Partners, 0.375 percent on the first $2 million of that Capital Account balance, 0.3125 percent on the next $3 million of that Capital Account balance and 0.25 percent of that Capital Account balance that exceeds $5 million. In the case of both New and Legacy Limited Partners, the Capital Account balance shall be based on the value of the assets and liabilities of the Partnership determined as of that date pursuant to section 10.6. A Limited Partner whom the General Partner permits to contribute capital on a date other than the first day of a Fiscal Quarter shall be charged a prorated Management Fee with respect to such Capital Contribution on the date the Capital Contribution is made. A Limited Partner who is permitted to withdraw or is distributed capital on a date other than the last day of a Fiscal Quarter shall receive a refund of any Management Fee paid in advance. The General Partner may assign its right to receive the Management Fee to any other person or entity, and it may waive all or any portion of the Management Fee with respect to any Limited Partner in any Fiscal Quarter without notice to the Limited Partners.

11.2 **Expenses**. The Partnership shall bear all costs and expenses incidental to its organization and ongoing operation including, without limitation, all:

(a) Trading expenses (such as brokerage commissions and charges, expenses relating to short sales, clearing and settlement charges, option premiums and custodial and service fees);

(b) Interest and commitment fees on loans and debit balances (on margin or otherwise);

(c) Expenses of negotiating and entering into contracts and arrangements and making investments (such as brokerage, legal, accounting, investment banking, appraisal and other professional and consulting fees and expenses arising from particular investments and potential investments) and similar expenses in terminating those contracts and arrangements and disposing of those investments;

(d)    Expenses incurred in visiting companies and attending research and investment conferences (for example, airfare, hotel accommodations and meals);

(e)    Expenses of registering the Partnership's restricted Securities;

(f)    Expenses incurred in attempting to protect or enhance the value of the Partnership's investments (including the expenses of instituting and defending lawsuits);

(g)    Income, withholding and transfer taxes, and other governmental charges and duties;

(h)    Fees of custodians, clearing agencies and banks;

(i)    Administration, bookkeeping, recordkeeping, legal, accounting, auditing, tax preparation and all professional, expert and consulting fees and expenses arising in connection with the Partnership's activities (and computer hardware and software related thereto), including without limitation:

(1)    Fees and expenses of counsel for the Partnership, the General Partner or one or more officers or managers of the General Partner;

(2)    Expenses related to research (including third-party research fees), and portfolio management and quotation services and equipment (and computer hardware and software related thereto); and

(3)    Fees and expenses of accounting, bookkeeping and recordkeeping services of the Partnership's administrator or any similar service provider that the General Partner retains to assist it in performing these services for the Partnership;

(j)    Fees and expenses of offering and selling Limited Partner interests and communicating with existing and prospective Limited Partners (including, without limitation, legal and accounting fees and expenses, governmental and self-regulatory agency filing fees, and travel expenses, such as airfare, hotel accommodations and meals);

(k)    Expenses of investing the Partnership's assets indirectly, such as through a partnership or other entity (a so-called "master fund"), including the Partnership's proportionate share of the costs and expenses of organizing and operating the master fund;

(l)    Premiums and other expenses of insurance policies that the General Partner considers appropriate, insuring the Partnership, the General Partner and their Affiliates against liabilities that may arise in connection with the business or management of the Partnership;

(m)    Proxy voting service expenses;

(n)    Contingencies for which the General Partner determines reserves are required; and

(o)    Extraordinary expenses (such as litigation expenses).

The Partnership shall reimburse the General Partner for any of these expenses that are paid directly by the General Partner. Except as described above, the General Partner shall bear all of its operating, general, administrative and overhead expenses and shall not otherwise charge the Partnership for them, except that these expenses, together with any of the Partnership's expenses, may be paid by securities

brokerage firms and futures commission merchants to which the General Partner directs the Securities trades of the Partnership and any other accounts that the General Partner manages as further provided in section 12.1(h).

12.    **The General Partner**.

12.1    **Management**.  Subject only to the rights of the Limited Partners to consent on specific matters as herein provided, the General Partner shall have full, exclusive and complete authority in managing and controlling the Partnership's activities for the purposes herein stated and shall make all decisions affecting the Partnership.  The powers of the General Partner on behalf and at the expense (subject to section 11.2) of the Partnership include, but are not limited to, the power to:

(a)    Expend the Partnership's capital and revenues to further its affairs;

(b)    Enter into, execute and deliver stock, bond, debenture, note, option, derivative and other Securities subscription, purchase and sale agreements, participation agreements, assignments, brokerage agreements, custodian agreements and any and all other agreements, documents or instruments that the General Partner deems to be necessary or appropriate to perform its duties effectively and properly or exercise its powers under this Agreement;

(c)    Purchase, hold, sell (long or short), borrow or otherwise trade or deal in Securities;

(d)    Sell (long or short), borrow, lend, dispose of, trade or exchange the Partnership's assets for such consideration and on such other terms and conditions and evidenced by such documents or instruments as the General Partner deems appropriate;

(e)    Open and maintain deposit, checking, money market, custodial and margin accounts with securities brokers and futures commission merchants and custodial accounts with banks, securities brokers, futures commission merchants and other financial institutions;

(f)    Designate one or more securities brokers and futures commission merchants to maintain Securities for the Partnership in the names of nominees of such brokers and futures commission merchants;

(g)    Borrow money and Securities from banks, securities brokers, futures commission merchants and other financial institutions for any Partnership purpose and, in connection therewith, mortgage, pledge or hypothecate any Partnership assets, to secure repayment of the borrowed sums, and no bank, securities broker, futures commission merchant, other financial institution or other person to which application for a loan is made by the General Partner shall be required to inquire as to the purposes for which such loan is sought, and as between the Partnership and such bank, securities broker, futures commission merchant or other financial institution or person, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for purposes authorized hereunder;

(h)    Enter into brokerage agreements with brokerage firms and futures commission merchants (whether or not affiliated with the Partnership or the General Partner), to execute or effect trades for the Partnership's account and to make arrangements with those firms whereby the General Partner agrees to direct trades for the Partnership's account to those firms, to interpose those firms as agents in principal transactions, including principal transactions in which the executing broker rebates a portion of its markup to such firms, or to pay those firms additional compensation on transactions made through electronic crossing networks or other alternative securities exchanges, in exchange for certain non-monetary benefits offered by those firms which may include, among other things, referring prospective investors in the Partnership or any other account managed by the General

Partner or any of its Affiliates, research reports, services and conferences, economic and market information, portfolio strategy advice, industry and company comments, technical data, consultations, performance measuring data, on-line pricing, special execution capabilities, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, order of call, offering to the General Partner on-line access to computerized data regarding clients' accounts, computerized trading systems, clearance, settlement, reputation, financial strength and stability, efficiency of execution and error resolution, quotation services, the availability of stocks to borrow for short trades, custody, recordkeeping and similar services, and other matters involved in the receipt of brokerage services generally. The General Partner also may purchase from a broker or futures commission merchant or allow a broker or futures commission merchant to pay for all or a portion of the Partnership's or the General Partner's or its Affiliates' costs and expenses of operation, such as newswire and data processing charges, proxy voting services, quotation services, periodical subscription fees, third-party research fees, computer hardware and software related to research, all costs and expenses of offering and selling Limited Partner interests and communicating with existing and prospective Limited Partners (including travel expenses, such as airfare, hotel accommodations and meals, legal and accounting fees and expenses and government and self-regulatory agency filing fees), all costs and expenses incurred in visiting companies and attending research and investment conferences (including airfare, hotel accommodations and meals), accounting and administrative fees (including the expenses of the accounting and bookkeeping services of third party vendors that provide such services), legal fees, and the like, whether or not such costs or expenses are within the safe harbor provided by section 28(e) of the Securities Exchange Act of 1934, as amended, or any provision subsequently adopted thereunder or by a securities regulator in connection therewith;

(i)     Engage and compensate such employees, agents, lawyers, accountants, brokers, futures commission merchants, investment advisers, administrators and other professionals, consultants, experts and contractors, as the General Partner may consider advisable in conducting the Partnership's affairs (including, but not limited to, delegating part or all of its duties to any such person);

(j)     Appoint additional or successor general partners of the Partnership without the consent of any of the Limited Partners;

(k)     Maintain adequate office facilities, records and accounts of all operations and expenditures and furnish the Limited Partners with all reports and statements of account required to be furnished to them pursuant hereto or that the General Partner deems advisable;

(l)     Purchase and maintain such insurance policies as the General Partner may consider appropriate, insuring the Partnership, the General Partner and its Affiliates against liabilities that may arise in connection with the business or management of the Partnership;

(m)     Collect amounts due to the Partnership, enforce the Partnership's rights, seek to recover compensation for injury or damage to the Partnership or to prevent such injury or damage through litigation or other means and engage and compensate lawyers, expert witnesses and others in connection therewith;

(n)     Solicit proxies, institute or participate in tender offers or take other actions under federal or state securities laws or state corporate laws as the General Partner deems advisable;

(o)     Establish reserves for the payment of any Partnership liability or obligation, whether known or unknown, liquidated, fixed, anticipated, contingent or other; and

(p)     Do or perform such other acts and things as the General Partner deems advisable and in the Partnership's interests.

12.2    **Exceptions.**  Notwithstanding anything to the contrary in section 12.1, but subject to section 19, the General Partner shall not take direct possession or custody of cash or Securities held for the Partnership's account and no act in contravention of this Agreement may be legally done without the consent of the General Partner and a majority in interest of the Limited Partners.

12.3    **General Partner's Discretion; Power to Bind**.  The General Partner may exercise any and all of its rights, powers, authority and discretion under this Agreement or the Act in its absolute and exclusive discretion, and the General Partner is authorized and empowered to grant or give any consent, approval or authorization, make any determination or do or perform any other act or thing conditionally or unconditionally, arbitrarily, or inconsistently in varying or similar circumstances, without any accountability to the Partnership or any other Partner, except only as otherwise specifically and expressly provided by this Agreement or the Act notwithstanding this Agreement.  The General Partner shall have exclusive authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the Partnership in the ordinary course of the Partnership's business and otherwise within the scope of its powers and authority as herein provided; provided that, if the General Partner should incur any obligation in the name or on the credit of the Partnership contrary to section 12.1 or 12.2 or this section 12.3, the Partnership may hold it liable for the entire amount of the obligation so incurred.  If one or more persons shall be admitted to the Partnership as additional general partners pursuant to this Agreement, each such general partner acting alone shall have all of the authority, rights and powers of the General Partner.

12.4    **Expelling Limited Partners.**

(a)    **Generally**.  The General Partner may at any time expel all or any portion of the Capital Account balance of any Limited Partner from the Partnership, with or without cause, on notice to that Limited Partner specifying the effective date of such expulsion and the amount of that Limited Partner's Capital Account balance so expelled.  In the event of such expulsion, the expelled Limited Partner shall be deemed to have withdrawn the portion of its Capital Account balance stated in such notice as provided in section 9.3(a), effective as of the date fixed therefor by the General Partner.

(b)    **ICA and ERISA Expulsion**.  If the General Partner determines at any time that:

(1)    The participation by any Limited Partner that is a corporation, partnership, limited liability company, trust or other entity may cause the Partnership not to be excluded from the definition of "investment company" under ICA section 3(c)(1); or

(2)    The participation by any Limited Partner may cause Partnership assets to be deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder,

then, at the General Partner's election and effective as of any date that the General Partner determines, that Limited Partner may be deemed to have given notice of withdrawal pursuant to section 9.3(a) of such portion or all of that Limited Partner's Capital Account balance as the General Partner determines is necessary or advisable; provided that such date may be before or after the time that the General Partner makes such determination.  Such withdrawal shall be consummated as provided in section 9.3 to the maximum feasible extent, except that the Partnership shall not charge the withdrawal fee described in section 9.3(d)(3).  The General Partner shall promptly notify the affected Limited Partner of the General Partner's determination under this section 12.4(b).  For purposes of this section 12.4(b), any Limited Partner that is a corporation, partnership, limited liability company, trust or other entity and that is an

"investment company" under the ICA or that relies on the exclusion from the definition of an investment company provided by ICA section 3(c)(1) or 3(c)(7) and that has an Ownership Percentage of ten percent or more of the Ownership Percentages of all Limited Partners shall inform the General Partner of the number of beneficial owners of its outstanding securities. Thereafter, that Limited Partner shall inform the General Partner immediately if that number changes.

12.5    **Indemnity and Limitation of Liability**.

(a)    **Indemnification and Limitation of Liability.** The General Partner, any of its Affiliates, any person acting on behalf of the General Partner or such Affiliate and any person that controls the General Partner within the meaning of section 15 of the Securities Act of 1933, as amended, or section 20 of the Securities Exchange Act of 1934, as amended (each, an "indemnitee")

(1)    Shall be indemnified by the Partnership from and against any cost, claim, liability, damage, loss, settlement or expense (including, without limitation, all court costs, legal and expert witness fees and expenses and all costs of investigation, taxes and penalties) incurred or suffered by the indemnitee by virtue of the indemnitee's acting as or on behalf of the General Partner for the Partnership in connection with the Partnership's activities; and

(2)    Shall not be liable to the Partnership or any Partner for any cost, claim, liability, damage, loss, settlement or expense incurred or suffered in connection with the Partnership's activities, including, without limitation, any (A) failure to obtain the lowest brokerage commission rates, failure to combine or arrange orders to obtain the lowest brokerage commission rates with respect to any transaction on behalf of the Partnership, or failure to recapture any brokerage commissions for the benefit of the Partnership; (B) error in judgment with respect to the Partnership; (C) trade error made by any indemnitee in connection with any transaction on behalf of the Partnership; or (D) tax liability asserted against any Partner by any federal, state or local authority as a result of any position taken by the Partnership or any Partner.

(b)    **Exclusions.** Notwithstanding the foregoing sections 12.5(a)(1) and (2), if such cost, claim, liability, damage, loss, settlement or expense arises out of any action or inaction of the indemnitee, the indemnitee must have believed at the time of such action or inaction, in good faith, that such course of conduct was in the interests of the Partnership, and such course of conduct must not have constituted a breach by the indemnitee of any fiduciary duty that the indemnitee may have to the Partnership (for these purposes, a failure described in section 12.5(a)(2)(A), an error in judgment described in section 12.5(a)(2)(B), a trading error described in section 12.5(a)(2)(C) or a tax position described in section 12.5(a)(2)(D) shall not be deemed a breach of an indemnitee's fiduciary duty), and such indemnification shall be available only as and to the extent that it is not prohibited by applicable law governing rights of indemnification.

(c)    **Advancing Legal Fees.** If the General Partner approves, the Partnership shall, on demand, pay all costs, expenses, attorneys' and expert witness fees as and when incurred by the indemnitee in connection with any such cost, claim, liability, damage, loss, settlement or expense if the indemnitee undertakes to repay the same to the Partnership if a court of competent jurisdiction finally determines that the indemnitee shall not have been entitled to indemnification hereunder.

(d)    **Related Issues.** Such payment, indemnification or amounts recoverable under the foregoing provisions shall only be recoverable out of the assets of the Partnership, and the Limited Partners shall not be personally liable therefor. If under section 12.5(c), the General Partner approves the advance of costs, expenses, or attorneys' or expert witness fees incurred by an indemnitee, the General Partner, on behalf of the Partnership, shall be entitled to assume the defense of the related litigation or proceeding with counsel of the General Partner's choice (in which case the Partnership shall

not be responsible under the foregoing indemnity for the fees and expenses of any separate counsel retained by the indemnitee if the indemnitee is not the General Partner); provided that such counsel shall be reasonably satisfactory to the indemnitee. Notwithstanding the General Partner's election to assume the defense of such litigation or proceeding, the indemnitee (if such person is not the General Partner) shall have the right to employ separate counsel and to participate in the defense of such litigation or proceeding, and the Partnership's indemnification obligation hereunder shall apply to the fees, costs and expenses of such separate counsel, if the representation of both parties by counsel that the General Partner selects to represent such indemnitee would constitute a conflict of interest for such counsel. The rights granted under this section 12.5 shall not be affected by, and shall survive, the Partnership's dissolution or termination and any Partner's death, disability, incapacity, withdrawal, insolvency or dissolution. In addition, such rights shall not be deemed to be exclusive of any other rights any indemnitee may have under any agreement, as a matter of law, in equity or otherwise.

        12.6    **Tax Matters Partner**. The General Partner is hereby appointed as the Tax Matters Partner. The General Partner may remove and replace the Tax Matters Partner from time to time.

        12.7    **Transactions with Affiliates**.

        (a)    **Agency Cross Transactions**. The General Partner shall have authority to effect on the Partnership's behalf at any time and from time to time any "agency cross transaction for an advisory client" (as defined in Rule 206(3)-2 under the Investment Advisers Act of 1940, as amended) with respect to purchases and sales of Securities by or on behalf of the Partnership with or through the General Partner or any Affiliate that is registered as a broker or dealer under section 15 of the Securities Exchange Act of 1934, as amended; provided that the authority granted in this section 12.7 may be revoked at any time by the General Partner or the consent of a majority in interest of the Limited Partners. Each Limited Partner acknowledges and consents that the General Partner may use such authority to rebalance the Partnership's account and the other accounts that the General Partner or its Affiliates manage, to reflect Capital Contributions and withdrawals and for other purposes consistent with the objectives of the Partnership and such other accounts.

        (b)    **Principal Transactions**. The General Partner may establish a committee of three Limited Partners that are not Affiliates of the General Partner to consider and consent, on behalf of the Limited Partners, to any purchase from or sale to the Partnership of any Security by the General Partner or any of its Affiliates, to the extent that the General Partner deems necessary or appropriate under the Investment Advisers Act of 1940, as amended. Such committee shall act by the unanimous vote or consent of its members. The General Partner may remove or replace a committee member at any time and may fill any vacancy on the committee. Each Limited Partner authorizes such committee to act on its behalf.

        13.    **Rights of Limited Partners**.

        13.1    **Limited Liability**. No Limited Partner shall be subject to assessment, nor except as may be otherwise required under the Act notwithstanding this Agreement, shall any Limited Partner be personally liable for any of the debts or liabilities of the Partnership or any of the losses thereof in excess of such Limited Partner's Capital Contributions and any undistributed income attributable to such Limited Partner.

        13.2    **Management**. No Limited Partner, as such, shall take part in managing or transacting any business for the Partnership or have power to sign for or bind the Partnership to any agreement, oral or written, or any instrument or other document; provided that no vote or consent of the Limited Partners that is specifically authorized hereby shall be deemed to violate this provision. The

Limited Partners shall not have any voting rights other than as expressly provided in this Agreement and, accordingly, the Limited Partners shall not have the power to remove a General Partner.

13.3 **No Meetings; All Actions by Written Consent**. No meetings of the Partners shall be held and, instead, all votes or consents that the Limited Partners are required or permitted to take shall be taken by a consent in writing, setting forth the action so taken, signed by Partners having not less than the aggregate Ownership Percentage that would be necessary to authorize or take that action.

13.4 **Record Date**. So that the Partnership may determine the Partners of record entitled to consent, or entitled to receive any distribution or to exercise any rights with respect to any other lawful action, the General Partner may fix, in advance, a record date, which is not more than sixty or less than ten days before the date on which the first written consent is given and not more than sixty days before any other action. If no record date is fixed the record date shall be the day on which the first written consent is given. The record date for determining Partners for any other purpose shall be at the close of business on the day on which the General Partner adopts it, or the sixtieth day before the date of the other action, whichever is later.

13.5 **Records**. The General Partner shall maintain and preserve during the Partnership's term at its principal executive office all accounts, books, records and other relevant Partnership documents, including, without limitation, all of the same required by applicable law to be maintained and preserved.

13.6 **Inspection**. Each Limited Partner has the right, subject to such reasonable standards as are set forth in this section 13.6 or that the General Partner otherwise establishes from time to time, to obtain from the General Partner from time to time on reasonable demand, for any purpose reasonably related to that Limited Partner's interest as a Limited Partner, any information required to be maintained by section 13.5, except that no Limited Partner shall have the right to obtain (a) the Partnership's daily trading records or (b) the name and address of any current or former Limited Partner. Any such demand shall be in writing and shall state the purpose of such demand. The General Partner, however, has the right to keep confidential from Limited Partners for such periods as the General Partner deems reasonable any information that the General Partner reasonably believes to be in the nature of trade secrets or other information (such as, for example, the identity of the Partnership's portfolio positions) the disclosure of which the General Partner believes is not in the Partnership's best interests or could damage the Partnership or its business, or that the Partnership is required by law or agreement with a third party to keep confidential.

13.7 **Bank Holding Company Act Subject Persons**. Notwithstanding any other provision of this Agreement to the contrary:

(a) **Notice**. Any Limited Partner that is or becomes a BHCA Subject Person shall immediately inform the General Partner in writing that it is a BHCA Subject Person.

(b) **Nonvoting Interests**. Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has an Ownership Percentage in excess of four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners entitled to participate in giving any consent or taking any action, shall be deemed, for voting purposes only, to hold an Ownership Percentage of only four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners (after giving effect to the limitations imposed by this section 13.7 on all such Limited Partners), and the voting rights with respect to the Ownership Percentage in excess of said four and nine-tenths percent shall be

deemed held by the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(c)     **Limited Right to Consent**. Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(d)     **Special Right of Withdrawal**. Promptly on receipt from any Partner of a notice of intention to withdraw any portion of such Partner's Capital Account balance pursuant to this Agreement and before consenting to any such withdrawal that requires the General Partner's consent or giving a notice of the General Partner's intention to expel a Partner's interest in the Partnership pursuant to the provisions of this Agreement governing expulsions, if such withdrawal or expulsion would result in a BHCA Subject Person, along with any of its Affiliates identified as such to the General Partner, having an Ownership Percentage in excess of twenty-four and nine-tenths percent, even if such BHCA Subject Person shall not have given the General Partner an Election Notice or, having given an Election Notice, shall thereafter have given a Revocation Notice, the General Partner shall so notify such BHCA Subject Person, which shall have the right to withdraw, at the time of the withdrawal or redemption giving rise thereto or as soon thereafter as is practical, so much of its Capital Account balance, after giving effect to any other withdrawals or redemptions (including withdrawals by other BHCA Subject Persons), as shall be required to reduce the Ownership Percentage of such BHCA Subject Person and any of its Affiliates identified as such to the General Partner to no more than twenty-four and nine-tenths percent. If any BHCA Subject Person has a right to withdraw a portion of its Capital Account balance under the preceding sentence but does not exercise that right, the General Partner may require such BHCA Subject Person to make a withdrawal to reduce the Ownership Percentage of such BHCA Subject Person and any of its Affiliates identified as such to the General Partner to no more than twenty-four and nine-tenths percent. Payments of the withdrawn amounts shall be made as described in sections 9.3(a) and (b) as if the date of withdrawal were a Permitted Withdrawal Date.

(e)     **Distributions in Kind**. The General Partner shall give at least fifteen days' prior notice to each Limited Partner that is a BHCA Subject Person of any proposal to distribute property in kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in kind to the extent that such Limited Partner advises the General Partner at least five days before the date set forth in such notice for such distribution that such distribution could reasonably be expected to cause it to violate the BHCA, but instead such Limited Partner shall receive other assets of equal value, the receipt of which will not cause such Limited Partner to violate the BHCA.

(f)     **Election**. A Limited Partner that is a BHCA Subject Person and that elects to be subject to sections 13.7(b) and (c) shall notify the General Partner thereof (an "Election Notice") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to sections 13.7(b) and (c) until ninety days after such Limited Partner notifies the General Partner that it elects no longer to be subject to sections 13.7(b) and (c) (a "Revocation Notice"), which ninety-day period may be reduced by the General Partner; provided that each such notice shall be accompanied by the Limited Partner's certification that such notice and any action by the General Partner in reliance thereon and in accordance with this Agreement is duly authorized under all applicable laws, rules and regulations.

13.8     **Voting Rights**. With the General Partner's consent, a Partner may waive all or any portion of the voting rights that this Agreement or the Act confers on that Partner. If a Limited

Partner and the General Partner agree to any such waiver, then, for voting purposes only, the portion of such Limited Partner's Ownership Percentage with respect to which voting rights are waived shall be deemed held by the Limited Partners who have not waived any of their voting rights, pro rata in proportion to their respective Ownership Percentages.

13.9    **Confidentiality**. The General Partner will deliver to the Limited Partners copies of the Partnership's financial statements and other information regarding the Partnership. Each Limited Partner shall use those financial statements and other information, including any information provided under section 13.6, only to further its interests as a Limited Partner and, except for disclosures required by applicable law, shall maintain the confidentiality of those financial statements and that other information. Notwithstanding the foregoing, a Limited Partner (and each of its employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and any materials provided to the Limited Partners relating to such tax treatment and structure.

14.    **Nature of Limited Partners' Liabilities for Claims Against the Partnership**. The parties intend that each Limited Partner shall be liable to creditors only for such Limited Partner's Capital Contributions and undistributed Profits. Therefore, (a) the General Partner shall arrange to prosecute, defend, settle or compromise such actions at law or in equity at the Partnership's expense as it may consider necessary to enforce or protect the Partnership's interests and (b) the General Partner shall satisfy any judgment, decree, decision or settlement under the terms of which the Partnership (or the General Partner, or any Affiliate of the General Partner, on behalf of the Partnership) is obligated to pay any amount, first, out of available proceeds of any insurance of which the Partnership is the beneficiary, next, out of Partnership assets and income, and, finally, out of the General Partner's assets and income; provided that if any such payment is made out of the General Partner's assets or income, the General Partner shall be entitled to reimbursement from the Partnership, with interest from the date of payment at the rate provided by statute for interest on judgments.

15.    **Costs of Special Services**. A Limited Partner shall pay any costs incurred in connection with special services requested by that Limited Partner. Such services would include, for example, those that would benefit the Limited Partner but would not benefit the Partnership, such as a special evaluation or financial accounting for the purposes of estate valuation and legal fees and other expenses relating to assigning or transferring an interest in the Partnership. If that Limited Partner does not pay the costs of such services promptly after the General Partner's request for payment, the General Partner may deduct the amount thereof from that Limited Partner's Capital Account balance and pay such amount to the person entitled thereto.

16.    **Withdrawal of General Partner; Additional and Successor General Partner**.

16.1    **Withdrawal, Etc**. A person shall cease to be a General Partner on the happening of any of the following events:

(a)    Such person withdraws as a General Partner by notice to the Partnership;

(b)    An order for relief against such person is entered under Chapter 7, Chapter 11 or Chapter 13 of the federal bankruptcy law, or such person makes a general assignment for the benefit of creditors, files a voluntary petition under the federal bankruptcy law, files a petition or answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such person in any proceeding of this nature, or seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such person or all or any substantial part of such person's properties;

(c)    Sixty days after the commencement of any proceeding against such person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed or if within sixty days after the appointment without such person's consent or acquiescence of a trustee, receiver or liquidator of such person or of all or any substantial part of such person's properties, the appointment is not vacated or stayed or within sixty days after the expiration of any stay, the appointment is not vacated;

(d)    If such person is a corporation, limited liability company or partnership, the dissolution of such person; or

(e)    If such person is a natural person, (1) his or her death, (2) the entry by a court of competent jurisdiction of an order adjudicating him or her incompetent to manage his or her person or estate, or (3) his or her inability to perform his or her duties as a General Partner because of a physical, mental or legal disability for a period of more than sixty consecutive days.

16.2    **New General Partner**.  The General Partner may appoint any person as an additional or successor General Partner at any time without any vote or consent of any of the Limited Partners.  If the General Partner ceases to be the general partner of the Partnership and there is no remaining or surviving general partner of the Partnership, with the consent of a majority in interest of the Limited Partners given within thirty days thereafter, the Partnership may appoint and admit a new General Partner to the Partnership and elect to continue the Partnership's business.  A person so appointed will become General Partner on accepting such appointment and agreeing to act as General Partner, to become a party to this Agreement and to assume all the obligations and responsibilities of the General Partner hereunder.  At all times when the Partnership has two or more General Partners, they shall be jointly and severally liable for performing all of the duties and obligations of the General Partner hereunder, and they shall determine by agreement between or among themselves the manner in which Management Fees and the Special Profit Allocation will be divided between or among them.

16.3    **Procedure**.  If a person ceases to be a General Partner, a General Partner is succeeded or the Partnership admits an additional General Partner, the remaining General Partner or Partners shall amend this Agreement and the Partnership's certificate of limited partnership to name the additional or successor General Partner or Partners without any further consent of any of the Limited Partners.

16.4    **Conversion of Interest**.  A person who ceases to be a General Partner for any reason shall:

(a)    Retain only the interest in such person's Capital Account, Profits, Losses and distributions as such person would have had if such person had been admitted to the Partnership as a Limited Partner at the date such person ceases to be a General Partner and shall exclude any value attributable to the right to manage and control the Partnership's business, and that interest shall be that of a Limited Partner;

(b)    Not be personally liable for the Partnership's debts incurred after such person ceases to be a General Partner; and

(c)    Be entitled to consent as (and only as) a Limited Partner only on matters on which the Limited Partners are entitled to consent.

17.    **Dissolution and Termination**.

17.1    **Events of Dissolution**.  The Partnership shall continue until terminated and dissolved (a) when a sole General Partner ceases to be a General Partner, if a successor General Partner

has not been appointed as and become the General Partner within thirty days after the date that there ceases to be a General Partner of the Partnership as provided in section 16.2, or (b) when the General Partner elects, by written notice to the Partnership, to dissolve the Partnership. Subject to the preceding sentence, the Partnership shall not be dissolved and its affairs shall continue so long as there are at least two Partners, at least one of which is the General Partner, and the remaining General Partner or Partners shall continue the Partnership's business, notwithstanding that any person shall cease to be a General Partner for any reason. The Partnership shall not be dissolved or terminated by the expulsion, retirement, withdrawal, death, insanity, adjudication of bankruptcy, insolvency or dissolution of any Limited Partner, or by the assignment by any Limited Partner of such Limited Partner's interest in the Partnership or the admission of any new Partner as provided herein.

      17.2   **Winding Up**. On the Partnership's dissolution, the General Partner shall wind up the Partnership's affairs; provided that if there is no General Partner, the Partnership's affairs shall be wound up by such person or persons as the General Partner shall theretofore have designated for liquidation of the Partnership's assets or, if the General Partner shall not have made any such designation, by such person or persons as may be designated by the consent of a majority in interest of the Limited Partners (the General Partner or such person or persons, as the case may be, being hereinafter called the "Liquidating Persons"). The Liquidating Persons shall manage the Partnership's assets and shall liquidate at least so much of those assets as may be required to pay all liabilities of the Partnership (including, without limitation, all costs of dissolution and winding up, any amount that the General Partner shall have agreed to pay to the Liquidating Persons for their services in connection with the dissolution, and loans to the Partnership by any Partner), pay all such liabilities, establish reserves, and distribute the Partnership's remaining assets to the Partners (in cash or in kind or partly in cash and partly in kind, as the Liquidating Persons may determine). On any distribution of assets to the Partners pursuant to this section 17.2, any such assets shall be distributed in proportion to the Partners' respective Capital Account balances. After it shall appear to the Liquidating Persons that the Partnership's liabilities have been paid or that adequate provision shall have been made therefor, any balance remaining in any reserve theretofore established shall be distributed to the Partners as provided in this section 17.2, thereby terminating the Partnership. If the Partnership's assets are insufficient to satisfy its liabilities, to the extent that the Act requires, within thirty days after receiving notice thereof from the Liquidating Persons, each Partner shall return in cash such part or all of the distributions, if any, made to such Partner pursuant to section 9.3(h) or this section 17.2 as may be required to satisfy such liabilities, with each Partner making returns in proportion to such Partner's share of any such distributions.

      17.3   **Legal Authority**. The winding up of the Partnership's affairs and the distribution of its assets shall be conducted exclusively by the Liquidating Persons, who are authorized, subject to sections 12 and 17.2, to do any and all acts and things authorized by law for those purposes.

      17.4   **No Recourse Against Partners**. Each Partner shall look solely to the assets of the Partnership for the return of that Partner's Capital Contributions, and, if the Partnership's property remaining after the payment or discharge of the debts and liabilities is insufficient to return each Partner's Capital Contributions, that Partner shall have no recourse against any other Partner.

    18.   **Assignments**.

      18.1   **Personal Property**. A Partner's interest in the Partnership is personal property and a Partner shall have no interest in specific Partnership property.

      18.2   **General Partner**. The General Partner may sell, assign, transfer, pledge, encumber, hypothecate or otherwise dispose of all or any part of its interest as a General Partner without the consent of any other Partner; provided that no such disposition shall cause or entitle any person to

become an additional or substitute General Partner of the Partnership otherwise than as provided in section 16.2.

18.3    **Limited Partners**.

(a)    **In General**.  A Limited Partner may sell, assign, transfer, pledge, encumber, hypothecate or otherwise dispose of an interest in the Partnership, subject to compliance at that Limited Partner's expense with federal and state securities laws, such Limited Partner's Subscription Agreement and this section 18.3(a).  For purposes of such compliance, (1) the Limited Partner shall furnish the Partnership with a detailed explanation of the proposed disposition, (2) unless waived by the General Partner, the Limited Partner shall furnish the Partnership with an opinion of the Limited Partner's counsel in form and substance satisfactory to the General Partner to the effect that the proposed disposition (A) complies with applicable provisions of the Securities Act of 1933, as amended, and any applicable state Blue Sky or securities laws, (B) will not result in the Partnership having to register as an investment company under the ICA, (C) will not render the Special Profit Allocation unlawful under or violate any applicable federal or state law or regulation, (D) will not result in the Partnership's termination for federal income tax purposes, and (E) will not result in Partnership assets being deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder, (3) counsel for the General Partner shall have concurred in such opinion and the General Partner shall have advised the Limited Partner of such concurrence and (4) the General Partner shall have consented to the disposition, which consent may be withheld in the General Partner's discretion.  Any attempted or purported disposition without such compliance shall be void.  Any permitted disposition shall be effective as of midnight of the last day of the calendar month in which it is made.  No such disposition shall relieve the assignor of such assignor's responsibility for any expenses, obligations or liabilities, whether accruing before or after the disposition.  Unless and until an assignee is admitted to the Partnership as a substituted Limited Partner as hereinafter provided, such assignee shall be entitled only to receive distributions from the Partnership attributable to the assigned interest from and after the effective date thereof; provided that the General Partner and the Partnership shall be entitled to treat the assigning Limited Partner as the absolute owner of such assignor's interest in the Partnership and shall incur no liability for distributions made in good faith to such assignor until the effective date of the disposition and until appropriate documents of assignment or other disposition have been delivered to the General Partner and recorded on the Partnership's books.

(b)    **Restricted Transferees**.  Without the consent of the General Partner, no Partner shall transfer any interest in the Partnership if such transfer would result in interests in the Partnership assets to be deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder.

(c)    **Substitution**.  An assignee of any Limited Partner's interest in the Partnership may become a substituted Limited Partner only with the General Partner's consent and compliance with this section 18.3. The General Partner may amend this Agreement and the Partnership's certificate of limited partnership without the consent of any of the Limited Partners, to effect such admission not later than the last day of the calendar month following receipt of notice of the assignment and such appropriate documentation of the assignment and substitution as the General Partner may reasonably require; provided that no such assignee shall become a substituted Limited Partner unless the assignee shall have consented in writing, in form satisfactory to the General Partner, to be bound by the terms of this Agreement and the Partnership's certificate of limited partnership in the place and stead of the assigning Limited Partner.

19.    **Amendments**.

19.1    **With Limited Partner Approval**.    The General Partner may propose amendments to this Agreement, in which case it shall submit to the Limited Partners a verbatim statement of any amendment so proposed.  The amendment shall become effective only on the consent of the General Partner and a majority in interest of the Limited Partners; provided that, for purposes of obtaining a written consent on a proposed amendment, the General Partner may require a response within a specified reasonable time (which shall not be less than fifteen days).  Failure to respond shall constitute a consent in accordance with the General Partner's recommendation as to the proposed amendment.

19.2    **Without Limited Partner Approval**.  Notwithstanding anything in section 19.1 to the contrary, the General Partner may, without any consent, approval, authorization or other action of any Limited Partner, amend this Agreement (a) if, in the General Partner's opinion, the amendment does not have a material adverse effect on the Limited Partners generally, or (b) whether or not any or all of the Limited Partners are adversely affected thereby, if (1) the General Partner first notifies the Limited Partners of such change and (2) such change does not become effective until such time as the Limited Partners shall have had the opportunity to withdraw from the Partnership pursuant to section 9.3.

19.3    **Amendments Requiring Unanimous Consent**.  Anything in section 19.1 or 19.2 to the contrary notwithstanding, without the consent of all of the Partners, no amendment shall change the Partnership to a general partnership, or change the General Partner's liability as such or the Limited Partner's limited liability as such.

20.    **Tax Elections**.  The General Partner shall make or cause the Partnership to make such elections as the General Partner may consider advisable under any applicable tax law, including, without limitation, any elections under Code section 754.

21.    **Power of Attorney**.  Each Limited Partner irrevocably constitutes and appoints the General Partner, with full power of substitution and resubstitution, that Limited Partner's true and lawful attorney, for that Limited Partner and in that Limited Partner's name, place and stead, and for that Limited Partner's use and benefit, to sign, execute, deliver, certify, acknowledge, swear to, file, record and publish (a) the Partnership's certificate of limited partnership and any amendment thereto or to this Agreement as provided herein, (b) any other certificates, instruments, agreements and documents necessary to qualify or continue the Partnership as a limited partnership or a partnership wherein limited partners have limited liability in the states or other jurisdictions where the General Partner deems necessary or desirable, (c) all conveyances, assignments, documents of transfer or other instruments and documents necessary to effect the assignment of an interest in the Partnership, the substitution of a Limited Partner, the admission of a Limited Partner to the Partnership or the dissolution and termination of the Partnership in accordance with this Agreement, (d) all filings and submissions pursuant to any applicable law, regulation, rule, order, decree or judgment which, in the General Partner's opinion, may be necessary or advisable in connection with the Partnership's affairs and (e) any governing documents or subscription documents of a Liquidating Fund.

The power of attorney granted herein is coupled with an interest, shall be irrevocable, shall survive any Limited Partner's death, disability or incapacity, shall be deemed given by each assignee and successor of each Limited Partner and may be exercised by the General Partner by listing on, or attaching a list thereto of, any or all of the names of the Limited Partners and executing such amendments, certificates, instruments and other documents with the signature by or on behalf of the General Partner, as attorney-in-fact for all of the persons whose names are so listed.

22.     **Notices**.     Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile transmission or three business days after being mailed by first class mail, or one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, charges and postage prepaid, properly addressed to the party to receive such notice at the last address furnished for such purpose by the party to whom the notice is directed.

23.     **Severability**.     If a court of competent jurisdiction shall hold any provision of this Agreement, or the application of such provision to any person or circumstance to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby and shall be enforced to the full extent of its validity.

24.     **Binding Effect**.     Subject to section 18, this Agreement shall bind and inure to the benefit of the parties and their respective successors, assigns, heirs, devisees, legatees, legal representatives, executors and administrators.

25.     **Partition**.     During the term of the Partnership, each party hereto irrevocably waives any right that such party may have to maintain any action for partition with respect to the Partnership's property.

26.     **Counterparts**.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

27.     **Entire Agreement**.     This Agreement contains the entire agreement of the parties and supersedes all prior negotiations, correspondence, understandings and agreements between or among the parties regarding the subject matter hereof, other than any and all Subscription Agreements and any and all amendments, supplements and appendices thereto, all of which Subscription Agreements, amendments, supplements and appendices shall continue in full force and effect.

28.     **Further Assurances**.     Each Partner shall provide such further information with respect to that Partner and any of its beneficial owners as the General Partner may request, including, but not limited to, any information regarding any Partner's tax treatment of a Capital Contribution of Securities, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

29.     **Governing Law**.     This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware.

30.     **Dispute Resolution**.     The Partners waive the right to a jury trial, if and to the extent that such a waiver is permissible under applicable law. The Partners consent to the personal jurisdiction and the exclusive venue of any state court in the city and county of the Partnership's principal place of business at the time the dispute arises and any United States District Court encompassing the Partnership's principal place of business at the time the dispute arises, with respect to any suit, action or other proceeding between or among any of the Partnership and the Partners or any of their respective Affiliates arising out of, relating to or in connection with this Agreement or the Partnership or its formation, organization, capitalization, activities or management.

31.     **Attorneys' Fees**.     If any dispute between or among any of the Partnership and the Partners or any of their respective Affiliates should result in litigation, the prevailing party or parties in

such dispute shall be entitled to recover from the other party or parties all reasonable fees, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred by the prevailing party or parties in connection therewith, all of which shall be deemed to have accrued on the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any award, judgment or order entered in such action shall specifically provide for the recovery of attorneys' fees and costs incurred in enforcing such award or judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this section 31, (a) attorneys' fees shall include, without limitation, fees incurred in postaward or postjudgment motions, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and (b) prevailing party shall mean the party that is determined in the proceeding to have prevailed or who prevails by dismissal, demurrer, default or otherwise.

32.     **Legal Counsel**.

32.1     **Counsel to the General Partner**.  Each Limited Partner acknowledges and understands that this Agreement and related documents have been prepared by Shartsis Friese LLP, counsel for the General Partner, and that such counsel has not represented or been engaged to provide services to any Limited Partner or to the Partnership. The Limited Partners understand that such counsel acts as legal counsel to many investment advisory, venture capital and brokerage firms, investors and other persons. Such counsel's relationships with such persons are periodic; they can and do lapse and then re-start on an unpredictable basis, making it impractical for such counsel to provide disclosure of each and every such relationship. Without limiting the foregoing, in its capacity as legal counsel for the General Partner, Shartsis Friese LLP may be subject to actual or potential conflicts of interest arising from: (a) representing one or more Partners or parties related thereto in connection with matters other than preparing this Agreement or operating the Partnership or (b) representing other managers of investment partnerships that seek or obtain capital from the same investors as the Partnership or compete with the Partnership for managerial resources or investment opportunities.

32.2     **Representations and Warranties by Limited Partners**.  Each Limited Partner: (a) represents and warrants that it has considered the foregoing carefully and hereby approves such counsel's representation of the General Partner; (b) acknowledges the possibility that, under the laws and ethical rules governing the conduct of attorneys, such counsel may be precluded from representing any one or more specific parties in connection with any dispute involving Limited Partners or the Partnership; (c) agrees that such counsel may decline to represent, or withdraw from representing, the General Partner at any time; (d) acknowledges that actual or potential conflicts of interest may exist among the Limited Partners, that no Limited Partner will be represented by legal counsel unless such Limited Partner specifically engages counsel on its own behalf, and that such Limited Partner has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; (e) agrees that in the event of a dispute between one or more Limited Partners, on the one hand, and the General Partner, on the other hand, Shartsis Friese LLP may represent one or more of the General Partner, the officers, members, managers and directors thereof, or the Partnership; (f) acknowledges that the approvals, acknowledgements and waivers in this section 32 do not reflect or create a right under this Agreement on the part of such Limited Partner to approve the General Partner's selection of legal counsel for the Partnership; (g) agrees that neither this Agreement nor the transactions and Partnership operations contemplated hereby are intended to create an attorney/client relationship between Shartsis Friese LLP and such Limited Partner or any other relationship pursuant to which such Limited Partner (acting other than in the name of the Partnership) would have a right to object to such counsel's representation of any person under any circumstances; (h) acknowledges and understands that Shartsis Friese LLP may at times agree to represent the Partnership, and each Limited Partner hereby consents to such representation and agrees that such representation shall not be deemed or result in representation of any Limited Partner by Shartsis Friese LLP, notwithstanding that the services of Shartsis Friese LLP rendered for the benefit of the Partnership may also benefit the Limited Partners by virtue of

their interests in the Partnership; and (i) agrees that, if there is ever a dispute between any Limited Partner and the General Partner or the Partnership, no Limited Partner shall be entitled to discovery of or regarding any communication between Shartsis Friese LLP and the General Partner or the Partnership relating to services provided by Shartsis Friese LLP to the General Partner or the Partnership.

32.3    **Related Issues**.  The parties intend that Shartsis Friese LLP shall be entitled to enforce this section 32 and each Limited Partner hereby consents in advance to such enforcement. Nothing in this section 32 shall preclude the General Partner from selecting different legal counsel at any time in the future and, except as specifically provided in this section 32, no Limited Partner shall be deemed by virtue of this Agreement to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions and Partnership operations contemplated hereby.

33.    **Intellectual Property**.  Notwithstanding any provision of this Agreement to the contrary, the Partners acknowledge that: (a) the "Covenant Global Investors" and "Covenant Global Alpha" names and marks (and any portion, abbreviation, derivation or variation thereof) and trade secrets, know-how, trading techniques, inventions, trademarks, trade names, and other intellectual property to the extent protectable are the property of the General Partner or its Affiliates; (b) the General Partner or its Affiliates may withdraw the Partnership's authority to use any such asset at any time without compensation to the Partnership; (c) no Partner other than the General Partner shall, by virtue of its ownership of an interest in the Partnership, hold any right, title or interest in or to any such asset; and (d) on the Partnership's dissolution and liquidation, all right, title and interest in and to any such asset shall be transferred to and held solely by the General Partner or its Affiliates without consideration.

34.    **No Third Party Beneficiaries**.  Except as otherwise provided in sections 12.5, 18.3(c) and 32, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party.

35.    **Headings; Gender; Number; References**.  The headings at the beginning of the sections hereof are solely for convenience of reference and are not part of this Agreement.  As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require and "person" shall be deemed to include natural person and corporation, limited liability company, partnership, trust or other entity.  All references to sections are intended to refer to sections of this Agreement, except as otherwise indicated.

IN WITNESS WHEREOF, this Third Amended and Restated Agreement of Limited Partnership has been duly executed by or on behalf of the General Partner and the Limited Partners listed on Schedule A attached hereto as of the date first above written, or on behalf of parties hereto subsequently admitted to the Partnership as Limited Partners, as shown on a Supplemental Schedule A attached hereto, as of the date shown on such Supplemental Schedule A.

GENERAL PARTNER:                          LIMITED PARTNERS:

Covenant Financial Services, LLC          The Limited Partners listed on Schedule A or
                                          Supplemental Schedule A Attached Hereto

By: _____
        Stephen E. Shafer, Chief Investment Officer    Covenant Financial Services, LLC, Attorney-in-Fact

                                          By: _____
                                                  Stephen E. Shafer, Chief Investment Officer

### FIRST AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP
### OF
### COVENANT OPPORTUNITY CAPITAL FUND, L.P.

This FIRST AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into as of January 1, 2012, and amends and restates in its entirety that certain Agreement of Limited Partnership dated as of December 1, 2008, by and among Covenant Financial Services, LLC, an Oklahoma limited liability company doing business as Covenant Global Investors (the "General Partner"), and the persons (the "Limited Partners") who have (as Limited Partners) executed counterparts of this Agreement personally or by attorney-in-fact and who shall not have ceased to be Limited Partners (the Limited Partners and the General Partner being herein sometimes called, collectively, the "Partners" and, individually, a "Partner").

1.    **Formation**.  The Partners have formed a limited partnership (the "Partnership") under the Act.  The General Partner filed a certificate of limited partnership of the Partnership under the Act in each jurisdiction where such filing or recordation was required and shall so file or record any additional, supplemental or amended certificates of limited partnership and like documents as the General Partner may deem necessary or advisable in accordance herewith.  The Partners agree further that they shall comply with the requirements and provisions of the Act, which shall govern the rights and liabilities of the Partners, except as otherwise provided in this Agreement.

2.    **Name**.  Before the date of this Agreement, the name of the Partnership was, and its business was conducted under the name, CFS Opportunity Capital Fund, L.P.  On and after such date, such name is hereby changed to Covenant Opportunity Capital Fund, L.P.

3.    **Term**.  The Partnership began on the date that this Agreement was executed (personally or by attorney-in-fact) and delivered by the General Partner and one or more Limited Partners.  The Partnership shall continue until it is terminated as herein provided.

4.    **Addresses**.

4.1    **Partnership and General Partner**.  The principal place of business and principal executive office of the Partnership is the office of the General Partner at 210 Park Avenue, Suite 3000, Oklahoma City, OK 73102 and such other place or places as the General Partner may from time to time designate by notice to each Limited Partner.  The Partnership may also maintain such other offices at such other places as the General Partner may deem advisable.

4.2    **Limited Partners**.  The address of each Limited Partner is set forth in such Limited Partner's Subscription Agreement.  A Limited Partner may change such address by notice to the General Partner, which notice shall become effective on receipt or such later time as such notice may specify.

4.3    **Agent for Service of Process**.  The Partnership's agent for service of process in Delaware shall be The Corporation Service Company, whose address is 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.  The General Partner may change such agent for service of process or such address from time to time in the manner provided by applicable law.

5.    **Certain Definitions**.  As used in this Agreement, the following terms shall have the meanings indicated:



5.1    "Act" means the Delaware Revised Uniform Limited Partnership Act, as amended.

5.2    "Affiliate" means, when used with reference to a specified person, any person directly or indirectly controlling, controlled by or under common control with the specified person, any trust or foundation to which the specified person has made a majority of the grants, donations or contributions received by that trust or foundation, a person owning or controlling ten percent or more of the outstanding voting securities of the specified person, a person ten percent or more of whose outstanding voting securities are owned or controlled by the specified person, any officer, director, general partner, manager or trustee of the specified person, and if the specified person is an officer, director, general partner, manager or trustee, any corporation, partnership, limited liability company or trust for which the specified person acts in any such capacity.

5.3    "BHCA" means the Bank Holding Company Act of 1956, as amended.

5.4    "BHCA Subject Person" means any Limited Partner that is subject, directly or indirectly, to the restrictions of the BHCA.

5.5    "Business Day" means any day that is not a public holiday in the State of Oklahoma and on which the major New York stock exchanges are open for trading.

5.6    "Capital Account" means:

(a)    The individual Capital Account that the Partnership shall establish and maintain for each Partner in accordance with the following provisions:

(1)    To the Capital Account of a Partner, the Partnership shall credit that Partner's Capital Contributions, share of Profits, any items in the nature of income or gain that the Partnership specially allocates thereto pursuant to section 10.5(b) and the amount of any Partnership liabilities that the related Partner personally assumes or that are secured by any Partnership property that the Partnership distributes to that Partner;

(2)    From the Capital Account of a Partner, the Partnership shall debit the amount of cash and the fair market value, determined as provided in section 10.6, of any Partnership property that the Partnership distributes to that Partner pursuant to any provision of this Agreement, that Partner's share of Losses, any items in the nature of expenses or loss that the Partnership specially allocates thereto pursuant to section 10.5(b) and the amount of any liabilities of that Partner that the Partnership assumes or that are secured by any property that the Partner contributes to the Partnership; and

(3)    In determining the amount of any liability, the Partnership shall take into account Code section 752(c) and any other applicable provisions of the Code and Regulations.

(b)    If any interest in the Partnership is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest.

(c)    The foregoing provisions and other provisions of this Agreement relating to maintaining Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent therewith. If the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed to comply with Regulations section 1.704-1(b), the General Partner may make such

modification if it is not likely to have a material adverse effect on amounts distributable to any Partner under this Agreement on the Partnership's dissolution. The General Partner shall adjust the amounts that the Partnership debits or credits to Capital Accounts with respect to any property that a Partner contributes to the Partnership or that the Partnership distributes to a Partner and any liabilities secured by such contributed or distributed property or that the Partnership or that Partner assumes in connection with such contribution or distribution if the General Partner determines that such adjustments are necessary or appropriate under Regulations section 1.704-1(b)(2)(iv). The General Partner also shall make any appropriate modifications if unanticipated events might cause this Agreement not to comply with Regulations section 1.704-1(b), and the General Partner shall make all elections provided for under such Regulations.

5.7    "Capital Contribution" means an investment of cash or assets contributed to the Partnership by a person that is (or thereupon becomes) a Partner, whether initially contributed or subsequently contributed as permitted hereby, but excluding loans designated as such.

5.8    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

5.9    "Election Notice" has the meaning ascribed to that term in section 13.7(f).

5.10    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

5.11    "FINRA" means the Financial Industry Regulatory Authority, Inc.

5.12    "Fiscal Period" means each period from the first day of a Fiscal Quarter, the date that a Partner makes a Capital Contribution or the day after any withdrawal from or distribution by the Partnership, to the earliest of (a) the last day of such Fiscal Quarter, (b) the day preceding the date that a Partner next makes a Capital Contribution or (c) the next date of a withdrawal from or distribution by the Partnership.

5.13    "Fiscal Quarter" means the period from the date the Partnership commences through the succeeding March 31, June 30, September 30 or December 31 (whichever is soonest), each period thereafter of three calendar months ending on any March 31, June 30, September 30 or December 31, or the period from the January 1, April 1, July 1 or October 1, whichever is the latest, preceding the date of dissolution and termination of the Partnership and ending on the date of dissolution and termination of the Partnership.

5.14    "Fiscal Year" means the period from the date the Partnership commences or commencing on any subsequent January 1, and ending on the succeeding December 31, or, if earlier, ending on the date of dissolution and termination of the Partnership.

5.15    "ICA" means the Investment Company Act of 1940, as amended.

5.16    "Illiquid Securities" means Securities that the Partnership holds that are restricted from transfer for any reason.

5.17    "Legacy Limited Partner" means (a) any Limited Partner admitted to the Partnership before January 1, 2012, (b) any person admitted as an investor before that date in any other investment pool or account managed by the General Partner, (c) any spouse, ex-spouse, parent, sibling or `descendant (biological or adopted, including step-children) and other family members of such a Limited Partner or investor, even if that person invests on or after that date, with the General Partner having the

power to determine and apply this familial status test in its discretion, and (d) any assignee of any such Limited Partner or investor so long as that assignee has complied with the provisions of section 18.3 and been admitted to the Partnership as a substituted Limited Partner as described in section 18.3(c).

5.18    "Liquidating Fund" has the meaning ascribed to that term in section 9.3(b)(1).

5.19    "Majority in interest" of the Partners (or a class of Partners) means Partners (or Partners of that class) whose Ownership Percentages (as modified for consent purposes pursuant to sections 13.7 and 13.8), on the first day of the Fiscal Period during which such majority is to be determined, aggregate more than fifty percent of the Ownership Percentages (as so modified) on such date of all Partners (or Partners of that class). For purposes of this section 5.19, Legacy Limited Partners and New Limited Partners shall not be considered separate classes of Limited Partners.

5.20    "Management Fee" means the fee payable to the General Partner pursuant to section 11.1.

5.21    "New Issue" means a Security that is included within the definition of "new issue" in FINRA Rule 5130.

5.22    "New Issue Rules" means FINRA Rules 5130 and 5131, as such Rules may be amended or replaced from time to time by FINRA, or any similar rule or interpretation of any self-regulatory organization or governmental agency or official having similar authority.

5.23    "New Limited Partner" means a Limited Partner admitted to the Partnership on or after January 1, 2012, but excludes the Legacy Limited Partners that are admitted after that date and deemed by the General Partner to be Legacy Limited Partners, as described in section 5.17.

5.24    "Outside Accountants" means the independent public accountants regularly engaged by the Partnership to prepare its tax returns or compile, review or audit its financial statements.

5.25    The "Ownership Percentage" of a Partner at any date means the percentage computed by dividing such Partner's Capital Account balance at that date by the aggregate of all Partners' Capital Account balances at that date, except as adjusted pursuant to section 13.7 or 13.8.

5.26    "Permitted Withdrawal Date" has the meaning ascribed to that term in section 9.3(a).

5.27    "Profits" and "Losses" mean for each Fiscal Year, Fiscal Quarter, Fiscal Period or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, Fiscal Quarter, Fiscal Period or other period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any Partnership income that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this section 5.27 shall be added to such taxable income or loss;

(b)    Any Partnership expenditures described in Code section 705(a)(2)(B) or treated as Code section 705(a)(2)(B) expenditures pursuant to Regulations section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this section 5.27 shall be subtracted from such taxable income or loss;

(c)    The initial book value of any asset contributed to the Partnership shall be its gross fair market value at the time of contribution determined as provided in section 9.1(b). The book value of all Partnership assets shall be adjusted pursuant to Regulation section 1.704-1(b)(2)(iv)(f) to equal their respective gross fair market values, determined as provided in section 10.6, as of the following times: (1) when any new or existing Partner acquires an additional interest in the Partnership; (2) when the Partnership distributes to a Partner, or a Partner withdraws, more than a de minimis amount of Partnership property, unless all Partners receive simultaneous distributions of undivided interests in the distributed property in proportion to their respective Ownership Percentages; (3) the last day of each Fiscal Period; and (4) a liquidation within the meaning of Regulations section 1.704-1(b)(2)(ii)(g). If the book value of any Partnership asset is adjusted pursuant to this section 5.27(c), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses, and gain or loss resulting from any subsequent disposition of such property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the adjusted book value of such property, notwithstanding that the adjusted tax basis of such property differs from such book value;

(d)    If the book value of any Partnership property is adjusted pursuant to section 5.27(c), then in lieu of the depreciation, amortization and other cost recovery deductions taken into account with respect to such property in computing such taxable income or loss, the Partnership shall take into account proportionate depreciation, amortization or other cost recovery deductions based on the adjusted book value of such property for such Fiscal Year or other period; and

(e)    Notwithstanding any other provision of this section 5.27, the Partnership shall not take into account in computing Profits and Losses any items that are specially allocated pursuant to sections 10.5(b) and (c), and the Partnership shall specially allocate Management Fees as expenses to the respective Capital Accounts against which they are charged and taken into account in computing Profits and Losses.

5.28    "Pro Rata Share" has the meaning ascribed to that term in section 9.3(b)(1).

5.29    "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

5.30    "Revocation Notice" has the meaning ascribed to that term in section 13.7(f).

5.31    "Securities" means securities, commodities, repurchase agreements and other intangible investment instruments and vehicles of every kind and nature, U.S. or non-U.S., whether publicly or nonpublicly traded, including, without limitation, stocks, notes, bills, bonds, debentures, subscriptions, preferred stocks, convertible securities, options (including, without limitation, covered and uncovered puts and calls and over-the-counter options), rights, warrants, swaps, units, currencies, futures, single stock futures, other commodity interests, commodity options, options on futures, certificates of deposit, trust receipts, American Depositary Receipts, global depositary receipts, equipment trust certificates, interests in partnerships and limited liability companies, certificates of interest or participation in any profit-sharing agreement, collateral trust certificates, bankruptcy claims, investment contracts, shares of investment companies, interests in real estate, natural resources (including but not limited to precious and industrial metals, rare earth materials and energy sources), electricity, bio-fuels, agricultural products, environmental products and resources, petrochemicals and plastics, weather contracts, pollution credits, collectibles, including but not limited to diamonds and other precious stones and gems, jewelry, wine, art and antiques, evidences of indebtedness and derivative and similar transactions, including, but not limited to, transactions such as: (a) basis, buy/sell-back, interest rate, currency, cross currency, foreign exchange, commodity, credit, emissions, equity, equity index,

weather, bond, option, bullion, repurchase, securities lending or total-return transactions, (b) any transaction included in the definition of "Specified Transaction" in the ISDA 1992 or 2002 Master Agreement (or any predecessor or successor thereto), (c) transactions ancillary to transactions described within this definition, (d) any other similar transaction existing now or developed in the future in the financial markets, or (e) transactions to secure, collateralize or provide credit support for any of the foregoing transactions or assets. Such transactions may be structured, where relevant, as swaps, collars, forwards, forward rate agreements, caps, floors, futures, options, options on transactions or other types of structures or combinations of structures.

5.32    "Subscription Agreement" means any subscription agreement executed and delivered by a Limited Partner and accepted by the General Partner as a condition precedent to becoming a Limited Partner.

5.33    "Tax Matters Partner" means the tax matters partner for the Partnership appointed by the General Partner, as such term is defined in Code section 6231(a)(7).

6.    **Investment Activities of the Partnership**.  The purpose and business of the Partnership generally is to acquire, directly or indirectly, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in Securities, to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities held or owned by the Partnership, and to engage in any activity incidental to the foregoing, including, without limitation, borrowing and lending Securities and funds and otherwise entering into credit arrangements in connection therewith.  The Partnership may engage in these activities directly or indirectly by investing in an investment entity, such as a so-called master fund, that may or may not be an Affiliate of the General Partner.  To these ends, the Partnership may enter into, make and perform all contracts and other undertakings and engage in all activities and transactions, as the General Partner may consider necessary or advisable to carry out the foregoing objects and purposes, including, without limitation, to:

6.1    Acquire long positions or short positions in Securities, and make purchases or sales increasing, decreasing, covering and liquidating such positions;

6.2    Borrow or lend monies and obtain letters of credit without limitation as to amount, and secure the payment of any obligation of the Partnership by mortgage on, or hypothecation or pledge of, all or any part of the property of the Partnership;

6.3    Enter into credit, deposit and custodian agreements with banks, securities brokerage firms, futures commission merchants and other financial institutions (whether or not affiliated with the Partnership or the General Partner), open, maintain and close bank, brokerage and other accounts and draw checks or other orders for the payment of money or the delivery of instruments; and

6.4    Hire full- or part-time managers to manage and operate any asset of the Partnership, hire or retain persons, such as administrators, attorneys, accountants, investment advisers, industry and financial consultants, to perform services with respect thereto, and purchase insurance.

7.    **Other Activities**.

7.1    **Interests in Other Activities**.  Any Partner and such Partner's Affiliates, agents, shareholders, limited partners, members and employees may engage in any activities, whether or not related to the Partnership's business.  The Partners specifically recognize that some or all of them and their Affiliates, agents, shareholders, limited partners, members and employees are or may be engaged in various aspects of the securities business, including, without limitation, Securities portfolio management

and organizing and managing other investment entities, both for their own accounts and for others. Such Partners, Affiliates, agents, shareholders, limited partners, members and employees may continue, or initiate further, such activities. Each Partner agrees that any Partner and any Affiliate, agent, shareholder, limited partner, member or employee of any Partner (a) is not and shall not be obligated to present any investment opportunity or prospective economic advantage to the Partnership or any Partner, even if the opportunity is of the character that, if presented to the Partnership, could be taken by the Partnership, and any Partner shall have the right to hold any investment opportunity or prospective economic advantage for such Partner's own account and to recommend such opportunity to persons other than the Partnership, (b) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for such person's own account, independently or with others, including, without limitation, any business, industry or activity in which the Partnership may be interested in investing or may also have investments and (c) may do so without any obligation to report the same to the Partnership or any Partner or to afford the Partnership or any Partner any opportunity to participate therein. Neither the Partnership nor any Partner shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom.

       7.2    **Consequences of Other Activities**. The Limited Partners hereby acknowledge that the General Partner may be prohibited from taking action for the benefit of the Partnership: (a) due to confidential information acquired or obligations incurred in connection with an outside activity permitted under section 7.1; (b) because an Affiliate, agent, shareholder, limited partner, member or employee of the General Partner serves as an officer or director of a company in which the Partnership has invested; or (c) in connection with activities undertaken by an Affiliate, agent, shareholder, limited partner, member or employee of the General Partner. In addition to the provisions of section 12.5, no person shall be liable to the Partnership or any Limited Partner for any failure to act for the benefit of the Partnership for one or more of the reasons described in the preceding sentence.

       8.    **Waiver of Conflicts**. The fact that any Partner, or any Affiliate of any Partner, or a member of such Partner's family, is employed by, or is directly or indirectly interested in or connected with, any person or entity employed or engaged by the Partnership, or any company in which the Partnership has invested, to render or perform a service, or from whom the Partnership or such company may make any purchase, or to whom the Partnership or such company may make any sale, or from or to whom the Partnership or such company may obtain or make any loan or enter into any lease or other arrangement, shall not prohibit the Partnership or such company from engaging in any transaction with such person or entity, or create any additional duty of legal justification by such Partner or such person or entity beyond that of an unrelated party, and neither the Partnership nor any other Partner shall have any right in or to any revenues or profits derived from such transaction by such Partner, Affiliate, person or entity.

       9.    **Capital**.

       9.1    **Limited Partners' Contributions**.

          (a)    **Initial and Additional Contributions by Limited Partners**. The Partnership is authorized to offer and sell an unlimited amount of limited partner interests in the Partnership. Each Limited Partner has contributed or shall contribute to the Partnership's capital the amount of that Limited Partner's Capital Contributions heretofore or hereafter subscribed by that Limited Partner and accepted by the General Partner on behalf of the Partnership. The General Partner may establish such minimum initial Capital Contribution as it deems appropriate and it may waive or change that minimum thereafter. With the General Partner's consent, any Limited Partner may make an additional Capital Contribution in an amount that the General Partner deems appropriate. With the General Partner's consent, a Limited Partner may make Capital Contributions in amounts other than those set forth above and at any time that the General Partner permits and, in such cases, the General

Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement with the advice of the Outside Accountants. A Limited Partner's initial or additional Capital Contributions pursuant to this section 9.1(a) shall not require any consent or approval of any other Limited Partner. The General Partner shall have the authority to accept a Capital Contribution as of a date before the date the Capital Contribution is actually made, if it determines that deeming such Capital Contribution to have been made as of an earlier date will not have a materially adverse effect on the Limited Partners generally.

    (b) **Contributions of Assets**. Any Capital Contribution under this section 9.1 or section 9.2 may be made in cash or, with the consent of the General Partner, by contributing assets, including Securities. If assets are contributed, the General Partner shall determine the value of those assets for purposes of establishing the contributor's Capital Account, but under no circumstances shall that value exceed the fair market value of those assets on the date the contribution is made, determined as provided in section 10.6. In determining the value, the General Partner may reduce that value to account for expenses, such as brokerage commissions, that the Partnership will incur when it sells such assets. The Partnership shall be under no obligation to hold the assets contributed to it. Each Partner contributing assets to the Partnership's capital hereby represents and warrants to the Partnership and the other Partners that such Partner is the sole and absolute owner of those assets, subject only to holding such assets of record in "street" or nominee name for such Partner's sole and exclusive benefit, that such assets have not been pledged, hypothecated or otherwise encumbered and that the Partnership will receive on completion of such contribution good and marketable title to such assets, free of all liens, claims, security interests, community property rights, restrictions on transfer and other restrictions or defects in title.

    9.2 **General Partner's Contributions**. The General Partner may contribute from time to time such amounts to the Partnership's capital as it may elect. The General Partner's Capital Contributions may be made in cash or by contributing assets as provided in section 9.1(b).

    9.3 **Capital Withdrawals by Partners**.

    (a) **Limited Partner Withdrawals**. A Limited Partner may, on at least ten Business Days' prior notice to the General Partner, withdraw all or part of the balance in such Limited Partner's Capital Account as of the last day of any calendar month (each such date being herein called a "Permitted Withdrawal Date"); provided that:

    (1) No partial withdrawal of less than $10,000 shall be permitted and no partial withdrawal may reduce a Limited Partner's Capital Account balance to an amount that is less than the lesser of the Limited Partner's initial Capital Contribution or $250,000;

    (2) Subject to section 9.3(b), withdrawals of up to ninety-eight percent of the balance of a Limited Partner's Capital Account shall be paid within ten days after the applicable Permitted Withdrawal Date;

    (3) Subject to section 9.3(b), if a withdrawal exceeds ninety-five percent of the balance of a Limited Partner's Capital Account, such ninety-five percent shall be paid within ten days after the applicable Permitted Withdrawal Date and the remainder, if any, of the withdrawal shall be paid as soon as the General Partner determines that it is reasonably practicable after the Partnership receives financial statements for the Fiscal Year in which the withdrawal occurs compiled, reviewed or audited by the Outside Accountants, but the total withdrawal paid may not exceed that Limited Partner's Capital Account balance, as shown by those financial statements (and such remainder shall not earn interest or be considered to be invested in the Partnership). If the Outside Accountants determine that the amount paid by the Partnership exceeds that Capital Account balance,

the Limited Partner shall forthwith, on demand by the General Partner, repay such excess to the Partnership in cash;

(4)     Subject to section 13.7(e), the Partnership may pay any amount that a Limited Partner withdraws by assigning to the Limited Partner any of the Partnership's assets (as the General Partner selects and including an interest in a Liquidating Fund as described in section 9.3(b)), or a combination of cash and such assets, having an aggregate value at the applicable Permitted Withdrawal Date equal to the amount to be withdrawn determined in the manner set forth in section 10.6;

(5)     The General Partner may suspend or limit the right of withdrawal or postpone the date of payment for any period during which (A) any exchange or over-the-counter market on which a substantial part of the Securities owned by the Partnership are traded is closed (other than weekend and holiday closings) or trading on any such exchange or market is restricted or suspended, (B) there is a state of emergency, as a result of which it is not reasonably practicable for the Partnership to dispose of its assets or to determine their value fairly, (C) any of the means normally employed in ascertaining the value of a substantial part of the Partnership's assets breaks down or when for any other reason the value of such assets cannot reasonably be ascertained, (D) the amount of requested withdrawals would (in the opinion of the General Partner) result in a disorderly liquidation of Partnership investments or a violation of the Partnership's investment policies, or (E) there are such other extraordinary circumstances, as the General Partner determines in good faith, that cause withdrawals or such payments to be impracticable under existing economic or market conditions or conditions relating to the Partnership (such as the receipt from Limited Partners of notices of withdrawal of amounts aggregating more than twenty-five percent of the Capital Account balances of all of the Partners or the inability or inadvisability, in the General Partner's opinion, to liquidate Securities). At the conclusion of such period, the General Partner shall resume permitting withdrawals as provided in the other provisions of this section 9.3 and shall resume any payments required pursuant to the other provisions of this section 9.3 as soon as reasonably practicable;

(6)     The General Partner may waive the foregoing notice period or any other Limited Partner withdrawal restriction in this Agreement, permit withdrawals and payments from Capital Accounts at times and in amounts other than those set forth above and, in addition, as provided in section 13.7. If a Limited Partner is permitted to make a withdrawal other than on a Permitted Withdrawal Date as described above, (A) payments of the withdrawn amounts shall be made as described in this section 9.3(a) and in section 9.3(b) as if the date of withdrawal were a Permitted Withdrawal Date, (B) the General Partner may require that Limited Partner to pay to the Partnership a withdrawal fee of up to $5,000, and (C) the General Partner shall, with the advice of the Outside Accountants, cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. No portion of the Management Fee or the expenses charged to a Limited Partner's Capital Account pursuant to section 11 shall be refunded to that Limited Partner on its withdrawal of capital; and

(7)     At the General Partner's election, a Limited Partner shall be deemed to have withdrawn from the Partnership (A) on his or her death, (B) on the entry of any court order charging that Limited Partner's interest in the Partnership with the unsatisfied amount of any judgment, (C) if that Limited Partner's interest in the Partnership vests in any other person as the result of the Limited Partner's insolvency or incapacity, (D) on notice from the Partnership to that Limited Partner indicating that the balance of that Limited Partner's Capital Account at the end of any Fiscal Year is less than the lesser of that Limited Partner's initial Capital Contribution or $250,000, unless within five days after receipt of the notice that Limited Partner makes an additional Capital Contribution to increase the balance to at least that amount, or (E) on notice given by the General Partner to that Limited Partner pursuant to section 12.4, which withdrawal shall be effective as of the end of the calendar month in which

any of the events described in the preceding clauses (A)-(D) occurs, or, in the case of an event described in the preceding clause (E), on the date specified in section 12.4. Payments of the withdrawn amounts shall be made as described in this section 9.3(a) and in section 9.3(b) as if the date of withdrawal were a Permitted Withdrawal Date.

(b)     **Liquidating Fund for Withdrawing Limited Partner.**

(1)     If a Limited Partner withdraws any or all of that Limited Partner's Capital Account balance pursuant to section 9.3(a) or is expelled pursuant to section 12.4 when the Partnership holds Illiquid Securities, the General Partner may transfer that Limited Partner's Pro-Rata Share of one or more of such Illiquid Securities to one or more separate liquidating funds (each, a "Liquidating Fund") that the General Partner may cause the Partnership to establish for withdrawing Limited Partners, in lieu of distributing to those Limited Partners the Illiquid Securities in kind or other Partnership assets. If a Limited Partner that has an interest in a Liquidating Fund makes an additional withdrawal, that Limited Partner's Pro Rata Share of any Illiquid Securities relating to that subsequent withdrawal may also be placed, at the election of the General Partner, in the same or an additional Liquidating Fund. A withdrawing Limited Partner's "Pro-Rata Share" of an Illiquid Security (or the proceeds thereof) on a Permitted Withdrawal Date is the value, as determined pursuant to section 10.6, of that Illiquid Security that the Partnership holds at the close of business on the Permitted Withdrawal Date, multiplied by a fraction, the numerator of which is the amount being liquidated by that Limited Partner and the denominator of which is the aggregate of all Capital Account balances of the Partners on the Permitted Withdrawal Date (including amounts being withdrawn on that Permitted Withdrawal Date).

(2)     The beneficial owners of a Liquidating Fund shall be subject to the governing documents of such Liquidating Fund, which shall include, unless waived by the General Partner, a management fee in the same amount and charged at the same times as the Management Fee applicable with respect to a Limited Partner's interest in the Partnership. The other terms of a Liquidating Fund shall be substantially similar to those of the Partnership, omitting the provisions in this section 9.3(b) and except that the withdrawal and distribution rights in the Liquidating Fund shall be as the General Partner deems appropriate. Notwithstanding such similar terms, however, a Limited Partner's or former Limited Partner's interest in a Liquidating Fund or in the Illiquid Securities held by that Liquidating Fund shall not be deemed an interest in the Partnership for any purpose and shall not give that Limited Partner or former Limited Partner any rights under this Agreement that such Limited Partner or former Limited Partner would not otherwise have.

(3)     The Liquidating Fund shall hold its interest in the Illiquid Securities contributed to it until such Illiquid Securities are sold or otherwise disposed of by the General Partner on behalf of the Partnership and the Liquidating Fund, at which time the Liquidating Fund shall distribute its share of the disposition proceeds, less any accrued but unpaid management fee relating to the Liquidating Fund, to the beneficial owners of the Liquidating Fund.

(c)     **General Partner Withdrawals.** The General Partner may withdraw all or part of its Capital Account balance at any time, including on dates other than Permitted Withdrawal Dates, without notice to the Partnership or the Limited Partners. Any such withdrawal shall not be subject to the other terms and conditions that apply to capital withdrawals by Limited Partners under section 9.3(a). The Partnership shall pay to the General Partner the entire amount withdrawn within thirty days after the withdrawal date.

(d)     **Distributions.** In addition to the withdrawal provisions in sections 9.3(a), (b) and (c), the General Partner shall determine the amounts, times and proportions as among the Partners of all distributions by the Partnership and whether such distributions will be in cash or in kind

or partly in cash and partly in kind.  Distributions in kind shall be made at valuations determined as provided in section 10.6 and may be made by using a Liquidating Fund as described in section 9.3(b).

(e)    **Withholdings**.    Each Partner acknowledges and agrees that the Partnership may be required to deduct and withhold tax or to fulfill other obligations of such Partner or the Partnership on any withdrawal or distribution under this section 9.3 or allocation under section 10.4. All amounts withheld with respect to any withdrawal, distribution or allocation to a Partner shall be treated as amounts withdrawn or distributed to such Partner for all purposes under this Agreement as of the effective date of the related withdrawal, distribution or allocation.

(f)    **Restrictions on Withdrawals and Distributions**.  Any of the foregoing provisions of this section 9.3 to the contrary notwithstanding, no withdrawal or distribution shall be made (1) if such withdrawal or distribution would violate any contract or agreement to which the Partnership is then a party or any law then applicable to the Partnership, or (2) to the extent that the General Partner determines that it is necessary or advisable for the Partnership to retain any amount otherwise withdrawable or distributable to pay, or to establish a reserve for the payment of, any liability or obligation of the Partnership, whether known or unknown, liquidated, fixed, contingent or other.

9.4    **Deposit of Contributions**.    Anything in this Agreement to the contrary notwithstanding, all Capital Contributions shall be paid directly to a custodian of the Partnership's assets designated by the General Partner and shall not be paid to the General Partner.  Any such payment may be made by check payable to the Partnership's account with such custodian or by wire transfer to such custodian for the Partnership's account according to wire transfer instructions furnished by the Partnership.

9.5    **Records of Contributions, Withdrawals and Distributions**.  On each Capital Contribution, withdrawal or distribution as contemplated by this Agreement, the General Partner shall cause the Partnership's records to reflect accurately such Capital Contribution, withdrawal or distribution.

9.6    **No Interest**.  No Partner shall be entitled to receive from the Partnership payment of any interest on any Capital Contribution.

9.7    **No Other Contributions**.  Without the consent of all Partners, no Partner shall contribute any funds or other property to the Partnership's capital except as is expressly required or permitted by this Agreement.

10.    **Profits and Losses**.

10.1    **Books**.  The General Partner shall maintain complete and accurate accounts in proper books of all transactions of or on behalf of the Partnership and shall enter or cause to be entered therein a full and accurate account of all transactions on behalf of the Partnership.  The Partnership's books and accounting records shall be kept in accordance with such accounting principles as the General Partner may determine to be convenient and advisable.

10.2    **Accountings**.  As soon as is reasonably practicable after the close of each Fiscal Year, the General Partner shall make or cause to be made a full and accurate accounting of the Partnership's affairs as of the close of that Fiscal Year and shall prepare or cause the Outside Accountants to prepare a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Partners' capital showing the respective Capital Accounts of the Partners as of the close of such Fiscal Year and, if any, the Capital Contributions of and distributions to Partners during such Fiscal Year.  In addition, the General Partner shall furnish to each Partner information regarding the

Partnership necessary for such Partner to complete such Partner's federal and state income tax returns. The General Partner shall also furnish a copy of the Partnership's tax returns to any Partner requesting the same, excluding the Schedules K-1 of the other Partners. On such accounting being made, Profits and Losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Partnership to the respective Partners as herein provided.

10.3    **Capital Accounts**.  The Partnership shall maintain an individual Capital Account for each Partner as provided in section 5.6, section 9.3 and this section 10.

10.4    **Allocations**.  Profits and Losses shall be allocated to the Partners for each period described below, as follows:

(a)    **Allocations Generally**.  Subject to the provisions below regarding the special allocations in section 10.5, all Profits and Losses for each Fiscal Period shall be allocated to the Capital Accounts of the Partners in proportion to their respective Ownership Percentages as of the first day of such Fiscal Period.

(b)    **Recapture**.  Anything herein to the contrary notwithstanding, any recapture under applicable tax laws shall be allocated to the Partners in the same proportions as the item generating the recapture shall have been allocated.

10.5    **Special Capital Account Allocations**.  Notwithstanding the allocation provisions of section 10.4, the following special allocations shall be made in allocating Profits and Losses:

(a)    **New Issues**.  The General Partner may cause the Partnership to invest in, hold, sell, transfer or otherwise dispose of one or more New Issues.  Anything in section 10.4 to the contrary notwithstanding, the General Partner shall specially allocate the Profits and Losses that relate to New Issues in a manner that it determines is consistent with section 10.4 to the extent permitted under the New Issue Rules or appropriate to ease the administrative or other burdens of applying these provisions.  Consistent with the preceding sentence, the General Partner may elect not to allocate any New Issue Profits and Losses to persons defined as "restricted persons" under the New Issue Rules, notwithstanding the fact that an allocation to such persons might be permitted under the New Issue Rules.

(b)    **Section 704 Allocations**.  Special allocations shall be made as the General Partner considers necessary to comply with the requirements of Code section 704 and the Regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions therein.

(c)    **Tax Allocations**.

(1)    Subject to section 10.5(c)(2), in each Fiscal Year, items of income, deduction, gain, loss or credit that are recognized for income tax purposes shall be allocated among the Partners, General and Limited, in a manner that reflects equitably amounts credited to or debited against the Capital Account of each Partner, whether in such Fiscal Year or in prior Fiscal Years.  To this end, the Partnership shall establish and maintain records that show the extent to which the Capital Account of each Partner comprises, as of the last day of each Fiscal Year, amounts that have not been reflected in the taxable income of such Partner.  To the extent that the General Partner deems it feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits.

(2)     Notwithstanding any of the foregoing provisions to the contrary, if a Partner withdraws capital during a Fiscal Year, the General Partner may elect to make allocations of taxable income and loss as follows:

(A)     The Partnership may first allocate taxable income or gain to each Partner who has withdrawn or been distributed all or part of that Partner's Capital Account balance in that Fiscal Year, to the extent that such withdrawal or distribution exceeds that Partner's adjusted tax basis in that Partner's interest in the Partnership immediately before such withdrawal or distribution. If more than one Capital Account has been so withdrawn or distributed in full or in part, such allocations, if made, shall be made to the extent of and in proportion to such differences;

(B)     The Partnership may first allocate taxable loss or deduction to each Partner who has withdrawn or been distributed all of that Partner's Capital Account balance in that Fiscal Year, to the extent that that Partner's adjusted tax basis in that Partner's interest in the Partnership exceeds that Capital Account balance immediately before such withdrawal or distribution. If more than one Capital Account balance has been so withdrawn or distributed, such allocations, if made, shall be made to the extent of and in proportion to such differences; and

(C)     Thereafter, the Partnership may allocate taxable income and loss as provided in section 10.5(c)(1).

(3)     The General Partner shall make any elections or other decisions relating to such allocations, or computations of taxable income, in any manner that reasonably reflects the purpose and intention of this Agreement and shall be binding on all Partners. Allocations pursuant to this section 10.5(c) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Capital Account or share of Profits, Losses or other items of any Partner, or distributions to any Partner, pursuant to any provision of this Agreement.

(d)     **Other Allocation Rules.**

(1)     Generally, all Profits and Losses shall be allocated among the Partners as provided in section 10.4 and this section 10.5. If Partners are admitted or make Capital Contributions to the Partnership on different dates during any Fiscal Year, the Profits or Losses for each such Fiscal Year shall be allocated in accordance with Code section 706, using any convention permitted by law and selected by the General Partner.

(2)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as the General Partner determines using any permissible method under Code section 706 and the Regulations thereunder.

(3)     The Partners acknowledge that they are aware of the income tax consequences of the allocations made by section 10.4 and this section 10.5 and hereby agree to be bound thereby in reporting their shares of Profits and Losses for income tax purposes.

(4)     Notwithstanding any of the foregoing provisions to the contrary, if taxable gain to be allocated includes income resulting from the sale or disposition of Partnership property or property of a limited partnership or joint venture in which the Partnership owns an interest that is treated as ordinary income, such gain so treated as ordinary income shall be allocated to and reported by each Partner in proportion to allocations to that Partner of the items that gave rise to such ordinary income, and the Partnership shall keep records of such allocations. In the event of the subsequent admission of any new Partner, any item that would constitute "unrealized receivables" under

Code section 751 and the Regulations thereunder shall not be shared by the newly admitted Partners, but rather shall remain allocated to existing Partners.

(e)    **Provisional Allocation**.  If any amount that the Partnership claims to constitute a deductible expense in any Fiscal Year is treated by any federal, state or local taxing authority as a payment to a Partner in that Partner's capacity as a member of the Partnership for income tax purposes, with regard to that authority, items of Partnership income and gain for such Fiscal Year shall first be allocated to that Partner to the extent of such payment.

10.6    **Valuation**.  The General Partner shall determine the value of the Partnership's assets and liabilities in good faith.  Such determination shall be conclusive and binding on all of the Partners and all parties claiming through or under them.

10.7    **Bank and Other Accounts**.  All Partnership funds shall be deposited and maintained in one or more accounts in the Partnership's name at such bank or banks or other financial institutions (including, without limitation, money market mutual funds and instruments, futures commission merchants and securities brokerage firms) as the General Partner may select.    All withdrawals from any such account or accounts shall be made only by written instrument signed by or on behalf of the General Partner.

11.    **General Partner's Management Fee and Expenses**.

11.1    **Management Fee**.  As compensation to the General Partner for its services in managing the Partnership's investments, on the first day of each Fiscal Quarter an amount shall be deducted from the Capital Account of each Limited Partner and paid as a Management Fee to the General Partner.  Such amount shall equal with respect to (a) New Limited Partners, 0.375 percent and (b) Legacy Limited Partners, 0.3125 percent, of that Capital Account balance.  In the case of both New and Legacy Limited Partners, the Capital Account balance shall be based on the value of the assets and liabilities of the Partnership determined as of that date pursuant to section 10.6.  A Limited Partner whom the General Partner permits to contribute capital on a date other than the first day of a Fiscal Quarter shall be charged a prorated Management Fee with respect to such Capital Contribution on the date the Capital Contribution is made.  A Limited Partner who is permitted to withdraw or is distributed capital on a date other than the last day of a Fiscal Quarter shall receive a refund of any Management Fee paid in advance. The General Partner may assign its right to receive the Management Fee to any other person or entity, and it may waive all or any portion of the Management Fee with respect to any Limited Partner in any Fiscal Quarter without notice to the Limited Partners.

11.2    **Expenses**.  The Partnership shall bear all costs and expenses incidental to its organization and ongoing operation including, without limitation, all:

(a)    Trading expenses (such as brokerage commissions and charges, expenses relating to short sales, clearing and settlement charges, option premiums and custodial and service fees);

(b)    Interest and commitment fees on loans and debit balances (on margin or otherwise);

(c)    Expenses of negotiating and entering into contracts and arrangements and making investments (such as brokerage, legal, accounting, investment banking, appraisal and other professional and consulting fees and expenses arising from particular investments and potential investments) and similar expenses in terminating those contracts and arrangements and disposing of those investments;

(d)      Expenses incurred in visiting companies and attending research and investment conferences (for example, airfare, hotel accommodations and meals);

(e)      Expenses of registering the Partnership's restricted Securities;

(f)      Expenses incurred in attempting to protect or enhance the value of the Partnership's investments (including the expenses of instituting and defending lawsuits);

(g)      Income, withholding and transfer taxes, and other governmental charges and duties;

(h)      Fees of custodians, clearing agencies and banks;

(i)      Administration, bookkeeping, recordkeeping, legal, accounting, auditing, tax preparation and all professional, expert and consulting fees and expenses arising in connection with the Partnership's activities (and computer hardware and software related thereto), including without limitation:

(1)      Fees and expenses of counsel for the Partnership, the General Partner or one or more officers or managers of the General Partner;

(2)      Expenses related to research (including third-party research fees), and portfolio management and quotation services and equipment (and computer hardware and software related thereto); and

(3)      Fees and expenses of accounting, bookkeeping and recordkeeping services of the Partnership's administrator or any similar service provider that the General Partner retains to assist it in performing these services for the Partnership;

(j)      Fees and expenses of offering and selling Limited Partner interests and communicating with existing and prospective Limited Partners (including, without limitation, legal and accounting fees and expenses, governmental and self-regulatory agency filing fees, and travel expenses, such as airfare, hotel accommodations and meals);

(k)      Expenses of investing the Partnership's assets indirectly, such as through a partnership or other entity (a so-called "master fund"), including the Partnership's proportionate share of the costs and expenses of organizing and operating the master fund;

(l)      Premiums and other expenses of insurance policies that the General Partner considers appropriate, insuring the Partnership, the General Partner and their Affiliates against liabilities that may arise in connection with the business or management of the Partnership;

(m)      Proxy voting service expenses;

(n)      Contingencies for which the General Partner determines reserves are required; and

(o)      Extraordinary expenses (such as litigation expenses).

The Partnership shall reimburse the General Partner for any of these expenses that are paid directly by the General Partner. Except as described above, the General Partner shall bear all of its operating, general, administrative and overhead expenses and shall not otherwise charge the Partnership for them,

except that these expenses, together with any of the Partnership's expenses, may be paid by securities brokerage firms and futures commission merchants to which the General Partner directs the Securities trades of the Partnership and any other accounts that the General Partner manages as further provided in section 12.1(h).

12.    **The General Partner.**

12.1    **Management.** Subject only to the rights of the Limited Partners to consent on specific matters as herein provided, the General Partner shall have full, exclusive and complete authority in managing and controlling the Partnership's activities for the purposes herein stated and shall make all decisions affecting the Partnership. The powers of the General Partner on behalf and at the expense (subject to section 11.2) of the Partnership include, but are not limited to, the power to:

(a)    Expend the Partnership's capital and revenues to further its affairs;

(b)    Enter into, execute and deliver stock, bond, debenture, note, option, derivative and other Securities subscription, purchase and sale agreements, participation agreements, assignments, brokerage agreements, custodian agreements and any and all other agreements, documents or instruments that the General Partner deems to be necessary or appropriate to perform its duties effectively and properly or exercise its powers under this Agreement;

(c)    Purchase, hold, sell (long or short), borrow or otherwise trade or deal in Securities;

(d)    Sell (long or short), borrow, lend, dispose of, trade or exchange the Partnership's assets for such consideration and on such other terms and conditions and evidenced by such documents or instruments as the General Partner deems appropriate;

(e)    Open and maintain deposit, checking, money market, custodial and margin accounts with securities brokers and futures commission merchants and custodial accounts with banks, securities brokers, futures commission merchants and other financial institutions;

(f)    Designate one or more securities brokers and futures commission merchants to maintain Securities for the Partnership in the names of nominees of such brokers and futures commission merchants;

(g)    Borrow money and Securities from banks, securities brokers, futures commission merchants and other financial institutions for any Partnership purpose and, in connection therewith, mortgage, pledge or hypothecate any Partnership assets, to secure repayment of the borrowed sums, and no bank, securities broker, futures commission merchant, other financial institution or other person to which application for a loan is made by the General Partner shall be required to inquire as to the purposes for which such loan is sought, and as between the Partnership and such bank, securities broker, futures commission merchant or other financial institution or person, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for purposes authorized hereunder;

(h)    Enter into brokerage agreements with brokerage firms and futures commission merchants (whether or not affiliated with the Partnership or the General Partner), to execute or effect trades for the Partnership's account and to make arrangements with those firms whereby the General Partner agrees to direct trades for the Partnership's account to those firms, to interpose those firms as agents in principal transactions, including principal transactions in which the executing broker rebates a portion of its markup to such firms, or to pay those firms additional compensation on transactions made through electronic crossing networks or other alternative securities exchanges, in

exchange for certain non-monetary benefits offered by those firms which may include, among other things, referring prospective investors in the Partnership or any other account managed by the General Partner or any of its Affiliates, research reports, services and conferences, economic and market information, portfolio strategy advice, industry and company comments, technical data, consultations, performance measuring data, on-line pricing, special execution capabilities, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, order of call, offering to the General Partner on-line access to computerized data regarding clients' accounts, computerized trading systems, clearance, settlement, reputation, financial strength and stability, efficiency of execution and error resolution, quotation services, the availability of stocks to borrow for short trades, custody, recordkeeping and similar services, and other matters involved in the receipt of brokerage services generally. The General Partner also may purchase from a broker or futures commission merchant or allow a broker or futures commission merchant to pay for all or a portion of the Partnership's or the General Partner's or its Affiliates' costs and expenses of operation, such as newswire and data processing charges, proxy voting services, quotation services, periodical subscription fees, third-party research fees, computer hardware and software related to research, all costs and expenses of offering and selling Limited Partner interests and communicating with existing and prospective Limited Partners (including travel expenses, such as airfare, hotel accommodations and meals, legal and accounting fees and expenses and government and self-regulatory agency filing fees), all costs and expenses incurred in visiting companies and attending research and investment conferences (including airfare, hotel accommodations and meals), accounting and administrative fees (including the expenses of the accounting and bookkeeping services of third party vendors that provide such services), legal fees, and the like, whether or not such costs or expenses are within the safe harbor provided by section 28(e) of the Securities Exchange Act of 1934, as amended, or any provision subsequently adopted thereunder or by a securities regulator in connection therewith;

(i)    Engage and compensate such employees, agents, lawyers, accountants, brokers, futures commission merchants, investment advisers, administrators and other professionals, consultants, experts and contractors, as the General Partner may consider advisable in conducting the Partnership's affairs (including, but not limited to, delegating part or all of its duties to any such person);

(j)    Appoint additional or successor general partners of the Partnership without the consent of any of the Limited Partners;

(k)    Maintain adequate office facilities, records and accounts of all operations and expenditures and furnish the Limited Partners with all reports and statements of account required to be furnished to them pursuant hereto or that the General Partner deems advisable;

(l)    Purchase and maintain such insurance policies as the General Partner may consider appropriate, insuring the Partnership, the General Partner and its Affiliates against liabilities that may arise in connection with the business or management of the Partnership;

(m)    Collect amounts due to the Partnership, enforce the Partnership's rights, seek to recover compensation for injury or damage to the Partnership or to prevent such injury or damage through litigation or other means and engage and compensate lawyers, expert witnesses and others in connection therewith;

(n)    Solicit proxies, institute or participate in tender offers or take other actions under federal or state securities laws or state corporate laws as the General Partner deems advisable;

(o)    Establish reserves for the payment of any Partnership liability or obligation, whether known or unknown, liquidated, fixed, anticipated, contingent or other; and

(p)      Do or perform such other acts and things as the General Partner deems advisable and in the Partnership's interests.

12.2    **Exceptions**.    Notwithstanding anything to the contrary in section 12.1, but subject to section 19, the General Partner shall not take direct possession or custody of cash or Securities held for the Partnership's account and no act in contravention of this Agreement may be legally done without the consent of the General Partner and a majority in interest of the Limited Partners.

12.3    **General Partner's Discretion; Power to Bind**.    The General Partner may exercise any and all of its rights, powers, authority and discretion under this Agreement or the Act in its absolute and exclusive discretion, and the General Partner is authorized and empowered to grant or give any consent, approval or authorization, make any determination or do or perform any other act or thing conditionally or unconditionally, arbitrarily, or inconsistently in varying or similar circumstances, without any accountability to the Partnership or any other Partner, except only as otherwise specifically and expressly provided by this Agreement or the Act notwithstanding this Agreement.  The General Partner shall have exclusive authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the Partnership in the ordinary course of the Partnership's business and otherwise within the scope of its powers and authority as herein provided; provided that, if the General Partner should incur any obligation in the name or on the credit of the Partnership contrary to section 12.1 or 12.2 or this section 12.3, the Partnership may hold it liable for the entire amount of the obligation so incurred.  If one or more persons shall be admitted to the Partnership as additional general partners pursuant to this Agreement, each such general partner acting alone shall have all of the authority, rights and powers of the General Partner.

12.4    **Expelling Limited Partners**.

(a)      **Generally**.    The General Partner may at any time expel all or any portion of the Capital Account balance of any Limited Partner from the Partnership, with or without cause, on notice to that Limited Partner specifying the effective date of such expulsion and the amount of that Limited Partner's Capital Account balance so expelled.  In the event of such expulsion, the expelled Limited Partner shall be deemed to have withdrawn the portion of its Capital Account balance stated in such notice as provided in section 9.3(a), effective as of the date fixed therefor by the General Partner.

(b)      **ICA and ERISA Expulsion**.    If the General Partner determines at any time that:

(1)      The participation by any Limited Partner that is a corporation, partnership, limited liability company, trust or other entity may cause the Partnership not to be excluded from the definition of "investment company" under ICA section 3(c)(1); or

(2)      The participation by any Limited Partner may cause Partnership assets to be deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder,

then, at the General Partner's election and effective as of any date that the General Partner determines, that Limited Partner may be deemed to have given notice of withdrawal pursuant to section 9.3(a) of such portion or all of that Limited Partner's Capital Account balance as the General Partner determines is necessary or advisable; provided that such date may be before or after the time that the General Partner makes such determination.  Such withdrawal shall be consummated as provided in section 9.3(a) to the maximum feasible extent, except that the Partnership shall not charge the withdrawal fee described in section 9.3(a)(6)(B).  The General Partner shall promptly notify the affected Limited Partner of the General Partner's determination under this section 12.4(b).  For purposes of this section 12.4(b), any Limited Partner that is a corporation, partnership, limited liability company, trust or other entity and that is an

"investment company" under the ICA or that relies on the exclusion from the definition of an investment company provided by ICA section 3(c)(1) or 3(c)(7) and that has an Ownership Percentage of ten percent or more of the Ownership Percentages of all Limited Partners shall inform the General Partner of the number of beneficial owners of its outstanding securities. Thereafter, that Limited Partner shall inform the General Partner immediately if that number changes.

      12.5    **Indemnity and Limitation of Liability**.

      (a)    **Indemnification and Limitation of Liability.** The General Partner, any of its Affiliates, any person acting on behalf of the General Partner or such Affiliate and any person that controls the General Partner within the meaning of section 15 of the Securities Act of 1933, as amended, or section 20 of the Securities Exchange Act of 1934, as amended (each, an "indemnitee")

      (1)    Shall be indemnified by the Partnership from and against any cost, claim, liability, damage, loss, settlement or expense (including, without limitation, all court costs, legal and expert witness fees and expenses and all costs of investigation, taxes and penalties) incurred or suffered by the indemnitee by virtue of the indemnitee's acting as or on behalf of the General Partner for the Partnership in connection with the Partnership's activities; and

      (2)    Shall not be liable to the Partnership or any Partner for any cost, claim, liability, damage, loss, settlement or expense incurred or suffered in connection with the Partnership's activities, including, without limitation, any (A) failure to obtain the lowest brokerage commission rates, failure to combine or arrange orders to obtain the lowest brokerage commission rates with respect to any transaction on behalf of the Partnership, or failure to recapture any brokerage commissions for the benefit of the Partnership; (B) error in judgment with respect to the Partnership; (C) trade error made by any indemnitee in connection with any transaction on behalf of the Partnership; or (D) tax liability asserted against any Partner by any federal, state or local authority as a result of any position taken by the Partnership or any Partner.

      (b)    **Exclusions.** Notwithstanding the foregoing sections 12.5(a)(1) and (2), if such cost, claim, liability, damage, loss, settlement or expense arises out of any action or inaction of the indemnitee, the indemnitee must have believed at the time of such action or inaction, in good faith, that such course of conduct was in the interests of the Partnership, and such course of conduct must not have constituted a breach by the indemnitee of any fiduciary duty that the indemnitee may have to the Partnership (for these purposes, a failure described in section 12.5(a)(2)(A), an error in judgment described in section 12.5(a)(2)(B), a trading error described in section 12.5(a)(2)(C) or a tax position described in section 12.5(a)(2)(D) shall not be deemed a breach of an indemnitee's fiduciary duty), and such indemnification shall be available only as and to the extent that it is not prohibited by applicable law governing rights of indemnification.

      (c)    **Advancing Legal Fees.** If the General Partner approves, the Partnership shall, on demand, pay all costs, expenses, attorneys' and expert witness fees as and when incurred by the indemnitee in connection with any such cost, claim, liability, damage, loss, settlement or expense if the indemnitee undertakes to repay the same to the Partnership if a court of competent jurisdiction finally determines that the indemnitee shall not have been entitled to indemnification hereunder.

      (d)    **Related Issues.** Such payment, indemnification or amounts recoverable under the foregoing provisions shall only be recoverable out of the assets of the Partnership, and the Limited Partners shall not be personally liable therefor. If under section 12.5(c), the General Partner approves the advance of costs, expenses, or attorneys' or expert witness fees incurred by an indemnitee, the General Partner, on behalf of the Partnership, shall be entitled to assume the defense of the related litigation or proceeding with counsel of the General Partner's choice (in which case the Partnership shall

not be responsible under the foregoing indemnity for the fees and expenses of any separate counsel retained by the indemnitee if the indemnitee is not the General Partner); provided that such counsel shall be reasonably satisfactory to the indemnitee. Notwithstanding the General Partner's election to assume the defense of such litigation or proceeding, the indemnitee (if such person is not the General Partner) shall have the right to employ separate counsel and to participate in the defense of such litigation or proceeding, and the Partnership's indemnification obligation hereunder shall apply to the fees, costs and expenses of such separate counsel, if the representation of both parties by counsel that the General Partner selects to represent such indemnitee would constitute a conflict of interest for such counsel. The rights granted under this section 12.5 shall not be affected by, and shall survive, the Partnership's dissolution or termination and any Partner's death, disability, incapacity, withdrawal, insolvency or dissolution. In addition, such rights shall not be deemed to be exclusive of any other rights any indemnitee may have under any agreement, as a matter of law, in equity or otherwise.

12.6    **Tax Matters Partner**. The General Partner is hereby appointed as the Tax Matters Partner. The General Partner may remove and replace the Tax Matters Partner from time to time.

12.7    **Transactions with Affiliates**.

(a)    **Agency Cross Transactions**. The General Partner shall have authority to effect on the Partnership's behalf at any time and from time to time any "agency cross transaction for an advisory client" (as defined in Rule 206(3)-2 under the Investment Advisers Act of 1940, as amended) with respect to purchases and sales of Securities by or on behalf of the Partnership with or through the General Partner or any Affiliate that is registered as a broker or dealer under section 15 of the Securities Exchange Act of 1934, as amended; provided that the authority granted in this section 12.7 may be revoked at any time by the General Partner or the consent of a majority in interest of the Limited Partners. Each Limited Partner acknowledges and consents that the General Partner may use such authority to rebalance the Partnership's account and the other accounts that the General Partner or its Affiliates manage, to reflect Capital Contributions and withdrawals and for other purposes consistent with the objectives of the Partnership and such other accounts.

(b)    **Principal Transactions**. The General Partner may establish a committee of three Limited Partners that are not Affiliates of the General Partner to consider and consent, on behalf of the Limited Partners, to any purchase from or sale to the Partnership of any Security by the General Partner or any of its Affiliates, to the extent that the General Partner deems necessary or appropriate under the Investment Advisers Act of 1940, as amended. Such committee shall act by the unanimous vote or consent of its members. The General Partner may remove or replace a committee member at any time and may fill any vacancy on the committee. Each Limited Partner authorizes such committee to act on its behalf.

13.    **Rights of Limited Partners**.

13.1    **Limited Liability**. No Limited Partner shall be subject to assessment, nor except as may be otherwise required under the Act notwithstanding this Agreement, shall any Limited Partner be personally liable for any of the debts or liabilities of the Partnership or any of the losses thereof in excess of such Limited Partner's Capital Contributions and any undistributed income attributable to such Limited Partner.

13.2    **Management**. No Limited Partner, as such, shall take part in managing or transacting any business for the Partnership or have power to sign for or bind the Partnership to any agreement, oral or written, or any instrument or other document; provided that no vote or consent of the Limited Partners that is specifically authorized hereby shall be deemed to violate this provision. The

Limited Partners shall not have any voting rights other than as expressly provided in this Agreement and, accordingly, the Limited Partners shall not have the power to remove a General Partner.

13.3    **No Meetings; All Actions by Written Consent**. No meetings of the Partners shall be held and, instead, all votes or consents that the Limited Partners are required or permitted to take shall be taken by a consent in writing, setting forth the action so taken, signed by Partners having not less than the aggregate Ownership Percentage that would be necessary to authorize or take that action.

13.4    **Record Date**. So that the Partnership may determine the Partners of record entitled to consent, or entitled to receive any distribution or to exercise any rights with respect to any other lawful action, the General Partner may fix, in advance, a record date, which is not more than sixty or less than ten days before the date on which the first written consent is given and not more than sixty days before any other action. If no record date is fixed the record date shall be the day on which the first written consent is given. The record date for determining Partners for any other purpose shall be at the close of business on the day on which the General Partner adopts it, or the sixtieth day before the date of the other action, whichever is later.

13.5    **Records**. The General Partner shall maintain and preserve during the Partnership's term at its principal executive office all accounts, books, records and other relevant Partnership documents, including, without limitation, all of the same required by applicable law to be maintained and preserved.

13.6    **Inspection**. Each Limited Partner has the right, subject to such reasonable standards as are set forth in this section 13.6 or that the General Partner otherwise establishes from time to time, to obtain from the General Partner from time to time on reasonable demand, for any purpose reasonably related to that Limited Partner's interest as a Limited Partner, any information required to be maintained by section 13.5, except that no Limited Partner shall have the right to obtain (a) the Partnership's daily trading records or (b) the name and address of any current or former Limited Partner. Any such demand shall be in writing and shall state the purpose of such demand. The General Partner, however, has the right to keep confidential from Limited Partners for such periods as the General Partner deems reasonable any information that the General Partner reasonably believes to be in the nature of trade secrets or other information (such as, for example, the identity of the Partnership's portfolio positions) the disclosure of which the General Partner believes is not in the Partnership's best interests or could damage the Partnership or its business, or that the Partnership is required by law or agreement with a third party to keep confidential.

13.7    **Bank Holding Company Act Subject Persons**. Notwithstanding any other provision of this Agreement to the contrary:

(a)    **Notice**. Any Limited Partner that is or becomes a BHCA Subject Person shall immediately inform the General Partner in writing that it is a BHCA Subject Person.

(b)    **Nonvoting Interests**. Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has an Ownership Percentage in excess of four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners entitled to participate in giving any consent or taking any action, shall be deemed, for voting purposes only, to hold an Ownership Percentage of only four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners (after giving effect to the limitations imposed by this section 13.7 on all such Limited Partners), and the voting rights with respect to the Ownership Percentage in excess of said four and nine-tenths percent shall be

deemed held by the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(c)     **Limited Right to Consent**. Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(d)     **Special Right of Withdrawal**. Promptly on receipt from any Partner of a notice of intention to withdraw any portion of such Partner's Capital Account balance pursuant to this Agreement and before consenting to any such withdrawal that requires the General Partner's consent or giving a notice of the General Partner's intention to expel a Partner's interest in the Partnership pursuant to the provisions of this Agreement governing expulsions, if such withdrawal or expulsion would result in a BHCA Subject Person, along with any of its Affiliates identified as such to the General Partner, having an Ownership Percentage in excess of twenty-four and nine-tenths percent, even if such BHCA Subject Person shall not have given the General Partner an Election Notice or, having given an Election Notice, shall thereafter have given a Revocation Notice, the General Partner shall so notify such BHCA Subject Person, which shall have the right to withdraw, at the time of the withdrawal or redemption giving rise thereto or as soon thereafter as is practical, so much of its Capital Account balance, after giving effect to any other withdrawals or redemptions (including withdrawals by other BHCA Subject Persons), as shall be required to reduce the Ownership Percentage of such BHCA Subject Person and any of its Affiliates identified as such to the General Partner to no more than twenty-four and nine-tenths percent. If any BHCA Subject Person has a right to withdraw a portion of its Capital Account balance under the preceding sentence but does not exercise that right, the General Partner may require such BHCA Subject Person to make a withdrawal to reduce the Ownership Percentage of such BHCA Subject Person and any of its Affiliates identified as such to the General Partner to no more than twenty-four and nine-tenths percent. Payments of the withdrawn amounts shall be made as described in sections 9.3(a) and (b) as if the date of withdrawal were a Permitted Withdrawal Date.

(e)     **Distributions in Kind**. The General Partner shall give at least fifteen days' prior notice to each Limited Partner that is a BHCA Subject Person of any proposal to distribute property in kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in kind to the extent that such Limited Partner advises the General Partner at least five days before the date set forth in such notice for such distribution that such distribution could reasonably be expected to cause it to violate the BHCA, but instead such Limited Partner shall receive other assets of equal value, the receipt of which will not cause such Limited Partner to violate the BHCA.

(f)     **Election**. A Limited Partner that is a BHCA Subject Person and that elects to be subject to sections 13.7(b) and (c) shall notify the General Partner thereof (an "Election Notice") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to sections 13.7(b) and (c) until ninety days after such Limited Partner notifies the General Partner that it elects no longer to be subject to sections 13.7(b) and (c) (a "Revocation Notice"), which ninety-day period may be reduced by the General Partner; provided that each such notice shall be accompanied by the Limited Partner's certification that such notice and any action by the General Partner in reliance thereon and in accordance with this Agreement is duly authorized under all applicable laws, rules and regulations.

13.8     **Voting Rights**. With the General Partner's consent, a Partner may waive all or any portion of the voting rights that this Agreement or the Act confers on that Partner. If a Limited

Partner and the General Partner agree to any such waiver, then, for voting purposes only, the portion of such Limited Partner's Ownership Percentage with respect to which voting rights are waived shall be deemed held by the Limited Partners who have not waived any of their voting rights, pro rata in proportion to their respective Ownership Percentages.

13.9    **Confidentiality**. The General Partner will deliver to the Limited Partners copies of the Partnership's financial statements and other information regarding the Partnership. Each Limited Partner shall use those financial statements and other information, including any information provided under section 13.6, only to further its interests as a Limited Partner and, except for disclosures required by applicable law, shall maintain the confidentiality of those financial statements and that other information.    Notwithstanding the foregoing, a Limited Partner (and each of its employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and any materials provided to the Limited Partners relating to such tax treatment and structure.

14.    **Nature of Limited Partners' Liabilities for Claims Against the Partnership**. The parties intend that each Limited Partner shall be liable to creditors only for such Limited Partner's Capital Contributions and undistributed Profits. Therefore, (a) the General Partner shall arrange to prosecute, defend, settle or compromise such actions at law or in equity at the Partnership's expense as it may consider necessary to enforce or protect the Partnership's interests and (b) the General Partner shall satisfy any judgment, decree, decision or settlement under the terms of which the Partnership (or the General Partner, or any Affiliate of the General Partner, on behalf of the Partnership) is obligated to pay any amount, first, out of available proceeds of any insurance of which the Partnership is the beneficiary, next, out of Partnership assets and income, and, finally, out of the General Partner's assets and income; provided that if any such payment is made out of the General Partner's assets or income, the General Partner shall be entitled to reimbursement from the Partnership, with interest from the date of payment at the rate provided by statute for interest on judgments.

15.    **Costs of Special Services**. A Limited Partner shall pay any costs incurred in connection with special services requested by that Limited Partner. Such services would include, for example, those that would benefit the Limited Partner but would not benefit the Partnership, such as a special evaluation or financial accounting for the purposes of estate valuation and legal fees and other expenses relating to assigning or transferring an interest in the Partnership. If that Limited Partner does not pay the costs of such services promptly after the General Partner's request for payment, the General Partner may deduct the amount thereof from that Limited Partner's Capital Account balance and pay such amount to the person entitled thereto.

16.    **Withdrawal of General Partner; Additional and Successor General Partner**.

16.1    **Withdrawal, Etc**. A person shall cease to be a General Partner on the happening of any of the following events:

(a)    Such person withdraws as a General Partner by notice to the Partnership;

(b)    An order for relief against such person is entered under Chapter 7, Chapter 11 or Chapter 13 of the federal bankruptcy law, or such person makes a general assignment for the benefit of creditors, files a voluntary petition under the federal bankruptcy law, files a petition or answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such person in any proceeding of this nature, or seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such person or all or any substantial part of such person's properties;

(c)      Sixty days after the commencement of any proceeding against such person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed or if within sixty days after the appointment without such person's consent or acquiescence of a trustee, receiver or liquidator of such person or of all or any substantial part of such person's properties, the appointment is not vacated or stayed or within sixty days after the expiration of any stay, the appointment is not vacated;

(d)      If such person is a corporation, limited liability company or partnership, the dissolution of such person; or

(e)      If such person is a natural person, (1) his or her death, (2) the entry by a court of competent jurisdiction of an order adjudicating him or her incompetent to manage his or her person or estate, or (3) his or her inability to perform his or her duties as a General Partner because of a physical, mental or legal disability for a period of more than sixty consecutive days.

16.2     **New General Partner**.  The General Partner may appoint any person as an additional or successor General Partner at any time without any vote or consent of any of the Limited Partners.  If the General Partner ceases to be the general partner of the Partnership and there is no remaining or surviving general partner of the Partnership, with the consent of a majority in interest of the Limited Partners given within thirty days thereafter, the Partnership may appoint and admit a new General Partner to the Partnership and elect to continue the Partnership's business.  A person so appointed will become General Partner on accepting such appointment and agreeing to act as General Partner, to become a party to this Agreement and to assume all the obligations and responsibilities of the General Partner hereunder.  At all times when the Partnership has two or more General Partners, they shall be jointly and severally liable for performing all of the duties and obligations of the General Partner hereunder, and they shall determine by agreement between or among themselves the manner in which Management Fees will be divided between or among them.

16.3     **Procedure**.  If a person ceases to be a General Partner, a General Partner is succeeded or the Partnership admits an additional General Partner, the remaining General Partner or Partners shall amend this Agreement and the Partnership's certificate of limited partnership to name the additional or successor General Partner or Partners without any further consent of any of the Limited Partners.

16.4     **Conversion of Interest**.  A person who ceases to be a General Partner for any reason shall:

(a)      Retain only the interest in such person's Capital Account, Profits, Losses and distributions as such person would have had if such person had been admitted to the Partnership as a Limited Partner at the date such person ceases to be a General Partner and shall exclude any value attributable to the right to manage and control the Partnership's business, and that interest shall be that of a Limited Partner;

(b)      Not be personally liable for the Partnership's debts incurred after such person ceases to be a General Partner; and

(c)      Be entitled to consent as (and only as) a Limited Partner only on matters on which the Limited Partners are entitled to consent.

17.    **Dissolution and Termination**.

17.1    **Events of Dissolution**.    The Partnership shall continue until terminated and dissolved (a) when a sole General Partner ceases to be a General Partner, if a successor General Partner has not been appointed as and become the General Partner within thirty days after the date that there ceases to be a General Partner of the Partnership as provided in section 16.2, or (b) when the General Partner elects, by written notice to the Partnership, to dissolve the Partnership. Subject to the preceding sentence, the Partnership shall not be dissolved and its affairs shall continue so long as there are at least two Partners, at least one of which is the General Partner, and the remaining General Partner or Partners shall continue the Partnership's business, notwithstanding that any person shall cease to be a General Partner for any reason. The Partnership shall not be dissolved or terminated by the expulsion, retirement, withdrawal, death, insanity, adjudication of bankruptcy, insolvency or dissolution of any Limited Partner, or by the assignment by any Limited Partner of such Limited Partner's interest in the Partnership or the admission of any new Partner as provided herein.

17.2    **Winding Up**.    On the Partnership's dissolution, the General Partner shall wind up the Partnership's affairs; provided that if there is no General Partner, the Partnership's affairs shall be wound up by such person or persons as the General Partner shall theretofore have designated for liquidation of the Partnership's assets or, if the General Partner shall not have made any such designation, by such person or persons as may be designated by the consent of a majority in interest of the Limited Partners (the General Partner or such person or persons, as the case may be, being hereinafter called the "Liquidating Persons"). The Liquidating Persons shall manage the Partnership's assets and shall liquidate at least so much of those assets as may be required to pay all liabilities of the Partnership (including, without limitation, all costs of dissolution and winding up, any amount that the General Partner shall have agreed to pay to the Liquidating Persons for their services in connection with the dissolution, and loans to the Partnership by any Partner), pay all such liabilities, establish reserves, and distribute the Partnership's remaining assets to the Partners (in cash or in kind or partly in cash and partly in kind, as the Liquidating Persons may determine). On any distribution of assets to the Partners pursuant to this section 17.2, any such assets shall be distributed in proportion to the Partners' respective Capital Account balances. After it shall appear to the Liquidating Persons that the Partnership's liabilities have been paid or that adequate provision shall have been made therefor, any balance remaining in any reserve theretofore established shall be distributed to the Partners as provided in this section 17.2, thereby terminating the Partnership. If the Partnership's assets are insufficient to satisfy its liabilities, to the extent that the Act requires, within thirty days after receiving notice thereof from the Liquidating Persons, each Partner shall return in cash such part or all of the distributions, if any, made to such Partner pursuant to section 9.3(d) or this section 17.2 as may be required to satisfy such liabilities, with each Partner making returns in proportion to such Partner's share of any such distributions.

17.3    **Legal Authority**.    The winding up of the Partnership's affairs and the distribution of its assets shall be conducted exclusively by the Liquidating Persons, who are authorized, subject to sections 12 and 17.2, to do any and all acts and things authorized by law for those purposes.

17.4    **No Recourse Against Partners**.    Each Partner shall look solely to the assets of the Partnership for the return of that Partner's Capital Contributions, and, if the Partnership's property remaining after the payment or discharge of the debts and liabilities is insufficient to return each Partner's Capital Contributions, that Partner shall have no recourse against any other Partner.

18.    **Assignments**.

18.1    **Personal Property**.    A Partner's interest in the Partnership is personal property and a Partner shall have no interest in specific Partnership property.

18.2 **General Partner**. The General Partner may sell, assign, transfer, pledge, encumber, hypothecate or otherwise dispose of all or any part of its interest as a General Partner without the consent of any other Partner; provided that no such disposition shall cause or entitle any person to become an additional or substitute General Partner of the Partnership otherwise than as provided in section 16.2.

18.3 **Limited Partners**.

(a) **In General**. A Limited Partner may sell, assign, transfer, pledge, encumber, hypothecate, or otherwise dispose of an interest in the Partnership, subject to compliance at that Limited Partner's expense with federal and state securities laws, such Limited Partner's Subscription Agreement and this section 18.3(a). For purposes of such compliance, (1) the Limited Partner shall furnish the Partnership with a detailed explanation of the proposed disposition, (2) unless waived by the General Partner, the Limited Partner shall furnish the Partnership with an opinion of the Limited Partner's counsel in form and substance satisfactory to the General Partner to the effect that the proposed disposition (A) complies with applicable provisions of the Securities Act of 1933, as amended, and any applicable state Blue Sky or securities laws, (B) will not result in the Partnership having to register as an investment company under the ICA, (C) will not result in the Partnership's termination for federal income tax purposes, and (D) will not result in Partnership assets being deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder, (3) counsel for the General Partner shall have concurred in such opinion and the General Partner shall have advised the Limited Partner of such concurrence and (4) the General Partner shall have consented to the disposition, which consent may be withheld in the General Partner's discretion. Any attempted or purported disposition without such compliance shall be void. Any permitted disposition shall be effective as of midnight of the last day of the calendar month in which it is made. No such disposition shall relieve the assignor of such assignor's responsibility for any expenses, obligations or liabilities, whether accruing before or after the disposition. Unless and until an assignee is admitted to the Partnership as a substituted Limited Partner as hereinafter provided, such assignee shall be entitled only to receive distributions from the Partnership attributable to the assigned interest from and after the effective date thereof; provided that the General Partner and the Partnership shall be entitled to treat the assigning Limited Partner as the absolute owner of such assignor's interest in the Partnership and shall incur no liability for distributions made in good faith to such assignor until the effective date of the disposition and until appropriate documents of assignment or other disposition have been delivered to the General Partner and recorded on the Partnership's books.

(b) **Restricted Transferees**. Without the consent of the General Partner, no Partner shall transfer any interest in the Partnership if such transfer would result in interests in the Partnership assets to be deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder.

(c) **Substitution**. An assignee of any Limited Partner's interest in the Partnership may become a substituted Limited Partner only with the General Partner's consent and compliance with this section 18.3. The General Partner may amend this Agreement and the Partnership's certificate of limited partnership without the consent of any of the Limited Partners, to effect such admission not later than the last day of the calendar month following receipt of notice of the assignment and such appropriate documentation of the assignment and substitution as the General Partner may reasonably require; provided that no such assignee shall become a substituted Limited Partner unless the assignee shall have consented in writing, in form satisfactory to the General Partner, to be bound by the terms of this Agreement and the Partnership's certificate of limited partnership in the place and stead of the assigning Limited Partner.

19.    **Amendments**.

19.1    **With Limited Partner Approval**.    The General Partner may propose amendments to this Agreement, in which case it shall submit to the Limited Partners a verbatim statement of any amendment so proposed.  The amendment shall become effective only on the consent of the General Partner and a majority in interest of the Limited Partners; provided that, for purposes of obtaining a written consent on a proposed amendment, the General Partner may require a response within a specified reasonable time (which shall not be less than fifteen days).  Failure to respond shall constitute a consent in accordance with the General Partner's recommendation as to the proposed amendment.

19.2    **Without Limited Partner Approval**.  Notwithstanding anything in section 19.1 to the contrary, the General Partner may, without any consent, approval, authorization or other action of any Limited Partner, amend this Agreement (a) if, in the General Partner's opinion, the amendment does not have a material adverse effect on the Limited Partners generally, or (b) whether or not any or all of the Limited Partners are adversely affected thereby, if (1) the General Partner first notifies the Limited Partners of such change and (2) such change does not become effective until such time as the Limited Partners shall have had the opportunity to withdraw from the Partnership pursuant to section 9.3.

19.3    **Amendments Requiring Unanimous Consent**.  Anything in section 19.1 or 19.2 to the contrary notwithstanding, without the consent of all of the Partners, no amendment shall change the Partnership to a general partnership, or change the General Partner's liability as such or the Limited Partner's limited liability as such.

20.    **Tax Elections**.  The General Partner shall make or cause the Partnership to make such elections as the General Partner may consider advisable under any applicable tax law, including, without limitation, any elections under Code section 754.

21.    **Power of Attorney**.  Each Limited Partner irrevocably constitutes and appoints the General Partner, with full power of substitution and resubstitution, that Limited Partner's true and lawful attorney, for that Limited Partner and in that Limited Partner's name, place and stead, and for that Limited Partner's use and benefit, to sign, execute, deliver, certify, acknowledge, swear to, file, record and publish (a) the Partnership's certificate of limited partnership and any amendment thereto or to this Agreement as provided herein, (b) any other certificates, instruments, agreements and documents necessary to qualify or continue the Partnership as a limited partnership or a partnership wherein limited partners have limited liability in the states or other jurisdictions where the General Partner deems necessary or desirable, (c) all conveyances, assignments, documents of transfer or other instruments and documents necessary to effect the assignment of an interest in the Partnership, the substitution of a Limited Partner, the admission of a Limited Partner to the Partnership or the dissolution and termination of the Partnership in accordance with this Agreement, (d) all filings and submissions pursuant to any applicable law, regulation, rule, order, decree or judgment which, in the General Partner's opinion, may be necessary or advisable in connection with the Partnership's affairs and (e) any governing documents or subscription documents of a Liquidating Fund.

The power of attorney granted herein is coupled with an interest, shall be irrevocable, shall survive any Limited Partner's death, disability or incapacity, shall be deemed given by each assignee and successor of each Limited Partner and may be exercised by the General Partner by listing on, or attaching a list thereto of, any or all of the names of the Limited Partners and executing such amendments, certificates, instruments and other documents with the signature by or on behalf of the General Partner, as attorney-in-fact for all of the persons whose names are so listed.

22.    **Notices**.    Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile transmission or three business days after being mailed by first class mail, or one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, charges and postage prepaid, properly addressed to the party to receive such notice at the last address furnished for such purpose by the party to whom the notice is directed.

23.    **Severability**.    If a court of competent jurisdiction shall hold any provision of this Agreement, or the application of such provision to any person or circumstance to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby and shall be enforced to the full extent of its validity.

24.    **Binding Effect**.    Subject to section 18, this Agreement shall bind and inure to the benefit of the parties and their respective successors, assigns, heirs, devisees, legatees, legal representatives, executors and administrators.

25.    **Partition**.    During the term of the Partnership, each party hereto irrevocably waives any right that such party may have to maintain any action for partition with respect to the Partnership's property.

26.    **Counterparts**.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

27.    **Entire Agreement**.    This Agreement contains the entire agreement of the parties and supersedes all prior negotiations, correspondence, understandings and agreements between or among the parties regarding the subject matter hereof, other than any and all Subscription Agreements and any and all amendments, supplements and appendices thereto, all of which Subscription Agreements, amendments, supplements and appendices shall continue in full force and effect.

28.    **Further Assurances**.    Each Partner shall provide such further information with respect to that Partner and any of its beneficial owners as the General Partner may request, including, but not limited to, any information regarding any Partner's tax treatment of a Capital Contribution of Securities, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

29.    **Governing Law**.    This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware.

30.    **Dispute Resolution**.    The Partners waive the right to a jury trial, if and to the extent that such a waiver is permissible under applicable law. The Partners consent to the personal jurisdiction and the exclusive venue of any state court in the city and county of the Partnership's principal place of business at the time the dispute arises and any United States District Court encompassing the Partnership's principal place of business at the time the dispute arises, with respect to any suit, action or other proceeding between or among any of the Partnership and the Partners or any of their respective Affiliates arising out of, relating to or in connection with this Agreement or the Partnership or its formation, organization, capitalization, activities or management.

31. **Attorneys' Fees**. If any dispute between or among any of the Partnership and the Partners or any of their respective Affiliates should result in litigation, the prevailing party or parties in such dispute shall be entitled to recover from the other party or parties all reasonable fees, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred by the prevailing party or parties in connection therewith, all of which shall be deemed to have accrued on the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any award, judgment or order entered in such action shall specifically provide for the recovery of attorneys' fees and costs incurred in enforcing such award or judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this section 31, (a) attorneys' fees shall include, without limitation, fees incurred in postaward or postjudgment motions, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and (b) prevailing party shall mean the party that is determined in the proceeding to have prevailed or who prevails by dismissal, demurrer, default or otherwise.

32. **Legal Counsel**.

32.1 **Counsel to the General Partner**. Each Limited Partner acknowledges and understands that this Agreement and related documents have been prepared by Shartsis Friese LLP, counsel for the General Partner, and that such counsel has not represented or been engaged to provide services to any Limited Partner or to the Partnership. The Limited Partners understand that such counsel acts as legal counsel to many investment advisory, venture capital and brokerage firms, investors and other persons. Such counsel's relationships with such persons are periodic; they can and do lapse and then re-start on an unpredictable basis, making it impractical for such counsel to provide disclosure of each and every such relationship. Without limiting the foregoing, in its capacity as legal counsel for the General Partner, Shartsis Friese LLP may be subject to actual or potential conflicts of interest arising from: (a) representing one or more Partners or parties related thereto in connection with matters other than preparing this Agreement or operating the Partnership or (b) representing other managers of investment partnerships that seek or obtain capital from the same investors as the Partnership or compete with the Partnership for managerial resources or investment opportunities.

32.2 **Representations and Warranties by Limited Partners**. Each Limited Partner: (a) represents and warrants that it has considered the foregoing carefully and hereby approves such counsel's representation of the General Partner; (b) acknowledges the possibility that, under the laws and ethical rules governing the conduct of attorneys, such counsel may be precluded from representing any one or more specific parties in connection with any dispute involving Limited Partners or the Partnership; (c) agrees that such counsel may decline to represent, or withdraw from representing, the General Partner at any time; (d) acknowledges that actual or potential conflicts of interest may exist among the Limited Partners, that no Limited Partner will be represented by legal counsel unless such Limited Partner specifically engages counsel on its own behalf, and that such Limited Partner has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; (e) agrees that in the event of a dispute between one or more Limited Partners, on the one hand, and the General Partner, on the other hand, Shartsis Friese LLP may represent one or more of the General Partner, the officers, members, managers and directors thereof, or the Partnership; (f) acknowledges that the approvals, acknowledgements and waivers in this section 32 do not reflect or create a right under this Agreement on the part of such Limited Partner to approve the General Partner's selection of legal counsel for the Partnership; (g) agrees that neither this Agreement nor the transactions and Partnership operations contemplated hereby are intended to create an attorney/client relationship between Shartsis Friese LLP and such Limited Partner or any other relationship pursuant to which such Limited Partner (acting other than in the name of the Partnership) would have a right to object to such counsel's representation of any person under any circumstances; (h) acknowledges and understands that Shartsis Friese LLP may at times agree to represent the Partnership, and each Limited Partner hereby consents to such representation and agrees that such representation shall not be deemed or result in

representation of any Limited Partner by Shartsis Friese LLP, notwithstanding that the services of Shartsis Friese LLP rendered for the benefit of the Partnership may also benefit the Limited Partners by virtue of their interests in the Partnership; and (i) agrees that, if there is ever a dispute between any Limited Partner and the General Partner or the Partnership, no Limited Partner shall be entitled to discovery of or regarding any communication between Shartsis Friese LLP and the General Partner or the Partnership relating to services provided by Shartsis Friese LLP to the General Partner or the Partnership.

32.3   **Related Issues**.  The parties intend that Shartsis Friese LLP shall be entitled to enforce this section 32 and each Limited Partner hereby consents in advance to such enforcement. Nothing in this section 32 shall preclude the General Partner from selecting different legal counsel at any time in the future and, except as specifically provided in this section 32, no Limited Partner shall be deemed by virtue of this Agreement to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions and Partnership operations contemplated hereby.

33.   **Intellectual Property**.  Notwithstanding any provision of this Agreement to the contrary, the Partners acknowledge that: (a) the "Covenant Global Investors" name and mark (and any portion, abbreviation, derivation or variation thereof) and trade secrets, know-how, trading techniques, inventions, trademarks, trade names, and other intellectual property to the extent protectable are the property of the General Partner or its Affiliates; (b) the Partnership's authority to use any such asset may be withdrawn by the General Partner or its Affiliates at any time without compensation to the Partnership; (c) no Partner other than the General Partner shall, by virtue of its ownership of an interest in the Partnership, hold any right, title or interest in or to any such asset; and (d) on the Partnership's dissolution and liquidation, all right, title and interest in and to any such asset shall be transferred to and held solely by the General Partner or its Affiliates, without consideration.

34.   **No Third Party Beneficiaries**.  Except as otherwise provided in sections 12.5, 18.3(c) and 32, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party.

35.   **Headings; Gender; Number; References**.  The headings at the beginning of the sections hereof are solely for convenience of reference and are not part of this Agreement.  As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require and "person" shall be deemed to include natural person and corporation, limited liability company, partnership, trust or other entity.  All references to sections are intended to refer to sections of this Agreement, except as otherwise indicated.

IN WITNESS WHEREOF, this First Amended and Restated Agreement of Limited Partnership has been duly executed by or on behalf of the General Partner and the Limited Partners listed on Schedule A attached hereto as of the date first above written, or on behalf of parties hereto subsequently admitted to the Partnership as Limited Partners, as shown on a Supplemental Schedule A attached hereto, as of the date shown on such Supplemental Schedule A.

GENERAL PARTNER:                              LIMITED PARTNERS:

Covenant Financial Services, LLC              The Limited Partners listed on Schedule A or
                                              Supplemental Schedule A Attached Hereto

By:  _____

        Stephen E. Shafer, Chief Investment Officer   Covenant Financial Services, LLC, Attorney-in-Fact

                                              By:  _____

                                                    Stephen E. Shafer, Chief Investment Officer

**SECOND AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**COVENANT INCOME APPRECIATION FUND, L.P.**

This SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into as of January 1, 2012, and amends and restates in its entirety that certain Agreement of Limited Partnership dated as of August 6, 2009, and first amended and restated on January 1, 2010, by and among Covenant Financial Services, LLC, an Oklahoma limited liability company doing business as Covenant Global Investors (the "General Partner"), and the persons (the "Limited Partners") who have (as Limited Partners) executed counterparts of this Agreement personally or by attorney-in-fact and who shall not have ceased to be Limited Partners (the Limited Partners and the General Partner being herein sometimes called, collectively, the "Partners" and, individually, a "Partner").

1.    **Formation**. The Partners have formed a limited partnership (the "Partnership") under the Act. The General Partner filed a certificate of limited partnership of the Partnership under the Act in each jurisdiction where such filing or recordation was required and shall so file or record any additional, supplemental or amended certificates of limited partnership and like documents as the General Partner may deem necessary or advisable in accordance herewith. The Partners agree further that they shall comply with the requirements and provisions of the Act, which shall govern the rights and liabilities of the Partners, except as otherwise provided in this Agreement.

2.    **Name**. The name of the Partnership is, and its business is conducted under the name Covenant Income Appreciation Fund, L.P.

3.    **Term**. The Partnership began on the date that this Agreement was executed (personally or by attorney-in-fact) and delivered by the General Partner and one or more Limited Partners. The Partnership shall continue until it is terminated as herein provided.

4.    **Addresses**.

4.1    **Partnership and General Partner**. The principal place of business and principal executive office of the Partnership is the office of the General Partner at 10914 Hefner Pointe Drive, Suite 304, Oklahoma City, OK 73120 and such other place or places as the General Partner may from time to time designate by notice to each Limited Partner. The Partnership may also maintain such other offices at such other places as the General Partner may deem advisable.

4.2    **Limited Partners**. The address of each Limited Partner is set forth in such Limited Partner's Subscription Agreement. A Limited Partner may change such address by notice to the General Partner, which notice shall become effective on receipt or such later time as such notice may specify.

4.3    **Agent for Service of Process**. The Partnership's agent for service of process in Delaware shall be The Corporation Service Company, whose address is 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808. The General Partner may change such agent for service of process or such address from time to time in the manner provided by applicable law.

5.    **Certain Definitions**. As used in this Agreement, the following terms shall have the meanings indicated:



**EXHIBIT**

**3**

5.1    "Act" means the Delaware Revised Uniform Limited Partnership Act, as amended.

5.2    "Affiliate" means, when used with reference to a specified person, any person directly or indirectly controlling, controlled by or under common control with the specified person, any trust or foundation to which the specified person has made a majority of the grants, donations or contributions received by that trust or foundation, a person owning or controlling ten percent or more of the outstanding voting securities of the specified person, a person ten percent or more of whose outstanding voting securities are owned or controlled by the specified person, any officer, director, general partner, manager or trustee of the specified person, and if the specified person is an officer, director, general partner, manager or trustee, any corporation, partnership, limited liability company or trust for which the specified person acts in any such capacity.

5.3    "BHCA" means the Bank Holding Company Act of 1956, as amended.

5.4    "BHCA Subject Person" means any Limited Partner that is subject, directly or indirectly, to the restrictions of the BHCA.

5.5    "Business Day" means any day that is not a public holiday in the State of Oklahoma and on which the major New York stock exchanges are open for trading.

5.6    "Capital Account" means:

(a)    The individual Capital Account that the Partnership shall establish and maintain for each Partner in accordance with the following provisions:

(1)    To the Capital Account of a Partner, the Partnership shall credit that Partner's Capital Contributions, share of Profits, any items in the nature of income or gain that the Partnership specially allocates thereto pursuant to section 10.5(b) and the amount of any Partnership liabilities that the related Partner personally assumes or that are secured by any Partnership property that the Partnership distributes to that Partner;

(2)    From the Capital Account of a Partner, the Partnership shall debit the amount of cash and the fair market value, determined as provided in section 10.6, of any Partnership property that the Partnership distributes to that Partner pursuant to any provision of this Agreement, that Partner's share of Losses, any items in the nature of expenses or loss that the Partnership specially allocates thereto pursuant to section 10.5(b) and the amount of any liabilities of that Partner that the Partnership assumes or that are secured by any property that the Partner contributes to the Partnership; and

(3)    In determining the amount of any liability, the Partnership shall take into account Code section 752(c) and any other applicable provisions of the Code and Regulations.

(b)    If any interest in the Partnership is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest.

(c)    The foregoing provisions and other provisions of this Agreement relating to maintaining Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent therewith. If the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed to comply with Regulations section 1.704-1(b), the General Partner may make such

modification if it is not likely to have a material adverse effect on amounts distributable to any Partner under this Agreement on the Partnership's dissolution. The General Partner shall adjust the amounts that the Partnership debits or credits to Capital Accounts with respect to any property that a Partner contributes to the Partnership or that the Partnership distributes to a Partner and any liabilities secured by such contributed or distributed property or that the Partnership or that Partner assumes in connection with such contribution or distribution if the General Partner determines that such adjustments are necessary or appropriate under Regulations section 1.704-1(b)(2)(iv). The General Partner also shall make any appropriate modifications if unanticipated events might cause this Agreement not to comply with Regulations section 1.704-1(b), and the General Partner shall make all elections provided for under such Regulations.

       5.7    "Capital Contribution" means an investment of cash or assets contributed to the Partnership by a person that is (or thereupon becomes) a Partner, whether initially contributed or subsequently contributed as permitted hereby, but excluding loans designated as such.

       5.8    "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

       5.9    "Election Notice" has the meaning ascribed to that term in section 13.7(f).

       5.10    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

       5.11    "FINRA" means the Financial Industry Regulatory Authority, Inc.

       5.12    "Fiscal Period" means each period from the first day of a Fiscal Quarter, the date that a Partner makes a Capital Contribution or the day after any withdrawal from or distribution by the Partnership, to the earliest of (a) the last day of such Fiscal Quarter, (b) the day preceding the date that a Partner next makes a Capital Contribution or (c) the next date of a withdrawal from or distribution by the Partnership.

       5.13    "Fiscal Quarter" means the period from the date the Partnership commences through the succeeding March 31, June 30, September 30 or December 31 (whichever is soonest), each period thereafter of three calendar months ending on any March 31, June 30, September 30 or December 31, or the period from the January 1, April 1, July 1 or October 1, whichever is the latest, preceding the date of dissolution and termination of the Partnership and ending on the date of dissolution and termination of the Partnership.

       5.14    "Fiscal Year" means the period from the date the Partnership commences or commencing on any subsequent January 1, and ending on the succeeding December 31, or, if earlier, ending on the date of dissolution and termination of the Partnership.

       5.15    "ICA" means the Investment Company Act of 1940, as amended.

       5.16    "Illiquid Securities" means Securities that the Partnership holds that are restricted from transfer for any reason.

       5.17    "Legacy Limited Partner" means (a) any Limited Partner admitted to the Partnership before January 1, 2012, (b) any person admitted as an investor before that date in any other investment pool or account managed by the General Partner, (c) any spouse, ex-spouse, parent, sibling or `descendant (biological or adopted, including step-children) and other family members of such a Limited Partner or investor, even if that person invests on or after that date, with the General Partner having the

power to determine and apply this familial status test in its discretion, and (d) any assignee of any such Limited Partner or investor so long as that assignee has complied with the provisions of section 18.3 and been admitted to the Partnership as a substituted Limited Partner as described in section 18.3(c).

5.18    "Liquidating Fund" has the meaning ascribed to that term in section 9.3(b)(1).

5.19    "Majority in interest" of the Partners (or a class of Partners) means Partners (or Partners of that class) whose Ownership Percentages (as modified for consent purposes pursuant to sections 13.7 and 13.8), on the first day of the Fiscal Period during which such majority is to be determined, aggregate more than fifty percent of the Ownership Percentages (as so modified) on such date of all Partners (or Partners of that class).  For purposes of this section 5.19, Legacy Limited Partners and New Limited Partners shall not be considered separate classes of Limited Partners.

5.20    "Management Fee" means the fee payable to the General Partner pursuant to section 11.1.

5.21    "New Issue" means a Security that is included within the definition of "new issue" in FINRA Rule 5130.

5.22    "New Issue Rules" means FINRA Rules 5130 and 5131, as such Rules may be amended or replaced from time to time by FINRA, or any similar rule or interpretation of any self-regulatory organization or governmental agency or official having similar authority.

5.23    "New Limited Partner" means a Limited Partner admitted to the Partnership on or after January 1, 2012, but excludes the Legacy Limited Partners that are admitted after that date and deemed by the General Partner to be Legacy Limited Partners, as described in section 5.17.

5.24    "Outside Accountants" means the independent public accountants regularly engaged by the Partnership to prepare its tax returns or compile, review or audit its financial statements.

5.25    The "Ownership Percentage" of a Partner at any date means the percentage computed by dividing such Partner's Capital Account balance at that date by the aggregate of all Partners' Capital Account balances at that date, except as adjusted pursuant to section 13.7 or 13.8.

5.26    "Permitted Withdrawal Date" has the meaning ascribed to that term in section 9.3(a).

5.27    "Profits" and "Losses" mean for each Fiscal Year, Fiscal Quarter, Fiscal Period or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, Fiscal Quarter, Fiscal Period or other period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any Partnership income that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this section 5.27 shall be added to such taxable income or loss;

(b)    Any Partnership expenditures described in Code section 705(a)(2)(B) or treated as Code section 705(a)(2)(B) expenditures  pursuant to Regulations section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this section 5.27 shall be subtracted from such taxable income or loss;

(c)     The initial book value of any asset contributed to the Partnership shall be its gross fair market value at the time of contribution determined as provided in section 9.1(b). The book value of all Partnership assets shall be adjusted pursuant to Regulation section 1.704-1(b)(2)(iv)(f) to equal their respective gross fair market values, determined as provided in section 10.6, as of the following times: (1) when any new or existing Partner acquires an additional interest in the Partnership; (2) when the Partnership distributes to a Partner, or a Partner withdraws, more than a de minimis amount of Partnership property, unless all Partners receive simultaneous distributions of undivided interests in the distributed property in proportion to their respective Ownership Percentages; (3) the last day of each Fiscal Period; and (4) a liquidation within the meaning of Regulations section 1.704-1(b)(2)(ii)(g). If the book value of any Partnership asset is adjusted pursuant to this section 5.27(c), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses, and gain or loss resulting from any subsequent disposition of such property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the adjusted book value of such property, notwithstanding that the adjusted tax basis of such property differs from such book value;

(d)     If the book value of any Partnership property is adjusted pursuant to section 5.27(c), then in lieu of the depreciation, amortization and other cost recovery deductions taken into account with respect to such property in computing such taxable income or loss, the Partnership shall take into account proportionate depreciation, amortization or other cost recovery deductions based on the adjusted book value of such property for such Fiscal Year or other period; and

(e)     Notwithstanding any other provision of this section 5.27, the Partnership shall not take into account in computing Profits and Losses any items that are specially allocated pursuant to sections 10.5(b) and (c), and the Partnership shall specially allocate Management Fees as expenses to the respective Capital Accounts against which they are charged and taken into account in computing Profits and Losses.

5.28     "Pro Rata Share" has the meaning ascribed to that term in section 9.3(b)(1).

5.29     "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

5.30     "Revocation Notice" has the meaning ascribed to that term in section 13.7(f).

5.31     "Securities" means securities, commodities, repurchase agreements and other intangible investment instruments and vehicles of every kind and nature, U.S. or non-U.S., whether publicly or nonpublicly traded, including, without limitation, stocks, notes, bills, bonds, debentures, subscriptions, preferred stocks, convertible securities, options (including, without limitation, covered and uncovered puts and calls and over-the-counter options), rights, warrants, swaps, units, currencies, futures, single stock futures, other commodity interests, commodity options, options on futures, certificates of deposit, trust receipts, American Depositary Receipts, global depositary receipts, equipment trust certificates, interests in partnerships and limited liability companies, certificates of interest or participation in any profit-sharing agreement, collateral trust certificates, bankruptcy claims, investment contracts, shares of investment companies, evidences of indebtedness and derivative and similar transactions, including, but not limited to, transactions such as: (a) basis, buy/sell-back, interest rate, currency, cross currency, foreign exchange, commodity, credit, emissions, equity, equity index, weather, bond, option, bullion, repurchase, securities lending or total-return transactions, (b) any transaction included in the definition of "Specified Transaction" in the ISDA 1992 or 2002 Master Agreement (or any predecessor or successor thereto), (c) transactions ancillary to transactions described within this definition, (d) any other similar transaction existing now or developed in the future in the

financial markets, or (e) transactions to secure, collateralize or provide credit support for any of the foregoing transactions or assets. Such transactions may be structured, where relevant, as swaps, collars, forwards, forward rate agreements, caps, floors, futures, options, options on transactions or other types of structures or combinations of structures.

5.32    "Subscription Agreement" means any subscription agreement executed and delivered by a Limited Partner and accepted by the General Partner as a condition precedent to becoming a Limited Partner.

5.33    "Tax Matters Partner" means the tax matters partner for the Partnership appointed by the General Partner, as such term is defined in Code section 6231(a)(7).

6.    **Investment Activities of the Partnership**. The purpose and business of the Partnership generally is to acquire, directly or indirectly, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in Securities, to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities held or owned by the Partnership, and to engage in any activity incidental to the foregoing, including, without limitation, borrowing and lending Securities and funds and otherwise entering into credit arrangements in connection therewith. The Partnership may engage in these activities directly or indirectly by investing in an investment entity, such as a so-called master fund, that may or may not be an Affiliate of the General Partner. To these ends, the Partnership may enter into, make and perform all contracts and other undertakings and engage in all activities and transactions, as the General Partner may consider necessary or advisable to carry out the foregoing objects and purposes, including, without limitation, to:

6.1    Acquire long positions or short positions in Securities, and make purchases or sales increasing, decreasing, covering and liquidating such positions;

6.2    Borrow or lend monies and obtain letters of credit without limitation as to amount, and secure the payment of any obligation of the Partnership by mortgage on, or hypothecation or pledge of, all or any part of the property of the Partnership;

6.3    Enter into credit, deposit and custodian agreements with banks, securities brokerage firms, futures commission merchants and other financial institutions (whether or not affiliated with the Partnership or the General Partner), open, maintain and close bank, brokerage and other accounts and draw checks or other orders for the payment of money or the delivery of instruments; and

6.4    Hire full- or part-time managers to manage and operate any asset of the Partnership, hire or retain persons, such as administrators, attorneys, accountants, investment advisers, industry and financial consultants, to perform services with respect thereto, and purchase insurance.

7.    **Other Activities**.

7.1    **Interests in Other Activities**. Any Partner and such Partner's Affiliates, agents, shareholders, limited partners, members and employees may engage in any activities, whether or not related to the Partnership's business. The Partners specifically recognize that some or all of them and their Affiliates, agents, shareholders, limited partners, members and employees are or may be engaged in various aspects of the securities business, including, without limitation, Securities portfolio management and organizing and managing other investment entities, both for their own accounts and for others. Such Partners, Affiliates, agents, shareholders, limited partners, members and employees may continue, or initiate further, such activities. Each Partner agrees that any Partner and any Affiliate, agent, shareholder, limited partner, member or employee of any Partner (a) is not and shall not be obligated to present any

investment opportunity or prospective economic advantage to the Partnership or any Partner, even if the opportunity is of the character that, if presented to the Partnership, could be taken by the Partnership, and any Partner shall have the right to hold any investment opportunity or prospective economic advantage for such Partner's own account and to recommend such opportunity to persons other than the Partnership, (b) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for such person's own account, independently or with others, including, without limitation, any business, industry or activity in which the Partnership may be interested in investing or may also have investments and (c) may do so without any obligation to report the same to the Partnership or any Partner or to afford the Partnership or any Partner any opportunity to participate therein. Neither the Partnership nor any Partner shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom.

       7.2    **Consequences of Other Activities**. The Limited Partners hereby acknowledge that the General Partner may be prohibited from taking action for the benefit of the Partnership: (a) due to confidential information acquired or obligations incurred in connection with an outside activity permitted under section 7.1; (b) because an Affiliate, agent, shareholder, limited partner, member or employee of the General Partner serves as an officer or director of a company in which the Partnership has invested; or (c) in connection with activities undertaken by an Affiliate, agent, shareholder, limited partner, member or employee of the General Partner. In addition to the provisions of section 12.5, no person shall be liable to the Partnership or any Limited Partner for any failure to act for the benefit of the Partnership for one or more of the reasons described in the preceding sentence.

      8.    **Waiver of Conflicts**. The fact that any Partner, or any Affiliate of any Partner, or a member of such Partner's family, is employed by, or is directly or indirectly interested in or connected with, any person or entity employed or engaged by the Partnership, or any company in which the Partnership has invested, to render or perform a service, or from whom the Partnership or such company may make any purchase, or to whom the Partnership or such company may make any sale, or from or to whom the Partnership or such company may obtain or make any loan or enter into any lease or other arrangement, shall not prohibit the Partnership or such company from engaging in any transaction with such person or entity, or create any additional duty of legal justification by such Partner or such person or entity beyond that of an unrelated party, and neither the Partnership nor any other Partner shall have any right in or to any revenues or profits derived from such transaction by such Partner, Affiliate, person or entity.

      9.    **Capital**.

      9.1    **Limited Partners' Contributions**.

      (a)    **Initial and Additional Contributions by Limited Partners**. The Partnership is authorized to offer and sell an unlimited amount of limited partner interests in the Partnership. Each Limited Partner has contributed or shall contribute to the Partnership's capital the amount of that Limited Partner's Capital Contributions heretofore or hereafter subscribed by that Limited Partner and accepted by the General Partner on behalf of the Partnership. The General Partner may establish such minimum initial Capital Contribution as it deems appropriate and it may waive or change that minimum thereafter. With the General Partner's consent, any Limited Partner may make an additional Capital Contribution in an amount that the General Partner deems appropriate. With the General Partner's consent, a Limited Partner may make Capital Contributions in amounts other than those set forth above and at any time that the General Partner permits and, in such cases, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement with the advice of the Outside Accountants. A Limited Partner's initial or additional Capital Contributions pursuant to this section 9.1(a) shall not require any consent or approval of any other Limited Partner. The General Partner shall have the authority to accept a Capital

Contribution as of a date before the date the Capital Contribution is actually made, if it determines that deeming such Capital Contribution to have been made as of an earlier date will not have a materially adverse effect on the Limited Partners generally.

        (b)    **Contributions of Assets**. Any Capital Contribution under this section 9.1 or section 9.2 may be made in cash or, with the consent of the General Partner, by contributing assets, including Securities. If assets are contributed, the General Partner shall determine the value of those assets for purposes of establishing the contributor's Capital Account, but under no circumstances shall that value exceed the fair market value of those assets on the date the contribution is made, determined as provided in section 10.6. In determining the value, the General Partner may reduce that value to account for expenses, such as brokerage commissions, that the Partnership will incur when it sells such assets. The Partnership shall be under no obligation to hold the assets contributed to it. Each Partner contributing assets to the Partnership's capital hereby represents and warrants to the Partnership and the other Partners that such Partner is the sole and absolute owner of those assets, subject only to holding such assets of record in "street" or nominee name for such Partner's sole and exclusive benefit, that such assets have not been pledged, hypothecated or otherwise encumbered and that the Partnership will receive on completion of such contribution good and marketable title to such assets, free of all liens, claims, security interests, community property rights, restrictions on transfer and other restrictions or defects in title.

        9.2    **General Partner's Contributions**. The General Partner may contribute from time to time such amounts to the Partnership's capital as it may elect. The General Partner's Capital Contributions may be made in cash or by contributing assets as provided in section 9.1(b).

        9.3    **Capital Withdrawals by Partners**.

        (a)    **Limited Partner Withdrawals**. A Limited Partner may, on at least ten Business Days' prior notice to the General Partner, withdraw all or part of the balance in such Limited Partner's Capital Account as of the last day of any calendar month (each such date being herein called a "Permitted Withdrawal Date"); provided that:

        (1)    No partial withdrawal of less than $10,000 shall be permitted and no partial withdrawal may reduce a Limited Partner's Capital Account balance to an amount that is less than the lesser of the Limited Partner's initial Capital Contribution or $200,000;

        (2)    Subject to section 9.3(b), withdrawals of up to ninety-eight percent of the balance of a Limited Partner's Capital Account shall be paid within ten days after the applicable Permitted Withdrawal Date;

        (3)    Subject to section 9.3(b), if a withdrawal exceeds ninety-five percent of the balance of a Limited Partner's Capital Account, such ninety- five percent shall be paid within ten days after the applicable Permitted Withdrawal Date and the remainder, if any, of the withdrawal shall be paid as soon as the General Partner determines that it is reasonably practicable after the Partnership receives financial statements for the Fiscal Year in which the withdrawal occurs compiled, reviewed or audited by the Outside Accountants, but the total withdrawal paid may not exceed that Limited Partner's Capital Account balance, as shown by those financial statements (and such remainder shall not earn interest or be considered to be invested in the Partnership). If the Outside Accountants determine that the amount paid by the Partnership exceeds that Capital Account balance, the Limited Partner shall forthwith, on demand by the General Partner, repay such excess to the Partnership in cash;

(4)      Subject to section 13.7(e), the Partnership may pay any amount that a Limited Partner withdraws by assigning to the Limited Partner any of the Partnership's assets (as the General Partner selects and including an interest in a Liquidating Fund as described in section 9.3(b)), or a combination of cash and such assets, having an aggregate value at the applicable Permitted Withdrawal Date equal to the amount to be withdrawn determined in the manner set forth in section 10.6;

(5)      The General Partner may suspend or limit the right of withdrawal or postpone the date of payment for any period during which (A) any exchange or over-the-counter market on which a substantial part of the Securities owned by the Partnership are traded is closed (other than weekend and holiday closings) or trading on any such exchange or market is restricted or suspended, (B) there is a state of emergency, as a result of which it is not reasonably practicable for the Partnership to dispose of its assets or to determine their value fairly, (C) any of the means normally employed in ascertaining the value of a substantial part of the Partnership's assets breaks down or when for any other reason the value of such assets cannot reasonably be ascertained, (D) the amount of requested withdrawals would (in the opinion of the General Partner) result in a disorderly liquidation of Partnership investments or a violation of the Partnership's investment policies, or (E) there are such other extraordinary circumstances, as the General Partner determines in good faith, that cause withdrawals or such payments to be impracticable under existing economic or market conditions or conditions relating to the Partnership (such as the receipt from Limited Partners of notices of withdrawal of amounts aggregating more than twenty-five percent of the Capital Account balances of all of the Partners or the inability or inadvisability, in the General Partner's opinion, to liquidate Securities). At the conclusion of such period, the General Partner shall resume permitting withdrawals as provided in the other provisions of this section 9.3 and shall resume any payments required pursuant to the other provisions of this section 9.3 as soon as reasonably practicable;

(6)      The General Partner may waive the foregoing notice period or any other Limited Partner withdrawal restriction in this Agreement, or permit withdrawals and payments from Capital Accounts at times and in amounts other than those set forth above and, in addition, as provided in section 13.7. If a Limited Partner is permitted to make a withdrawal other than on a Permitted Withdrawal Date as described above, (A) payments of the withdrawn amounts shall be made as described in this section 9.3(a) and in section 9.3(b) as if the date of withdrawal were a Permitted Withdrawal Date, (B) the General Partner may require that Limited Partner to pay to the Partnership a withdrawal fee of up to $5,000, and (C) the General Partner shall, with the advice of the Outside Accountants, cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. No portion of the Management Fee or the expenses charged to a Limited Partner's Capital Account pursuant to section 11 shall be refunded to that Limited Partner on its withdrawal of capital; and

(7)      At the General Partner's election, a Limited Partner shall be deemed to have withdrawn from the Partnership (A) on his or her death, (B) on the entry of any court order charging that Limited Partner's interest in the Partnership with the unsatisfied amount of any judgment, (C) if that Limited Partner's interest in the Partnership vests in any other person as the result of the Limited Partner's insolvency or incapacity, (D) on notice from the Partnership to that Limited Partner indicating that the balance of that Limited Partner's Capital Account at the end of any Fiscal Year is less than the lesser of that Limited Partner's initial Capital Contribution or $200,000, unless within five days after receipt of the notice that Limited Partner makes an additional Capital Contribution to increase the balance to at least that amount, or (E) on notice given by the General Partner to that Limited Partner pursuant to section 12.4, which withdrawal shall be effective as of the end of the calendar month in which any of the events described in the preceding clauses (A)-(D) occurs, or, in the case of an event described in the preceding clause (E), on the date specified in section 12.4. Payments of the withdrawn amounts

shall be made as described in this section 9.3(a) and in section 9.3(b) as if the date of withdrawal were a Permitted Withdrawal Date.

(b) **Liquidating Fund for Withdrawing Limited Partner**.

(1) If a Limited Partner withdraws any or all of that Limited Partner's Capital Account balance pursuant to section 9.3(a) or is expelled pursuant to section 12.4 when the Partnership holds Illiquid Securities, the General Partner may transfer that Limited Partner's Pro-Rata Share of one or more of such Illiquid Securities to one or more separate liquidating funds (each, a "Liquidating Fund") that the General Partner may cause the Partnership to establish for withdrawing Limited Partners, in lieu of distributing to those Limited Partners the Illiquid Securities in kind or other Partnership assets. If a Limited Partner that has an interest in a Liquidating Fund makes an additional withdrawal, that Limited Partner's Pro Rata Share of any Illiquid Securities relating to that subsequent withdrawal may also be placed, at the election of the General Partner, in the same or an additional Liquidating Fund. A withdrawing Limited Partner's "Pro-Rata Share" of an Illiquid Security (or the proceeds thereof) on a Permitted Withdrawal Date is the value, as determined pursuant to section 10.6, of that Illiquid Security that the Partnership holds at the close of business on the Permitted Withdrawal Date, multiplied by a fraction, the numerator of which is the amount being withdrawn by that Limited Partner and the denominator of which is the aggregate of all Capital Account balances of the Partners on the Permitted Withdrawal Date (including amounts being withdrawn on that Permitted Withdrawal Date).

(2) The beneficial owners of a Liquidating Fund shall be subject to the governing documents of such Liquidating Fund, which shall include, unless waived by the General Partner, a management fee in the same amount and charged at the same times as the Management Fee applicable with respect to a Limited Partner's interest in the Partnership. The other terms of a Liquidating Fund shall be substantially similar to those of the Partnership, omitting the provisions in this section 9.3(b) and except that the withdrawal and distribution rights in the Liquidating Fund shall be as the General Partner deems appropriate. Notwithstanding such similar terms, however, a Limited Partner's or former Limited Partner's interest in a Liquidating Fund or in the Illiquid Securities held by that Liquidating Fund shall not be deemed an interest in the Partnership for any purpose and shall not give that Limited Partner or former Limited Partner any rights under this Agreement that such Limited Partner or former Limited Partner would not otherwise have.

(3) The Liquidating Fund shall hold its interest in the Illiquid Securities contributed to it until such Illiquid Securities are sold or otherwise disposed of by the General Partner on behalf of the Partnership and the Liquidating Fund, at which time the Liquidating Fund shall distribute its share of the disposition proceeds, less any accrued but unpaid management fee relating to the Liquidating Fund, to the beneficial owners of the Liquidating Fund.

(c) **General Partner Withdrawals**. The General Partner may withdraw all or part of its Capital Account balance at any time, including on dates other than Permitted Withdrawal Dates, without notice to the Partnership or the Limited Partners. Any such withdrawal shall not be subject to the other terms and conditions that apply to capital withdrawals by Limited Partners under section 9.3(a). The Partnership shall pay to the General Partner the entire amount withdrawn within thirty days after the withdrawal date.

(d) **Distributions**. In addition to the withdrawal provisions in sections 9.3(a), (b) and (c), the General Partner shall determine the amounts, times and proportions as among the Partners of all distributions by the Partnership and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Distributions in kind shall be made at valuations determined as provided in section 10.6 and may be made by using a Liquidating Fund as described in section 9.3(b).

(e) **Withholdings**. Each Partner acknowledges and agrees that the Partnership may be required to deduct and withhold tax or to fulfill other obligations of such Partner or the Partnership on any withdrawal or distribution under this section 9.3 or allocation under section 10.4. All amounts withheld with respect to any withdrawal, distribution or allocation to a Partner shall be treated as amounts withdrawn or distributed to such Partner for all purposes under this Agreement as of the effective date of the related withdrawal, distribution or allocation.

(f) **Restrictions on Withdrawals and Distributions**. Any of the foregoing provisions of this section 9.3 to the contrary notwithstanding, no withdrawal or distribution shall be made (1) if such withdrawal or distribution would violate any contract or agreement to which the Partnership is then a party or any law then applicable to the Partnership, or (2) to the extent that the General Partner determines that it is necessary or advisable for the Partnership to retain any amount otherwise withdrawable or distributable to pay, or to establish a reserve for the payment of, any liability or obligation of the Partnership, whether known or unknown, liquidated, fixed, contingent or other.

9.4 **Deposit of Contributions**. Anything in this Agreement to the contrary notwithstanding, all Capital Contributions shall be paid directly to a custodian of the Partnership's assets designated by the General Partner and shall not be paid to the General Partner. Any such payment may be made by check payable to the Partnership's account with such custodian or by wire transfer to such custodian for the Partnership's account according to wire transfer instructions furnished by the Partnership.

9.5 **Records of Contributions, Withdrawals and Distributions**. On each Capital Contribution, withdrawal or distribution as contemplated by this Agreement, the General Partner shall cause the Partnership's records to reflect accurately such Capital Contribution, withdrawal or distribution.

9.6 **No Interest**. No Partner shall be entitled to receive from the Partnership payment of any interest on any Capital Contribution.

9.7 **No Other Contributions**. Without the consent of all Partners, no Partner shall contribute any funds or other property to the Partnership's capital except as is expressly required or permitted by this Agreement.

10. **Profits and Losses**.

10.1 **Books**. The General Partner shall maintain complete and accurate accounts in proper books of all transactions of or on behalf of the Partnership and shall enter or cause to be entered therein a full and accurate account of all transactions on behalf of the Partnership. The Partnership's books and accounting records shall be kept in accordance with such accounting principles as the General Partner may determine to be convenient and advisable.

10.2 **Accountings**. As soon as is reasonably practicable after the close of each Fiscal Year, the General Partner shall make or cause to be made a full and accurate accounting of the Partnership's affairs as of the close of that Fiscal Year and shall prepare or cause the Outside Accountants to prepare a balance sheet as of the end of such Fiscal Year, a profit and loss statement for that Fiscal Year and a statement of Partners' capital showing the respective Capital Accounts of the Partners as of the close of such Fiscal Year and, if any, the Capital Contributions of and distributions to Partners during such Fiscal Year. In addition, the General Partner shall furnish to each Partner information regarding the Partnership necessary for such Partner to complete such Partner's federal and state income tax returns. The General Partner shall also furnish a copy of the Partnership's tax returns to any Partner requesting the same, excluding the Schedules K-1 of the other Partners. On such accounting being made, Profits and

Losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Partnership to the respective Partners as herein provided.

          10.3    **Capital Accounts**.  The Partnership shall maintain an individual Capital Account for each Partner as provided in section 5.6, section 9.3 and this section 10.

          10.4    **Allocations**.  Profits and Losses shall be allocated to the Partners for each period described below, as follows:

          (a)    **Allocations Generally**.  Subject to the provisions below regarding the special allocations in section 10.5, all Profits and Losses for each Fiscal Period shall be allocated to the Capital Accounts of the Partners in proportion to their respective Ownership Percentages as of the first day of such Fiscal Period.

          (b)    **Recapture**.  Anything herein to the contrary notwithstanding, any recapture under applicable tax laws shall be allocated to the Partners in the same proportions as the item generating the recapture shall have been allocated.

          10.5    **Special Capital Account Allocations**.  Notwithstanding the allocation provisions of section 10.4, the following special allocations shall be made in allocating Profits and Losses:

          (a)    **New Issues**.  The General Partner may cause the Partnership to invest in, hold, sell, transfer or otherwise dispose of one or more New Issues.  Anything in section 10.4 to the contrary notwithstanding, the General Partner shall specially allocate the Profits and Losses that relate to New Issues in a manner that it determines is consistent with section 10.4 to the extent permitted under the New Issue Rules or appropriate to ease the administrative or other burdens of applying these provisions.  Consistent with the preceding sentence, the General Partner may elect not to allocate any New Issue Profits and Losses to persons defined as "restricted persons" under the New Issue Rules, notwithstanding the fact that an allocation to such persons might be permitted under the New Issue Rules.

          (b)    **Section 704 Allocations**.  Special allocations shall be made as the General Partner considers necessary to comply with the requirements of Code section 704 and the Regulations thereunder, including, without limitation, the qualified income offset and minimum gain chargeback provisions therein.

          (c)    **Tax Allocations**.

          (1)    Subject to section 10.5(c)(2), in each Fiscal Year, items of income, deduction, gain, loss or credit that are recognized for income tax purposes shall be allocated among the Partners, General and Limited, in a manner that reflects equitably amounts credited to or debited against the Capital Account of each Partner, whether in such Fiscal Year or in prior Fiscal Years.  To this end, the Partnership shall establish and maintain records that show the extent to which the Capital Account of each Partner comprises, as of the last day of each Fiscal Year, amounts that have not been reflected in the taxable income of such Partner.  To the extent that the General Partner deems it feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits.

          (2)    Notwithstanding any of the foregoing provisions to the contrary, if a Partner withdraws capital during a Fiscal Year, the General Partner may elect to make allocations of taxable income and loss as follows:

(A)    The Partnership may first allocate taxable income or gain to each Partner who has withdrawn or been distributed all or part of that Partner's Capital Account balance in that Fiscal Year, to the extent that such withdrawal or distribution exceeds that Partner's adjusted tax basis in that Partner's interest in the Partnership immediately before such withdrawal or distribution. If more than one Capital Account has been so withdrawn or distributed in full or in part, such allocations, if made, shall be made to the extent of and in proportion to such differences;

(B)    The Partnership may first allocate taxable loss or deduction to each Partner who has withdrawn or been distributed all of that Partner's Capital Account balance in that Fiscal Year, to the extent that that Partner's adjusted tax basis in that Partner's interest in the Partnership exceeds that Capital Account balance immediately before such withdrawal or distribution. If more than one Capital Account balance has been so withdrawn or distributed, such allocations, if made, shall be made to the extent of and in proportion to such differences; and

(C)    Thereafter, the Partnership may allocate taxable income and loss as provided in section 10.5(c)(1).

(3)    The General Partner shall make any elections or other decisions relating to such allocations, or computations of taxable income, in any manner that reasonably reflects the purpose and intention of this Agreement and shall be binding on all Partners. Allocations pursuant to this section 10.5(c) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Capital Account or share of Profits, Losses or other items of any Partner, or distributions to any Partner, pursuant to any provision of this Agreement.

(d)    **Other Allocation Rules.**

(1)    Generally, all Profits and Losses shall be allocated among the Partners as provided in section 10.4 and this section 10.5. If Partners are admitted or make Capital Contributions to the Partnership on different dates during any Fiscal Year, the Profits or Losses for each such Fiscal Year shall be allocated in accordance with Code section 706, using any convention permitted by law and selected by the General Partner.

(2)    For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as the General Partner determines using any permissible method under Code section 706 and the Regulations thereunder.

(3)    The Partners acknowledge that they are aware of the income tax consequences of the allocations made by section 10.4 and this section 10.5 and hereby agree to be bound thereby in reporting their shares of Profits and Losses for income tax purposes.

(4)    Notwithstanding any of the foregoing provisions to the contrary, if taxable gain to be allocated includes income resulting from the sale or disposition of Partnership property or property of a limited partnership or joint venture in which the Partnership owns an interest that is treated as ordinary income, such gain so treated as ordinary income shall be allocated to and reported by each Partner in proportion to allocations to that Partner of the items that gave rise to such ordinary income, and the Partnership shall keep records of such allocations. In the event of the subsequent admission of any new Partner, any item that would constitute "unrealized receivables" under Code section 751 and the Regulations thereunder shall not be shared by the newly admitted Partners, but rather shall remain allocated to existing Partners.

(e)    **Provisional Allocation**.  If any amount that the Partnership claims to constitute a deductible expense in any Fiscal Year is treated by any federal, state or local taxing authority as a payment to a Partner in that Partner's capacity as a member of the Partnership for income tax purposes, with regard to that authority, items of Partnership income and gain for such Fiscal Year shall first be allocated to that Partner to the extent of such payment.

10.6    **Valuation**.  The General Partner shall determine the value of the Partnership's assets and liabilities in good faith.  Such determination shall be conclusive and binding on all of the Partners and all parties claiming through or under them.

10.7    **Bank and Other Accounts**.  All Partnership funds shall be deposited and maintained in one or more accounts in the Partnership's name at such bank or banks or other financial institutions (including, without limitation, money market mutual funds and instruments, futures commission merchants and securities brokerage firms) as the General Partner may select.  All withdrawals from any such account or accounts shall be made only by written instrument signed by or on behalf of the General Partner.

11.    General Partner's Management Fee and Expenses.

11.1    **Management Fee**.  As compensation to the General Partner for its services in managing the Partnership's investments, on the first day of each Fiscal Quarter an amount shall be deducted from the Capital Account of each Limited Partner and paid as a Management Fee to the General Partner.  Such amount shall equal with respect to (a) New Limited Partners, 0.375 percent of that Capital Account balance and (b) Legacy Limited Partners, 0.375 percent on the first $2 million of that Capital Account balance, 0.3125 percent on the next $3 million of that Capital Account balance and 0.25 percent of that Capital Account balance that exceeds $5 million.  In the case of both New and Legacy Limited Partners, the Capital Account balance shall be based on the value of the assets and liabilities of the Partnership determined as of that date pursuant to section 10.6.  A Limited Partner whom the General Partner permits to contribute capital on a date other than the first day of a Fiscal Quarter shall be charged a prorated Management Fee with respect to such Capital Contribution on the date the Capital Contribution is made.  A Limited Partner who is permitted to withdraw or is distributed capital on a date other than the last day of a Fiscal Quarter shall receive a refund of any Management Fee paid in advance. The General Partner may assign its right to receive the Management Fee to any other person or entity, and it may waive all or any portion of the Management Fee with respect to any Limited Partner in any Fiscal Quarter without notice to the Limited Partners.

11.2    **Expenses**.  The Partnership shall bear all costs and expenses incidental to its organization and ongoing operation including, without limitation, all:

(a)    Trading expenses (such as brokerage commissions and charges, expenses relating to short sales, clearing and settlement charges, option premiums and custodial and service fees);

(b)    Interest and commitment fees on loans and debit balances (on margin or otherwise);

(c)    Expenses of negotiating and entering into contracts and arrangements and making investments (such as brokerage, legal, accounting, investment banking, appraisal and other professional and consulting fees and expenses arising from particular investments and potential investments) and similar expenses in terminating those contracts and arrangements and disposing of those investments;

        (d)      Expenses incurred in visiting companies and attending research and investment conferences (for example, airfare, hotel accommodations and meals);

        (e)      Expenses of registering the Partnership's restricted Securities;

        (f)      Expenses incurred in attempting to protect or enhance the value of the Partnership's investments (including the expenses of instituting and defending lawsuits);

        (g)      Income, withholding and transfer taxes, and other governmental charges and duties;

        (h)      Fees of custodians, clearing agencies and banks;

        (i)      Administration, bookkeeping, recordkeeping, legal, accounting, auditing, tax preparation and all professional, expert and consulting fees and expenses arising in connection with the Partnership's activities (and computer hardware and software related thereto), including without limitation:

        (1)      Fees and expenses of counsel for the Partnership, the General Partner or one or more officers or managers of the General Partner;

        (2)      Expenses related to research (including third-party research fees), and portfolio management and quotation services and equipment (and computer hardware and software related thereto); and

        (3)      Fees and expenses of accounting, bookkeeping and recordkeeping services of the Partnership's administrator or any similar service provider that the General Partner retains to assist it in performing these services for the Partnership;

        (j)      Fees and expenses of offering and selling Limited Partner interests and communicating with existing and prospective Limited Partners (including, without limitation, legal and accounting fees and expenses, governmental and self-regulatory agency filing fees, and travel expenses, such as airfare, hotel accommodations and meals);

        (k)      Expenses of investing the Partnership's assets indirectly, such as through a partnership or other entity (a so-called "master fund"), including the Partnership's proportionate share of the costs and expenses of organizing and operating the master fund;

        (l)      Premiums and other expenses of insurance policies that the General Partner considers appropriate, insuring the Partnership, the General Partner and their Affiliates against liabilities that may arise in connection with the business or management of the Partnership;

        (m)      Proxy voting service expenses;

        (n)      Contingencies for which the General Partner determines reserves are required; and

        (o)      Extraordinary expenses (such as litigation expenses).

The Partnership shall reimburse the General Partner for any of these expenses that are paid directly by the General Partner. Except as described above, the General Partner shall bear all of its operating, general, administrative and overhead expenses and shall not otherwise charge the Partnership for them,

except that these expenses, together with any of the Partnership's expenses, may be paid by securities brokerage firms and futures commission merchants to which the General Partner directs the Securities trades of the Partnership and any other accounts that the General Partner manages as further provided in section 12.1(h).

12.    **The General Partner**.

12.1    **Management**. Subject only to the rights of the Limited Partners to consent on specific matters as herein provided, the General Partner shall have full, exclusive and complete authority in managing and controlling the Partnership's activities for the purposes herein stated and shall make all decisions affecting the Partnership. The powers of the General Partner on behalf and at the expense (subject to section 11.2) of the Partnership include, but are not limited to, the power to:

(a)    Expend the Partnership's capital and revenues to further its affairs;

(b)    Enter into, execute and deliver stock, bond, debenture, note, option, derivative and other Securities subscription, purchase and sale agreements, participation agreements, assignments, brokerage agreements, custodian agreements and any and all other agreements, documents or instruments that the General Partner deems to be necessary or appropriate to perform its duties effectively and properly or exercise its powers under this Agreement;

(c)    Purchase, hold, sell (long or short), borrow or otherwise trade or deal in Securities;

(d)    Sell (long or short), borrow, lend, dispose of, trade or exchange the Partnership's assets for such consideration and on such other terms and conditions and evidenced by such documents or instruments as the General Partner deems appropriate;

(e)    Open and maintain deposit, checking, money market, custodial and margin accounts with securities brokers and futures commission merchants and custodial accounts with banks, securities brokers, futures commission merchants and other financial institutions;

(f)    Designate one or more securities brokers and futures commission merchants to maintain Securities for the Partnership in the names of nominees of such brokers and futures commission merchants;

(g)    Borrow money and Securities from banks, securities brokers, futures commission merchants and other financial institutions for any Partnership purpose and, in connection therewith, mortgage, pledge or hypothecate any Partnership assets, to secure repayment of the borrowed sums, and no bank, securities broker, futures commission merchant, other financial institution or other person to which application for a loan is made by the General Partner shall be required to inquire as to the purposes for which such loan is sought, and as between the Partnership and such bank, securities broker, futures commission merchant or other financial institution or person, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for purposes authorized hereunder;

(h)    Enter into brokerage agreements with brokerage firms and futures commission merchants (whether or not affiliated with the Partnership or the General Partner), to execute or effect trades for the Partnership's account and to make arrangements with those firms whereby the General Partner agrees to direct trades for the Partnership's account to those firms, to interpose those firms as agents in principal transactions, including principal transactions in which the executing broker rebates a portion of its markup to such firms, or to pay those firms additional compensation on transactions made through electronic crossing networks or other alternative securities exchanges, in

exchange for certain non-monetary benefits offered by those firms which may include, among other things, referring prospective investors in the Partnership or any other account managed by the General Partner or any of its Affiliates, research reports, services and conferences, economic and market information, portfolio strategy advice, industry and company comments, technical data, consultations, performance measuring data, on-line pricing, special execution capabilities, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, order of call, offering to the General Partner on-line access to computerized data regarding clients' accounts, computerized trading systems, clearance, settlement, reputation, financial strength and stability, efficiency of execution and error resolution, quotation services, the availability of stocks to borrow for short trades, custody, recordkeeping and similar services, and other matters involved in the receipt of brokerage services generally. The General Partner also may purchase from a broker or futures commission merchant or allow a broker or futures commission merchant to pay for all or a portion of the Partnership's or the General Partner's or its Affiliates' costs and expenses of operation, such as newswire and data processing charges, proxy voting services, quotation services, periodical subscription fees, third-party research fees, computer hardware and software related to research, all costs and expenses of offering and selling Limited Partner interests and communicating with existing and prospective Limited Partners (including travel expenses, such as airfare, hotel accommodations and meals, legal and accounting fees and expenses and government and self-regulatory agency filing fees), all costs and expenses incurred in visiting companies and attending research and investment conferences (including airfare, hotel accommodations and meals), accounting and administrative fees (including the expenses of the accounting and bookkeeping services of third party vendors that provide such services), legal fees, and the like, whether or not such costs or expenses are within the safe harbor provided by section 28(e) of the Securities Exchange Act of 1934, as amended, or any provision subsequently adopted thereunder or by a securities regulator in connection therewith;

(i)     Engage and compensate such employees, agents, lawyers, accountants, brokers, futures commission merchants, investment advisers, administrators and other professionals, consultants, experts and contractors, as the General Partner may consider advisable in conducting the Partnership's affairs (including, but not limited to, delegating part or all of its duties to any such person);

(j)     Appoint additional or successor general partners of the Partnership without the consent of any of the Limited Partners;

(k)     Maintain adequate office facilities, records and accounts of all operations and expenditures and furnish the Limited Partners with all reports and statements of account required to be furnished to them pursuant hereto or that the General Partner deems advisable;

(l)     Purchase and maintain such insurance policies as the General Partner may consider appropriate, insuring the Partnership, the General Partner and its Affiliates against liabilities that may arise in connection with the business or management of the Partnership;

(m)     Collect amounts due to the Partnership, enforce the Partnership's rights, seek to recover compensation for injury or damage to the Partnership or to prevent such injury or damage through litigation or other means and engage and compensate lawyers, expert witnesses and others in connection therewith;

(n)     Solicit proxies, institute or participate in tender offers or take other actions under federal or state securities laws or state corporate laws as the General Partner deems advisable;

(o)     Establish reserves for the payment of any Partnership liability or obligation, whether known or unknown, liquidated, fixed, anticipated, contingent or other; and

(p)    Do or perform such other acts and things as the General Partner deems advisable and in the Partnership's interests.

12.2    **Exceptions**.    Notwithstanding anything to the contrary in section 12.1, but subject to section 19, the General Partner shall not take direct possession or custody of cash or Securities held for the Partnership's account and no act in contravention of this Agreement may be legally done without the consent of the General Partner and a majority in interest of the Limited Partners.

12.3    **General Partner's Discretion; Power to Bind**.    The General Partner may exercise any and all of its rights, powers, authority and discretion under this Agreement or the Act in its absolute and exclusive discretion, and the General Partner is authorized and empowered to grant or give any consent, approval or authorization, make any determination or do or perform any other act or thing conditionally or unconditionally, arbitrarily, or inconsistently in varying or similar circumstances, without any accountability to the Partnership or any other Partner, except only as otherwise specifically and expressly provided by this Agreement or the Act notwithstanding this Agreement. The General Partner shall have exclusive authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the Partnership in the ordinary course of the Partnership's business and otherwise within the scope of its powers and authority as herein provided; provided that, if the General Partner should incur any obligation in the name or on the credit of the Partnership contrary to section 12.1 or 12.2 or this section 12.3, the Partnership may hold it liable for the entire amount of the obligation so incurred. If one or more persons shall be admitted to the Partnership as additional general partners pursuant to this Agreement, each such general partner acting alone shall have all of the authority, rights and powers of the General Partner.

12.4    **Expelling Limited Partners**.

(a)    **Generally**.    The General Partner may at any time expel all or any portion of the Capital Account balance of any Limited Partner from the Partnership, with or without cause, on notice to that Limited Partner specifying the effective date of such expulsion and the amount of that Limited Partner's Capital Account balance so expelled. In the event of such expulsion, the expelled Limited Partner shall be deemed to have withdrawn the portion of its Capital Account balance stated in such notice as provided in section 9.3(a), effective as of the date fixed therefor by the General Partner.

(b)    **ICA and ERISA Expulsion**.    If the General Partner determines at any time that:

(1)    The participation by any Limited Partner that is a corporation, partnership, limited liability company, trust or other entity may cause the Partnership not to be excluded from the definition of "investment company" under ICA section 3(c)(1); or

(2)    The participation by any Limited Partner may cause Partnership assets to be deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder,

then, at the General Partner's election and effective as of any date that the General Partner determines, that Limited Partner may be deemed to have given notice of withdrawal pursuant to section 9.3(a) of such portion or all of that Limited Partner's Capital Account balance as the General Partner determines is necessary or advisable; provided that such date may be before or after the time that the General Partner makes such determination. Such withdrawal shall be consummated as provided in section 9.3(a) to the maximum feasible extent, except that the Partnership shall not charge the withdrawal fee described in section 9.3(a)(6)(B). The General Partner shall promptly notify the affected Limited Partner of the General Partner's determination under this section 12.4(b). For purposes of this section 12.4(b), any Limited Partner that is a corporation, partnership, limited liability company, trust or other entity and that is an

"investment company" under the ICA or that relies on the exclusion from the definition of an investment company provided by ICA section 3(c)(1) or 3(c)(7) and that has an Ownership Percentage of ten percent or more of the Ownership Percentages of all Limited Partners shall inform the General Partner of the number of beneficial owners of its outstanding securities. Thereafter, that Limited Partner shall inform the General Partner immediately if that number changes.

12.5    **Indemnity and Limitation of Liability**.

(a)    **Indemnification and Limitation of Liability.** The General Partner, any of its Affiliates, any person acting on behalf of the General Partner or such Affiliate and any person that controls the General Partner within the meaning of section 15 of the Securities Act of 1933, as amended, or section 20 of the Securities Exchange Act of 1934, as amended (each, an "indemnitee")

(1)    Shall be indemnified by the Partnership from and against any cost, claim, liability, damage, loss, settlement or expense (including, without limitation, all court costs, legal and expert witness fees and expenses and all costs of investigation, taxes and penalties) incurred or suffered by the indemnitee by virtue of the indemnitee's acting as or on behalf of the General Partner for the Partnership in connection with the Partnership's activities; and

(2)    Shall not be liable to the Partnership or any Partner for any cost, claim, liability, damage, loss, settlement or expense incurred or suffered in connection with the Partnership's activities, including, without limitation, any (A) failure to obtain the lowest brokerage commission rates, failure to combine or arrange orders to obtain the lowest brokerage commission rates with respect to any transaction on behalf of the Partnership, or failure to recapture any brokerage commissions for the benefit of the Partnership; (B) error in judgment with respect to the Partnership; (C) trade error made by any indemnitee in connection with any transaction on behalf of the Partnership; or (D) tax liability asserted against any Partner by any federal, state or local authority as a result of any position taken by the Partnership or any Partner.

(b)    **Exclusions.** Notwithstanding the foregoing sections 12.5(a)(1) and (2), if such cost, claim, liability, damage, loss, settlement or expense arises out of any action or inaction of the indemnitee, the indemnitee must have believed at the time of such action or inaction, in good faith, that such course of conduct was in the interests of the Partnership, and such course of conduct must not have constituted a breach by the indemnitee of any fiduciary duty that the indemnitee may have to the Partnership (for these purposes, a failure described in section 12.5(a)(2)(A), an error in judgment described in section 12.5(a)(2)(B), a trading error described in section 12.5(a)(2)(C) or a tax position described in section 12.5(a)(2)(D) shall not be deemed a breach of an indemnitee's fiduciary duty), and such indemnification shall be available only as and to the extent that it is not prohibited by applicable law governing rights of indemnification.

(c)    **Advancing Legal Fees.** If the General Partner approves, the Partnership shall, on demand, pay all costs, expenses, attorneys' and expert witness fees as and when incurred by the indemnitee in connection with any such cost, claim, liability, damage, loss, settlement or expense if the indemnitee undertakes to repay the same to the Partnership if a court of competent jurisdiction finally determines that the indemnitee shall not have been entitled to indemnification hereunder.

(d)    **Related Issues.** Such payment, indemnification or amounts recoverable under the foregoing provisions shall only be recoverable out of the assets of the Partnership, and the Limited Partners shall not be personally liable therefor. If under section 12.5(c), the General Partner approves the advance of costs, expenses, or attorneys' or expert witness fees incurred by an indemnitee, the General Partner, on behalf of the Partnership, shall be entitled to assume the defense of the related litigation or proceeding with counsel of the General Partner's choice (in which case the Partnership shall

not be responsible under the foregoing indemnity for the fees and expenses of any separate counsel retained by the indemnitee if the indemnitee is not the General Partner); provided that such counsel shall be reasonably satisfactory to the indemnitee. Notwithstanding the General Partner's election to assume the defense of such litigation or proceeding, the indemnitee (if such person is not the General Partner) shall have the right to employ separate counsel and to participate in the defense of such litigation or proceeding, and the Partnership's indemnification obligation hereunder shall apply to the fees, costs and expenses of such separate counsel, if the representation of both parties by counsel that the General Partner selects to represent such indemnitee would constitute a conflict of interest for such counsel. The rights granted under this section 12.5 shall not be affected by, and shall survive, the Partnership's dissolution or termination and any Partner's death, disability, incapacity, withdrawal, insolvency or dissolution. In addition, such rights shall not be deemed to be exclusive of any other rights any indemnitee may have under any agreement, as a matter of law, in equity or otherwise.

12.6     **Tax Matters Partner**. The General Partner is hereby appointed as the Tax Matters Partner. The General Partner may remove and replace the Tax Matters Partner from time to time.

12.7     **Transactions with Affiliates**.

(a)     **Agency Cross Transactions**. The General Partner shall have authority to effect on the Partnership's behalf at any time and from time to time any "agency cross transaction for an advisory client" (as defined in Rule 206(3)-2 under the Investment Advisers Act of 1940, as amended) with respect to purchases and sales of Securities by or on behalf of the Partnership with or through the General Partner or any Affiliate that is registered as a broker or dealer under section 15 of the Securities Exchange Act of 1934, as amended; provided that the authority granted in this section 12.7 may be revoked at any time by the General Partner or the consent of a majority in interest of the Limited Partners. Each Limited Partner acknowledges and consents that the General Partner may use such authority to rebalance the Partnership's account and the other accounts that the General Partner or its Affiliates manage, to reflect Capital Contributions and withdrawals and for other purposes consistent with the objectives of the Partnership and such other accounts.

(b)     **Principal Transactions**. The General Partner may establish a committee of three Limited Partners that are not Affiliates of the General Partner to consider and consent, on behalf of the Limited Partners, to any purchase from or sale to the Partnership of any Security by the General Partner or any of its Affiliates, to the extent that the General Partner deems necessary or appropriate under the Investment Advisers Act of 1940, as amended. Such committee shall act by the unanimous vote or consent of its members. The General Partner may remove or replace a committee member at any time and may fill any vacancy on the committee. Each Limited Partner authorizes such committee to act on its behalf.

13.     **Rights of Limited Partners**.

13.1     **Limited Liability**. No Limited Partner shall be subject to assessment, nor except as may be otherwise required under the Act notwithstanding this Agreement, shall any Limited Partner be personally liable for any of the debts or liabilities of the Partnership or any of the losses thereof in excess of such Limited Partner's Capital Contributions and any undistributed income attributable to such Limited Partner.

13.2     **Management**. No Limited Partner, as such, shall take part in managing or transacting any business for the Partnership or have power to sign for or bind the Partnership to any agreement, oral or written, or any instrument or other document; provided that no vote or consent of the Limited Partners that is specifically authorized hereby shall be deemed to violate this provision. The

Limited Partners shall not have any voting rights other than as expressly provided in this Agreement and, accordingly, the Limited Partners shall not have the power to remove a General Partner.

13.3    **No Meetings; All Actions by Written Consent**.  No meetings of the Partners shall be held and, instead, all votes or consents that the Limited Partners are required or permitted to take shall be taken by a consent in writing, setting forth the action so taken, signed by Partners having not less than the aggregate Ownership Percentage that would be necessary to authorize or take that action.

13.4    **Record Date**.  So that the Partnership may determine the Partners of record entitled to consent, or entitled to receive any distribution or to exercise any rights with respect to any other lawful action, the General Partner may fix, in advance, a record date, which is not more than sixty or less than ten days before the date on which the first written consent is given and not more than sixty days before any other action.  If no record date is fixed the record date shall be the day on which the first written consent is given.  The record date for determining Partners for any other purpose shall be at the close of business on the day on which the General Partner adopts it, or the sixtieth day before the date of the other action, whichever is later.

13.5    **Records**.  The General Partner shall maintain and preserve during the Partnership's term at its principal executive office all accounts, books, records and other relevant Partnership documents, including, without limitation, all of the same required by applicable law to be maintained and preserved.

13.6    **Inspection**.  Each Limited Partner has the right, subject to such reasonable standards as are set forth in this section 13.6 or that the General Partner otherwise establishes from time to time, to obtain from the General Partner from time to time on reasonable demand, for any purpose reasonably related to that Limited Partner's interest as a Limited Partner, any information required to be maintained by section 13.5, except that no Limited Partner shall have the right to obtain (a) the Partnership's daily trading records or (b) the name and address of any current or former Limited Partner. Any such demand shall be in writing and shall state the purpose of such demand.  The General Partner, however, has the right to keep confidential from Limited Partners for such periods as the General Partner deems reasonable any information that the General Partner reasonably believes to be in the nature of trade secrets or other information (such as, for example, the identity of the Partnership's portfolio positions) the disclosure of which the General Partner believes is not in the Partnership's best interests or could damage the Partnership or its business, or that the Partnership is required by law or agreement with a third party to keep confidential.

13.7    **Bank Holding Company Act Subject Persons**.  Notwithstanding any other provision of this Agreement to the contrary:

(a)    **Notice**.  Any Limited Partner that is or becomes a BHCA Subject Person shall immediately inform the General Partner in writing that it is a BHCA Subject Person.

(b)    **Nonvoting Interests**.  Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has an Ownership Percentage in excess of four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners entitled to participate in giving any consent or taking any action, shall be deemed, for voting purposes only, to hold an Ownership Percentage of only four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners (after giving effect to the limitations imposed by this section 13.7 on all such Limited Partners), and the voting rights with respect to the Ownership Percentage in excess of said four and nine-tenths percent shall be

deemed held by the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(c)    **Limited Right to Consent**.  Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law.  Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(d)    **Special Right of Withdrawal**.  Promptly on receipt from any Partner of a notice of intention to withdraw any portion of such Partner's Capital Account balance pursuant to this Agreement and before consenting to any such withdrawal that requires the General Partner's consent or giving a notice of the General Partner's intention to expel a Partner's interest in the Partnership pursuant to the provisions of this Agreement governing expulsions, if such withdrawal or expulsion would result in a BHCA Subject Person, along with any of its Affiliates identified as such to the General Partner, having an Ownership Percentage in excess of twenty-four and nine-tenths percent, even if such BHCA Subject Person shall not have given the General Partner an Election Notice or, having given an Election Notice, shall thereafter have given a Revocation Notice, the General Partner shall so notify such BHCA Subject Person, which shall have the right to withdraw, at the time of the withdrawal or redemption giving rise thereto or as soon thereafter as is practical, so much of its Capital Account balance, after giving effect to any other withdrawals or redemptions (including withdrawals by other BHCA Subject Persons), as shall be required to reduce the Ownership Percentage of such BHCA Subject Person and any of its Affiliates identified as such to the General Partner to no more than twenty-four and nine-tenths percent.  If any BHCA Subject Person has a right to withdraw a portion of its Capital Account balance under the preceding sentence but does not exercise that right, the General Partner may require such BHCA Subject Person to make a withdrawal to reduce the Ownership Percentage of such BHCA Subject Person and any of its Affiliates identified as such to the General Partner to no more than twenty-four and nine-tenths percent.  Payments of the withdrawn amounts shall be made as described in sections 9.3(a) and (b) as if the date of withdrawal were a Permitted Withdrawal Date.

(e)    **Distributions in Kind**.  The General Partner shall give at least fifteen days' prior notice to each Limited Partner that is a BHCA Subject Person of any proposal to distribute property in kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in kind to the extent that such Limited Partner advises the General Partner at least five days before the date set forth in such notice for such distribution that such distribution could reasonably be expected to cause it to violate the BHCA, but instead such Limited Partner shall receive other assets of equal value, the receipt of which will not cause such Limited Partner to violate the BHCA.

(f)    **Election**.  A Limited Partner that is a BHCA Subject Person and that elects to be subject to sections 13.7(b) and (c) shall notify the General Partner thereof (an "Election Notice") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to sections 13.7(b) and (c) until ninety days after such Limited Partner notifies the General Partner that it elects no longer to be subject to sections 13.7(b) and (c) (a "Revocation Notice"), which ninety-day period may be reduced by the General Partner; provided that each such notice shall be accompanied by the Limited Partner's certification that such notice and any action by the General Partner in reliance thereon and in accordance with this Agreement is duly authorized under all applicable laws, rules and regulations.

13.8    **Voting Rights**.  With the General Partner's consent, a Partner may waive all or any portion of the voting rights that this Agreement or the Act confers on that Partner.  If a Limited

Partner and the General Partner agree to any such waiver, then, for voting purposes only, the portion of such Limited Partner's Ownership Percentage with respect to which voting rights are waived shall be deemed held by the Limited Partners who have not waived any of their voting rights, pro rata in proportion to their respective Ownership Percentages.

      13.9   **Confidentiality**. The General Partner will deliver to the Limited Partners copies of the Partnership's financial statements and other information regarding the Partnership. Each Limited Partner shall use those financial statements and other information, including any information provided under section 13.6, only to further its interests as a Limited Partner and, except for disclosures required by applicable law, shall maintain the confidentiality of those financial statements and that other information. Notwithstanding the foregoing, a Limited Partner (and each of its employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and any materials provided to the Limited Partners relating to such tax treatment and structure.

      14.   **Nature of Limited Partners' Liabilities for Claims Against the Partnership**. The parties intend that each Limited Partner shall be liable to creditors only for such Limited Partner's Capital Contributions and undistributed Profits. Therefore, (a) the General Partner shall arrange to prosecute, defend, settle or compromise such actions at law or in equity at the Partnership's expense as it may consider necessary to enforce or protect the Partnership's interests and (b) the General Partner shall satisfy any judgment, decree, decision or settlement under the terms of which the Partnership (or the General Partner, or any Affiliate of the General Partner, on behalf of the Partnership) is obligated to pay any amount, first, out of available proceeds of any insurance of which the Partnership is the beneficiary, next, out of Partnership assets and income, and, finally, out of the General Partner's assets and income; provided that if any such payment is made out of the General Partner's assets or income, the General Partner shall be entitled to reimbursement from the Partnership, with interest from the date of payment at the rate provided by statute for interest on judgments.

      15.   **Costs of Special Services**. A Limited Partner shall pay any costs incurred in connection with special services requested by that Limited Partner. Such services would include, for example, those that would benefit the Limited Partner but would not benefit the Partnership, such as a special evaluation or financial accounting for the purposes of estate valuation and legal fees and other expenses relating to assigning or transferring an interest in the Partnership. If that Limited Partner does not pay the costs of such services promptly after the General Partner's request for payment, the General Partner may deduct the amount thereof from that Limited Partner's Capital Account balance and pay such amount to the person entitled thereto.

      16.   **Withdrawal of General Partner; Additional and Successor General Partner**.

      16.1   **Withdrawal, Etc**. A person shall cease to be a General Partner on the happening of any of the following events:

          (a)    Such person withdraws as a General Partner by notice to the Partnership;

          (b)    An order for relief against such person is entered under Chapter 7, Chapter 11 or Chapter 13 of the federal bankruptcy law, or such person makes a general assignment for the benefit of creditors, files a voluntary petition under the federal bankruptcy law, files a petition or answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such person in any proceeding of this nature, or seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such person or all or any substantial part of such person's properties;

(c)    Sixty days after the commencement of any proceeding against such person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed or if within sixty days after the appointment without such person's consent or acquiescence of a trustee, receiver or liquidator of such person or of all or any substantial part of such person's properties, the appointment is not vacated or stayed or within sixty days after the expiration of any stay, the appointment is not vacated;

(d)    If such person is a corporation, limited liability company or partnership, the dissolution of such person; or

(e)    If such person is a natural person, (1) his or her death, (2) the entry by a court of competent jurisdiction of an order adjudicating him or her incompetent to manage his or her person or estate, or (3) his or her inability to perform his or her duties as a General Partner because of a physical, mental or legal disability for a period of more than sixty consecutive days.

16.2    **New General Partner**.  The General Partner may appoint any person as an additional or successor General Partner at any time without any vote or consent of any of the Limited Partners.  If the General Partner ceases to be the general partner of the Partnership and there is no remaining or surviving general partner of the Partnership, with the consent of a majority in interest of the Limited Partners given within thirty days thereafter, the Partnership may appoint and admit a new General Partner to the Partnership and elect to continue the Partnership's business.  A person so appointed will become General Partner on accepting such appointment and agreeing to act as General Partner, to become a party to this Agreement and to assume all the obligations and responsibilities of the General Partner hereunder.  At all times when the Partnership has two or more General Partners, they shall be jointly and severally liable for performing all of the duties and obligations of the General Partner hereunder, and they shall determine by agreement between or among themselves the manner in which Management Fees will be divided between or among them.

16.3    **Procedure**.  If a person ceases to be a General Partner, a General Partner is succeeded or the Partnership admits an additional General Partner, the remaining General Partner or Partners shall amend this Agreement and the Partnership's certificate of limited partnership to name the additional or successor General Partner or Partners without any further consent of any of the Limited Partners.

16.4    **Conversion of Interest**.  A person who ceases to be a General Partner for any reason shall:

(a)    Retain only the interest in such person's Capital Account, Profits, Losses and distributions as such person would have had if such person had been admitted to the Partnership as a Limited Partner at the date such person ceases to be a General Partner and shall exclude any value attributable to the right to manage and control the Partnership's business, and that interest shall be that of a Limited Partner;

(b)    Not be personally liable for the Partnership's debts incurred after such person ceases to be a General Partner; and

(c)    Be entitled to consent as (and only as) a Limited Partner only on matters on which the Limited Partners are entitled to consent.

17.    **Dissolution and Termination**.

17.1    **Events of Dissolution**.    The Partnership shall continue until terminated and dissolved (a) when a sole General Partner ceases to be a General Partner, if a successor General Partner has not been appointed as and become the General Partner within thirty days after the date that there ceases to be a General Partner of the Partnership as provided in section 16.2, or (b) when the General Partner elects, by written notice to the Partnership, to dissolve the Partnership. Subject to the preceding sentence, the Partnership shall not be dissolved and its affairs shall continue so long as there are at least two Partners, at least one of which is the General Partner, and the remaining General Partner or Partners shall continue the Partnership's business, notwithstanding that any person shall cease to be a General Partner for any reason. The Partnership shall not be dissolved or terminated by the expulsion, retirement, withdrawal, death, insanity, adjudication of bankruptcy, insolvency or dissolution of any Limited Partner, or by the assignment by any Limited Partner of such Limited Partner's interest in the Partnership or the admission of any new Partner as provided herein.

17.2    **Winding Up**.    On the Partnership's dissolution, the General Partner shall wind up the Partnership's affairs; provided that if there is no General Partner, the Partnership's affairs shall be wound up by such person or persons as the General Partner shall theretofore have designated for liquidation of the Partnership's assets or, if the General Partner shall not have made any such designation, by such person or persons as may be designated by the consent of a majority in interest of the Limited Partners (the General Partner or such person or persons, as the case may be, being hereinafter called the "Liquidating Persons"). The Liquidating Persons shall manage the Partnership's assets and shall liquidate at least so much of those assets as may be required to pay all liabilities of the Partnership (including, without limitation, all costs of dissolution and winding up, any amount that the General Partner shall have agreed to pay to the Liquidating Persons for their services in connection with the dissolution, and loans to the Partnership by any Partner), pay all such liabilities, establish reserves, and distribute the Partnership's remaining assets to the Partners (in cash or in kind or partly in cash and partly in kind, as the Liquidating Persons may determine). On any distribution of assets to the Partners pursuant to this section 17.2, any such assets shall be distributed in proportion to the Partners' respective Capital Account balances. After it shall appear to the Liquidating Persons that the Partnership's liabilities have been paid or that adequate provision shall have been made therefor, any balance remaining in any reserve theretofore established shall be distributed to the Partners as provided in this section 17.2, thereby terminating the Partnership. If the Partnership's assets are insufficient to satisfy its liabilities, to the extent that the Act requires, within thirty days after receiving notice thereof from the Liquidating Persons, each Partner shall return in cash such part or all of the distributions, if any, made to such Partner pursuant to section 9.3(d) or this section 17.2 as may be required to satisfy such liabilities, with each Partner making returns in proportion to such Partner's share of any such distributions.

17.3    **Legal Authority**.    The winding up of the Partnership's affairs and the distribution of its assets shall be conducted exclusively by the Liquidating Persons, who are authorized, subject to sections 12 and 17.2, to do any and all acts and things authorized by law for those purposes.

17.4    **No Recourse Against Partners**.    Each Partner shall look solely to the assets of the Partnership for the return of that Partner's Capital Contributions, and, if the Partnership's property remaining after the payment or discharge of the debts and liabilities is insufficient to return each Partner's Capital Contributions, that Partner shall have no recourse against any other Partner.

18.    **Assignments**.

18.1    **Personal Property**.    A Partner's interest in the Partnership is personal property and a Partner shall have no interest in specific Partnership property.

        18.2    **General Partner**.   The General Partner may sell, assign, transfer, pledge, encumber, hypothecate or otherwise dispose of all or any part of its interest as a General Partner without the consent of any other Partner; provided that no such disposition shall cause or entitle any person to become an additional or substitute General Partner of the Partnership otherwise than as provided in section 16.2.

        18.3    **Limited Partners**.

        (a)    **In General**.   A Limited Partner may sell, assign, transfer, pledge, encumber, hypothecate, or otherwise dispose of an interest in the Partnership, subject to compliance at that Limited Partner's expense with federal and state securities laws, such Limited Partner's Subscription Agreement and this section 18.3(a).   For purposes of such compliance, (1) the Limited Partner shall furnish the Partnership with a detailed explanation of the proposed disposition, (2) unless waived by the General Partner, the Limited Partner shall furnish the Partnership with an opinion of the Limited Partner's counsel in form and substance satisfactory to the General Partner to the effect that the proposed disposition (A) complies with applicable provisions of the Securities Act of 1933, as amended, and any applicable state Blue Sky or securities laws, (B) will not result in the Partnership having to register as an investment company under the ICA, (C) will not result in the Partnership's termination for federal income tax purposes, and (D) will not result in Partnership assets being deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder, (3) counsel for the General Partner shall have concurred in such opinion and the General Partner shall have advised the Limited Partner of such concurrence and (4) the General Partner shall have consented to the disposition, which consent may be withheld in the General Partner's discretion.   Any attempted or purported disposition without such compliance shall be void.   Any permitted disposition shall be effective as of midnight of the last day of the calendar month in which it is made.   No such disposition shall relieve the assignor of such assignor's responsibility for any expenses, obligations or liabilities, whether accruing before or after the disposition. Unless and until an assignee is admitted to the Partnership as a substituted Limited Partner as hereinafter provided, such assignee shall be entitled only to receive distributions from the Partnership attributable to the assigned interest from and after the effective date thereof; provided that the General Partner and the Partnership shall be entitled to treat the assigning Limited Partner as the absolute owner of such assignor's interest in the Partnership and shall incur no liability for distributions made in good faith to such assignor until the effective date of the disposition and until appropriate documents of assignment or other disposition have been delivered to the General Partner and recorded on the Partnership's books.

        (b)    **Restricted Transferees**.   Without the consent of the General Partner, no Partner shall transfer any interest in the Partnership if such transfer would result in interests in the Partnership assets to be deemed "plan assets" under ERISA and the U.S. Department of Labor regulations thereunder.

        (c)    **Substitution**.   An assignee of any Limited Partner's interest in the Partnership may become a substituted Limited Partner only with the General Partner's consent and compliance with this section 18.3. The General Partner may amend this Agreement and the Partnership's certificate of limited partnership without the consent of any of the Limited Partners, to effect such admission not later than the last day of the calendar month following receipt of notice of the assignment and such appropriate documentation of the assignment and substitution as the General Partner may reasonably require; provided that no such assignee shall become a substituted Limited Partner unless the assignee shall have consented in writing, in form satisfactory to the General Partner, to be bound by the terms of this Agreement and the Partnership's certificate of limited partnership in the place and stead of the assigning Limited Partner.

19.    **Amendments**.

19.1    **With Limited Partner Approval**.    The General Partner may propose amendments to this Agreement, in which case it shall submit to the Limited Partners a verbatim statement of any amendment so proposed. The amendment shall become effective only on the consent of the General Partner and a majority in interest of the Limited Partners; provided that, for purposes of obtaining a written consent on a proposed amendment, the General Partner may require a response within a specified reasonable time (which shall not be less than fifteen days).  Failure to respond shall constitute a consent in accordance with the General Partner's recommendation as to the proposed amendment.

19.2    **Without Limited Partner Approval**. Notwithstanding anything in section 19.1 to the contrary, the General Partner may, without any consent, approval, authorization or other action of any Limited Partner, amend this Agreement (a) if, in the General Partner's opinion, the amendment does not have a material adverse effect on the Limited Partners generally, or (b) whether or not any or all of the Limited Partners are adversely affected thereby, if (1) the General Partner first notifies the Limited Partners of such change and (2) such change does not become effective until such time as the Limited Partners shall have had the opportunity to withdraw from the Partnership pursuant to section 9.3.

19.3    **Amendments Requiring Unanimous Consent**.  Anything in section 19.1 or 19.2 to the contrary notwithstanding, without the consent of all of the Partners, no amendment shall change the Partnership to a general partnership, or change the General Partner's liability as such or the Limited Partner's limited liability as such.

20.    **Tax Elections**.  The General Partner shall make or cause the Partnership to make such elections as the General Partner may consider advisable under any applicable tax law, including, without limitation, any elections under Code section 754.

21.    **Power of Attorney**.  Each Limited Partner irrevocably constitutes and appoints the General Partner, with full power of substitution and resubstitution, that Limited Partner's true and lawful attorney, for that Limited Partner and in that Limited Partner's name, place and stead, and for that Limited Partner's use and benefit, to sign, execute, deliver, certify, acknowledge, swear to, file, record and publish (a) the Partnership's certificate of limited partnership and any amendment thereto or to this Agreement as provided herein, (b) any other certificates, instruments, agreements and documents necessary to qualify or continue the Partnership as a limited partnership or a partnership wherein limited partners have limited liability in the states or other jurisdictions where the General Partner deems necessary or desirable, (c) all conveyances, assignments, documents of transfer or other instruments and documents necessary to effect the assignment of an interest in the Partnership, the substitution of a Limited Partner, the admission of a Limited Partner to the Partnership or the dissolution and termination of the Partnership in accordance with this Agreement, (d) all filings and submissions pursuant to any applicable law, regulation, rule, order, decree or judgment which, in the General Partner's opinion, may be necessary or advisable in connection with the Partnership's affairs and (e) any governing documents or subscription documents of a Liquidating Fund.

The power of attorney granted herein is coupled with an interest, shall be irrevocable, shall survive any Limited Partner's death, disability or incapacity, shall be deemed given by each assignee and successor of each Limited Partner and may be exercised by the General Partner by listing on, or attaching a list thereto of, any or all of the names of the Limited Partners and executing such amendments, certificates, instruments and other documents with the signature by or on behalf of the General Partner, as attorney-in-fact for all of the persons whose names are so listed.

22. **Notices**. Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile transmission or three business days after being mailed by first class mail, or one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, charges and postage prepaid, properly addressed to the party to receive such notice at the last address furnished for such purpose by the party to whom the notice is directed.

23. **Severability**. If a court of competent jurisdiction shall hold any provision of this Agreement, or the application of such provision to any person or circumstance to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby and shall be enforced to the full extent of its validity.

24. **Binding Effect**. Subject to section 18, this Agreement shall bind and inure to the benefit of the parties and their respective successors, assigns, heirs, devisees, legatees, legal representatives, executors and administrators.

25. **Partition**. During the term of the Partnership, each party hereto irrevocably waives any right that such party may have to maintain any action for partition with respect to the Partnership's property.

26. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

27. **Entire Agreement**. This Agreement contains the entire agreement of the parties and supersedes all prior negotiations, correspondence, understandings and agreements between or among the parties regarding the subject matter hereof, other than any and all Subscription Agreements and any and all amendments, supplements and appendices thereto, all of which Subscription Agreements, amendments, supplements and appendices shall continue in full force and effect.

28. **Further Assurances**. Each Partner shall provide such further information with respect to that Partner and any of its beneficial owners as the General Partner may request, including, but not limited to, any information regarding any Partner's tax treatment of a Capital Contribution of Securities, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

29. **Governing Law**. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware.

30. **Dispute Resolution**. The Partners waive the right to a jury trial, if and to the extent that such a waiver is permissible under applicable law. The Partners consent to the personal jurisdiction and the exclusive venue of any state court in the city and county of the Partnership's principal place of business at the time the dispute arises and any United States District Court encompassing the Partnership's principal place of business at the time the dispute arises, with respect to any suit, action or other proceeding between or among any of the Partnership and the Partners or any of their respective Affiliates arising out of, relating to or in connection with this Agreement or the Partnership or its formation, organization, capitalization, activities or management.

31.    **Attorneys' Fees**.  If any dispute between or among any of the Partnership and the Partners or any of their respective Affiliates should result in litigation, the prevailing party or parties in such dispute shall be entitled to recover from the other party or parties all reasonable fees, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred by the prevailing party or parties in connection therewith, all of which shall be deemed to have accrued on the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any award, judgment or order entered in such action shall specifically provide for the recovery of attorneys' fees and costs incurred in enforcing such award or judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law.  For the purposes of this section 31, (a) attorneys' fees shall include, without limitation, fees incurred in postaward or postjudgment motions, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and (b) prevailing party shall mean the party that is determined in the proceeding to have prevailed or who prevails by dismissal, demurrer, default or otherwise.

32.    **Legal Counsel**.

32.1    **Counsel to the General Partner**.  Each Limited Partner acknowledges and understands that this Agreement and related documents have been prepared by Shartsis Friese LLP, counsel for the General Partner, and that such counsel has not represented or been engaged to provide services to any Limited Partner or to the Partnership.  The Limited Partners understand that such counsel acts as legal counsel to many investment advisory, venture capital and brokerage firms, investors and other persons.  Such counsel's relationships with such persons are periodic; they can and do lapse and then re-start on an unpredictable basis, making it impractical for such counsel to provide disclosure of each and every such relationship.  Without limiting the foregoing, in its capacity as legal counsel for the General Partner, Shartsis Friese LLP may be subject to actual or potential conflicts of interest arising from: (a) representing one or more Partners or parties related thereto in connection with matters other than preparing this Agreement or operating the Partnership or (b) representing other managers of investment partnerships that seek or obtain capital from the same investors as the Partnership or compete with the Partnership for managerial resources or investment opportunities.

32.2    **Representations and Warranties by Limited Partners**.  Each Limited Partner: (a) represents and warrants that it has considered the foregoing carefully and hereby approves such counsel's representation of the General Partner; (b) acknowledges the possibility that, under the laws and ethical rules governing the conduct of attorneys, such counsel may be precluded from representing any one or more specific parties in connection with any dispute involving Limited Partners or the Partnership; (c) agrees that such counsel may decline to represent, or withdraw from representing, the General Partner at any time; (d) acknowledges that actual or potential conflicts of interest may exist among the Limited Partners, that no Limited Partner will be represented by legal counsel unless such Limited Partner specifically engages counsel on its own behalf, and that such Limited Partner has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement; (e) agrees that in the event of a dispute between one or more Limited Partners, on the one hand, and the General Partner, on the other hand, Shartsis Friese LLP may represent one or more of the General Partner, the officers, members, managers and directors thereof, or the Partnership; (f) acknowledges that the approvals, acknowledgements and waivers in this section 32 do not reflect or create a right under this Agreement on the part of such Limited Partner to approve the General Partner's selection of legal counsel for the Partnership; (g) agrees that neither this Agreement nor the transactions and Partnership operations contemplated hereby are intended to create an attorney/client relationship between Shartsis Friese LLP and such Limited Partner or any other relationship pursuant to which such Limited Partner (acting other than in the name of the Partnership) would have a right to object to such counsel's representation of any person under any circumstances; (h) acknowledges and understands that Shartsis Friese LLP may at times agree to represent the Partnership, and each Limited Partner hereby consents to such representation and agrees that such representation shall not be deemed or result in

representation of any Limited Partner by Shartsis Friese LLP, notwithstanding that the services of Shartsis Friese LLP rendered for the benefit of the Partnership may also benefit the Limited Partners by virtue of their interests in the Partnership; and (i) agrees that, if there is ever a dispute between any Limited Partner and the General Partner or the Partnership, no Limited Partner shall be entitled to discovery of or regarding any communication between Shartsis Friese LLP and the General Partner or the Partnership relating to services provided by Shartsis Friese LLP to the General Partner or the Partnership.

              32.3   **Related Issues.**  The parties intend that Shartsis Friese LLP shall be entitled to enforce this section 32 and each Limited Partner hereby consents in advance to such enforcement. Nothing in this section 32 shall preclude the General Partner from selecting different legal counsel at any time in the future and, except as specifically provided in this section 32, no Limited Partner shall be deemed by virtue of this Agreement to have waived its right to object to any conflict of interest relating to matters other than this Agreement or the transactions and Partnership operations contemplated hereby.

       33.   **Intellectual Property.**  Notwithstanding any provision of this Agreement to the contrary, the Partners acknowledge that: (a) the "Covenant Global Investors" name and mark (and any portion, abbreviation, derivation or variation thereof) and trade secrets, know-how, trading techniques, inventions, trademarks, trade names, and other intellectual property to the extent protectable are the property of the General Partner or its Affiliates; (b) the Partnership's authority to use any such asset may be withdrawn by the General Partner or its Affiliates at any time without compensation to the Partnership; (c) no Partner other than the General Partner shall, by virtue of its ownership of an interest in the Partnership, hold any right, title or interest in or to any such asset; and (d) on the Partnership's dissolution and liquidation, all right, title and interest in and to any such asset shall be transferred to and held solely by the General Partner or its Affiliates without consideration.

       34.   **No Third Party Beneficiaries.**  Except as otherwise provided in sections 12.5, 18.3(c) and 32, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party.

       35.   **Headings; Gender; Number; References.**  The headings at the beginning of the sections hereof are solely for convenience of reference and are not part of this Agreement.  As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require and "person" shall be deemed to include natural person and corporation, limited liability company, partnership, trust or other entity.  All references to sections are intended to refer to sections of this Agreement, except as otherwise indicated.

       IN WITNESS WHEREOF, this Second Amended and Restated Agreement of Limited Partnership has been duly executed by or on behalf of the General Partner and the Limited Partners listed on Schedule A attached hereto as of the date first above written, or on behalf of parties hereto subsequently admitted to the Partnership as Limited Partners, as shown on a Supplemental Schedule A attached hereto, as of the date shown on such Supplemental Schedule A.

GENERAL PARTNER:

LIMITED PARTNERS:

Covenant Financial Services, LLC

The Limited Partners listed on Schedule A or Supplemental Schedule A Attached Hereto

By: _____

Covenant Financial Services, LLC, Attorney-in-Fact

     Stephen E. Shafer, Chief Investment Officer

By: _____

     Stephen E. Shafer, Chief Investment Officer

210 Park Avenue, Suite 3000
Oklahoma City, OK 73102
Tel: ·405 848 6999
·800 856 0711
Fax: ·405 848 6953



*To the investors in Covenant Global Alpha Fund, L.P. ("Global Alpha L.P.), Covenant Global Alpha Fund, Ltd. ("Global Alpha Ltd."), Covenant Income Appreciation Fund, L.P. ("Income Appreciation") and Covenant Opportunity Capital Fund, L.P. ("Opportunity Capital," and collectively, the "Funds")*

Dear Investor,

While Scott, Raquel, Ollie or I have already been in touch with most of you regarding the mechanics of the upcoming transition at Covenant we informed you about on 12/22/2014, I want to provide each of you with an outline of the process and associated dates that will facilitate the movement of all client and Fund investor assets in the coming months.

As you recall, Covenant Global Investors (CGI) has entered into an arrangement with Covenant Multifamily Offices (CMFO) based in San Antonio, Texas. Under the terms of this arrangement, Fund investors and clients that desire to transition the management of a portion of their CGI-managed assets to CMFO may do so on the closing of the agreement between CGI and CMFO, which we expect to take place during the first week of February.

CGI has structured this arrangement with CMFO to offer clients a more conventional investment approach that could serve as a complement to the risk-managed focus executed by CGI. Our initial conversations with many clients thus far have confirmed our anticipation that a customized allocation of capital between CGI and CMFO is the preferred approach to navigate the unique challenges that have come to characterize the global economic and investment landscape since the financial crisis in 2008.

To facilitate an orderly and equitable transition for all Fund investors, the Funds will begin distributing their assets to investors in a multi-month distribution process beginning in February upon the completion of January Fund performance. These distributions will allow for 1) the process of beginning the movement of any capital you have designated to be invested with CMFO, 2) the process of consolidating all capital to be managed by CGI into a single partnership, Cartographer LP, and 3) the process of moving capital that has not been reserved for management by CGI or CMFO to the custodian of your choice.

This multi-month distribution process to begin in February will be executed in place of the withdrawal and redemption protocol that has historically been executed on behalf of Fund investors at month end. The Funds are suspending withdrawals and redemptions for the January withdrawal and redemption date, 1/31/2015, and all subsequent withdrawals and redemptions. Assets related to withdrawal or redemption requests for January and later will remain in the Funds until distributed and will be subject to market risk, except assets held in cash pending such distribution. All investors, including those that have requested full or partial withdrawals or distributions for January, will receive distributions through the same incremental process outlined below.



210 Park Avenue, Suite 3000
Oklahoma City, OK 73102
Tel: ·405 848 6999
·800 856 0711
Fax: ·405 848 6953



On finalizing January Fund performance, which should be complete by mid-February, we will distribute a percentage of investor capital out of the Funds to your existing Fidelity or Raymond James account(s). We do not yet know what this distribution percentage will be, but it will represent a portion of the liquid assets currently held by the Funds.

As your fiduciary, our priority is to protect and optimize your capital. For this reason, while trying to work *quickly*, we are also trying to work *thoughtfully* to execute the sale of Fund assets, liquid and illiquid alike, at what we believe are favorable prices when market opportunities present themselves. This process will continue through the months of February and March, and we expect that the Funds will make additional distributions in March following the finalizing of February's performance, and again in April following the finalizing of March's performance. We anticipate that the majority of the Funds' liquid investment positions will have been sold and cash proceeds distributed by the mid-April distribution, but it could take longer.

We believe that assets remaining in the Funds by the time of the mid-April distribution will primarily be represented by less liquid investments in real estate or private transactions in debt or equity for which there is no market. As we noted in our 12/22 communication, these are the assets that may take six, nine or more months through the course of 2015 and possibly later to either sell or bring to a liquidity event at what we believe are acceptable prices in order to generate cash proceeds that can then be distributed to each investor.

In short, we expect the distributions out of the various Funds to be as follows:

1. <u>Opportunity Capital</u>: Each investor in this Fund will receive distributions as its positions are sold as described above. This Fund is comprised primarily of liquid investment positions that should enable the majority of assets to be distributed in mid-February and mid-March with the prospect of modest remaining liquid asset distributions to occur in mid-April. Opportunity Capital also has a small interest in Covenant Real Return Partners LLC, the precious gemstone collection we have accumulated since 2011. The proceeds of this interest will be distributed as Real Return Partners LLC is unwound.

2. <u>Income Appreciation</u>: Each investor in this Fund will receive distributions as its positions are sold as described above. This Fund is comprised primarily of liquid and semi-liquid investment positions that should enable the majority of the assets to be distributed in mid-February, mid-March and mid-April. The income-oriented focus of this Fund means that some of its investments are bond and credit related instruments for which there is less liquidity than most large capitalization domestically listed equities, for example. The lower level of liquidity associated with these bond and credit positions may extend the time it takes to sell these positions at what we believe are favorable prices when market opportunities present themselves. This Fund also has a single private debt investment for which there is no publicly traded market. We expect that the proceeds of this position will be distributed as a purchase transaction or liquidity event is executed.

A Commitment To Trust

210 Park Avenue, Suite 3000
Oklahoma City, OK 73102
Tel: ·405 848 6999
·800 856 0711
Fax: ·405 848 6953



**3. Global Alpha L.P. and Global Alpha Ltd.**  Because these Funds have a more aggressive investment strategy than the others, they hold more illiquid assets, which may take longer to sell. We anticipate the sale and distribution of the majority of these Funds' liquid assets in mid-February, mid-March and mid-April.  Any semi-liquid but publicly traded investment positions that remain following the mid-April distributions will be sold at what we believe are favorable prices when market opportunities present themselves.  We expect that the proceeds of these Funds' investment positions in real estate, private equity, private debt and physical assets will be distributed as opportunities to sell at what we believe are favorable prices are identified.

As it relates to the upcoming transition at Covenant, we noted in our original 12/22 communication that clients are not required to transition away from CGI and may remain fully or partially invested at CGI.  To create efficiency after the closing of our transaction with CMFO, all investor capital at CGI will be consolidated and managed through a single partnership called Cartographer LP.  Cartographer will execute a continuation of the same process we initiated in June 2012 that emphasizes a focus on "stores of value," represented by liquid investments in common security types like publicly traded stocks and bonds, and less liquid investments in real estate, physical assets, and private transactions in debt or equity.  All investments, however, will reflect our view of the importance of owning productive business assets intended to generate acceptable positive returns that preserve the purchasing power of your capital during "good times," and seek to avoid the prospect of permanent capital loss during times of significant market upheaval.

For those we have not yet had a chance to meet or speak with, our discussions in the coming days will enable us to determine the path best suited to meet your objectives, risk profile and time horizon through the execution of this orderly, multi-month distribution process intended to facilitate the diversification of your capital.

Thank you and we will continue to be in touch as the agreement between CGI and CMFO is finalized and the first stage of capital distributions is prepared by mid-February.

Steve Shafer
Chief Investment Officer
Covenant Global Investors

# Exhibit D

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

TWITTER INC., Petitioner,

v.

YOUTOO
TECHNOLOGIES, LLC,
Patent Owner.

———————————

Case IPR2017-01131
U.S. Patent No. 8,464,304

———————————

**PATENT OWNER'S POWER OF ATTORNEY**

Case IPR2017-01131
Patent 8,464,304

Pursuant to 37 C.F.R. § 42.10(b), Youtoo Technologies, LLC, the Patent

Owner, hereby appoints the following backup counsel in **the United** States

Patent **and Trademark** Office associated with the above-captioned Petition for

*Inter Partes* Review of U.S. Patent No. 8,464,304:

> Stephen L. Levine (Reg. No. 33,413)
> Carrington, Coleman, Sloman & Blumenthal, L.L.P.
> 901 Main Street, Suite 5500
> Dallas, Texas 75202
> Phone: 214-855-3025
> Fax: 214-855-1333

The individual signing below has the authority to execute this document on

behalf of Youtoo Technologies, LLC.

YOUTOO TECHNOLOGIES, LLC


By: _____
Name:  Stephen E. Shafer
Title: CEO / MANAGER
Date: April 21, 2017

Case IPR2017-01131
Patent 8,464,304

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e), I certify that I caused to be served on the counsel for Petitioner a true and correct copy of the foregoing "Patent Owner's Power of Attorney" by electronic means on April 21, 2017 at the following email addresses of record:

| Lead Counsel | Backup Counsel |
|---|---|
| Todd M. Siegel<br>KLARQUIST SPARKMAN, LLP<br>121 SW Salmon Street, Suite 1600,<br>Portland, Oregon, 97204<br>Tel: 503-595-5300<br>Fax: 503-595-5301<br>todd.siegel@klarquist.com | Andrew M. Mason<br>KLARQUIST SPARKMAN, LLP<br>121 SW Salmon Street, Suite 1600,<br>Portland, Oregon, 97204<br>Tel: 503-595-5300<br>Fax: 503-595-5301<br>andrew.mason@klarquist.com |
| | Robert T. Cruzen<br>KLARQUIST SPARKMAN, LLP<br>121 SW Salmon Street, Suite 1600,<br>Portland, Oregon, 97204<br>Tel: 503-595-5300<br>Fax: 503-595-5301<br>rob.cruzen@klarquist.com |

Dated:    April 21, 2017          /Spencer C. Patterson/
                                  Spencer C. Patterson (Reg. No. 43,849)
                                  Grable Martin Fulton PLLC
                                  1914 Skillman St., Ste. 110-144
                                  Dallas, TX 75206 Tel.:
                                  (214) 396-8601
                                  Fax.: (214) 988-0775

# Exhibit E



*1036704458*

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

|  |  |
|---|---|
| ROBERT F. BROWNE FAMILY LLC, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>STEPHEN E. SHAFER, COVENANT<br>FINANCIAL SERVICES, LLC d/b/a<br>COVENANT GLOBAL INVESTORS, and<br>CARTOGRAPHER LP,<br><br>    Defendants,<br><br>and<br><br>COVENANT GLOBAL ALPHA FUND, L.P.<br>f/k/a/ as CFS AGGRESSIVE STRATEGY<br>FUND, L.P., COVENANT GLOBAL ALPHA<br>FUND, LTD., COVENANT OPPORTUNITY<br>CAPITAL FUND, L.P., and COVENANT<br>INCOME APPRECIATION FUND, L.P.,<br><br>    Nominal Defendants.<br><br>v.<br><br>COVENANT MULTI-FAMILY OFFICES,<br>LLC, and SCOTT R. DUNCAN,<br><br>    Third-Party Defendants. | **FILED IN DISTRICT COURT**<br>**OKLAHOMA COUNTY**<br><br>**MAY 1 0 2017**<br><br>**RICK WARREN**<br>**COURT CLERK**<br>89_____<br><br>Case No. CJ-2016-4937<br><br>Judge Patricia G. Parrish |

**PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
EMERGENCY MOTION TO APPROVE THE SALE OF THE RED SPINEL
GEMSTONE AND DEFENDANTS' SUPPLEMENT OT ITS EMERGENCY
MOTION TO APPROVE THE SALE OF THE RED SPINEL GEMSTONE AND TO
ADD REQUEST FOR YOUTOO FUNDING**

First and foremost, there is no emergency involved in Defendants' requests. The gemstone Defendants' claim should be sold immediately has been held since 2011. And, as Defendants admit in the Supplement, the funding they request the Court to approve—without any prior consultation with Plaintiffs—is for "maintaining the Youtoo patent litigation for the **next 60-90 days**."[1] Shafer and CFS's time managing the Funds and their assets ended April 28 and there is simply no emergency. The receiver and/or new General Partner/Investment Adviser can and should be allowed to deal with these matters in a thoughtful and prudent manner.

## GEMSTONE

Plaintiffs object to the purported emergency sale of a gemstone that Defendants have held for a half-dozen years—since 2011. Plaintiffs have serious concerns about being presented with an ultimatum late on a Sunday afternoon and more than 24 hours after Steve Shafer apparently communicated with Christies about the Red Spinel transaction. The sale of this gem is particularly concerning because there have been no valuations or information provided to investors for over a year. For all intents and purposes, as far as Plaintiffs know, this gem has been missing for over a year.[2]

Plaintiffs object not because they "think the gemstone collection should be sold as a whole set," but because Plaintiffs, who represent a majority of the investors in the Funds, believe that the prudent course is to have the entire gemstone collection evaluated and to then make a plan for the portfolio—rather than making a decision under the gun with Shafer still withholding critical information, including even basic details of his communications with Christies and who the

---

[1]  Defs.' Supp. Br, at 1 (emphasis added).

[2]  *See* Third Quarter Investor Report, Ex. 22 to Plaintiffs' Receiver Motion, at 1 (describing the 3 gemstones sold at Christies Auction and the "remaining two items in the collection" with no reference to the Red Spinel); Excerpt from Shafer's Aug. 11, 2016 Letter to Certain Limited Partners, **Ex. 1**, at 2 (providing Q1 16 and Q2 16 valuations for the individual gemstones with no reference to the Red Spinel).

purchaser is. In light of this Court's Order granting Plaintiffs' motion to appoint a receiver, Shafer has no authority to determine what is in the best interests of the investors; nor do Plaintiffs trust Shafer to make such a determination. A sale now only creates more opportunity for mischief before Shafer and CFS formally depart.

There is absolutely no need for spending more investor assets litigating an issue that the Court has already adjudicated, let alone on short notice. Shafer has noticeably never demonstrated such alacrity in attempting to liquidate assets in the two and a half years since he gated the Covenant Funds. Because this is not Shafer's problem anymore, this motion represents either an effort to manufacture some sort of claim that a receiver cannot act as quickly as Shafer or to churn more fees and expenses. Either way, the Court should deny the motion and stop such tactics.

What makes the timing of this proposed urgent transaction even more suspicious is that Shafer has given Plaintiffs no details about his efforts, if any, to sells the gemstones—or other assets—and to this day he has not disclosed what happened to the more than $6.5 million in proceeds from the December 2016 sale of three gemstones. Shafer sold those gemstones at 57.68% of the value at which he was carrying them on CFS's books and was using to calculate his management fees.[3] Moreover, William Noble in Dallas, Texas—who Plaintiffs understand is Shafer's close friend—has held the Red Spinel on consignment for nearly 2 years [4] Notwithstanding Defendants' statement that "the current offer would result in a net profit for the Funds," they fail to account for the expenses assessed against the Funds in relation to this gem. For example, there have been multiple appraisals and, upon information and belief, Shafer traveled to Geneva, Switzerland with this and other gems after this case was filed. Also, Shafer may use

---

[3]    Christies' Auction Results, Ex. 25 to Plaintiffs' Receiver Motion.

[4]    Shafer Email Responding to Questions RE Red Spinel, **Ex. 2**; First Amendment to the Letter Services Agreement Between William Noble Rare Jewels, L.P. and Covenant Financial Services, **Ex. 3**, at CFS007202-7203.

the sale now to claim that the Covenant Funds owe money to his friend Noble. In light of the Court's Order granting Plaintiffs' motion to appoint a receiver, the receiver and/or new General Partner/Investment Adviser should decide how to deal not only with the Red Spinel but also with Noble and others. The possibility that some proceeds may find their way out of state to a Shafer insider is especially troubling here.

Just as troubling is the revelation in Defendants' motion that the Covenant Funds have been paying an outsourced Chief Financial Officer—Scott Rosenthal—to do work for which Shafer was charging Plaintiffs millions of dollars in fees and expenses.[5] The Covenant Funds also apparently paid Rosenthal to commission another valuation from Shafer's gem appraiser, someone in whose impartiality and ability Plaintiffs have absolutely no confidence. For example, the valuation that Defendants produced to Plaintiffs for the first time on May 7, 2017, is riddled with typos and addressed to an office that Defendants have not occupied for at least 5 years. It seems that rather than conserving fund assets, Shafer has been going out of his way to spend them—having paid Rosenthal some $66,000 in 2016 on a part-time basis.[6]

## YOUTOO FUNDING

Defendants' Supplement  seeking more Fund money for Youtoo litigation (without conferring with Plaintiffs) after spending millions on unknown projects flies in the face of this Court's Order granting Plaintiffs' motion to appoint a receiver. Any decision about spending more money on Youtoo should be made by the receiver or the investors' newly selected General Partner/Investment Adviser, after assessing the entire case file. Neither Plaintiffs nor the Court

---

[5]   Email from K. Kress at Tomlinson McKinstry law firm explaining why Scott Rosenthall requested the 2017 gem appraisal rather than Shafer, **Ex. 4** ("Scott Rosenthal is CFS' outsourced/contract CFO. He serves as an intermediary between CFS and the auditor. Scott is the managing member of Scoven, LLC. Scoven, LLC is based in New York.").

[6]   CFS' Expenses Billed to Covenant Funds, Ex. 27 to Plaintiffs' Receiver Motion, at CFS013287.

can even begin to make that decision until they know what Defendants have done with the millions of dollars they allegedly devoted to Youtoo. Nor do Plaintiffs know when or why CFS and Shafer increased the Covenant Funds' ownership of Youtoo to 7/8ths—as their counsel stated at the hearing on April 28, 2017.[7]

If Defendants' withholding of information were not sufficiently clear already, Plaintiffs discovered only last week—through their own digging—that the United States District Court for the Northern District of Texas rendered a $3 million judgment (not including pre- and post-judgment interest and attorneys' fees) last month against Youtoo and its former CEO, Christopher Wyatt, after a jury trial on a vendor's breach of contract claim filed in 2015.[8] Defendants have disclosed nothing to investors about this case, let alone that a big money judgment has been rendered. Nor did Shafer's counsel mention this during the all-day hearing before this Court on April 28. Thus, Youtoo is $3 million plus in the hole before the additional funding request.

As the Court is now aware, for years CFS and Shafer have pumped money purportedly into the Youtoo patent litigation, which was being handled on contingency until only a couple of months ago. And on November 10, 2016, the United States District Court for the Northern District Court of Texas dismissed two of Youtoo's three claims against Twitter, a fact that Shafer described to investors as a "positive and expeditious development."[9] Whether that case merits more money is not a decision to be made in a drumhead proceeding by someone who has been relieved of his managerial duties. Nor should this decision be based on (i) a claimed valuation given to an entity that is not a party to this litigation and that, in fact, was formed by Shafer on December 5, 2016,

---

[7]    Hr'g Transcript of Receiver Motion, April 28, 2017 [transcript requested].

[8]    Plaintiff's Motion for Entry of Judgment and for Award of Attorney's Fees, *Mansour Bin Abdullah Al-Saud v. YouToo Media, LP, YouToo Management, LLC, and Christopher Wyatt*, 3:15-CV-3074-C, Dkt. 109 (N.D. TX, April 27, 2017), **Ex. 5**, at 2.

[9]    Third Quarter Investor Report, Ex. 22 to Plaintiffs' Receiver Motion, at 2.

just over 2 months after this litigation was filed; or (ii) the basis of an undated letter from an employee who asks that his $240,000 salary be continued (to do some undescribed task). The bottom line is that the receiver and/or new General Partner/Investment Adviser is entitled to have a reasonable opportunity to evaluate all the Funds' assets and make prudent determinations regarding those assets, not decisions on the fly based on claimed emergencies by the parties whom the Plaintiffs claim have defrauded them and over whom this Court has ordered a receiver.

*  *  *

Although Plaintiffs have wanted to liquidate the Covenant Funds assets for years, they are now concerned about a hasty sale being made based on limited, and perhaps even incorrect, information and about converting gemstones to cash while Shafer still has access to the Funds. Another buyer can and will be found after a receiver or new General Partner/Investment Adviser takes over and a prudent evaluation and plan for the liquidation of the assets is made. In any event, should this Court allow the Red Spinel sale to proceed, Plaintiffs ask the Court to confirm that all the proceeds will go directly to the Covenant Funds, which will remain frozen until a receiver or new General Partner/Investment Adviser is in place. With regard to Youtoo, no emergency exists and Plaintiffs ask that the receiver/new General Partner/Investment Adviser be provided the opportunity to make thoughtful and prudent decisions.

Dated: Oklahoma City, Oklahoma
        May 10, 2017

Respectfully submitted,

By: _____

Cheryl P. Hunter, OBA #4499
Nicole M. Nash, OBA #31412
HOLLADAY & CHILTON, PLLC
204 N. Robinson Ave., Ste. 1550 Oklahoma
City, Oklahoma  73102
405-236-0045 (phone)
405-236-2349 (fax)
cheryl.hunter@holladaychilton.com
nicole.nash@holladaychilton.com

-and-

Gary Svirsky (admitted *pro hac vice*)
Janine Panchok-Berry (admitted *pro hac
vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
212-326-2000 (phone)
212-326-2061 (fax)
gsvirsky@omm.com
jpanchok-berry@omm.com

ATTORNEYS FOR PLAINTIFFS

6

## CERTIFICATE OF SERVICE

This is to certify that on the 10th day of May 2017, a true and correct copy of the above

and foregoing was served via email and U.S. mail to:

Toby M. McKinstry
Ross N. Chaffin
Kelly J. Kress
Robert D. Tomlinson
Jefferson Rust
Tomlinson--McKinstry
Two Leadership Square, Suite 450
211 North Robinson Avenue
Oklahoma City, Oklahoma 73102

Jeffery S. Ludlam
Ashley A. Warshell
Hall & Ludlam, P.L.L.C.
210 Park Avenue, Suite 3001
Oklahoma City, OK 73102

ATTORNEYS FOR DEFENDANTS

Joe M. Hampton
Amy J. Pierce
Corbyn Hampton Barghols Pierce, PLLC
One Leadership Square, Ste. 1910
211 N. Robinson
Oklahoma City, OK 73102

ATTORNEYS FOR SCOTT R. DUNCAN

**CFS LLC**
210 Park Avenue, Suite 3000
Oklahoma City, OK  73102
405-848-6999

**Gemstones:**
*It looks like the next round of Gem auctions is coming up in September.*
*What are the plans to list the gemstones; please outline the reserve prices you've described which are currently being offered by Christies and Sotheby's, and how they compare to your carrying values.*

The prospective auctions that Christie's would consider our collection for inclusion is the Geneva Magnificent Jewels auction on 11/15/16 and the Magnificent Jewels auction in New York on 12/7/16. The prospective auction that Sotheby's would consider our collection for inclusion is the Magnificent Jewels auction to be held in Geneva on 11/16/16.

Our initial discussions with Christie's through June and July were specifically led by our strategic partner Mr. Bill Noble of William Noble Rare Jewels in Dallas. We communicated a desire to have our items considered for inclusion in their upcoming Magnificent Jewels auction with reserve levels approximating their independently appraised current values. Christie's indicated a willingness to consider including our collection at reserve levels equal to one-half of their estimated wholesale value. These reserve levels would be approximately less than half of their current independently appraised values which are inclusive of auction price comparables. While I believe the likelihood of obtaining auction prices levels above these indicative reserve levels we might run the risk of sales well beneath our currently appraised carrying value, which would likely result in material losses relative to both their cost basis and current carrying value, is simply too high and would represent an unnecessary permanent loss of capital for limited partners.

Our items are currently en route to Christie's for physical inspection, review and consideration. I will be personally meeting with Christie's in the month of August to discuss their consideration of our items for inclusion in their upcoming Geneva or New York auctions. I will also discuss alternative arrangements, including their private sale introductory process.

The Q2-16 appraisal and valuation summary is provided below.

| Description | Q2 Appraisals | | | | | | Overall Average |
|---|---|---|---|---|---|---|---|
| | Shara Jarvis | | | Neil H. Cohen | | | |
| | Low | High | Average | Low | High | Average | |
| Yellow Rose (5131020246) | $ 12,500,000 | $ 13,500,000 | $ 13,000,000 | $ 12,539,200 | $ 12,539,200 | $ 12,539,200 | $ 12,969,600 |
| Golconda-White Flawless (219773312) | $ 4,500,000 | $ 5,000,000 | $ 4,750,000 | $ 4,544,200 | $ 4,544,200 | $ 4,544,000 | $ 4,647,000 |
| Burma Blue-Natural Sapphire (1011568) | $ 4,500,000 | $ 5,200,000 | $ 4,900,000 | $ 5,208,290 | $ 5,208,290 | $ 5,208,290 | $ 5,054,645 |
| Star Sapphire | $ 1,250,000 | $ 1,400,000 | $ 1,325,000 | $ 1,343,500 | $ 1,343,500 | $ 1,343,500 | $ 1,334,250 |
| Mandalay-Platinum Ring with Cushion Cut Burmese Sapphire (41582) | $ 1,850,000 | $ 1,850,000 | $ 1,600,000 | $ 1,945,560 | $ 1,945,560 | $ 1,945,560 | $ 1,772,780 |
| **Totals:** | **$ 24,600,000** | **$ 26,750,000** | **$ 25,575,000** | **$ 25,679,200** | **$ 25,679,200** | **$ 25,678,200** | **$ 25,679,370** |

The cost basis information for each item in our collection is provided below.

| Description | Cost Basis (Covenant) | Gems | | | | Profit Since | |
|---|---|---|---|---|---|---|---|
| | | Q3 Valuation | Q2 Valuation | Valuation Change | Valuation Change (%) | Inception | Profit (%) |
| Yellow Rose-77.12 Ct. Fancy Vivid Yellow VS2 (5131020246) | $ 11,310,000 | $ 12,969,600 | $ 12,969,600 | $ | 0.0% | $ 1,320,600 | 11.8% |
| Golconda-White Flawless (219773312) 22.72 Ct. Cash Med 8r8 Type Ila | $ 4,400,000 | $ 4,497,000 | $ 4,647,000 | 150,000 | 3.3% | $ 247,000 | 5.6% |
| Burma Blue-75.41 Ct. Natural Burmese Sapphire (1011568) | $ 4,578,750 | $ 5,051,645 | $ 5,051,645 | $ | 0.0% | $ 472,895 | 10.3% |
| Star Sapphire - 13.1 Ct. | $ 625,000 | $ 1,000,688 | $ 1,000,688 | $ | 0.0% | $ 375,688 | 25.3% |
| Mandalay-31.38 Ct. Platium Ring with Cushion Cut Burmese Sapphire (41582) | $ 1,432,497 | $ 1,772,780 | $ 1,772,780 | $ | 0.0% | $ 340,283 | 23.7% |
| **Totals:** | **$ 22,846,247** | **$ 24,985,713** | **$ 26,146,713** | **180,000** | **4.4%** | **$ 2,879,886** | **11.4%** |

Since the update offered above (in grayscale), I had the opportunity to personally meet with Mr. Rahul Kadakia, Christie's International Head of Jewelry. I have inserted the email I received from him as a follow up to our meeting earlier this week, and I have attached his proposal related to the inclusion of

*A Commitment To Trust*



CFS 012571

**From:**     Steve Shafer
**To:**       cori.browne@gmail.com
**Subject:**  RE: Red Spinel
**Date:**     Friday, March 18, 2016 2:17:18 PM

Responses below...

Stephen E. Shafer | Chief Investment Officer

210 Park Avenue, Suite 3000
Oklahoma City, OK 73102
T: 405-848-6999 | F: 405-848-6953
Steve.Shafer@CartographerCapital.com
Information contained in this communication is not considered an official record of your account and does not
supersede normal trade confirmations or statements. Any information provided has been prepared from sources
believed to be reliable but is not guaranteed, does not represent all available data necessary for making investment
decisions, and is for informational purposes only.
This email may be privileged and/or confidential, and the sender does not waive any related rights and obligations.
Any distribution, use or copying of this email, or the information it contains, by other than an intended recipient is
unauthorized. If you receive this email in error, please advise sender (by return email or otherwise) immediately.
Information received by or sent from this system is subject to review by supervisory personnel, is retained, and may
be produced to regulatory authorities or others with a legal right to the information.

-----Original Message-----
From: cori.browne@gmail.com [mailto:cori.browne@gmail.com]
Sent: Wednesday, March 16, 2016 12:59 PM
To: Steve Shafer <steve.shafer@CartographerCapital.com>; Karen & Bob Browne <robertfbrowne@me.com>
Subject: Red Spinel

When was the Red Spinel sold? - the spinel is committed to a consignment sale through our strategic partner, Bill
Noble of William Noble Rare Jewels...the consignment arrangement was put in place last July...

What was the sale price? - $600k

Where were the proceeds deposited? - The sale is not complete, but when it is, and the item is released, sale
proceeds will be deposited into the respective Real Return entities that own all of the gemstone items...

Sent from my iPhone



EXHIBIT
2

*WPGM Draft dated July 25, 2011*

FIRST AMENDMENT
TO THE LETTER SERVICES AGREEMENT
BETWEEN WILLIAM NOBLE RARE JEWELS, L.P.
AND
COVENANT FINANCIAL SERVICES, LLC

This First Amendment (this "Amendment"") to the Letter Services Agreement between William Noble Rare Jewels, L.P., a Texas limited partnership, ("WNRJ") and Covenant Financial Services, LLC ("Covenant") (the "Letter Agreement"), is entered into and effective as of the date executed by the last party hereto (the "Effective Date"). Capitalized terms used without definition herein have the meanings specified in the Letter Agreement (as in effect immediately prior to the effectiveness of this Amendment).

WHEREAS, WNRJ and Covenant entered the Letter Agreement, effective December 15, 2010 to govern the terms and conditions of their relationship pertaining to Covenant's strategy to build an investment portfolio of fine jewels;

WHEREAS, the Parties wish to amend the Letter Agreement as to modify the consideration paid to WNRJ for the Services;

WHEREAS, WNRJ and Covenant hereby agree to this Amendment.

NOW, THEREFORE, as of the Effective Date, the Agreement is modified as follows:

1.     Section 2 of the Letter Agreement is hereby amended by deleting such Section 2 in its entirety and substituting the following in its place:

(a)     Acquisitions.  If Covenant agrees to authorize WNRJ to purchase a jewel on behalf of the Funds, Covenant shall pay WNRJ as follows with respect to such purchase (each such purchase, an "Acquisition"): (i) the acquisition price of such jewel to which Covenant and WNRJ shall agree (the "Acquisition Price") and (ii) an acquisition fee equal to ten percent of the Acquisition Price (the "Acquisition Fee"). Covenant shall pay the Acquisition Price and the Acquisition Fee by wire transfer in accordance with such instructions as WNRJ shall provide by notice to Covenant prior to the purchase of such jewel by WNRJ on behalf of the Funds.  WNRJ shall provide Covenant evidence satisfactory to Covenant in its exclusive discretion that such jewel is in WNRJ's physical possession and is stored and insured as provided in Section 3 prior to WNRJ remitting payment to effect any Acquisition.  In the event that any Acquisition is not consummated following payment of the Acquisition Price and Acquisition Fee by Covenant, WNRJ shall immediately refund such Acquisition Price and Acquisition Fee to Covenant.

(b)     Marketing Expenses.  At its discretion, WNRJ may incur marketing, advertising and sales commission expenses in connection with each Consignment Sale (collectively, the "Marketing Expenses").  The Parties agree that Marketing Expenses relating to a Consignment Sale may include up to fifty percent of any sales commissions paid to an employee of WNJR that is responsible for that Consignment Sale, but William N. Noble, Jr. will not personally receive any sales commissions in connection with a Consignment Sale.  On or before the closing of each Consignment Sale, WNRJ shall present Covenant with an itemized statement of the Marketing Expenses relating to that Consignment Sale.  Covenant shall pay WNRJ fifty percent of that portion of such Marketing Expenses that (1) does not exceed ten percent of the Consignment Sale Price

1

EXHIBIT

3

CFS 007202

of the jewel sold in that Consignment Sale and (2) Covenant does not dispute in good faith (such portion of the Marketing Expenses, the "Covenant Marketing Expenses"). In the event that Covenant disputes any Marketing Expense, the Parties shall meet promptly, but in any event within five (5) business days, to resolve such dispute in good faith. At its election, Covenant may pay the Covenant Marketing Expenses to WNRJ in cash at the closing of the applicable Consignment Sale or it may direct WNRJ to deduct the Covenant Marketing Expense from the Covenant Consignment Profit (hereinafter defined) payable to Covenant in accordance with Section 2(c) with respect to the applicable jewel.

    (c)    Consignment Sales. WNRJ shall not deliver physical possession of any jewel that is the subject of a Consignment Sale until the purchaser of such jewel has paid WNRJ the jewel's Consignment Sale Price plus all applicable taxes in the form of cash, check, credit card, or wire transfer, as determined by WNRJ in its sole discretion. The "Profits" from each Consignment Sale of a jewel shall be the Consignment Sale Price of the jewel (excluding any taxes described in the preceding sentence) less its Acquisition Price. No Consignment Sale may close until WNRJ shall have provided to Covenant evidence of the proposed Consignment Sale Price satisfactory to Covenant in its exclusive discretion. Within two (2) business days after the closing of any Consignment Sale WNRJ shall pay Covenant fifty-five percent (55%) of the Profits from such Consignment Sale (the "Covenant Consignment Profit") plus the Acquisition Price by wire transfer to such account held in the name of the applicable Fund or Funds as Covenant shall direct. Notwithstanding any provision in this Agreement to the contrary, Covenant shall have no authority to take for itself any Profits or other cash proceeds of the sale of any jewel or to direct delivery of any such Profits or funds to itself or to direct any disposition of such Profits or funds except to an account held by a qualified custodian in the name of one or more of the Funds that were the beneficial owner or owners of such jewel.

Notwithstanding the foregoing, the Acquisition Fee shall be included in calculating the amount of Profit actually paid to WNRJ; provided, however, that in no event shall the amount paid to WNRJ in connection with any Consignment Sale be less than the Acquisition Fee. For illustrative purposes only, if a jewel is purchased in an Acquisition for a price of $10,000,000, Covenant would pay to WNRJ an Acquisition Fee equal to $1,000,000. If following such Acquisition, WNRJ incurs $10,000 in Marketing Expenses, and the jewel is sold through a Consignment Sale for $12,010,000, the total Profit would be $2,000,000. The Profit payable to WNRJ would equal $1,000,000, the floor profit Acquisition Fee amount, and the Covenant Consignment Profit would equal $1,000,000. Following the closing of such Consignment Sale, WNRJ would wire $11,005,000 of the purchase price to Covenant and retain the previously received $1,000,000 Acquisition Fee, as well as WNRJ's one-half share of the $10,000 incurred as Marketing Expenses. If however, the jewel sold for $13,010,000, the Profit payable to WNRJ would equal $1,350,000 and the Covenant Consignment Profit would equal $1,650,000. Following the closing of such Consignment Sale, WNRJ would retain $350,000 (in addition to the previously received $1,000,000 Acquisition Fee), as well as $5,000 as its portion of incurred Marketing Expenses, and wire the remaining $11,655,000 of the purchase price to Covenant.

CFS 007203

2.    Effect; Governing Law.  Except as specifically amended by this Amendment, the Letter Services Agreement shall remain unmodified and in full force and effect.  This Amendment shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, successors, and permitted assigns.  This Amendment shall be governed by the laws of the State of Texas.

\* \* \* \* \*

3

CFS 007204

IN WITNESS WHEREOF, this Amendment is hereby accepted as of the Effective Date.

William Noble Rare Jewels, L.P.

By: _____
Name: William N. Noble, Jr.
Title: President

Date: _____

Covenant Financial Services, LLC

By: _____
Name: Stephen E. Shafer
Title: Chief Investment Officer

Date: __8·4·11__

4

CFS 007205

# WNRJ LETTER AGREEMENT

CFS 007206

December 15, 2010

Mr. Stephen E. Shafer
Chief Investment Officer
Covenant Financial Services, LLC
10914 Hefner Pointe Drive
Suite 304
Oklahoma City, OK 73120

     Re:    Letter Services Agreement (the "Agreement") by and between William Noble
             Rare Jewels, L.P. ("WNRJ") and Covenant Financial Services, LLC
             ("Covenant" and together with WNRJ, the "Parties").

Dear Steve:

     This Agreement sets forth the terms under which WNRJ will provide exclusive procurement and sales agent services to Covenant as the general partner of CFS Aggressive Strategy Fund, L.P., CFS Total Return Fund, L.P. and other investment funds or accounts for which Covenant may serve as General Partner or investment adviser (collectively, the "Funds") to assist Covenant in purchasing and selling fine jewels on behalf of the Funds (the "Services").

     1.     The Services. The Services shall include, but shall not be limited to:

- Locating jewels for the Funds to acquire;
- Identifying jewels of interest;
- Interacting with potential sellers and buyers;
- Performing gemological assessments of and valuing prospective jewels to be acquired by the Funds;
- Negotiating acquisition terms between sellers of jewels and Covenant on behalf of the Funds;
- Managing transportation of jewels that Covenant is considering for purchase or sale on behalf of the Funds;
- Storing jewels acquired by Covenant on behalf of the Funds;
- Managing and purchasing at WNRJ's expense third-party insurance coverage in such amounts and on such terms as are acceptable to Covenant in its exclusive discretion for jewels being so stored and transported;
- Handling the transaction closing process on jewels sold or acquired by the Funds;
- Providing monthly portfolio reporting to Covenant; and
- Managing the Consignment Sales (defined below) process.

     WNRJ shall perform the Services in good faith and to the best of its abilities. Covenant understands and acknowledges that WNRJ shall continue to perform similar Services for its own

CFS 007207

account and for the purposes of operating William Noble Rare Jewels. Nothing in this Agreement shall be construed as requiring Covenant to purchase any jewel that WNRJ presents to it for potential acquisition or as providing Covenant with a right of first refusal, or similar rights, with respect to any jewels identified or examined by any officer, employee, owner, or representative of WNRJ. WNRJ will use its good faith efforts to procure and sell jewels for Covenant on behalf of the Funds and shall determine in good faith the amount of resources and hours to be expended in providing the Services, the jewels to be presented to Covenant for potential acquisition on behalf of the Funds and the proposed sale price for any jewel subject to a Consignment Sale. To that end, WNRJ shall promote the sale of the jewels purchased by Covenant on behalf of the Funds, provide prompt and reliable service to potential purchasers and sellers of such jewels, maintain suitable displays of such jewels or its premises and employ qualified and knowledgeable personnel. Covenant shall consign to WNRJ for resale certain jewels that Covenant purchases through WNRJ on behalf of the Covenant Funds, and WNRJ agrees to market such jewels to third parties, in the case of each jewel, at a price not less than the minimum to which Covenant shall agree in writing (the "Consignment Sale Price"), and provide the applicable Services with respect to such transaction (each such transaction, a "Consignment Sale"). WNRJ makes no assurance to Covenant that WNRJ's provision of the Services will result in specific results or returns for Covenant.

2.    Compensation

(a)    Acquisitions. If Covenant agrees to authorize WNRJ to purchase a jewel on behalf of the Funds, Covenant shall pay WNRJ as follows with respect to such purchase (each such purchase, an "Acquisition"): (i) the acquisition price of such jewel to which Covenant and WNRJ shall agree (the "Acquisition Price") and (ii) an acquisition fee equal to ten percent of the Acquisition Price (the "Acquisition Fee"). Covenant shall pay the Acquisition Price and the Acquisition Fee by wire transfer in accordance with such instructions as WNRJ shall provide by notice to Covenant prior to the purchase of such jewel by WNRJ on behalf of the Funds. WNRJ shall provide Covenant evidence satisfactory to Covenant in its exclusive discretion that such jewel is in WNRJ's physical possession and is stored and insured as provided in Section 3 prior to WNRJ remitting payment to effect any Acquisition. In the event that any Acquisition is not consummated following payment of the Acquisition Price and Acquisition Fee by Covenant, WNRJ shall immediately refund such Acquisition Price and Acquisition Fee to Covenant.

(b)    Marketing Expenses. At its discretion, WNRJ may incur marketing, advertising and sales commission expenses in connection with each Consignment Sale (collectively, the "Marketing Expenses"). The Parties agree that Marketing Expenses relating to a Consignment Sale may include up to fifty percent of any sales commissions paid to an employee of WNJR that is responsible for that Consignment Sale, but William N. Noble, Jr. will not personally receive any sales commissions in connection with a Consignment Sale. On or before the closing of each Consignment Sale, WNRJ shall present Covenant with an itemized statement of the Marketing Expenses relating to that Consignment Sale. Covenant shall pay WNRJ fifty percent of that portion of such Marketing Expenses that (1) does not exceed ten percent of the Consignment Sale Price of the jewel sold in that Consignment Sale and (2)

Covenant does not dispute in good faith (such portion of the Marketing Expenses, the "Covenant Marketing Expenses"). In the event that Covenant disputes any Marketing Expense, the Parties shall meet promptly, but in any event within five (5) business days, to resolve such dispute in good faith. At its election, Covenant may pay the Covenant Marketing Expenses to WNRJ in cash at the closing of the applicable Consignment Sale or it may direct WNRJ to deduct the Covenant Marketing Expense from the Covenant Consignment Profit (hereinafter defined) payable to Covenant in accordance with Section 2(c) with respect to the applicable jewel.

(c)    Consignment Sales.    WNRJ shall not deliver physical possession of any jewel that is the subject of a Consignment Sale until the purchaser of such jewel has paid WNRJ the jewel's Consignment Sale Price plus all applicable taxes in the form of cash, check, credit card, or wire transfer, as determined by WNRJ in its sole discretion. The "Profits" from each Consignment Sale of a jewel shall be the Consignment Sale Price of the jewel (excluding any taxes described in the preceding sentence) less its Acquisition Price. No Consignment Sale may close until WNRJ shall have provided to Covenant evidence of the proposed Consignment Sale Price satisfactory to Covenant in its exclusive discretion. Within two (2) business days after the closing of any Consignment Sale WNRJ shall pay Covenant fifty percent of the Profits from such Consignment Sale (the "Covenant Consignment Profit") by wire transfer to such account held in the name of the applicable Fund or Funds as Covenant shall direct. Notwithstanding any provision in this Agreement to the contrary, Covenant shall have no authority to take for itself any Profits or other cash proceeds of the sale of any jewel or to direct delivery of any such Profits or funds to itself or to direct any disposition of such Profits or funds except to an account held by a qualified custodian in the name of one or more of the Funds that were the beneficial owner or owners of such jewel.

3.    Title and Insurance

From the closing of each Acquisition of a jewel until the closing of the Consignment Sale of such jewel, Covenant shall have sole legal title to such jewel on behalf of the Funds and WNRJ shall provide documentary evidence of such title to Covenant in form and substance satisfactory to Covenant in its exclusive discretion. WNRJ shall at its expense store and transport such jewels in a manner that meets, at a minimum, the current security standards of WNRJ for storing and transporting like jewels. WNRJ shall at all times keep jewels belonging to Covenant in WNRJ's possession or control or that WNRJ is transporting, clearly marked as belonging to Covenant. While WNRJ has possession or control of any jewel belonging to a Fund, WNRJ will be responsible for, and will bear the cost and risk of, providing insurance coverage for such jewel in such amount and on such other terms as Covenant shall approve in its exclusive discretion. Before transporting any jewel to any location other than WNRJ's storage or retail facilities, WNRJ shall have (a) received written authorization from Covenant for such transport, (b) purchased or arranged for at WNRJ's expense insurance coverage for such jewel in such amount and on such other terms as Covenant shall approve in its reasonable discretion, (c) provided Covenant with proof of the insurance described in Section 3(b) satisfactory to Covenant in its reasonable discretion and (d) provided at WNRJ's expense such security for the transport of such jewel as Covenant shall have approved in its reasonable discretion. If WNRJ intends to

CFS 007209

transport any jewel to Covenant, WNRJ shall give Covenant 5 days' prior notice of such transportation.

4.    Term and Notice

This Agreement is effective from the date it is signed by Covenant and shall continue until thirty days after one Party provides written notice to the other terminating this Agreement (such period, the "Engagement Period"), provided, however, that if either Party breaches this Agreement, the other Party may terminate this Agreement immediately on notice to the breaching Party.  On termination of this Agreement, WNRJ shall as soon as is practicable thereafter deliver all jewels belonging to the Funds in its possession and control to such place as Covenant shall specify by written notice.  WNRJ shall be responsible for the costs and expenses of transporting such jewels and the insurance and security necessary for such transportation as provided in section 3; provided, however, that if this Agreement is terminated by Covenant, without the mutual consent of WNRJ, and such termination is not due to a breach of this Agreement by WNRJ, Covenant shall be responsible for the additional costs and expenses of transporting such jewels and the insurance and security necessary for such transportation.  Each notice delivered under this Agreement must be in writing, delivered by courier, a nationally-recognized overnight delivery service or by certified U.S. Mail to such address as each Party shall provide to the other, and shall be deemed to be delivered when it is received by the Party to whom it is addressed.  The provisions of sections 2, 3, 6, 8 and 9 shall survive the termination of this Agreement.

5.    Exclusivity

During the Engagement Period (as defined above), Covenant shall not engage any third party to provide the Services; provided, however, this Section 5 shall not restrict Covenant in any manner from engaging any third party, at its cost and expense, to (a) perform gemological assessments of prospective jewels to be acquired or jewels already acquired or (b) to provide valuation assessment services on prospective jewels to be acquired or jewels already acquired.

6.    Confidential Information

(a)    WNRJ Confidential Information.  As used in this Agreement, "WNRJ Confidential Information" means proprietary techniques and confidential information that WNRJ has or will develop, compile, or own, or that Covenant and/or any of its affiliates receives under conditions of confidentiality from WNRJ's vendors or customers.  WNRJ Confidential Information includes not only information disclosed by WNRJ and/or any of its affiliates (including its employees, agents, independent contractors, and consultants) to Covenant in connection with WNRJ's duties, but also information developed or learned by Covenant during the course of its engagement of WNRJ.  WNRJ Confidential Information is to be broadly defined and includes, but is not limited to, WNRJ's trade secrets, financial data, business and marketing strategies, business operations, customer preferences, and supplier contact information and costs and arrangements.  Covenant will hold in trust, keep confidential, not make use of (or allow

CFS 007210

others to make use of) except as contemplated by this Agreement, and not disclose or reveal to any third party any Confidential Information.

(b)    Covenant Confidential Information.  WNRJ shall hold and shall cause its affiliates, employees and agents to hold in confidence all information and materials provided to any of them by Covenant or its affiliates.  WNRJ shall not use and shall cause its affiliates, employees and agents not to use any of the same except for purposes contemplated by this Agreement.  WNRJ shall not reproduce, disclose or distribute and shall cause its affiliates, employees and agents not to reproduce, disclose or distribute any of the same without Covenant's prior written consent.  WNRJ shall, on Covenant's demand or on the termination of this Agreement for any reason, return to Covenant all documents and other materials that Covenant or its affiliates have theretofore provided to WNRJ, its affiliates, employees or agents and all copies thereof and excerpts therefrom.

7.    Independent Contractor

At all times during the Engagement Period, WNRJ is and shall be an independent contractor in providing the Services hereunder.  Nothing in this Agreement shall be construed to imply or to create a joint venture, partnership, employment relationship, agency relationship, or other business association between WNRJ and Covenant.

8.    Compliance with Laws and Required Permits/Licenses

WNRJ represents and warrants to Covenant that WNRJ has and maintains all permits, licenses, certificates, approvals and authorizations under all federal, state, local and foreign laws as are required for WNRJ to provide the Services and perform its duties and obligations hereunder.  WNRJ agrees that all Services rendered and all activities of WNRJ conducted pursuant to this Agreement will be conducted in accordance with all applicable federal, state, local and foreign laws.  This representation and warranty shall be continuing during the term of this Agreement and if at any time any event shall occur that could make any provision of this section 8 incomplete or inaccurate, such event shall be deemed to be a breach by WNRJ of this Agreement and WNRJ shall immediately notify Covenant of the occurrence of such event.

9.    Indemnification

Each Party (each an "Indemnifying Party") agrees to indemnify and hold harmless the other Party and its affiliates (the "Indemnified Party") against any and all losses, claims, damages, judgments, penalties, liabilities, settlements and expenses of every kind, at law or in equity (including, without limitation, all expenses of litigation, preparation therefor, including reasonable attorneys' and expert witness fees and expenses) (collectively, the "Liabilities") incurred by the Indemnified Party arising out of or based upon any claim relating to any act or omission of the Indemnifying Party or its assignee, except to the extent such Liability arises out of the willful misconduct or gross negligence of the Indemnified Party or its assignee, or the breach or inaccuracy of any of the warranties, representations, covenants or agreements of the Indemnifying Party contained in this Agreement.  In case any litigation or proceeding is brought

CFS 007211

against any Indemnified Party under this Agreement, the Indemnifying Party shall be entitled to assume the defense of such litigation or proceeding with counsel of the Indemnifying Party's choice at the Indemnifying Party's expense (in which case the Indemnifying Party shall not be responsible for the fees and expenses of any separate counsel retained by the Indemnified Party). Notwithstanding the Indemnifying Party's election to assume the defense of such litigation or proceeding, such Indemnified Party shall have the right to employ separate counsel and to participate in the defense of such litigation or proceeding, and the Indemnifying Party shall pay all reasonable fees, costs and expenses of separate counsel, if the use of counsel selected by the Indemnifying Party to represent such Indemnified Party would be a conflict of interest for such counsel.

10.    Miscellaneous

Subject to section 9, WNRJ may retain consultants or contractors to assist in the performance of this Agreement and WNRJ's duties and obligations hereunder. Accordingly, WNRJ may assign any part of its compensation under this Agreement to any third party. Otherwise, neither Party to this Agreement may assign its rights or interests under this Agreement to any third party(ies) without the express, written consent of the other Party. Any unauthorized assignment/attempted assignment shall be null and void, unenforceable at law or in equity.

Each Party represents and warrants to the other Party that is has full power and authorization to enter into the terms and conditions of this Agreement and that the person executing this Agreement on such Party's behalf has been duly authorized to do so. This Agreement shall be governed, construed and enforced in accordance with the laws of Oklahoma without regard to principles of conflicts of law. Should any provision of this Agreement, or portion thereof, be found invalid and unenforceable, the remainder of this Agreement shall be construed to be enforceable to the greatest extent allowable under applicable law, and such remaining provisions shall continue in force and effect. The Parties waive their rights to a jury trial to the extent permitted by applicable law and agree that all actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in the State or Federal courts located in Oklahoma City, Oklahoma. In the event of any controversy, claim or dispute between the Parties arising out of or relating to this Agreement, or the alleged breach thereof, the prevailing Party shall, in addition to any other relief or award, be entitled to recover its reasonable attorneys' fees and all of the expenses incurred in connection therewith. This Agreement sets forth the entire understanding between the Parties and supersedes any prior representations or agreements, whether written or oral; there are no terms, conditions, representations, warranties or covenants other than those contained herein. Except as provided in section 9, nothing in this Agreement shall be construed to vest any rights under this Agreement to any third party or parties other than as provided in this Agreement. No term or provision of this Agreement may be amended waived, released, discharged or modified except in writing, signed by both parties. This letter may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement

CFS 007212

Please indicate your acceptance of this Agreement by signing below.

Sincerely

William M. Noble, Jr.
President
William Noble Rare Jewels, L.P.

AGREED AND ACCEPTED

Covenant Financial Services, LLC

By: Stephen E. Shafer, Chief Investment Officer
Date:    /·//·//

CFS 007213

**From:**        KellyK@tmoklaw.com
**Sent:**        Monday, May 8, 2017 2:07 PM
**To:**          Cheryl Hunter; BobT@tmoklaw.com; Nicole Nash; gsvirsky@omm.com;
                 ashley@okcfirm.com
**Cc:**          KristinH@tmoklaw.com; jeff@okcfirm.com; TobyM@tmoklaw.com; jpanchok-
                 berry@omm.com
**Subject:**     RE: Offer to purchase  URGENT RESPONSE NEEDED!

Scott Rosenthal is CFS' outsourced/contract CFO.  He serves as an intermediary between CFS and the auditor.  Scott is the managing member of Scoven, LLC.  Scoven, LLC is based in **New York.**

Thanks,

**Kelly Kress**



Tomlinson
McKinstry

Two Leadership Square
211 N. Robinson Ave, Suite 450
Oklahoma City, OK 73102
Tel: 405.606.3360
Fax: 1-866-633-6160
e-mail: kellyk@tmoklaw.com

### Confidentiality Note

This e-mail and any attachments are confidential and are protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system.  Thank you for your cooperation.

**From:** Cheryl Hunter [mailto:cheryl.hunter@holladaychilton.com]
**Sent:** Monday, May 08, 2017 12:48 PM
**To:** Kelly Kress; Bob Tomlinson; Nicole Nash; gsvirsky@omm.com; ashley@okcfirm.com
**Cc:** Kristin Harrison; jeff@okcfirm.com; Toby McKinstry; jpanchok-berry@omm.com
**Subject:** RE: Offer to purchase URGENT RESPONSE NEEDED!

Thanks Kelly. Yes, we still object as stated. Also, who is Scott Rosenthal at "10914 Hefner Pointe Drive, Suie *(sic)* 304, Oaklahoma *(sic)* City, OK 73120."

Cheryl P. Hunter
Holladay & Chilton, PLLC
204 N. Robinson, Suite 1550  |  Oklahoma City, Oklahoma 73102
D: 405.236.0045 |T: 405.236.2343 | F: 405.236.2349 | Cell: 405.209.7565
cheryl.hunter@holladaychilton.com  |  www.holladaychilton.com



1

Confidentiality Notice:

The information in this email, including attachments, is sent by, or on behalf of, an attorney and is intended solely for the receipt, use, benefit and information of the recipient indicated above. This communication may be confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are notified that retention, use, review, disclosure, copying, distribution, or the taking of any other action in reliance on the contents of this transmission or attachments is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and discarding/deleting the message received. Thank you for your cooperation.

TAX NOTICE: Any tax advice included in this message is not intended and cannot be used for the purpose of avoiding tax related penalties or promoting, marketing or recommending any tax related matter to another person.

**From:** KellyK@tmoklaw.com [mailto:KellyK@tmoklaw.com]
**Sent:** Monday, May 8, 2017 12:01 PM
**To:** Cheryl Hunter <cheryl.hunter@holladaychilton.com>; BobT@tmoklaw.com; Nicole Nash <nicole.nash@holladaychilton.com>; gsvirsky@omm.com; ashley@okcfirm.com
**Cc:** KristinH@tmoklaw.com; jeff@okcfirm.com; TobyM@tmoklaw.com; jpanchok-berry@omm.com
**Subject:** RE: Offer to purchase URGENT RESPONSE NEEDED!

Hi Cheryl,

There is a picture of the red spinel ring on p. 12 of the attached valuation. The red spinel is mounted in a ring that has two diamonds. The offer is for the ring that includes the red spinel and the diamonds, as is shown in the picture.

Please let us know if you still object to the sale of this item.

Thanks,

**Kelly Kress**



**Tomlinson McKinstry**

Two Leadership Square
211 N. Robinson Ave, Suite 450
Oklahoma City, OK 73102
Tel: 405.606.3360
Fax: 1-866-633-6160
e-mail: kellyk@tmoklaw.com

## Confidentiality Note
This e-mail and any attachments are confidential and are protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Cheryl Hunter [mailto:cheryl.hunter@holladaychilton.com]
**Sent:** Monday, May 08, 2017 11:29 AM
**To:** Bob Tomlinson; Nicole Nash; gsvirsky@omm.com; ashley@okcfirm.com

2

**Cc:** Kristin Harrison; jeff@okcfirm.com; Toby McKinstry; Kelly Kress; Panchok-Berry, Janine
**Subject:** RE: Offer to purchase URGENT RESPONSE NEEDED!

Bob:

      Our clients object to this proposed transaction, and have serious concerns about being presented with an urgent ultimatum late on a Sunday afternoon and more than 24 hours after Steve Shafer apparently communicated with Christies. In the interests of all investors, the prudent course is to have the entire gemstone collection evaluated and then make a plan for the whole portfolio—rather than making a decision under the gun when the gem has been held for a half dozen years and the gate has been down almost 2 ½ years.

      Moreover, it is unclear what assets are being discussed here. The supposed email from Rahul Kadakia at Christies refers to the Red Spinel **and** diamond ring ("we have an offer of $600,000 less commission for the spinel and diamond ring"). We cannot determine if that is a reference to the diamonds in the ring containing the Red Spinel or to another asset. If this is a legitimate offer, then another buyer will be found after a new GP or receiver takes over.

      Further, we object to any attorneys' fees incurred in pushing an "emergency" notice less than 24 hours after the Sunday afternoon notice. Steve Shafer's time managing the funds ended on April 28, 2017, and there is no need for spending more investor assets litigating an issue that the Court has already adjudicated.

Cheryl P. Hunter
Holladay & Chilton, PLLC
204 N. Robinson, Suite 1550  |  Oklahoma City, Oklahoma 73102
D: 405.236.0045  |T: 405.236.2343  |  F: 405.236.2349 | Cell: 405.209.7565
cheryl.hunter@holladaychilton.com  |  www.holladaychilton.com

Confidentiality Notice:

The information in this email, including attachments, is sent by, or on behalf of, an attorney and is intended solely for the receipt, use, benefit and information of the recipient indicated above. This communication may be confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are notified that retention, use, review, disclosure, copying, distribution, or the taking of any other action in reliance on the contents of this transmission or attachments is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and discarding/deleting the message received. Thank you for your cooperation.

TAX NOTICE: Any tax advice included in this message is not intended and cannot be used for the purpose of avoiding tax related penalties or promoting, marketing or recommending any tax related matter to another person.

**From:** BobT@tmoklaw.com [mailto:BobT@tmoklaw.com]
**Sent:** Monday, May 8, 2017 9:22 AM
**To:** Nicole Nash <nicole.nash@holladaychilton.com>; Cheryl Hunter <cheryl.hunter@holladaychilton.com>; gsvirsky@omm.com; ashley@okcfirm.com
**Cc:** KristinH@tmoklaw.com; jeff@okcfirm.com; TobyM@tmoklaw.com; KellyK@tmoklaw.com
**Subject:** Re: Offer to purchase URGENT RESPONSE NEEDED!

Kelly:  please call Judge Parrish's chambers and find out a time we could meet wth her today if plaintiffs won't agree to an order.

Sent from my iPhone

On May 7, 2017, at 3:02 PM, Bob Tomlinson <BobT@tmoklaw.com> wrote:

3

Please direct your attention to the e-mails below. Christie's has received an offer to purchase the red spinel for $600,000 for a net of $540,000 after a reduced sales commission of 10%. This red spinel was purchased for $528,000 on 11/11/11 and was appraised in 2014 for $528,000. There was a contract to sell it for $600,000 in 2015 but the buyer did not follow through on the purchase.

As noted below, time is of the essence. Will you agree that we can submit an agreed order to Judge Parrish tomorrow authorizing Steve to accept this offer?

## Robert D. Tomlinson

<image003.png>

Two Leadership Square
211 N. Robinson Ave, Suite 450
Oklahoma City, OK 73102
Direct: 405-606-3351
Cell: 405-202-7178
Main: 405-606-3350
Fax: 1-866-633-6165
e-mail: bobt@tmoklaw.com

### Confidentiality Note
This e-mail and any attachments are confidential and are protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Steve Shafer [mailto:steve.shafer@cartographercapital.com]
**Sent:** Saturday, May 06, 2017 2:58 PM
**To:** Jeff Ludlam; Toby McKinstry; Kristin Harrison; Kelly Kress; Bob Tomlinson
**Subject:** Fwd: Offer to purchase

I spoke with our Christie's representative from Geneva this morning...he has an offer for our smallest item...see his email below - we'll need to get this into the pipeline and the plaintiffs/court will need to move quickly, as offers can be pulled if they linger too long and alternatives attract a buyer's attention away...I would have accepted this offer on behalf of partners prior to the receiver ruling...let me know how to proceed, thanks...

Steve Shafer
Cartographer Capital

405-202-2699
Sent from my iPhone

Begin forwarded message:

> **From:** "Kadakia, Rahul" <rkadakia@christies.com>
> **Date:** May 6, 2017 at 2:26:19 PM CDT
> **To:** Steve Shafer <steve.shafer@cartographercapital.com>
> **Subject: Offer to purchase**
>
> Hi Steve,

4

Yes we have an offer of $600,000 less commission for the spinel and diamond ring. As discussed, the fee structure on our private sales tries to mirror auction sale commission which would be 20% at this level and in your case we would reduce this by half to 10%. Once you and the buyer confirm the transaction, we would have a NET amount of $540,000 for you.

Best wishes,

**From:** Steve Shafer [mailto:steve.shafer@cartographercapital.com]
**Sent:** Saturday, May 06, 2017 2:44 PM
**To:** Kadakia, Rahul <rkadakia@christies.com>
**Subject:** Offer to purchase

Rahul - thank you for your call this morning...could you confirm by responding to this email that you have received an offer to purchase the red spinel...I will forward your confirmation and description of the terms of the offer to our investors and be back in touch with their response...thank you and I hope you have success in Geneva...

Steve Shafer
Cartographer Capital

405-202-2699
Sent from my iPhone

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Visit www.christies.com to explore special multi-media sale promotions, browse our illustrated catalogues and leave absentee bids through LotFinder(R), Christie's online search engine, and register for Internet bidding with Christie's Live(TM).

This message and any attachment are confidential. If you are not the intended recipient, please telephone or email the sender and delete the message and any attachment from your system. If you are not the intended recipient you must not copy this message or attachment or disclose the contents to any other person.

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MANSOUR BIN ABDULLAH AL-SAUD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:15-CV-3074-C |
| | § | |
| | § | |
| YOUTOO MEDIA, L.P., YOUTOO | § | |
| MANAGEMENT, LLC and | § | |
| CHRISTOPHER WYATT, | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT AND
## FOR AWARD OF ATTORNEY'S FEES WITH BRIEF IN SUPPORT

---

TO THE HONORABLE COURT:

Plaintiff moves the Court pursuant to Federal Rule of Civil Procedure 58(d) to enter judgment on the jury verdict and, in addition, requests that the Court award Plaintiff his attorney's fees pursuant to Federal Rule of Civil Procedure 54(d)(2) and applicable law In support of this Motion, Plaintiff respectfully shows the Court the following:

### I.    BACKGROUND

The Plaintiff in the above-captioned cause is Mansour Bin Abdullah Al-Saud.  The Defendants are Youtoo Media, L.P., Youtoo Management, LLC, and Christopher Wyatt (collectively, "Defendants").

On September 22, 2015, Plaintiff filed suit against Defendants, alleging a claim of breach of contract against Youtoo Media and Christopher Wyatt for breach of the Letter of Intent (APP. 012-019) and a claim for breach of contract against Youtoo Media for breach of the

---


EXHIBIT
5

Facility Agreement (APP. 020-029). [Docket No. 1 at 11-12]. Plaintiff also alleged a claim for conversion against all Defendants and further sought to recover his attorney's fees pursuant to the terms of the referenced contracts and Texas Civil Practice & Remedies Code § 38.001. *Id.*

For their part, Defendants asserted affirmative defenses to Plaintiff's claims, including the defenses of payment with respect to both the Letter of Intent and Facility Agreement, prior material breach of the Letter of Intent, and fraudulent inducement of the Letter of Intent. [Docket No. 26 at 7-9]. Defendants also alleged counterclaims against Plaintiff for breach of contract related to the Letter of Intent, fraud, and breach of fiduciary duty. *Id.* at 28-34. Defendants' affirmative defenses and counterclaims were intended to avoid liability for Plaintiff's breach of contract claims against them.

On March 15, 2017, the Court dismissed Plaintiff's conversion claim.

On April 10, 2017, trial began on Plaintiff's breach of contract claims and Defendants' counterclaims and affirmative defenses. After the close of evidence at trial, on April 13, 2017, the Court granted directed verdict on all of Defendants' counterclaims. The Court then submitted instructions, definitions, and questions to the jury. The jury returned its verdict. [Docket No. 105]. Specifically, the jury found that Plaintiff proved his claim for breach of contract as to the Letter of Intent (App. 012-019) against Youtoo Media and Christopher Wyatt as well as his claim for breach of contract as to the Facility Agreement (APP. 020-029) against Youtoo Media. *Id.* The jury awarded Plaintiff $3 million in damages on his claim for breach of the Letter of Intent and $6,820 on his claim for breach of the Facility Agreement. *Id.* The jury found that Youtoo Media and Christopher Wyatt did not prove their affirmative defense of fraudulent inducement as to the Letter of Intent. *Id.*

The Court subsequently entered an order requiring that post-verdict motions and supporting briefs, together with attorney fee affidavits be filed by 9:00 a.m., on April 28, 2017. [Docket No. 108].

## II.    ARGUMENT

### A.    Entry of Judgment

Federal Rule of Civil Procedure 58(d) allows a party to request that a judgment be entered. Specifically, Plaintiff requests that the Court enter a judgment in accordance with the jury's verdict. The judgment should award Plaintiff damages in the amount of $3 million against Youtoo Media and Christopher Wyatt, jointly and severally, for breach of the Letter of Intent. In addition, the judgment should award Plaintiff damages in the amount of $6,820 against Youtoo Media for breach of the Facility Agreement.

Accordingly, Plaintiff respectfully requests that the Court enter the proposed Judgment attached to the Appendix at (APP. 133-134).

### B.    Award of Pre-Judgment Interest

This Court has the authority to, and may in its discretion, award pre-judgment interest to Plaintiff. *See, e.g., Williams v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000) (holding that "[a] district court has discretion to impose a pre and post-judgment interest award to make a plaintiff whole"). Because this is a diversity action and Plaintiff's claims against Defendants were based on Texas law, the Court should look to Texas state law regarding the award of pre-judgment interest. *See Canal Ins. Co. v. Gen. Ins. Co.*, 901 F.2d 45, 47 (5th Cir. 1990) (holding that issues regarding pre-judgment interest in a diversity case "are governed by applicable state law").

---

Under Texas law, a court may award pre-judgment interest "if either the general principles of equity or an enabling statute permit such an award." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)). It is well-settled in Texas that "the decision to award pre-judgment interest is left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making this decision." *Citizens Nat. Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.)). Texas courts have allowed for recovery of pre-judgment interest in cases involving claims for breach of contract. *Perry Roofing Co., v. Olcott*, 744 S.W.2d 929, 930-31 (Tex. 1988).

Under Texas law, the rate for pre-judgment interest is identical to the rate of post-judgment interest. *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002)). The post-judgment interest rate is statutorily set at prime rate as published by the Board of Governors of the Federal Reserve System; however, if the current prime rate is less than 5%, then the judgment rate shall be set at 5%. Tex. Fin. Code Ann. § 304.003(c).

The current prime rate is 4.00%. *See* http://www.federalreserve.gov/releases/h15/current. Accordingly, pursuant to Texas Finance Code Annotated Section 304.003(c)(2), the rate of pre-judgment interest that the Court should apply is 5%, with pre-judgment interest calculated from September 22, 2015, which is the date that Plaintiff filed his suit against Defendants, to the date judgment is entered. *See* Tex. Fin. Code Ann. § 304.104 (stating that pre-judgment interest begins to accrue either (1) 180 days after the date the defendant received written notice of the claim or (2) on the date the suit in which judgment is rendered was filed, whichever is earlier).

For these reasons, Plaintiff respectfully requests that the Court award it pre-judgment interest at the rate of 5% per annum accruing from September 22, 2015 until the date judgment is entered in this case. Specifically, the amount of pre-judgment interest that accrued from

---

September 22, 2015 through April 28, 2017 is $240,000.00 on Plaintiff's claim for breach of the Letter of Intent and $545.60 on Plaintiff's claim for breach of the Facility Agreement. The per diem amount of pre-judgment interest that will continue to accrue until the date on which the Court enters judgment is $410.96/day on the $3,000,000.00 awarded as damages for breach of the Letter of Intent and $0.93/day on the $6,280.00 awarded as damages for breach of the Facility Agreement. The proposed final judgment filed with this motion includes pre-judgment interest from the date this case was filed through April 28, 2017.

## C.    Award of Post-Judgment Interest

The award of post-judgment interest is controlled by 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." The relevant statute further provides that "[s]uch interest shall be calculated from the date of entry of the judgment, at a rate equal to the weekly 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment." 28 U.S.C. § 1961(a). On that basis, Plaintiff respectfully requests that the Court award Plaintiff post-judgment interest at the applicable federal post-judgment interest rate, as published on the Northern District website at http://www.txnd.uscourts.gov/post-judgment-rates, which shall accrue from the date that the Court enters judgment until the date that the judgment is satisfied.

## D.    Award of Attorney's Fees and Costs[1]

Plaintiff requests that the Court award him his attorney's fees and costs pursuant to Federal Rule of Civil Procedure 54(d)(2) and applicable law. Specifically, Plaintiff is entitled to recover attorney's fees as the prevailing party on his breach of contract claims against Youtoo

---

[1]    In the Joint Pretrial Order, the parties agreed that the issue of attorney's fees and expenses would be submitted to the Court for determination after the trial of this matter. [Docket No. 84 at 11].

Media and Christopher Wyatt for breach of the Letter of Intent and against Youtoo Media for breach of the Facility Agreement. In addition, as the prevailing party, Plaintiff is entitled to recover his costs pursuant to Federal Rule of Civil Procedure 54(d)(1).

As set out in the Affidavit of Michael P. Lynn filed with this motion (APP. 001-011), Plaintiff incurred reasonable attorney's fees to prosecute his breach of contract claims (and to defeat Defendants' breach of contract counterclaims and to overcome Defendants' affirmative defenses to Plaintiff's contract claims) in the total amount of $794,129.50, after appropriate segregation and adjustment of the billing in this case.[2] This amount of $794,129.50 is comprised of $567,074.00 charged by Lynn Pinker Cox & Hurst, LLP, and $227,055.50 charged by Laktineh & Co. (APP. 004 and APP. 006). As explained below, Plaintiff requests that the Court award him 90% of these fees – $714,716.55 – as the prevailing party on his claim for breach of the Letter of Intent against Youtoo Media and Christopher Wyatt (APP. 010). Plaintiff further requests that the Court award him 10% of these fees – $79,412.95 – as the prevailing party on his claim for breach of the Facility Agreement against Youtoo Media (APP. 010).

**1.    Plaintiff is entitled to recover attorney's fees from Christopher Wyatt and Youtoo Media for breach of the Letter of Intent.**

The Letter of Intent contains a United Kingdom choice-of-law clause, which would require application of the laws of England and Wales. (APP. 016). Under that law, Plaintiff is entitled to recover his fees from both Youtoo Media and Christopher Wyatt pursuant to the

---

[2]    Texas law related to segregation of fees allows Plaintiff to recover for fees incurred in pursuing his affirmative claims as well as fees incurred defending against counterclaims (including tort counterclaims) arising out of the same transaction. *See, e.g. Campbell Harrison & Dagley L.L.P. v. Lisa Blue/Baron & Blue*, 843 F. Supp. 2d 673, 692-93 (N.D. Tex. 2011) (recognizing, under Texas law, that "if the plaintiff's breach of contract claim and the defendant's counterclaims arise from the same transaction, and the same facts required to prosecute the claim are required to defend against the counterclaim, then attorney's fees may be appropriate"); *Brockie v. Webb*, 244 S.W.3d 905, 910 (Tex. App.-Dallas 2008, pet. denied) (when attorney sued client for breach of contract for failure to pay fees and client counterclaimed with legal malpractice claim, affirming award of fees incurred in defending counterclaim because "Webb's claim and Brockie's counterclaim arose from the same transaction and the same facts required to prosecute the claim were also required to defend against the counterclaim").

"English rule," which generally requires that the loser pays the prevailing party in a lawsuit. Declaration of Heather Newman (APP. 135-138). Texas courts recognize that the UK applies the English rule under which the prevailing party in a lawsuit may recover its attorney's fees from the losing party. *See 1/2 Price Checks Cashed v. United Auto Ins. Co.*, 344 S.W.3d 378, 382 & n. 8 (Tex. 2011) (contrasting the "American Rule for the award of attorney's fees, under which attorney's fees are recoverable in a suit only if permitted by statute or by contract," with the "English Rule, in which a court may award attorney's fees to the prevailing party in a suit"); *New Hampshire Ins. Co. v. Magellan Reins. Co. Ltd.*, No. 02-11-00334-CV, 2013 WL 105654, *11 (Tex.App.—Ft. Worth Jan. 10, 2013, pet. denied). Federal courts have also recognized that contract clauses selecting English law allow the prevailing party in litigation to recover attorney's fees per the English rule. *See, e.g., RLS Associates, LLC v. United Bank of Kuwait PLC*, 464 F.Supp.2d 206, 218-220 (S.D. N.Y. 2006). Indeed, the Defendants in this matter previously asserted a counterclaim against Plaintiff where they asserted that because the Letter of Intent contained a UK choice-of-law clause they were entitled to recover their attorney's fees pursuant to the English rule.[3] [Docket No. 9 at ¶ 55].

Applying the English rule, after appropriate segregation and allocation of fees between the claims on which Plaintiff prevailed, Plaintiff asks the Court to award him attorney's fees from Youtoo Media and Christopher Wyatt, jointly and severally, for breach of the Letter of Intent in the amount of $714,716.55, which represents 90% of the total reasonable fees incurred by Plaintiff. (App. 010 at ¶ 26).

---

[3]     In addition, or in the alternative, Plaintiff is entitled to recover reasonable and necessary attorney's fees for breach of the Letter of Intent from Christopher Wyatt, individually, pursuant to Texas Civil Practice & Remedies Code § 38.001(8), which authorizes recovery of reasonable attorney's fees from an individual if the claim is for an oral or written contract. Both parties pleaded for fees pursuant to § 38.001 for their respective breach of contract claims. [Docket No. 1 at 11-12; Docket No. 26 at 32-34].

**2.    Plaintiff is entitled to recover attorney's fees from Youtoo Media for breach of the Facility Agreement.**

Further, Plaintiff is entitled to recover from Youtoo Media all costs and expenses, including legal fees, incurred by Plaintiff for enforcement of the Facility Agreement pursuant to Section 10.2 of that agreement. (APP. 026 at § 10.2) ("The Borrower must pay to the Lender the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, this Agreement."). The Facility Agreement contains a New York choice-of-law clause. (APP. 028 at § 15.) Under New York law, contractual fee-shifting provisions are enforceable. *See NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 175 (2d Cir.2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear"); *Hooper Assoc., Ltd. V. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989).

Applying Section 10.2 of the Facility Agreement, and after appropriate segregation and allocation of fees between the claims on which Plaintiff prevailed, Plaintiff asks the Court to award him attorney's fees from Youtoo Media for breach of the Facility Agreement in the amount of $79,412.90, which represents 10% of the total reasonable fees incurred by Plaintiff in this lawsuit. (APP. 010 at ¶ 26).

### III.    CONCLUSION

For the reasons described above, Plaintiff respectfully requests that the Court enter a final judgment in the form of the proposed Judgment attached to the Appendix at (APP. 133-134), and award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorney's fees, and court costs.

DATE:  April 27, 2017                          Respectfully submitted,


Michael P. Lynn, P.C. (mlynn@lynnllp.com)
Texas Bar No. 12738500
John Volney (jvolney@lynnllp.com)
Texas Bar No. 24003118
**LYNN PINKER COX & HURST, L.L.P.**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile

**ATTORNEYS FOR PLAINTIFF**
**MANSOUR BIN ABDULLAH AL-SAUD**


## CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of every item presented to the Court in this motion and despite best efforts the counsel have not been able to resolve those matters presented.

Certified on April 27, 2017, by


John Volney


**PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT**                                    **Page 9**
02961-601/4824-3069-2167

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served *via ECF* on counsel of record on April 27, 2017:

_____
John Volney

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MANSOUR BIN ABDULLAH AL-SAUD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:15-CV-3074-C** |
| | § | |
| | § | |
| **YOUTOO MEDIA, L.P., YOUTOO** | § | |
| **MANAGEMENT, LLC and** | § | |
| **CHRISTOPHER WYATT,** | § | |
| | § | |
| **Defendants.** | § | |

## FINAL JUDGMENT

Pursuant to the jury verdict of April 13, 2017, and Plaintiff's Motion for Entry of Judgment and for Award of Attorney's Fees, the Court enters final judgment as follows:

1.    Plaintiff Mansour bin Abdullah Al-Saud is awarded damages in the amount of $3,240,000.00 against Defendants Youtoo Media, L.P., and Christopher Wyatt, jointly and severally, which award includes pre-judgment interest at the statutory rate of 5% per annum from the date the lawsuit was filed through April 28, 2017.

2.    Plaintiff Mansour bin Abdullah Al-Saud is awarded damages in the additional amount of $7,365.60 against Defendant Youtoo Media, L.P., which award includes pre-judgment interest at the statutory rate of 5% per annum from the date the lawsuit was filed through April 28, 2017.

3.    Plaintiff Mansour bin Abdullah Al-Saud is awarded post-judgment interest on the amounts awarded above at the applicable statutory rate.

4.    Plaintiff Mansour bin Abdullah Al-Saud is awarded court costs.

5.    Plaintiff Mansour bin Abdullah Al-Saud is awarded attorney's fees in the amount of $714,716.55 from Defendants Youtoo Media, L.P., and Christopher Wyatt, jointly and severally. Plaintiff Mansour bin Abdullah Al-Saud is awarded additional attorney's fees in the amount of $79,412.95 from Defendant Youtoo Media, L.P. If this case is unsuccessfully appealed to the Fifth Circuit Court of Appeals, Plaintiff Mansour bin Abdullah Al-Saud is awarded additional attorney's fees in the amount of $75,000 from Defendants Youtoo Media, L.P., and Christopher Wyatt.

6.    Defendants take nothing on their counterclaims.

1

7.    This judgment finally disposes of all parties and all claims and is appealable. All relief not expressly granted herein is denied.

8.    Execution may issue for enforcement of this judgment.

SO ORDERED.


Dated _____ , 2017.


_____
SAM. R. CUMMINGS
SENIOR UNITED STATES DISTRICT JUDGE

2

# Exhibit F



* 1 0 3 6 7 0 3 8 4 1 *

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| ROBERT F. BROWNE FAMILY LLC, et al., | |
| Plaintiffs, | **FILED IN DISTRICT COURT**<br>**OKLAHOMA COUNTY** |
| v. | **MAY 1 0 2017** |
| STEPHEN E. SHAFER, COVENANT<br>FINANCIAL SERVICES, LLC d/b/a<br>COVENANT GLOBAL INVESTORS, and<br>CARTOGRAPHER, L.P., | **RICK WARREN**<br>**COURT CLERK**<br>89 |
| Defendants/<br>Third-Party<br>Plaintiff, | Case No. CJ-2016-4937 |
| and | |
| COVENANT GLOBAL ALPHA FUND, L.P.<br>f/k/a CFS AGGRESSIVE STRATEGY<br>FUND, L.P., COVENANT GLOBAL ALPHA<br>FUND, LTD., f/k/a COVENANT<br>AGGRESSIVE STRATEGY FUND, LTD.,<br>COVENANT OPPORTUNITY CAPITAL<br>FUND, L.P., and COVENANT INCOME<br>APPRECIATION FUND, L.P., | Judge Patricia Parrish |
| Nominal Defendants, | |
| v. | |
| COVENANT MULTI-FAMILY OFFICES,<br>LLC, and SCOTT R. DUNCAN, | |
| Third-Party<br>Defendants. | |

**DEFENDANTS' SUPPLEMENT TO ITS EMERGENCY MOTION TO APPROVE**
**THE SALE OF THE RED SPINEL GEMSTONE AND TO ADD REQUEST FOR**
**YOUTOO FUNDING**

As a supplement to its May 8, 2017 Emergency Motion to Approve the Sale of the

Red Spinel Gemstone, Defendants respectfully request the Court approve the funding to

maintain the Youtoo patent litigation for the next 60-90 days. Defendants are concurrently

providing to counsel of record the confidential documentation referenced below in support of its request to continue funding the patent litigation.

The confidential documents include: Exhibit A, a May 10, 2017 letter from Defendants' counsel to Plaintiffs' counsel attaching and summarizing the confidential materials and asking their agreement to this funding; Exhibit 1, a Letter from Youtoo's Ryland Reed; Exhibit 2, BVA Group's Youtoo Technologies Valuation Report; and supporting documents: Exhibit 3, Docket Navigator Year in Review 2015 and Exhibit 4, Gibson Dunn Federal Circuit 2015-2016 Year in Review.[1]

Defendants bring this request pursuant to the Court's direction at the hearing on May 1, 2017. The Court directed that, "If there is anything above rent, utilities - - and I say those because it is the first of the month. If there is anything above that, just let me know. If there is some amount that - - I certainly don't intend to do anything to jeopardize that lawsuit at this point in time. (*See* Exhibit 5, Hearing Transcript of May 1, 2017, p. 72, ll. 7-12.)

Defendants respectfully request the Court approve the funding to maintain the Youtoo patent litigation at the hearing on May 11, 2017, at 10:00 a.m.

Respectfully Submitted,

*Robert Tomlinson*

ROBERT D. TOMLINSON, OBA #9056
TOBY M. McKINSTRY, OBA #17401
ROSS N. CHAFFIN, OBA # 21131
KELLY J. KRESS, OBA #30771
JEFFERSON I. RUST, OBA #16722
TOMLINSON MCKINSTRY
Two Leadership Square, Suite 450
211 North Robinson Ave.

---

[1] Exhibits A and 1 through 4 hereto are not filed with the Court due to the confidential nature of the documents and the accelerated status of this Motion. Copies of Exhibits A and 1 through 4 will be provided today to the Court via hand-delivery, and to counsel of record via e-mail.

Oklahoma City, Oklahoma 73102
Telephone:  (405) 606-3350
Facsimile:  (866) 633-6162
bobt@tmoklaw.com
tobym@tmoklaw.com
rossc@tmoklaw.com
kellyk@tmoklaw.com
jeffr@tmoklaw.com
***Attorneys for Defendants,***
***Covenant Financial Services, LLC and***
***Stephen E. Shafer***

## CERTIFICATE OF SERVICE

This is to certify that on this 10th day of May, 2017, a true and correct copy of the above and foregoing has been served via electronic mail and First Class U.S. mail to:

Cheryl P. Hunter, OBA #4499
Nicole M. Nash, OBA #31412
HOLLADAY & CHILTON
204 N. Robinson Ave., Ste. 1550
Oklahoma City, OK 73102
(405) 236-0045 (phone)
(405) 236-2349 (fax)
cheryl.hunter@holladaychilton.com
nicole.nash@holladaychilton.com

-and-

Gary Svirsky, *pro hac vice*
Janine Frances Panchok-Berry, *pro hac vice*
O'MELVENY & MYERS
7 Times Square
New York, NY 10036
(212) 326-2000 (phone)
(212) 326-2061 (fax)
gsvirsky@omm.com
jpanchok-berry@omm.com
**Attorneys for Plaintiffs**

Joe M. Hampton, OBA # 11851
Amy J. Pierce, OBA #17980
CORBYN HAMPTON BARGHOLS PIERCE, PLLC
One Leadership Square, Suite 1910
211 North Robinson
Oklahoma City, Oklahoma 73102
(405) 239-7055 (phone)
(405) 702-4348 (fax)
jhampton@corbynhampton.com
apierce@corbynhampton.com
**Attorneys for Third Party Defendant, Scott R. Duncan**

Jeffery S. Ludlam, OBA #17822
Ashley A. Warshell, OBA #30576
HALL & LUDLAM, PLLC
210 Park Avenue, Suite 3001
Oklahoma City, OK 73102
(405) 600-9500 (phone)
(405) 600-9550 (fax)
jeff@okcfirm.com
ashley@okcfirm.com
**Attorney for Defendant, Cartographer, L.P.**

ROBERT D. TOMLINSON

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| Robert F. Browne Family LLC, et al., | ) ) ) ) | |
|      Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. CJ-2016-4937 |
| Stephen E. Shafer, Covenant Financial Services, LLC d/b/a Covenant Global Investors and Cartographer, L.P., | ) ) ) ) ) | |
|      Defendants, | ) ) | |
| and | ) ) | **COPY** |
| Covenant Global Alpha Fund, L.P., f/k/a DFS Aggressive Strategy Fund, L.P., Covenant Global Alpha Fund, Ltd., f/k/a Covenant Aggressive Strategy Fund, Ltd., Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund, L.P., | ) ) ) ) ) ) ) ) ) | |
|      Nominal Defendants, | ) ) | |
| v. | ) ) | |
| Covenant Multi-Family Offices, LLC, and Scott R. Duncan, | ) ) ) | |
|     Third-Party Defendants. | ) | |

\* \* \* \* \*

TRANSCRIPT OF PROCEEDINGS

HAD ON THE 1ST DAY OF MAY, 2017

BEFORE THE HONORABLE PATRICIA G. PARRISH,

DISTRICT JUDGE

Reported by:  Karen Twyford, RPR

**DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT**

EXHIBIT 5

1          THE COURT:  What is due between now and Wednesday

2   or Thursday on litigation expenses?

3          MR. TOMLINSON:  Attorneys' fees.

4          THE COURT:  Between now and Thursday they're due?

5          MR. TOMLINSON:  Well, they are not due, but --

6   there may be some that are due right now.

7          THE COURT:  If there is anything above rent,

8   utilities -- and I say those because it is the first of the

9   month.  If there is anything above that, just let me know.

10  If there is some amount that -- I certainly don't intend to

11  do anything to jeopardize that lawsuit at this point in

12  time.

13         If there is an amount that must be paid in order to

14  keep that going until we can figure out how to pursue that,

15  then I certainly -- perhaps you can ask your client if there

16  is some sort of payment.  I thought it was now on a

17  contingency or are we looking for someone to do it now on a

18  contingency?  Right now who is representing the funds in

19  that lawsuit?  What law firm?

20         MR. TOMLINSON:  They're not representing the funds,

21  they're representing the company.

22         THE COURT:  Sorry.

23         MR. TOMLINSON:  It is a law firm in Dallas.  Sam

24  Joyner is the lawyer's name.

25         THE COURT:  But he is not the one that initially

DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT

73

1   took it on the contingency?

2           MR. TOMLINSON:  No.  That was Ray Niro.  He died.

3           THE COURT:  So Mr. Joyner is charging an hourly

4   rate at this point in time?

5           MR. TOMLINSON:  That's correct, your Honor.

6           THE COURT:  So if there is an invoice that remained

7   unpaid that must be paid between now and Thursday, and if

8   you and Ms. Hunter cannot agree to it, call my office and I

9   will see you and, in all likelihood, approve whatever

10  payment needs to be.  I will not let that lawsuit --

11  jeopardize that lawsuit until we can get a receiver

12  appointed.

13          MS. HUNTER:  Your Honor, just for the record, this

14  is all new to us.  We did not know until Friday that

15  Mr. Niro had died.  We knew that there was some withdraw and

16  they hired someone hourly.  This is just all new.

17          THE COURT:  Okay.  We're in recess until Thursday

18  at 3:00 p.m.

19          Thank you.

20          (Conclusion of proceedings.)

21

22

23

24

25


**DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT**

74

```
 1   STATE OF OKLAHOMA    )
                          )
 2   COUNTY OF OKLAHOMA   )

 3

 4                  C-E-R-T-I-F-I-C-A-T-E

 5

 6        I, Karen Twyford, Certified Shorthand Reporter, in

 7   and for the County of Oklahoma, State of Oklahoma, do hereby

 8   certify that the foregoing transcript is a true, correct,

 9   and complete transcript of my stenographic notes.

10        I further certify that I am not related to any of

11   the parties herein, nor am I interested in any way in the

12   outcome of these proceedings.

13        WITNESS my Hand this  3  day of  May  ,

14   2017.

15

16

17

18   _____

     KAREN TWYFORD
19   CERTIFIED SHORTHAND REPORTER
     CERTIFICATE NO. 01780
20

21

22                      Karen S. Twyford
                          State of Oklahoma
23                  Certified Shorthand Reporter
                           CSR # 1780
24   My Certificate Expires  12.31-17

25
```

**DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT**

# Exhibit G


IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 1 5 2017

RICK WARREN
COURT CLERK
34

| | |
|---|---|
| ROBERT F. BROWNE FAMILY LLC, *et al.*, | |
| Plaintiffs, | |
| v. | |
| STEPHEN E. SHAFER, COVENANT FINANCIAL SERVICES, LLC d/b/a COVENANT GLOBAL INVESTORS, and CARTOGRAPHER LP, | Case No. CJ-2016-4937 |
| Defendants, | Judge Patricia G. Parrish |
| and | |
| COVENANT GLOBAL ALPHA FUND, L.P. f/k/a CFS AGGRESSIVE STRATEGY FUND, L.P., COVENANT GLOBAL ALPHA FUND, LTD., COVENANT OPPORTUNITY CAPITAL FUND, L.P., and COVENANT INCOME APPRECIATION FUND, L.P., | |
| Nominal Defendants. | |
| v. | |
| COVENANT MULTI-FAMILY OFFICES, LLC, and SCOTT R. DUNCAN, | |
| Third-Party Defendants. | |

## ORDER

The Court FINDS and ORDERS as follows:

1.     CFS is authorized and ordered to pay on behalf of Youtoo Technologies, LLC

("Youtoo")—an asset of the funds Covenant Global Alpha Fund, L.P., Covenant Global Alpha

Fund, Ltd., Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund,

L.P. (the "Covenant Funds")—$25,500 in the exact amounts and for the purposes designated below:

      i.    $15,500 for payroll to Ryland Reed, Danny Ohman, and Brandon Robinson;

      ii.    $5,000 to patent lawyers in Washington DC; and

      iii.    $5,000 for the expert retainer as specified and disclosed to Plaintiffs.

2.    This money is to be used only in the amounts and for the specific purposes designated, and if any of the money cannot be used for such purpose, it must be returned to the Funds.

IT IS SO ORDERED this 5th day of May, 2017.

The Honorable Patricia G. Parrish

2

APPROVED FOR FORM:

Cheryl P. Hunter, OBA #4499
Nicole M. Nash, OBA #31412
HOLLADAY & CHILTON, PLLC
204 N. Robinson Ave., Ste. 1550
Oklahoma City, Oklahoma 73102
405-236-0045 (phone)
405-236-2349 (fax)
cheryl.hunter@holladaychilton.com
nicole.nash@holladaychilton.com

-and-

Gary Svirsky (admitted *pro hac vice*)
Janine Panchok-Berry (admitted *pro
hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
212-326-2000 (phone)
212-326-2061 (fax)
gsvirsky@omm.com
jpanchok-berry@omm.com

*ATTORNEYS FOR PLAINTIFFS*

3

## Cheryl Hunter

| | |
|---|---|
| **From:** | BobT@tmoklaw.com |
| **Sent:** | Monday, May 15, 2017 10:09 AM |
| **To:** | Cheryl Hunter |
| **Cc:** | TobyM@tmoklaw.com; KristinH@tmoklaw.com; JHampton@Corbynhampton.com; jeff@okcfirm.com |
| **Subject:** | Re: Youtoo |

ok with us

Sent from my iPhone

On May 15, 2017, at 9:58 AM, Cheryl Hunter <cheryl.hunter@holladaychilton.com> wrote:

Counsel:

Here is the Order we plan to present to the judge this morning.

Cheryl

Cheryl P. Hunter
Holladay & Chilton, PLLC
204 N. Robinson, Suite 1550  |  Oklahoma City, Oklahoma 73102
D: 405.236.0045  |T: 405.236.2343  |  F: 405.236.2349 | Cell: 405.209.7565
cheryl.hunter@holladaychilton.com  |  www.holladaychilton.com

Confidentiality Notice:

The information in this email, including attachments, is sent by, or on behalf of, an attorney and is intended solely for the receipt, use, benefit and information of the recipient indicated above.  This communication may be confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure.  If the reader of this message is not the intended recipient, you are notified that retention, use, review, disclosure, copying, distribution, or the taking of any other action in reliance on the contents of this transmission or attachments is strictly prohibited.  If you have received this communication in error, please immediately notify us by replying to the message and discarding/deleting the message received.  Thank you for your cooperation.

TAX NOTICE:  Any tax advice included in this message is not intended and cannot be used for the purpose of avoiding tax related penalties or promoting, marketing or recommending any tax related matter to another person.

<OrderYTpayments.pdf>

## Cheryl Hunter

| | |
|---|---|
| **From:** | Joe M. Hampton <JHampton@Corbynhampton.com> |
| **Sent:** | Monday, May 15, 2017 10:11 AM |
| **To:** | Cheryl Hunter; BobT@tmoklaw.com; TobyM@tmoklaw.com; KristinH@tmoklaw.com |
| **Cc:** | jeff@okcfirm.com |
| **Subject:** | RE: Youtoo |

Fine with Duncan.

**From:** Cheryl Hunter [mailto:cheryl.hunter@holladaychilton.com]
**Sent:** Monday, May 15, 2017 9:58 AM
**To:** BobT@tmoklaw.com; TobyM@tmoklaw.com; KristinH@tmoklaw.com
**Cc:** Joe M. Hampton; jeff@okcfirm.com
**Subject:** Youtoo
**Importance:** High

Counsel:

Here is the Order we plan to present to the judge this morning.

Cheryl

Cheryl P. Hunter
Holladay & Chilton, PLLC
204 N. Robinson, Suite 1550  |  Oklahoma City, Oklahoma 73102
D: 405.236.0045  |T: 405.236.2343  |  F: 405.236.2349 | Cell: 405.209.7565
cheryl.hunter@holladaychilton.com  |  www.holladaychilton.com

Confidentiality Notice:

The information in this email, including attachments, is sent by, or on behalf of, an attorney and is intended solely for the receipt, use, benefit and information of the recipient indicated above. This communication may be confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are notified that retention, use, review, disclosure, copying, distribution, or the taking of any other action in reliance on the contents of this transmission or attachments is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and discarding/deleting the message received. Thank you for your cooperation.

TAX NOTICE: Any tax advice included in this message is not intended and cannot be used for the purpose of avoiding tax related penalties or promoting, marketing or recommending any tax related matter to another person.

# Exhibit H

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUN - 1 2017

RICK WARREN
COURT CLERK
40



IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| ROBERT F. BROWNE FAMILY LLC, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>STEPHEN E. SHAFER, COVENANT<br>FINANCIAL SERVICES, LLC d/b/a<br>COVENANT GLOBAL INVESTORS, and<br>CARTOGRAPHER LP,<br><br>        Defendants,<br><br>and<br><br>COVENANT GLOBAL ALPHA FUND, L.P.<br>f/k/a CFS AGGRESSIVE STRATEGY<br>FUND, L.P., COVENANT GLOBAL ALPHA<br>FUND, LTD., COVENANT OPPORTUNITY<br>CAPITAL FUND, L.P., and COVENANT<br>INCOME APPRECIATION FUND, L.P.,<br><br>        Nominal Defendants.<br><br>v.<br><br>COVENANT MULTI-FAMILY OFFICES,<br>LLC, and SCOTT R. DUNCAN,<br><br>        Third-Party Defendants. | Case No. CJ-2016-4937<br><br>Judge Patricia G. Parrish |

## AGREED ORDER

The Court FINDS and ORDERS as follows:

1.      Plaintiffs are authorized to instruct CFS, LLC ("CFS") to pay expenditures for the

benefit of the assets of Covenant Global Alpha Fund, L.P., Covenant Global Alpha Fund, Ltd.,

Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund, L.P. (the "Covenant Funds")— for the purposes designated below:

    i.   Loan payment to Crossfirst Bank in the amount of $18,163.36, plus any necessary expenses for the mailing and/or wiring of such payment;

    ii.   Payment of the 2016 LLC Tax Notice for Youtoo Technologies, LLC to the Delaware Secretary of State in the amount of $300, plus any necessary expenses for the mailing of such payment;

    iii.   Payment of $18,500 for payroll to Ryland Reed, Danny Ohman, and Brandon Robinson; and

    iv.   Payment to Shannon Anderson in the amount of $8,166.67.

2.    CFS is ordered to follow these instructions.

3.    This money is to be used only in the amounts and for the specific purposes designated, and if any of the money cannot be used for such purpose, it must be returned to the Funds.

4.    Plaintiffs are further authorized to instruct CFS to shut down the Youtoo Technologies Bank of America business advantage checking account and to transfer all funds to the existing Youtoo Technologies Crossfirst Bank account, along with notifying appropriate vendors of the change of account.

5.    Nothing in this Order shall be construed as designating or authorizing Plaintiffs to serve as general partner of the Covenant Funds.

IT IS SO ORDERED this ___ day of ~~May~~ June, 2017.

The Honorable Patricia G. Parrish

APPROVED FOR FORM:

Cheryl P. Hunter, OBA #4499
Nicole M. Nash, OBA #31412
HOLLADAY & CHILTON, PLLC
204 N. Robinson Ave., Ste. 1550
Oklahoma City, Oklahoma  73102
405-236-0045 (phone)
405-236-2349 (fax)
cheryl.hunter@holladaychilton.com
nicole.nash@holladaychilton.com

-and-

Gary Svirsky (admitted *pro hac vice*)
Janine Panchok-Berry (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
212-326-2000 (phone)
212-326-2061 (fax)
gsvirsky@omm.com
jpanchok-berry@omm.com

*ATTORNEYS FOR PLAINTIFFS*



Toby M. McKinstry, OBA # 17401
Ross N. Chaffin, OBA # 20131
Kelly J. Kress, OBA # 30771
Robert D. Tomlinson, OBA # 9056
Jefferson Rust, OBA # 16722
TOMLINSON MCKINSTRY
Two Leadership Square, Suite 450
211 N. Robinson Ave
Oklahoma City, OK 73102

*ATTORNEYS FOR DEFENDANTS*
*STEPHEN E. SHAFER AND*
*COVENANT FINANCIAL SERVICES,*
*LLC*

3

# Exhibit I

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| Robert F. Browne Family LLC, et al., | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. CJ-2016-4937 |
| Stephen E. Shafer, Covenant Financial Services, LLC d/b/a Covenant Global Investors and Cartographer, L.P., | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | **COPY** |
| Covenant Global Alpha Fund, L.P., f/k/a DFS Aggressive Strategy Fund, L.P., Covenant Global Alpha Fund, Ltd., f/k/a Covenant Aggressive Strategy Fund, Ltd., Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund, L.P., | ) ) ) ) ) ) ) ) ) | |
| Nominal Defendants, | ) ) | |
| v. | ) ) | |
| Covenant Multi-Family Offices, LLC, and Scott R. Duncan, | ) ) ) | |
| Third-Party Defendants. | ) | |

\* \* \* \* \*

TRANSCRIPT OF PROCEEDINGS

HAD ON THE 1ST DAY OF MAY, 2017

BEFORE THE HONORABLE PATRICIA G. PARRISH,

DISTRICT JUDGE

Reported by:  Karen Twyford, RPR

**DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT**

EXHIBIT 5

72

1          THE COURT:  What is due between now and Wednesday
2    or Thursday on litigation expenses?
3          MR. TOMLINSON:  Attorneys' fees.
4          THE COURT:  Between now and Thursday they're due?
5          MR. TOMLINSON:  Well, they are not due, but --
6    there may be some that are due right now.
7          THE COURT:  If there is anything above rent,
8    utilities -- and I say those because it is the first of the
9    month.  If there is anything above that, just let me know.
10   If there is some amount that -- I certainly don't intend to
11   do anything to jeopardize that lawsuit at this point in
12   time.
13          If there is an amount that must be paid in order to
14   keep that going until we can figure out how to pursue that,
15   then I certainly -- perhaps you can ask your client if there
16   is some sort of payment.  I thought it was now on a
17   contingency or are we looking for someone to do it now on a
18   contingency?  Right now who is representing the funds in
19   that lawsuit?  What law firm?
20          MR. TOMLINSON:  They're not representing the funds,
21   they're representing the company.
22          THE COURT:  Sorry.
23          MR. TOMLINSON:  It is a law firm in Dallas.  Sam
24   Joyner is the lawyer's name.
25          THE COURT:  But he is not the one that initially

DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT

1    took it on the contingency?

2           MR. TOMLINSON:  No.  That was Ray Niro.  He died.

3           THE COURT:  So Mr. Joyner is charging an hourly

4    rate at this point in time?

5           MR. TOMLINSON:  That's correct, your Honor.

6           THE COURT:  So if there is an invoice that remained

7    unpaid that must be paid between now and Thursday, and if

8    you and Ms. Hunter cannot agree to it, call my office and I

9    will see you and, in all likelihood, approve whatever

10   payment needs to be.  I will not let that lawsuit --

11   jeopardize that lawsuit until we can get a receiver

12   appointed.

13          MS. HUNTER:  Your Honor, just for the record, this

14   is all new to us.  We did not know until Friday that

15   Mr. Niro had died.  We knew that there was some withdraw and

16   they hired someone hourly.  This is just all new.

17          THE COURT:  Okay.  We're in recess until Thursday

18   at 3:00 p.m.

19          Thank you.

20       (Conclusion of proceedings.)

21

22

23

24

25


**DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT**

74

```
 1   STATE OF OKLAHOMA    )
                          )
 2   COUNTY OF OKLAHOMA   )

 3

 4                    C-E-R-T-I-F-I-C-A-T-E

 5

 6          I, Karen Twyford, Certified Shorthand Reporter, in

 7   and for the County of Oklahoma, State of Oklahoma, do hereby

 8   certify that the foregoing transcript is a true, correct,

 9   and complete transcript of my stenographic notes.

10          I further certify that I am not related to any of

11   the parties herein, nor am I interested in any way in the

12   outcome of these proceedings.

13          WITNESS my Hand this   3   day of   May       ,

14   2017.

15

16

17

18   _____
     KAREN TWYFORD
19   CERTIFIED SHORTHAND REPORTER
     CERTIFICATE NO. 01780
20

21                          Karen S. Twyford
22                          State of Oklahoma
23                          Certified Shorthand Reporter
                            CSR # 1780
24                   My Certificate Expires  12-31-17

25
```

**DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT**

# Exhibit J



*1036926771*

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUN - 5 2017

RICK WARREN
COURT CLERK
34_____

| | |
|---|---|
| ROBERT F. BROWNE FAMILY LLC, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>STEPHEN E. SHAFER, COVENANT FINANCIAL SERVICES, LLC d/b/a COVENANT GLOBAL INVESTORS, and CARTOGRAPHER LP,<br><br>        Defendants,<br><br>and<br><br>COVENANT GLOBAL ALPHA FUND, L.P. f/k/a CFS AGGRESSIVE STRATEGY FUND, L.P., COVENANT GLOBAL ALPHA FUND, LTD., COVENANT OPPORTUNITY CAPITAL FUND, L.P., and COVENANT INCOME APPRECIATION FUND, L.P.,<br><br>        Nominal Defendants.<br><br>v.<br><br>COVENANT MULTI-FAMILY OFFICES, LLC, and SCOTT R. DUNCAN,<br><br>        Third-Party Defendants. | Case No. CJ-2016-4937<br><br>Judge Patricia G. Parrish |

## AGREED ORDER

**WHEREAS** Covenant Financial Services, LLC ("CFS") was the General Partner of Covenant Global Alpha Fund, L.P., Covenant Opportunity Capital Fund, L.P., and Covenant Income Appreciation Fund, L.P.; and the Investment Adviser of Covenant Global Alpha Fund, Ltd. (collectively, the "Covenant Funds");

**WHEREAS**   MCFGA LLC ("MCFGA") has replaced CFS and become the new manager of the Covenant Funds.

**WHEREAS**   defendants CFS and Stephen Shafer will cooperate in transitioning management of the Covenant Funds to MCFGA;

**NOW, THEREFORE, THE UNDERSIGNED PARTIES HEREBY STIPULATE AND AGREE AS FOLLOWS:**

CFS, its employees, and its authorized and agents shall release and provide to MCFGA all documents and information related to the Covenant Funds and their assets, including confidential information related to the Covenant Funds' investors.

IT IS SO ORDERED this ___ day of June, 2017.

The Honorable Patricia G. Parrish

2

APPROVED FOR FORM:

Cheryl P. Hunter, OBA #4499
Nicole M. Nash, OBA #31412
HOLLADAY & CHILTON, PLLC
204 N. Robinson Ave., Ste. 1550
Oklahoma City, Oklahoma  73102
405-236-0045 (phone)
405-236-2349 (fax)
cheryl.hunter@holladaychilton.com
nicole.nash@holladaychilton.com

-and-

Gary Svirsky (admitted *pro hac vice*)
Janine Panchok-Berry (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
212-326-2000 (phone)
212-326-2061 (fax)
gsvirsky@omm.com
jpanchok-berry@omm.com

*ATTORNEYS FOR PLAINTIFFS*

ROBERT D. TOMLINSON, OBA #9056
TOBY M. McKINSTRY, OBA #17401
ROSS N. CHAFFIN, OBA # 21131
KELLY J. KRESS, OBA #30771
JEFFERSON I. RUST, OBA #16722
TOMLINSON MCKINSTRY, P.C.
Two Leadership Square, Suite 450
211 North Robinson Ave.
Oklahoma City, Oklahoma 73102
Telephone:  (405) 606-3350
Facsimile:  (866) 633-6162
bobt@tmoklaw.com
tobym@tmoklaw.com
rossc@tmoklaw.com
kellyk@tmoklaw.com
jeffr@tmoklaw.com

*ATTORNEYS FOR DEFENDANTS,
COVENANT FINANCIAL SERVICES, LLC AND
STEPHEN E. SHAFER*

3

# Exhibit K

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| Youtoo Technologies, LLC | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  3:16-cv-00764-N |
| Twitter, Inc. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Covenant Global Alpha Fund, L.P., Registered Agent of Service: Corporation Service Co.
2711 Centerville Rd., Ste. 400, Wilmington, DE 19808

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attachment A

| Place: Durie Tangri<br>217 Leidesdorff Street<br>San Francisco, CA 94111 | Date and Time:<br><br>03/22/2017 5:00 pm |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        03/02/2017

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ James S. Tsuei<br>_____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendnant Twitter, Inc.          Attorney James S. Tsuei          , who issues or requests this subpoena, are:

Durie Tangri LLP, 217 Leidesdorff St., San Francisco, CA 94111, jtsuei@durietangri.com; 415-362-6666

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   3:16-cv-00764-N

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                        *Server's signature*

                                          _____
                                                        *Printed name and title*

                                          _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

## DEFINITIONS

1.      "You", "Your", and "Covenant" means Covenant Global Alpha Fund, L.P., including all its predecessors, successors, subsidiaries, parents, affiliates, and entities acting in joint-venture or partnership relations therewith, including without limitation Covenant Private Equity Partners II, Inc., as well as any person acting on its behalf, as well as all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and others acting on behalf thereof.

2.      "Youtoo" means Youtoo Media LP f/k/a ComStar Media LP, including all its predecessors, successors, subsidiaries, parents, affiliates, and entities acting in joint-venture or partnership relationships therewith, including without limitation Youtoo Technologies, LLC, YoutooTV, LLC, Youtoo.com, LLC, and Youtoo Network, LLC, as well as all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and others acting on behalf thereof.

3.      "AQUA" means AQUA Licensing LLC and any person acting on its behalf, including without limitation any current or former attorneys, agents, investigators, or other representatives.

4.      "Twitter Patent Litigation" means the civil case *Youtoo Technologies, LLC v. Twitter, Inc.*, 3:15-cv-00764-N (N.D. Tex.).

5.      "Mansour Litigation" means the civil case *Mansour bin Abdullah Al-Saud* v. *Youtoo Media, L.P. et al.*, 3:15-CV-3074-C (N.D. Tex.).

6.      The "'997 Patent" means U.S. Patent No. 9,083,997 to Mark A. Harwell, Christopher W. Wyatt, and Ryland M. Reed, titled "Recording and publishing content on social media websites."

7.      The "'768 Application" refers to U.S. Patent Application No. 13/674,768, filed on November 12, 2012.

8.      The "'765 Application" refers to U.S. Patent Application No. 13/475,765, filed on May 18, 2012.

9.      The term "Youtoo Intellectual Property" means any patent or patent application, divisional, provisional, reissue, reexamination, and any U.S. or foreign application or patent assigned to, or owned by, either in whole or in part, Youtoo.  The term "Youtoo Patents" includes, without limitation, the '997 Patent, '768 Application, and the '765 Application, any domestic or foreign counterpart, continuation, continuation-in-part, or divisional of the '997 Patent, the '768 Application, the '765 Application, and/or any patent or patent application, divisionals, provisionals, reissues, reexaminations, and any U.S. or foreign application or patent that claims priority to or incorporates the '997 Patent.

10.      The term "Document(s)" is used herein in its broadest sense and includes, without limitation, written, recorded, or graphic matter, however produced, including but not limited to, communications, training manuals, videotapes, photographs, memoranda, correspondence, telegrams, memoranda, letters, telecopies, telexes, brochures, licenses, assignments, contracts, agreements, notes, transcripts, précis, outlines, instructions, checks, analyses, projections, charts, graphs, work papers, drawings, designs, diagrams, photographs, films, newspaper clippings, records, reports, studies, advertisements, press releases, or any other writings of any kind including drafts and copies of the foregoing, which by reason of notes, identification marks, or

other modifications are not identical to the original. The term also includes any information that is stored or carried electronically (by means of computer equipment or otherwise) and that can be retrieved in visual, printed, audio, or graphic form.

11. The terms "Communication(s)" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to electronic communications and electronic mail.

12. The term "Identify" means to state, in the case of a document, the title of the document, the author, the title or position of the author, the addressee, each recipient, the type of document, the subject matter, the date of preparation, and its number of pages.

13. The terms "and" and "or" are terms of inclusion and not of exclusion and are to be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests any information which might otherwise be construed to be outside their scope.

14. Nouns, whether singular or plural herein, shall be construed either as singular or plural as necessary to bring within the scope of these requests any information which might otherwise be construed to be outside their scope.

## INSTRUCTIONS

1. You are required to produce all responsive documents within Your possession, custody, or control. You must produce documents either as they are kept in the ordinary course of business or organized and labeled to correspond with the categories of the Requests below. *See* Rule 45(e) of the Federal Rules of Civil Procedure.

2.      In the event You withhold a document on a claim of attorney-client privilege, attorney work-product immunity, or any other privilege from disclosure, You must produce a privilege log that provides the basis for such claim, and provides the following information:

     a.  the title of the document;

     b.  a brief description of the subject matter of the document;

     c.  the known or approximate date of the document;

     d.  the source of the document;

     e.  the purpose for which the document was prepared;

     f.  any portion of the document that is not privileged;

     g.  any person to whom that information was disclosed; and

     h.  any fact, statute, rule, decision, or any other basis upon which you rely in withholding the document.

3.      When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.  You must then log the redacted portion on a privilege log as described above.

4.      If You are aware that a document within the scope of these Requests once existed but has been destroyed, make a statement to that effect, Identify the document, and state who destroyed the document, why it was destroyed, and the circumstances under which it was destroyed.

5.      If You are aware that a document within the scope of these Requests once existed but has been lost or cannot currently be located, make a statement to that effect, Identify the

document, and state who was last in possession of the document, the circumstances under which it was lost, and the steps that You have taken to locate the document.

## REQUESTS FOR PRODUCTION

1.      Documents and communications relating to the Patent Security Agreement dated May 1, 2015, between Covenant and Youtoo Technologies, LLC.

2.      Documents and communications relating to any security interest in the Youtoo Patents held by any third party, including without limitation Heartland Bank, Strategic Gaming Management, LLC, and Trestle Creek Properties, LLC.

3.      Documents relating to the funding or financing of the Mansour Litigation and/or the Twitter Patent Litigation.

4.      Documents relating to any decision by You or Youtoo to file the Twitter Patent Litigation.

5.      Documents relating to any decision by You or Youtoo to file the Mansour Litigation.

6.      Documents relating to the ownership, security interest, chain of title, any past or present assignment of, and any past or present exclusive license to any of the Youtoo Patents.

7.      Documents related to the actual or potential sale, license, or other transfer of rights to the Youtoo Patents, individually or together, including without limitation all communications with any potential acquirer of any rights to the Youtoo Patents.

8.      Documents sufficient to show entities identified by You, Youtoo, AQUA, or any other entity or person as potential acquirers of any rights to any of the Youtoo Patents.

9.      Documents sufficient to show entities identified by You, Youtoo, AQUA, or any other entity or person as potential infringers of any of the Youtoo Patents.

10.     Documents sufficient to show any agreements between Covenant, on the one hand, and Youtoo, AQUA, or any named inventor of the Youtoo Patents, on the other hand.

11.     Documents sufficient to show the identity of all employees and officers of Covenant involved in any effort to acquire, license, sell, or market any of the Youtoo Patents.

12.     Documents sufficient to show Covenant's interest, financial or otherwise, in the

Youtoo Patents and/or the outcome of the Twitter Patent Litigation, and documents sufficient to show the nature and quantity of the financial stake for each person or entity.

13.    Documents sufficient to show other persons and entitites with any interest, financial or otherwise, in the Youtoo Patents and/or the outcome of the Twitter Patent Litigation, and documents sufficient to show the nature and quantity of the financial stake for each person or entity.

14.    Documents relating to any infringement search, study, analysis, evaluation, investigation, or opinion related to any portion of the subject matter disclosed or claimed by any of the Youtoo Patents.

15.    Documents relating to any investigation, testing, analysis, study, examination, or reverse engineering, conducted by or on behalf of You, Youtoo and/or AQUA, of any Twitter product or technology.

16.    Documents relating to the patentability, validity, invalidity, enforceability, unenforceability, scope, or interpretation of any of the Youtoo Patents.

17.    Documents disclosed to, provided to, reviewed by, or prepared by any engineer, expert, or consultant in connection with any of the Youtoo Patents.

18.    Agreements with any person or entity related to the Twitter Patent Litigation or the Youtoo Patents.

19.    Documents relating to any valuation or monetary assessment of the subject matter disclosed or claimed by any of the Youtoo Patents.

20.    Communications with Youtoo regarding the Youtoo Patents.

21.    Communications with Youtoo relating to the Twitter Patent Litigation.

22.    Communications with Youtoo relating to the Mansour Litigation.

23.    Communications with AQUA regarding the Youtoo Patents.

24.    Communications with AQUA relating to the Twitter Patent Litigation.

25.    Communications with AQUA relating to the Mansour Litigation.

26.    Documents sufficient to show any ownership interest in Youtoo or any financial

stake in the outcome of either the Twitter Patent Litigation or the Mansour Litigation.

27.     Documents relating to any correspondence, meetings, or communications between You, Youtoo, and/or AQUA, and investors, customers, or analysts regarding the Twitter Patent Litigation and/or the Mansour Litigation.

28.     Documents sufficient to describe Covenant's policies or practices with respect to retention of or destruction of documents, and, if such policy or practice has been different with respect to any category of documents or over different times, documents sufficient to identify each such category or time period and to describe Covenant's retention policy or practice with respect to each such category or time period.

# Exhibit L

**From:** James Tsuei
**Sent:** Wednesday, June 14, 2017 11:40 AM
**To:** Samuel E. Joyner
**Cc:** Sonal Mehta; Laura Miller; Mark C. Howland; Chijioke E. Offor
**Subject:** RE: Twitter's subpoena to Covenant

Samuel,

Please confirm that (1) you will also be producing documents responsive to Twitter's subpoena to Heartland Bank; and that (2) your search for and production of documents on behalf of Heartland, Covenant, and Strategic Gaming were not narrowed based on any objections (whether raised in your written objections and responses, in the parties' March 30, 2017 meet and confer, or otherwise) and that no documents falling within the scope of the subpoenas are being withheld on the basis of any objection. If the forthcoming document productions are anything other than all documents responsive to the full scope of Twitter's document subpoenas, please notify us immediately so that we may proceed with filing our motions to compel with the appropriate court(s).

Best,

James S. Tsuei | Durie Tangri LLP | jtsuei@durietangri.com | (415) 362-6666

---

**From:** Samuel E. Joyner [mailto:SJoyner@CCSB.com]
**Sent:** Wednesday, June 14, 2017 9:47 AM
**To:** James Tsuei
**Cc:** Sonal Mehta ; Laura Miller ; Mark C. Howland ; Chijioke E. Offor
**Subject:** RE: Twitter's subpoena to Covenant

James,

There is no need for Twitter to file a motion to compel. Covenant Global Alpha Fund, LP will produce its non-privileged, responsive documents later today. Twitter will also receive Strategic Gaming Management LLC's non-privileged, responsive documents today.

Best,

**Samuel E. Joyner**
*Partner*



D 214.855.3016 / C 214-923-1543 / F 214.758.3725

SJoyner@CCSB.com / ccsb.com / v-card

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

**From:** James Tsuei [mailto:jtsuei@durietangri.com]
**Sent:** Tuesday, June 13, 2017 1:18 PM
**To:** Samuel E. Joyner; Chijioke E. Offor; Mark C. Howland
**Cc:** Sonal Mehta; Laura Miller
**Subject:** Twitter's subpoena to Covenant

Counsel,

In light of the fact that Covenant has not produced documents responsive to Twitter's March 2 subpoena or even provided a substantive response to my letter of May 4—despite promises to do both—we intend to file a motion to compel in the United States District Court for the Western District of Oklahoma. Please let us know whether Covenant will agree to stipulate to transfer the motion to compel when it is filed to the Northern District of Texas, where the main action and AQUA's motion to quash are pending, no later than Thursday, June 15. A draft stipulation is attached.

Best,

James S. Tsuei | Durie Tangri LLP | jtsuei@durietangri.com | (415) 362-6666

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system.

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
www.carringtoncoleman.com

# Exhibit M

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

YOUTOO TECHNOLOGIES, LLC,    )
    )
       Plaintiff,    )
    )
vs.    )    Case No. CIV-17-728-M
    )
TWITTER, INC.,    )
    )
       Defendant.    )

## ORDER

On July 10, 2017, defendant filed a Motion to Compel Covenant Global Alpha Fund, L.P. to Produce Documents Pursuant to Fed. R. Civ. P. 45 and Brief in Support.  Nonparty Covenant Global Alpha Fund, L.P. ("Covenant") has filed a response, and defendant has filed a reply.

In its response, Covenant states that after defendant had been provided with Covenant's complete document production, it asked defendant to withdraw its motion to compel, which defendant refused to do.  Covenant further states that on August 4, 2017, its counsel[1] conferred with defendant in an attempt to resolve the matter and thereafter did a search to ensure it had produced all responsive documents, and on August 9, 2017, Covenant again informed defendant that it had produced all responsive documents and requested that defendant withdraw its motion, but defendant refused to respond.  Because it has already voluntarily produced its responsive documents, Covenant asserts this Court should deny defendant's motion to compel as moot.

In its reply, defendant asserts that Covenant has only produced a handful of agreements between certain Covenant and Youtoo affiliates and has not produced any email or other communications at all.  Defendant further asserts that Covenant's response provides no

---

[1] Covenant changed counsel at some point after defendant filed the instant motion to compel.

explanation whatsoever for omitting certain categories of documents for which documents would normally exist. Additionally, defendant contends that Covenant has failed to provide any description or explanation of its search for responsive documents, including whether it even attempted to get documents from Covenant's former general partner, Covenant Financial Services, LLC. Finally, defendant asserts that it should not be required to accept Covenant's self-serving *ipse dixit*.

Having reviewed the parties' submissions, the Court finds that defendant's motion to compel is moot. Specifically, the Court finds that because Covenant has produced all responsive documents it has, there are no other documents this Court could compel Covenant to produce.[2] Accordingly, the Court DENIES defendant's Motion to Compel Covenant Global Alpha Fund, L.P. to Produce Documents Pursuant to Fed. R. Civ. P. 45 [docket no. 1].

**IT IS SO ORDERED this 25th day of August, 2017.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE

---

[2] The Court would note that if defendant believes Covenant Financial Services, LLC has documents and/or information relevant to the litigation pending in the United States District Court for the Northern District of Texas, defendant can subpoena those documents/information from Covenant Financial Services, LLC.

# Exhibit N

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Northern District of Texas

| | |
|---|---|
| Youtoo Technologies, LLC | ) |
| _Plaintiff_ | ) |
| v. | )     Civil Action No.   3:16-cv-00764-N |
| Twitter, Inc. | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:     Covenant Financial Services, LLC, Steve Shafer, 210 Park Ave. Ste. 3000, Oklahoma City, OK, 73102

_____
*(Name of person to whom this subpoena is directed)*

   ☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: OKLAHOMA JUDICIAL PROCESS SERVERS<br>C/o Nationwide Legal ,LLC, 3111 W Wilshire Blvd,<br>Oklahoma City, OK 73116 | Date and Time:<br><br>08/28/2017 5:00 pm |
|---|---|

   ❏ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

     The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/07/2017
_____

      _CLERK OF COURT_

                            OR

| _____ | /s/ Laura E. Miller<br>_____ |
|---|---|
| _Signature of Clerk or Deputy Clerk_ | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

Defendant Twitter, Inc.       Attorney Laura E. Miller      , who issues or requests this subpoena, are:

  Durie Tangri LLP, 217 Leidesdorff St., San Francisco, CA 94111, lmiller@durietangri.com; 415-362-6666

### Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  3:16-cv-00764-N

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____    _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

## DEFINITIONS

1.       "You", "Your", and "Covenant" means Covenant Financial Services, LLC, including all its predecessors, successors, subsidiaries, parents, affiliates, and entities acting in joint-venture or partnership relations therewith, including without limitation Covenant Global Alpha Fund, L.P. and Covenant Private Equity Partners II, Inc., as well as any person acting on its behalf, as well as all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and others acting on behalf thereof.

2.       "Youtoo" means Youtoo Media LP f/k/a ComStar Media LP, including all its predecessors, successors, subsidiaries, parents, affiliates, and entities acting in joint-venture or partnership relationships therewith, including without limitation Youtoo Capital Partners, LP, Youtoo Management, LLC, Youtoo Technologies, LLC, YoutooTV, LLC, Youtoo.com, LLC, Youtoo Networks, LLC, Youtoo Licensing, LLC, Youto Media Properties, LLC, as well as all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and others acting on behalf thereof.

3.       "AQUA" means AQUA Licensing LLC and any person acting on its behalf, including without limitation any current or former attorneys, agents, investigators, or other representatives.

4.       "Twitter Patent Litigation" means the civil case *Youtoo Technologies, LLC v. Twitter, Inc.*, 3:15-cv-00764-N (N.D. Tex.).

5.       "Mansour Litigation" means the civil case *Mansour bin Abdullah Al-Saud* v. *Youtoo Media, L.P. et al.*, 3:15-CV-3074-C (N.D. Tex.).

6.      The "'997 Patent" means U.S. Patent No. 9,083,997 to Mark A. Harwell, Christopher W. Wyatt, and Ryland M. Reed, titled "Recording and publishing content on social media websites."

7.      The "'768 Application" refers to U.S. Patent Application No. 13/674,768, filed on November 12, 2012.

8.      The "'765 Application" refers to U.S. Patent Application No. 13/475,765, filed on May 18, 2012.

9.      The term "Youtoo Intellectual Property" means any patent or patent application, divisional, provisional, reissue, reexamination, and any U.S. or foreign application or patent assigned to, or owned by, either in whole or in part, Youtoo.  The term "Youtoo Patents" includes, without limitation, the '997 Patent, '768 Application, and the '765 Application, any domestic or foreign counterpart, continuation, continuation-in-part, or divisional of the '997 Patent, the '768 Application, the '765 Application, and/or any patent or patent application, divisionals, provisionals, reissues, reexaminations, and any U.S. or foreign application or patent that claims priority to or incorporates the '997 Patent.

10.     The term "Document(s)" is used herein in its broadest sense and includes, without limitation, written, recorded, or graphic matter, however produced, including but not limited to, communications, training manuals, videotapes, photographs, memoranda, correspondence, telegrams, memoranda, letters, telecopies, telexes, brochures, licenses, assignments, contracts, agreements, notes, transcripts, précis, outlines, instructions, checks, analyses, projections, charts, graphs, work papers, drawings, designs, diagrams, photographs, films, newspaper clippings, records, reports, studies, advertisements, press releases, or any other writings of any kind including drafts and copies of the foregoing, which by reason of notes, identification marks, or

other modifications are not identical to the original.  The term also includes any information that is stored or carried electronically (by means of computer equipment or otherwise) and that can be retrieved in visual, printed, audio, or graphic form.

11.     The terms "Communication(s)" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to electronic communications and electronic mail.

12.     The term "Identify" means to state, in the case of a document, the title of the document, the author, the title or position of the author, the addressee, each recipient, the type of document, the subject matter, the date of preparation, and its number of pages.

13.     The terms "and" and "or" are terms of inclusion and not of exclusion and are to be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests any information which might otherwise be construed to be outside their scope.

14.     Nouns, whether singular or plural herein, shall be construed either as singular or plural as necessary to bring within the scope of these requests any information which might otherwise be construed to be outside their scope.

## INSTRUCTIONS

1.     You are required to produce all responsive documents within Your possession, custody, or control.  You must produce documents either as they are kept in the ordinary course of business or organized and labeled to correspond with the categories of the Requests below. *See* Rule 45(e) of the Federal Rules of Civil Procedure.

2.      In the event You withhold a document on a claim of attorney-client privilege, attorney work-product immunity, or any other privilege from disclosure, You must produce a privilege log that provides the basis for such claim, and provides the following information:

      a.  the title of the document;

      b.  a brief description of the subject matter of the document;

      c.  the known or approximate date of the document;

      d.  the source of the document;

      e.  the purpose for which the document was prepared;

      f.  any portion of the document that is not privileged;

      g.  any person to whom that information was disclosed; and

      h.  any fact, statute, rule, decision, or any other basis upon which you rely in withholding the document.

3.      When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.  You must then log the redacted portion on a privilege log as described above.

4.      If You are aware that a document within the scope of these Requests once existed but has been destroyed, make a statement to that effect, Identify the document, and state who destroyed the document, why it was destroyed, and the circumstances under which it was destroyed.

5.      If You are aware that a document within the scope of these Requests once existed but has been lost or cannot currently be located, make a statement to that effect, Identify the

document, and state who was last in possession of the document, the circumstances under which it was lost, and the steps that You have taken to locate the document.

## REQUESTS FOR PRODUCTION

1.      Documents and communications relating to the Patent Security Agreement dated May 1, 2015, between Covenant and Youtoo Technologies, LLC.

2.      Documents and communications relating to any security interest in the Youtoo Patents held by any third party, including without limitation Heartland Bank, Strategic Gaming Management, LLC, and Trestle Creek Properties, LLC.

3.      Documents relating to the funding or financing of the Mansour Litigation and/or the Twitter Patent Litigation.

4.      Documents relating to any decision by You or Youtoo to file the Twitter Patent Litigation.

5.      Documents relating to any decision by You or Youtoo to file the Mansour Litigation.

6.      Documents relating to the ownership, security interest, chain of title, any past or present assignment of, and any past or present exclusive license to any of the Youtoo Patents.

7.      Documents related to the actual or potential sale, license, or other transfer of rights to the Youtoo Patents, individually or together, including without limitation all communications with any potential acquirer of any rights to the Youtoo Patents.

8.      Documents sufficient to show entities identified by You, Youtoo, AQUA, or any other entity or person as potential acquirers of any rights to any of the Youtoo Patents.

9.      Documents sufficient to show entities identified by You, Youtoo, AQUA, or any other entity or person as potential infringers of any of the Youtoo Patents.

10.     Documents sufficient to show any agreements between Covenant, on the one hand, and Youtoo, AQUA, or any named inventor of the Youtoo Patents, on the other hand.

11.     Documents sufficient to show the identity of all employees and officers of Covenant involved in any effort to acquire, license, sell, or market any of the Youtoo Patents.

12.     Documents sufficient to show Covenant's interest, financial or otherwise, in the

6

Youtoo Patents and/or the outcome of the Twitter Patent Litigation, and documents sufficient to show the nature and quantity of the financial stake for each person or entity.

13.     Documents sufficient to show other persons and entitites with any interest, financial or otherwise, in the Youtoo Patents and/or the outcome of the Twitter Patent Litigation, and documents sufficient to show the nature and quantity of the financial stake for each person or entity.

14.     Documents relating to any infringement search, study, analysis, evaluation, investigation, or opinion related to any portion of the subject matter disclosed or claimed by any of the Youtoo Patents.

15.     Documents relating to any investigation, testing, analysis, study, examination, or reverse engineering, conducted by or on behalf of You, Youtoo and/or AQUA, of any Twitter product or technology.

16.     Documents relating to the patentability, validity, invalidity, enforceability, unenforceability, scope, or interpretation of any of the Youtoo Patents.

17.     Documents disclosed to, provided to, reviewed by, or prepared by any engineer, expert, or consultant in connection with any of the Youtoo Patents.

18.     Agreements with any person or entity related to the Twitter Patent Litigation or the Youtoo Patents.

19.     Documents relating to any valuation or monetary assessment of the subject matter disclosed or claimed by any of the Youtoo Patents.

20.     Communications with Youtoo regarding the Youtoo Patents.

21.     Communications with Youtoo relating to the Twitter Patent Litigation.

22.     Communications with Youtoo relating to the Mansour Litigation.

23.     Communications with AQUA regarding the Youtoo Patents.

24.     Communications with AQUA relating to the Twitter Patent Litigation.

25.     Communications with AQUA relating to the Mansour Litigation.

26.     Documents sufficient to show any ownership interest in Youtoo or any financial

stake in the outcome of either the Twitter Patent Litigation or the Mansour Litigation.

27.    Documents relating to any correspondence, meetings, or communications between You, Youtoo, and/or AQUA, and investors, customers, or analysts regarding the Twitter Patent Litigation and/or the Mansour Litigation.

28.    Documents sufficient to describe Covenant's policies or practices with respect to retention of or destruction of documents, and, if such policy or practice has been different with respect to any category of documents or over different times, documents sufficient to identify each such category or time period and to describe Covenant's retention policy or practice with respect to each such category or time period.

# Exhibit O

| | |
|---|---|
| **From:** | Samuel E. Joyner <SJoyner@CCSB.com> |
| **Sent:** | Thursday, August 31, 2017 8:40 AM |
| **To:** | Sonal Mehta |
| **Cc:** | Service-Twitter-Youtoo; Service-Youtoo |
| **Subject:** | RE: Covenant Financial Services |

Sonal,

Yesterday, my firm was retained to protect Covenant Financial Services, LLC's legal rights and commercial interests with respect to Twitter's document subpoena (issued August 7, 2017). Covenant Financial Services, LLC is currently winding down, but it believes it can produce its non-privileged, responsive documents within the next 30 days. I'll be in touch next week, after I'm able to visit with my client about its documents.

All my best,
Sam


**Samuel E. Joyner**
*Partner*





D 214.855.3016 / C 214-923-1543 / F 214.758.3725
SJoyner@CCSB.com / ccsb.com / v-card

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202


---

**From:** Sonal Mehta [mailto:SMehta@durietangri.com]
**Sent:** Wednesday, August 30, 2017 3:48 PM
**To:** cheryl.hunter@holladaychilton.com; Samuel E. Joyner; Chijioke E. Offor; nicole.nash@holladaychilton.com; Service-Youtoo
**Cc:** Service-Twitter-Youtoo
**Subject:** Covenant Financial Services

Counsel:

Please let us know by tomorrow morning if either of your firms is representing Covenant Financial Services, LLC in connection with Twitter's subpoena dated August 7, 2017.

Best,

Sonal N. Mehta | Durie Tangri LLP | smehta@durietangri.com | (415) 376-6427

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system.

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
www.carringtoncoleman.com